**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Phyllis Ball, by her General Guardian,** | : | |
| **Phyllis Burba,** | | |
| | : | **Case No.: 2:16-cv-282** |
| **Antonio Butler, individually** | | |
| | : | |
| **Caryl Mason, by her Next Friend** | | **Judge:** |
| **Cathy Mason-Jordan** | : | |
| | | |
| **Richard Walters, by his Next Friend** | : | **Magistrate Judge:** |
| **Linda Walters** | | |
| | : | |
| **Nathan Narowitz, individually** | | |
| | : | |
| **Ross Hamilton, by his Next Friend** | | **CLASS ACTION COMPLAINT** |
| **Sherry Hamilton** | : | |
| | | |
| **and** | : | |
| | | |
| **The Ability Center of Greater Toledo,** | : | |
| **in its organizational and representative** | | |
| **capacity,** | : | |
| | | |
| | : | |
| **Plaintiffs,** | | |
| | : | |
| | | |
| **v.** | : | |
| | | |
| | : | |
| **John Kasich, Governor of Ohio,** | | |
| **in his official capacity,** | : | |
| | | |
| **John Martin, Director of the Ohio** | : | |
| **Department of Developmental** | | |
| **Disabilities, in his official capacity,** | : | |
| | | |
| **John McCarthy, Director of the Ohio** | : | |
| **Department of Medicaid, in his official** | | |
| **capacity,** | : | |
| | | |
| **and** | : | |

**Kevin Miller, Director of Opportunities**          :
**for Ohioans with Disabilities, in his**
**official capacity,**                               :

                                                     :

     **Defendants.**

                                                     :

## I.        INTRODUCTION

1.        Plaintiffs Phyllis Ball, Antonio Butler, Caryl Mason, Richard Walters, Nathan Narowitz, and Ross Hamilton (hereafter "Individual Plaintiffs") are adults with intellectual and developmental disabilities who are institutionalized, or at serious risk of institutionalization, in Intermediate Care Facilities for Individuals with Intellectual Disabilities with eight or more beds ("large ICFs") throughout Ohio.  Each of the Individual Plaintiffs would prefer to reside in an integrated, community-based setting and receive integrated, community-based employment or day services.  Each is qualified for such services and would be able to live, work, and spend his or her time in the community with appropriate, individualized support.  However, due to the Defendants' administration, management, and funding of Ohio's service system for people with intellectual and developmental disabilities, they are experiencing or at serious risk of experiencing pervasive and widespread isolation and segregation in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 *et seq.*, Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794 *et seq.*, the United States Supreme Court's landmark decision in *Olmstead v. L.C.*, 527 U.S. 581 (1999), and the Social Security Act, 42 U.S.C. § 1396n(c)(2)(B)&(C).

2.        The six Individual Plaintiffs are part of a class of approximately 27,800 similarly-situated adults with intellectual and developmental disabilities throughout Ohio ("Ohio" or "the State") who are needlessly institutionalized in publicly- and privately-operated large ICFs or are at serious risk of institutionalization because of systemic limitations on access to integrated, home and community-based services.  By virtue of where they live and spend their day, they are isolated from their communities and denied meaningful opportunities to interact with their non-disabled peers.

3.      Plaintiff, the Ability Center of Greater Toledo, also joins this suit on its own behalf as an organization that has suffered specific economic injury as a result of the Defendants' unlawful service system, and on behalf of its constituents who include people with intellectual and developmental disabilities currently institutionalized in large ICFs or at serious risk of institutionalization in these facilities.

4.      Large ICFs, which are facilities with eight or more beds, share a common design, funding stream, and operational model that reflects their institutional character and perpetuates ongoing segregation. Once admitted to a large ICF, people quickly become isolated from their families, friends, and communities. Most have little or no contact with their non-disabled peers. Their lives are highly regimented and controlled, with little privacy, independence, or personal autonomy.

5.      By virtue of their discriminatory institutionalization, the Individual Plaintiffs in large ICFs and thousands of other similarly-situated Medicaid-eligible adults with intellectual and developmental disabilities are denied access to integrated employment and day services. They have little or no choice but to spend their days in segregated, facility-based sheltered workshops where they perform routinized, repetitive manual tasks, usually for less than minimum wage, or in equally segregated day programs, where they are deprived of meaningful community interactions and experiences consistent with their unique abilities, skills, and preferences. The lack of access to integrated employment at competitive pay, in particular, deprives them of the dignity that comes with work and the autonomy and self-sufficiency that comes with financial resources.

6.      Once in the ICF system, people often remain institutionalized indefinitely. There are approximately 5,800 people in the State's vast network of publicly- and privately-operated

2

large ICFs. Of these, approximately 2,500 individuals are on waiting lists for home and community-based services. Yet the median wait time for people in ICFs to access these services is 13 years. This prolonged segregation results from the Defendants' failure to develop an adequate home and community-based system.

7. Over 40,000 people with intellectual and developmental disabilities are on waiting lists for home and community-based waiver services throughout Ohio, including 22,000 people who live in the community, but have immediate, unmet service needs, such as inadequate residential supports and aging primary caregivers. These individuals are at serious risk of institutionalization in the large ICF system because of insufficient access to integrated home and community-based services.

8. The Defendants acknowledge in state budget filings that Ohio's ICF "footprint is one of the largest in the United States." Yet in direct opposition to the national trend away from institutional care, Ohio continues to maintain and invest in segregated settings for people with intellectual and developmental disabilities.

9. Despite their continued overreliance on large ICFs, the Defendants have the capacity to deliver integrated, community-based residential, employment, and day services to people with intellectual and developmental disabilities. By expanding the existing home and community-based service system and increasing access to integrated service options, the Defendants can remedy and prevent the unnecessary institutionalization and segregation of the Individual Plaintiffs and the members of the Plaintiff class.

10. In fact, the Defendants have publicly recognized the need to rebalance Ohio's service system and to provide greater access to home and community-based service options for people with intellectual and developmental disabilities. Yet they have failed to make the

3

requisite administrative and budgetary changes necessary to remedy and prevent the unnecessary and discriminatory segregation of the members of the Plaintiff class.  As a result, the promise of meaningful community integration for these class members remains unrealized.

11.     The Defendants' administration of the service system for people with intellectual and developmental disabilities causes the Individual Plaintiffs and the members of the Plaintiff class to be segregated in the places where they live, work, and spend their days, or causes them to be at serious risk of segregation.  This common injury arises out of the planning, funding, administrative, and policy decisions that drive the Defendants' operation of the service system for people with intellectual and developmental disabilities and, specifically, their failure to provide the integrated, community-based services needed to remedy and prevent the unnecessary institutionalization and discriminatory segregation of the Individual Plaintiffs and the members of the Plaintiff class.

12.     By their actions and inactions, the Defendants have harmed the Individual Plaintiffs and the members of the Plaintiff class as a whole, perpetuating their segregation or causing them to be at serious risk of segregation in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 *et seq.*, Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794, *et seq.*, and the Social Security Act, 42 U.S.C. § 1396n(c)(2)(B)&(C), entitling them to class-wide injunctive and declaratory relief.  Through this action, the Individual Plaintiffs and the members of the Plaintiff class seek injunctive and declaratory relief for the Defendants' ongoing violation of the ADA, the Rehabilitation Act, and the Social Security Act.  They seek an order from this Court directing the Defendants to remedy and prevent their unnecessary institutionalization and discriminatory segregation and provide them with integrated, community-based services as required by federal law.

## II.      JURISDICTION AND VENUE

13.      This action is brought pursuant to Title II of the Americans with Disabilities Act

(ADA), 42 U.S.C. § 12132 *et seq.*, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §

794, and the Social Security Act, 42 U.S.C. § 1396n(c)(2)(B)&(C).  This Court has jurisdiction

pursuant to 28 U.S.C. §§ 1331 and 1343.

14.      The Individual Plaintiffs' claims for declaratory and injunctive relief are

authorized by 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 12133, 29 U.S.C. § 794a, and 42 U.S.C.

§ 1983, and by Rules 57 and 65 of the Federal Rules of Civil Procedure.

15.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a

substantial part of the acts and omissions giving rise to the claims occurred in the Southern

District of Ohio.

## III.     PARTIES

### A.      Individual Plaintiffs

### Phyllis Ball

16.      Phyllis Ball is an outgoing 49-year-old woman who resides in a 12-bed ICF in

Hillsboro.  She brings this action through her general guardian and mother, Phyllis Burba.

17.      Despite her desire to live in the community, Ms. Ball has lived in the ICF for

nearly 20 years.  The facility sits directly in front of another ICF, adjacent to a nursing facility.

18.      Ms. Ball lived at home in the community with her mother and stepfather until the

summer of 1998.  After her stepfather experienced health problems, her parents became

concerned about their ability to continue providing physical care to Ms. Ball.  Because of the

manner in which the Defendants administer and fund the service system in Ohio and the

consequent lack of available home and community-based services, her family had no choice but

to place Ms. Ball in her current ICF.  Moreover, after admission to the ICF, she and her family

were merely informed that she could place herself on a waiting list for home and community-based waiver services.

19.     Ms. Ball is eligible for Medicaid and has been determined to meet the level of care necessary to receive either ICF or home and community-based services.  Her diagnoses include intellectual disability, cerebral palsy, spastic quadriplegia, asthma, and seizure disorder. She uses a power wheelchair for mobility, and requires assistance with activities of daily living, such as eating, dressing, and preparing her medications and meals.  She is non-verbal and uses sounds, gestures, facial expressions, and a communication device to communicate.

20.     At the ICF, Ms. Ball has limited control over her choices, movement, and privacy. Ms. Ball uses a power wheelchair, but ICF staff have on several occasions turned off her wheelchair as punishment.  ICF staff has opened and read Ms. Ball's mail in the past.  The ICF even sometimes limits her ability to spend time alone in her own bedroom watching television or listening to music.

21.     Ms. Ball makes friends easily, and enjoys participating in activities in the community, such as shopping and dining out.  However, the ICF offers very few recreational outings.  It is very rare that residents at Ms. Ball's ICF are transported to any activities.

22.     Ms. Ball attends a sheltered workshop in Hillsboro, Monday through Friday from approximately 8 am to 2 pm.  She is among an estimated 95 people with disabilities who spend their days at this sheltered workshop.  They have limited, if any, contact with nondisabled people other than paid workshop staff.  Currently, Ms. Ball is not participating in paid work at the sheltered workshop.  Instead, she participates in arts and crafts activities in the facility building and spends the rest of her time at the ICF.

23.     Ms. Ball wants to meet other people and earn wages to enjoy everyday activities like shopping and attending social events. She previously volunteered at a library, and she becomes excited and animated when work and community activities are discussed. She is not receiving vocational rehabilitation services and does not have opportunities to work in the community with the services and support she would need.

24.     Ms. Ball wishes to and would be able to live and spend her time in the community with appropriate services and supports. However, the Defendants' administration, planning, and funding of the service system for people with intellectual and developmental disabilities denies her these opportunities, while subjecting her to continued discriminatory segregation.

**Antonio Butler**

25.     Antonio Butler is a polite and charismatic 41-year-old man who resides in an eight-bed ICF in Geneva. Mr. Butler has a very small bedroom at the ICF, where he lives upstairs with seven other men with developmental disabilities. Downstairs in the same building is another ICF, and next door is an administrative office building for the ICF provider. The doors to the ICF are kept locked, and food in the kitchen is also locked away. Because Mr. Butler does not have a key, he cannot enter his home or even eat a snack without requesting assistance from ICF staff. It is difficult for Mr. Butler to engage in activities that interest him while living at the ICF. Because of the lack of individualized services, Mr. Butler is frequently bored at the ICF, and residents often fight because everyone is bored.

26.     Mr. Butler is highly motivated to live in his own apartment and to be competitively employed in the community. Despite his preference for integrated community living, Mr. Butler has spent the last 18 years of his life in various ICFs. Mr. Butler first unsuccessfully requested home and community-based waiver services in 1995, so he has spent the last 20 years on a waiting list for home and community-based waiver services. A lack of

access to integrated residential, employment, and day services have left him few options other than the ICF system. He does not recall receiving any information regarding home and community-based services as an alternative to institutional care.

27. Mr. Butler is eligible for Medicaid and has been determined to have service needs that meet the level of care necessary to receive either ICF or home and community-based services. He is diagnosed with a mild intellectual disability, fetal alcohol syndrome, bipolar disorder, and unilateral hearing loss. Mr. Butler is independent in most activities of daily living, and is able to communicate his needs and preferences, including his long-standing desire to work in the community. Mr. Butler would benefit from assistance with transportation, and skills training to increase his independence with cooking, cleaning, financial management, and self-medication.

28. Each weekday, Mr. Butler works at the local sheltered workshop in Geneva, which is operated by his ICF provider. The building is set up with cafeteria-style tables where individuals do repetitive tasks. Assuming work is even available under the contracts the sheltered workshop holds at any given time, Mr. Butler may perform rote tasks, like light assembly and finishing, for which he receives less than minimum wage. Mr. Butler does not like making parts over and over again for little money. When no work is available, he and other participants engage in arts and crafts activities or board games. Opportunities for outings outside the sheltered workshop are very limited. In this workshop setting, Mr. Butler has no contact with non-disabled individuals other than paid sheltered workshop staff. He has little choice in the tasks he performs, because the scope of work is dependent upon provider contracts, not individuals' personal employment goals or interests. As a result, these activities are neither consistent with his interests, nor helpful in advancing his goals for community independence.

29.     Mr. Butler has consistently sought help to obtain competitive employment. He has worked in several integrated settings in the past, including McDonald's, Goodwill, a nursing facility, and a nursery.  He applied for services from the Bureau of Vocational Rehabilitation, part of Opportunities for Ohioans with Disabilities (OOD), but he is not currently receiving any vocational rehabilitation services.  In spite of his demonstrated abilities, and his expressed preference for integrated community employment, Mr. Butler remains in a sheltered workshop setting with no access to vocational rehabilitation or other integrated employment services.

30.     Mr. Butler wants the opportunity to work competitively in the community.  He enjoys dining out, shopping, and other activities that require access to money.  Without a job or the financial resources that come with employment, Mr. Butler has little structure in his day, limited opportunities to improve his money management and budgeting skills, and few opportunities to engage in the integrated, community-based activities he enjoys.

31.     Mr. Butler wants to move out of the ICF and to live more independently.  In 2013, Mr. Butler applied for the HOME Choice program, which is intended to transition eligible Ohioans from institutional settings to home and community-based settings.  However, the integrated home and community-based waiver services Mr. Butler needs to transition from the ICF were not readily available and, as a result, the State denied his HOME Choice application.

32.     Mr. Butler is qualified for, and capable of residing in, a more integrated setting. With access to integrated residential, employment, and day services, Mr. Butler could live, work and spend his days in his chosen community, pursuing his personal goals and engaging in activities that are meaningful to him.  The Defendants' administration, planning, and funding of the service system for people with intellectual and developmental disabilities continue to deny him these opportunities while perpetuating his long-standing, discriminatory segregation.

**Caryl Mason**

33.     Caryl Mason is a sociable 46-year-old woman who enjoys spending time with family and friends.  She brings this action through her next friend, Cathy Mason-Jordan, her sister and guardian of her person.

34.     Ms. Mason is eligible for Medicaid and has been determined to have service needs that meet the level of care necessary to receive either ICF or home and community-based services.  She is non-verbal, but she uses sounds, gestures, and limited sign language to communicate.  She is able to ambulate independently with monitoring, but requires assistance or supervision with most of her daily care needs.  At a young age, Ms. Mason was diagnosed with a severe intellectual disability, cri-du-chat syndrome, and mild microcephaly.  She also has a degenerative joint disease and mild to moderate hearing loss.

35.     Ms. Mason has spent most of her life in institutional settings, having resided for decades in Ohio's state-operated large ICFs, also known as developmental centers.  For the last eight years, she has lived in an eight-bed ICF in Columbus.  The ICF is not a home-like environment.  Its interior contains several staff bulletin boards for posting work-related information (like an "Employee of the Month" display and staff policies), as well as an exit door with an illuminated exit sign above it.   A "wet floor" sign is stationed on the floor after staff cleans.  The facility also contains two offices for staff, "Do not change 72 degrees" is written in black marker on the thermostat, and there is a "visitor sign out/sign in" logbook maintained at the entrance of the facility in a plastic container.

36.     By virtue of her ICF placement, Ms. Mason has very few opportunities to spend time in the community, which she enjoys doing.  Individuals at the ICF infrequently go on community outings.  She has little or no contact with her non-disabled peers other than paid staff and immediate family.  Activities at the ICF are rare.  When they do occur, they are planned by

ICF staff and not tailored to Ms. Mason's individual goals or interests.  Instead, she is often left to watch television, an activity she does not enjoy, or to sit alone on the porch.

37.     Ms. Mason attends a facility-based day program in Columbus that serves over 100 others with developmental disabilities.  There, she takes part in a sensory integration program and pre-planned, non-employment activities determined by the day service provider.  Her ability to engage in these activities and express her needs and preferences to staff and participants is impaired by a lack of assistive technology or adaptive communication strategies.  Ms. Mason spends five days a week, six hours a day in this facility-based setting with little, if any, direct community involvement.  The day program rarely takes individuals like Ms. Mason out into the community for outings or integrated activities.

38.     Ms. Mason enjoys recycling, gardening, and socializing in the community, but she has limited opportunities to pursue these interests or to develop other skills which could increase her independence.  She has no access to vocational rehabilitation or other integrated employment services.

39.     Ms. Mason-Jordan wants her sister to live outside of the ICF system and to spend her days involved in the community-based activities she enjoys.  Ms. Mason-Jordan believes that her sister would prefer opportunities for integrated residential, day, and employment services.

40.     Unfortunately, Ms. Mason does not have access to the services required to facilitate her transition from an institutional setting.  Instead, she has spent the last 14 years on a waiting list for home and community-based services.  She and her family have been not been informed about alternatives to institutional care available through the State's home and community-based waiver programs.  Through their administration, planning, and funding of the service system for people with intellectual and developmental disabilities, the Defendants

11

continue to deny Ms. Mason the opportunity to leave the overly-restrictive large ICF system and put an end to her lifetime of discriminatory segregation.

**Richard Walters**

41.     Richard Walters is a 62-year-old man who resides in an eight-bed ICF in Marietta. He brings this action through his next friend, Linda Walters.  Ms. Walters is his sister and guardian of his person.

42.     Mr. Walters is eligible for Medicaid and has been determined to meet the level of care to be eligible for either ICF or home and community-based services.  He is diagnosed with a moderate intellectual disability, traumatic brain injury, edema, mood disorder, and right side paralysis.

43.     Though Mr. Walters has previously lived in the community with the support of waiver services, for almost four years he has been stuck in his present ICF.  At this ICF, Mr. Walters has little freedom to determine the scheduling of his day or activities.  Residents typically eat meals together and go on all outings together.  During meals, Mr. Walters does not even have a choice about where he sits.  He enjoys going on outings and dining out, yet rarely can do so because the ICF fails to provide appropriate supports.  When an outing occurs, all residents must go together, and often the "activity" consists of everyone getting in an eight-person van and riding around together.  The large offers few meaningful opportunities to interact with the community, and staff are generally the only people without disabilities with whom Mr. Walters interacts on a daily basis.

44.     Mr. Walters likes to ride his wheelchair on the sidewalk in the park and go on boat rides.  He enjoys going out to eat ice cream or pizza and would like to go to bowling.  He also likes to play card games.

45.     Mr. Walters lived with his parents for many years, but eventually they were no longer able to act as his primary caregivers.  Without access to home and community-based services, Mr. Walter's family had no choice but to move him to an ICF.  In July 2001, he was enrolled in the Individual Options waiver program, which allowed him to move out of the ICF into a home in the community in Marietta.  He remained in a community setting for almost eleven years, until he was hospitalized for a medical emergency in May 2012.

46.     After the hospitalization, he was discharged to a nursing facility as part of his recovery plan.  As he prepared to leave the nursing facility, his waiver services provider advised him that it would no longer serve him due to his recent transition to use of a colostomy bag.  Once again, Mr. Walter's family was faced with no alternatives to institutional care.  His sister placed him in an ICF as the only option to leave the nursing facility, and he has remained in this ICF for the past four years.

47.     Mr. Walters' sister wants him to live and spend his days in the community as he did before, and to receive the services and supports that he needs to do so.  However, he is once again on a waiting list for a home and community-based services waiver and has been waiting for several years for these services.

48.     Mr. Walters has been spending his days at a sheltered workshop for 31 years.  He participates in a day services program in the sheltered workshop for three days a week from about 8:30 a.m. to 2:30 p.m.  In the day program, the participants have limited contact with nondisabled people other than paid staff, and neither Mr. Walters nor his guardian have much choice in the activities in which he participates.

49.     Mr. Walters is not receiving vocational rehabilitation services, and Mr. Walters has never had the opportunity to work in the community.

50.     For the four days each week he is not at the workshop, Mr. Walters stays at the ICF and receives no structured vocational or day programming.

51.     Mr. Walters is qualified for and could live and spend his days in the community with appropriate services and supports.  By the Defendants' administration, planning, and funding of the service system for people with intellectual and developmental disabilities, Mr. Walters is denied this freedom and is subjected to continued discriminatory segregation.

**Nathan Narowitz**

52.     Nathan Narowitz is a friendly and outgoing 24-year-old man who enjoys helping people.  He lives in North Ridgeville with his aging parents, who are his primary caregivers.  His mother is 62 years old and his father is 66 years old.

53.     Both Mr. Narowitz and his parents want him to remain in the community, but due to the lack of home and community-based services, he is at serious risk of institutionalization.

54.     Mr. Narowitz's diagnoses include developmental delay, attention deficit/hyperactivity disorder, and obsessive compulsive disorder.  He uses various forms of expressive communication, including gestures, facial expressions, and electronic communication applications on his iPad.  Mr. Narowitz requires assistance with avoiding impulsive choices, managing his finances, meal preparation, hygiene, medication administration, selecting appropriate attire to wear, grocery shopping, housekeeping, and laundry.  He may also benefit from supervision to ensure that he does not wander away from his home or place of employment.

55.     Mr. Narowitz is eligible for Medicaid and would qualify for the level of care necessary to receive either ICF or home and community-based services.  He does not receive Medicaid home and community-based waiver services and has been on the waiting list for such services for almost four years.

56.     Mr. Narowitz does not currently receive vocational rehabilitation services.  He was part of an employment training program at a restaurant in high school with the rest of his class, but he currently spends his days at a segregated, facility-based sheltered workshop with hundreds of others with developmental disabilities.  He makes substantially less than minimum wage and is bored in this work setting.  He would rather be involved in activities in his community, and craves interactions with peers.  He is frequently disciplined by workshop staff because of his need to be social and interact with others.  When he has nothing to do at home, he sleeps.

57.     Mr. Narowitz loves animals, swimming, bowling, puzzles, going to the movies, and going out to eat. He enjoys keeping busy and engaging with friends and family.  Given the lack of integrated, home and community-based services, and to mitigate his isolation at home, his parents have no choice but to pay out-of-pocket for someone to take him on social outings and help him use transportation as well as to stay with him when they must leave the home for some reason since he cannot be left alone.  This arrangement is a financial burden for them and allows for only limited opportunities for involvement in his community.

58.     His parents worry about their continued ability to provide adequate care for Mr. Narowitz at home.  They also are concerned about their continued ability to pay out-of-pocket for the supports that he needs.  They want their son to remain in the community. Mr. Narowitz also wants to continue living at home with his parents or in a home or apartment in his community.  However, without the home and community-based services he needs, he is at serious risk of institutionalization because of the Defendants' administration, planning, and funding of the service system for people with intellectual and developmental disabilities.

**Ross Hamilton**

59.     Ross Hamilton is a 22-year-old man with autism who lives at home with family. He brings this action through his next friend, Sherry Hamilton, who is his mother and the guardian of his person.

60.     Mr. Hamilton lives in Cincinnati with his mother, Ms. Hamilton, who is 56 years old.  Ms. Hamilton acts as his primary caregiver and also pays for an aide out of her own pocket to watch over him while she is at work.  Ms. Hamilton is a single parent and works full-time to support herself and her son.  She has at times been unable to work as much as she needs because Mr. Hamilton does not have the services and support he needs, which affects the level of income available to the family to make ends meet.  She does receive a limited amount of money from the county for respite services, but this is wholly insufficient.

61.     Mr. Hamilton is at serious risk of institutionalization.  His mother is concerned about her continued ability to care for Mr. Hamilton at home due to her age and level of exhaustion and limited financial resources.  Mr. Hamilton wants to continue living with his mother or in a home or apartment in the community.

62.     Mr. Hamilton does not receive Medicaid home and community-based waiver services.  He has been on waiting lists for both the Individual Options and Level One waiver programs for seven years, since he was 15 years old.

63.     Mr. Hamilton is enrolled in the Medicaid program and would qualify for the level of care necessary to receive either ICF or home and community-based services.  He communicates with words and short phrases to express his preferences, like his desire to continue living in the community.  He would benefit from assistance with meal preparation, medication management, transportation, wearing appropriate attire, managing his finances and

public benefits, and maintaining employment, and he needs constant supervision because of his behavioral needs and functioning level.

64.     Mr. Hamilton loves music, animals, going to church, going to the zoo, bowling, visiting museums, swimming, going to the gym and using an exercise bike, trains, and computers.  He is not able to participate in these activities because of the lack of home and community-based waiver services.  When he was in school, he worked at various job sites, and his favorite job was doing dishes.  He is not currently employed and does not receive vocational rehabilitation services.  He will soon be attending a segregated, facility-based day program for a couple days a week.  Mr. Hamilton would like to work and be an active participant in his community, and he would need support to do these things.  His lack of activities makes him feel bored, frustrated, and sad, which increases his behavioral needs.

65.     Mr. Hamilton wants to continue living in the community.  However, without the home and community-based services he needs, he is at serious risk of institutionalization because of the Defendants' administration, planning, and funding of the service system for people with intellectual and developmental disabilities.

**B.     The Ability Center of Greater Toledo**

66.     The Ability Center of Greater Toledo ("the Ability Center") is a not-for-profit center for independent living ("CIL") incorporated in the state of Ohio.  CILs are consumer-controlled, community-based, cross-disability agencies providing an array of independent living services to people with disabilities.  34 CFR § 364.4(b).

67.     Established pursuant to 29 U.S.C. § 796, the Ability Center's purpose is "to promote a philosophy of independent living . . . consumer control, peer support, self-help, self-determination, equal access, and individual and system advocacy, in order to maximize the leadership, empowerment, independence, and productivity of individuals with disabilities, and

the integration and full inclusion of individuals with disabilities into the mainstream of American society."

68.      The Ability Center's mission includes the pursuit of legal, administrative, and other appropriate remedies to protect the rights of individuals with disabilities and to increase the capacity, availability, and quality of community-based service options.  The Ability Center offers a wide range of services and opportunities to assist people with disabilities, including those with intellectual and developmental disabilities, in gaining or maintaining independence in their lives. The Ability Center thus maintains a housing resource center, a community connections program, systemic and individual legal advocacy, nursing home transition supports, a home modification program, equipment loans, and intake and referral assistance.

69.      Based in Sylvania, the Ability Center maintains regional offices in Bryan and Port Clinton, and serves seven northwestern Ohio counties (Lucas, Ottawa, Wood, Fulton, Henry, Defiance, and Williams counties).

70.      The Ability Center was an organizational, representative plaintiff in several class action lawsuits in Ohio federal courts including, but not limited to, *Ability Center v. Sandusky*, Case No. 3:99 cv 7555, *Ability Center v. Dubose and Associates*, Case No. 3:01 cv 7299, and *Ability Center v. Lumpkin*, Case No. 3:10 cv 00446.  The Ability Center joins this suit on its own behalf as an organization that has suffered specific economic injury as result of the Defendants' unlawful acts and omissions, and on behalf of its constituents who include individuals with intellectual and developmental disabilities currently institutionalized in large ICFs or at serious risk of institutionalization in these facilities.

          a)      *Organizational standing*

71.      The Defendants' administration, operation, and funding of the service system for people with intellectual and developmental disabilities, and the resulting discriminatory

18

segregation of the members of the Plaintiff class, impede the Ability Center's capacity to carry out its mission.  The Ability Center faces significant challenges helping people with intellectual and developmental disabilities access the services and supports they need to leave large ICFs and to avoid unnecessary segregation.  If more integrated home and community-based services were available to its constituents, the Ability Center could expand its nursing home transition program to include more people in large ICFs.

72.     Instead, the Ability Center has been forced to expend significant monetary and staffing resources advocating for increased access to home and community-based services for its constituents with intellectual and developmental disabilities.  In response to persistently inadequate community-based options, the Ability Center has directed funding towards the grassroots organizing of people with intellectual and developmental disabilities, facilitating trainings on self-advocacy skills, meetings with federal and state legislators and policymakers, participation in the Ohio *Olmstead* Task Force, and the hiring of a staff attorney whose systemic advocacy work includes advocating for the expansion of integrated, community-based service options for people with intellectual and developmental disabilities in Ohio.

73.     Despite these efforts, the Ability Center has been unable to achieve the reforms necessary to redress ongoing segregation experienced by its constituents with intellectual and developmental disabilities.  If the Defendants' service system complied with federal law, and integrated, community-based services were available in the community, the Ability Center could and would devote these considerable resources to assisting its constituent class members with finding community-based residential and employment services, accessing recreational or leisure opportunities, and gaining independent living skills.

b)      *Associational Standing*

74.     Within its seven-county service area, the Ability Center advocates for the rights and interests of people with a range of disabilities, including those who are institutionalized in large ICFs or who are at serious risk of institutionalization in such facilities. As a result, members of the Plaintiff class are among the constituents who are served by, and who inform the work of, the Ability Center. The interest of these constituents in remedying discriminatory segregation goes to the heart of the Ability Center's mission to ensure that people with disabilities have access to the services and supports they need to live and work in the most integrated settings appropriate to their needs.

75.     Pursuant to 29 U.S.C. § 796f-4(b)(1), the Ability Center must "promote and practice the independent living philosophy of consumer control of the center regarding decision-making, service delivery, management, and establishment of the policy and direction of the center." 29 U.S.C. § 796f-4(b)(1)(A). People with disabilities make up the majority of members of the Ability Center's Board of Trustees, which sets the overall policy direction of the organization. The Board includes four members who have intellectual and developmental disabilities or are parents of people with intellectual and developmental disabilities.

76.     People with disabilities also play a significant part in the day-to-day operations of the Ability Center. A majority of the Ability Center's staff are people with disabilities. These staff work directly with the Ability Center's constituents, and they perform key leadership functions within the organization. Ability Center staff collaborate regularly with local disability organizations and task forces that also consist of people with disabilities.

77.     The Ability Center maintains a grievance process so that constituents can express concerns about the Ability Center's capacity to meet their needs. In addition, constituents are surveyed about their experience with the organization. This feedback from constituents and their

20

families informs financial and programmatic decisions regarding the delivery of services and the allocation of resources for future advocacy.

78.     As a result of the Ability Center's organizational structure, its leadership and staffing decisions, its connections with constituents, and its involvement in the advocacy community, people with disabilities, including those with intellectual and developmental disabilities, have a strong voice in, and a direct influence on, the work of the Ability Center.

C.     **The Defendants**

**John Kasich, Governor of the State of Ohio**

79.     Defendant John Kasich is the Governor of the State of Ohio.  Under Article III, Section 6 of the Ohio Constitution, he is charged with seeing that the laws of the State of Ohio are faithfully executed.

80.     Defendant Kasich appoints the directors of the Ohio Department of Developmental Disabilities ("DODD"), the Ohio Department of Medicaid ("ODM"), and Opportunities for Ohioans with Disabilities ("OOD") in accordance with Article III, Section 21 of the Ohio Constitution.  He is responsible for directing, supervising, controlling, and setting policy for the executive departments of state government.

81.     Defendant Kasich is responsible for developing and submitting an executive budget to the legislature each fiscal biennium, and for approving a final budget and budget modifications that include funding for DODD, ODM, and OOD.

82.     Defendant Kasich is responsible for the Governor's Office of Health Transformation, which he created through Executive Order 2011-02K "in order to carry out the immediate need to address Medicaid spending issues, plan for the long-term efficient administration of Ohio's Medicaid program, and act to improve overall health system performance in Ohio."  Since its creation, the Governor's Office for Health Transformation has

coordinated and implemented planning and budget activities for the State of Ohio's compliance with the U.S. Supreme Court's decision in *Olmstead v. L.C.*, 527 U.S. 581 (1999).  Defendant Kasich has authority to issue proclamations and executive orders regarding employment services for people with intellectual and developmental disabilities and has issued such executive orders. He is responsible for ensuring that state agencies fully implement his policies concerning integrated employment for people with intellectual and developmental disabilities.

83.     Defendant Kasich is sued in his official capacity.

**John Martin, Director of the Ohio Department of Developmental Disabilities**

84.     Defendant John Martin is the Director and executive head of DODD.  DODD is legally responsible for the operation of Ohio's statewide comprehensive programs and services for people with intellectual and developmental disabilities and their families, including public education, prevention, diagnosis, treatment, training, and care, pursuant to Ohio Revised Code § 5123.02.

85.     Defendant Martin has oversight and control over all of DODD's programs and operations, including the maintenance of ten state-operated large ICFs, also called developmental centers.  Through interagency agreements with the ODM, Defendant Martin also exercises certain powers and duties with regard to the administration, licensing, and operations of privately-operated ICFs in Ohio.

86.     Defendant Martin is responsible for the administration of Ohio's four Medicaid-funded home and community-based waiver programs for people with intellectual and developmental disabilities.

87.     Defendant Martin's duties include, but are not limited to, entering into contracts and other agreements on behalf of DODD, monitoring county boards of developmental disabilities, and adopting, amending, or rescinding agency rules, including rules for

administration and licensing of ICFs in Ohio and those which regulate the certification of home and community-based services waiver providers.

88.     Defendant Martin has responsibility for ensuring that DODD's programs and services operate in compliance with federal law.

89.     Defendant Martin is sued in his official capacity.

### John McCarthy, Director of the Ohio Department of Medicaid

90.     Defendant John McCarthy is the Director and executive head of the Ohio Department of Medicaid (ODM).  ODM is Ohio's single state Medicaid agency, responsible under 42 U.S.C. § 1396a(a)(5) and Ohio Revised Code § 5162.03 for the administration of Ohio's Medicaid program.  Under this program, the federal government partially reimburses states for the costs of medical and other services provided to eligible persons, including long-term services and supports to people with intellectual and developmental disabilities.

91.     Defendant McCarthy has ultimate responsibility, authority, oversight, and control over all ODM programs, services and operations.  ODM has delegated responsibilities for administration of Ohio's Medicaid waivers programs for people with intellectual and developmental disabilities to DODD.  ODM has also delegated to DODD its powers and duties regarding Medicaid-funded ICF services, including licensure, level of care determinations for admissions to Medicaid-funded ICFs, and adopting, amending, or rescinding administrative rules regulating the operation of ICFs.

92.     Defendant McCarthy is directly responsible for the design and structure of the Medicaid program in Ohio and for ensuring that the programs administered by ODM are operated and administered in compliance with federal law.

93.     Defendant McCarthy is sued in his official capacity.

**Kevin Miller, Director of Opportunities for Ohioans with Disabilities**

94.     Defendant Miller is the Director and executive head of OOD, the designated state agency in Ohio that is legally responsible, pursuant to Title I of the Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq., as amended, for providing to people with disabilities, including those with intellectual and developmental disabilities, vocational rehabilitation services necessary to attain and maintain competitive employment in integrated, community-based settings.  Under the Rehabilitation Act, the federal government partially reimburses states for the costs of their vocational rehabilitation programs.

95.     Defendant Miller is directly responsible for ensuring that the state's vocational rehabilitation services are operated in compliance with federal law.  Defendant Miller is directly responsible for implementing and overseeing policies and procedures concerning vocational rehabilitation services for people with intellectual and developmental disabilities and for the development, implementation, and oversight of this system of vocational rehabilitation services for people with intellectual and developmental disabilities.   He is also directly responsible for ensuring that this system provides employment services consistent with each person's "individual plan for employment."

96.     Defendant Miller is sued in his official capacity.

**D.     Class Allegations**

97.     Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, the Individual Plaintiffs bring this action on behalf of themselves and tens of thousands of other similarly-situated Ohio residents.  The Individual Plaintiffs, and the class they seek to represent, are Medicaid-eligible adults with intellectual and developmental disabilities who, on or after March 31, 2016, are institutionalized, or are at serious risk of institutionalization, in a large ICF.

98.     Class members at serious risk of institutionalization include people with intellectual and developmental disabilities who:  1) have been referred to a large ICF for admission; or 2) are now, or will be, placed on waiting lists for Medicaid home and community-based waiver programs and whose unmet service needs include inadequate residential services and supports or reliance upon aging caregivers.

99.     The Individual Plaintiffs, and the members of the Plaintiff class, are entitled to be served in the most integrated, least restrictive settings appropriate for their individual needs. However, they do not have access to the integrated home and community-based services required to avoid their unnecessary institutionalization, and they are denied the opportunity to make meaningful and informed choices regarding alternatives to segregation in a large ICF.

100.     Once in these institutional settings, members of the Plaintiff class must attend facility-based sheltered workshops and day programs operated by or contracted through their ICF provider.  In these settings, members of the Plaintiff class have few, if any, interactions with their non-disabled peers, other than paid staff.  Their opportunities for individual choice or meaningful participation in their communities are very limited or non-existent.

101.     Based on their common injury and experience of illegal segregation, the Individual Plaintiffs seek declaratory and injunctive relief on behalf of themselves and the members of the Plaintiff class as a whole, in order to remedy and prevent their unnecessary institutionalization in large ICFs by gaining access to integrated residential, employment, and day services.

102.     The Plaintiff class, approximately 27,800 people in total, is so numerous that joinder of all members is impracticable. The class includes approximately 5,800 people with

25

intellectual and developmental disabilities who are institutionalized in Ohio's statewide network of publicly- and privately-operated large ICFs.

103.    In addition, as a result of the Defendants' administration, planning, operation, and funding of the service system for people with intellectual and developmental disabilities, tens of thousands of other individuals with intellectual and developmental disabilities are at serious risk of admission to a large ICF.  The Governor's Office of Health Transformation observed in its public explanation of the SFY 2016-17 state budget proposals that "there are more than 22,000 Ohioans with immediate needs on waiting lists, 8,000 of whom live with an aging caregiver, and 1,000 of whom will lose the support of their primary caregiver in the next year."  This extraordinary extent of unmet need, coupled with prolonged delays in access to the home and community-based services that do exist, will continue to place additional class members at serious risk of institutionalization during the course of this litigation, making joinder impractical, if not impossible.

104.    Finally, because of their institutionalization and disability, the members of the Plaintiff class would face difficulty pursuing their own individual legal claims.  Even if such claims could be brought, they would be unable to remedy underlying systematic violations of federal law without the benefit of class treatment.

105.    There are multiple questions of law common to the class, susceptible to a common answer, and capable of resolving the legal claims of the members of the Plaintiff class "in a single stroke":

    a)    Whether the Defendants are violating the ADA and Section 504 of the Rehabilitation Act by failing to provide the integrated, community-based

services needed to avoid the unnecessary institutionalization and resulting

segregation of the members of the Plaintiff class;

b)  Whether the Defendants are violating the ADA and Section 504 of the

Rehabilitation Act by administering their service system for people with

intellectual and developmental disabilities in a way that discriminates

against the members of the Plaintiff class;

c)  Whether the Defendants are violating the ADA and Section 504 of the

Rehabilitation Act by failing to serve the members of the Plaintiff class in

the most integrated setting appropriate to their needs;

d)  Whether the Defendants have developed a comprehensive, effectively

working plan for serving the members of the Plaintiff class in the

community instead of in segregated, institutional settings;

e)  Whether the Defendants have failed to evaluate plaintiffs' eligibility for

more integrated community-based services and to inform them of feasible

alternatives to institutional care in violation of 42 U.S.C.

1396n(c)(2)(B)&(C).

106.  Similarly, there are multiple factual contentions that are common to the members

of the Plaintiff class, could generate common answers, and, if so answered, would resolve the

legal claims of the class as a whole:

a)  The Defendants' administration, funding, and operation of their service

system for people with intellectual and developmental disabilities

arbitrarily and impermissibly denies the members of the Plaintiff class the

opportunity to receive services in the most integrated setting appropriate

for their needs by failing to provide an adequate array of integrated residential, employment, and day services to people in large ICFs and those at serious risk of admission to these facilities;

b)   The Defendants' pattern and practice of failing to provide meaningful alternatives to ICF admissions denies those class members in large ICFs and those at serious risk of institutionalization the opportunity to access the integrated services necessary to remain in the community;

c)   The Defendants' pattern and practice of failing to provide adequate transitional assistance services to people already in large ICFs denies class members access to integrated community-based service options, causing them to remain unnecessarily and impermissibly segregated in the settings where they live, work, and spend their days;

d)   Through the administration, funding, and operation of their service system for people with intellectual and developmental disabilities, the Defendants demonstrate a failure to accommodate the needs of the members of the Plaintiff class, by investing in and sustaining the growth of segregated service settings, and by not making adequate community services available to people in large ICFs or at serious risk of admission to a large ICF;

e)   In their administration and funding of the service system for people with intellectual and developmental disabilities, the Defendants demonstrate a failure to accommodate the needs of the members of the Plaintiff class by not adequately funding integrated, community-based services and by

28

perpetuating a system of financial disincentives which leads to class

members' unnecessary institutionalization or serious risk of

institutionalization.

107.     The Individual Plaintiffs' claims are typical of the members of the Plaintiff class.
The Individual Plaintiffs possess the same interests as the members of the Plaintiff class, suffer
the same injury, and raise legal claims arising out of the same course of governmental conduct.

108.     The Individual Plaintiffs will fully and vigorously prosecute this action, and can
adequately and fairly represent the interests of the purported class.

109.     The members of the Plaintiff class are represented by attorneys experienced in
federal class action litigation and disability law.

110.     The Defendants administer, operate, and fund their service system for people with
intellectual and developmental disabilities in a way that discriminates against them by failing to
provide the integrated residential, employment, and day services needed to remedy and prevent
their unnecessary institutionalization.  This unlawful government action has resulted in the
unnecessary and discriminatory segregation and serious risk of segregation experienced by the
Individual Plaintiffs and the members of the Plaintiff class.

111.     The Defendants have acted or refused to act on grounds that apply generally to the
class, making injunctive and declaratory relief appropriate with respect to the class as a whole.
The members of the Plaintiff class raise common questions of law and fact that are capable of,
and susceptible to, class-wide resolution, making class treatment appropriate.   For these reasons,
and consistent with long-standing precedent in similar civil rights actions, the Individual
Plaintiffs seek class certification pursuant to Fed. R. Civ. P. 23(b)(2).

## IV.    STATUTORY PROVISIONS

### A.    The Americans with Disabilities Act (ADA)

112.    The ADA was enacted in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities[.]"  42 U.S.C. § 12101(b)(1).

113.    In enacting the ADA, Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem[.]"  42 U.S.C. § 12101(a)(2).

114.    In addition, Congress recognized that "people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally; [and] the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals[.]"  42 U.S.C. § 12101(a)(6)-(7).

115.    Title II of the ADA applies to public entities, including state or local governments and any departments, agencies, or other instrumentalities of state or local governments.  42 U.S.C. §§ 12131, 12132.  It provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

116.    The U.S. Department of Justice ("DOJ") has authority under 42 U.S.C. § 12134 to issue federal regulations implementing and enforcing Title II of the ADA.

117.    Title II's implementing regulations prohibit public entities from utilizing "criteria or methods of administration" that "have the effect of subjecting qualified individuals with

disabilities to discrimination," or "[t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities[.]" 28 C.F.R. § 35.130(b)(3)(i), (ii).

118.    The Title II implementing regulation known as the "integration mandate" requires that public entities "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). "The most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. § Pt. 35, App. B.

119.    The U.S. Supreme Court has held that Title II of the ADA prohibits the unjustified institutionalization of individuals with disabilities (*Olmstead v. L.C.*, 527 U.S. 581, 597-600 (1999)), noting that segregation of people with disabilities "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life," and "severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, [and] economic independence."

120.    According to case law and the Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the ADA and *Olmstead v. L.C.*, the ability to state a claim under Title II of the ADA and *Olmstead* is not limited to people currently in institutional or other segregated settings, but applies equally to those at serious risk of institutionalization or segregation (*e.g.*, if a public entity's failure to provide community services "will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution"). Available at http://www.ada.gov/olmstead/q&a_olmstead.htm.

121.    As a result, "[i]ndividuals need not wait until the harm of institutionalization or segregation occurs or is imminent" before they may state a claim for illegal discrimination.  Id.

122.    *Olmstead* specifically addressed the unjustified residential institutionalization of individuals who were qualified to live in the community.  527 U.S. 581.  But Title II's integration mandate applies not only to the right to be free from discrimination in a residential setting, but also to any "services, programs, and activities" administered by a state, including its employment and day programs for people with intellectual and developmental disabilities.

123.    The DOJ's Statement on Enforcement affirms that Title II of the ADA and *Olmstead* prohibits segregation not only in residential institutions, but in segregated settings that have "qualities of an institutional nature," including, but not limited to, "congregate settings characterized by regimentation in daily activities, lack of privacy or autonomy, policies limiting visitors, or limits on individuals' ability to engage freely in community activities and to manage their own activities of daily living" and "settings that provide for daytime activities primarily with other individuals with disabilities."  Accordingly, a state's *Olmstead* plan "should include commitments for . . . persons who are unnecessarily segregated, such as . . . individuals spending their days in sheltered workshops or segregated day programs."

**B.    Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act")**

124.    The Rehabilitation Act prohibits discrimination against people with disabilities under any program or activity that receives federal financial assistance.  29 U.S.C. § 794(a).

125.    The Rehabilitation Act's implementing regulations prohibit recipients of federal financial assistance from utilizing "criteria or methods of administration" that have the effect of subjecting qualified persons with disabilities to discrimination on the basis of disability, or that have the purpose or effect of defeating or substantially impairing accomplishment of the

objectives of the recipient's program with respect to persons with disabilities.  45 C.F.R. §
41.51(b)(3)(i)-(ii); 45 C.F.R. § 84.4(b)(4)(i)-(ii).

126.     These implementing regulations also require entities receiving federal financial
assistance to "administer programs and activities in the most integrated setting appropriate to the
needs of qualified . . . persons [with disabilities]."  28 C.F.R. § 41.51(d); *see also*, 45 C.F.R. §
84.4(b)(2).

### C.     Section 1915(c) of the Social Security Act

127.     The State of Ohio is required to operate its Medicaid program in compliance with
the Social Security Act, 42 U.S.C. § 1396, and its implementing regulations.  Section 1915(c) of
the Social Security Act, 42 U.S.C. § 1396n(c), allows states to submit a request to the U.S.
Secretary of Health and Human Services ("Secretary") to "waive" certain federal Medicaid
requirements in order to offer a broad range of home and community-based services as an
alternative to institutional care.

128.     In order to comply with federal and state law requirements governing Medicaid
home and community-based services waivers for people with intellectual and developmental
disabilities, the Defendants must evaluate all individuals referred for admission to an ICF, and
periodically re-evaluate those in ICFs, to determine if they require an institutional level of care
and whether they may be eligible to receive home and community-based services in lieu of
residing in an ICF.  42 U.S.C. § 1396n(c)(2)(B); Ohio Rev. Code § 5123:2-8-01.

129.     With the help of these evaluations, the Defendants must inform individuals
determined to be likely to require an ICF level of care of the feasible alternatives to institutional
placement, including the availability of home and community-based services which could
prevent or avoid their continued institutionalization.  42 U.S.C. § 1396n(c)(2)(B)-(C).

130.    Implementing regulations for 42 U.S.C. § 1396n(c) require the Defendants to provide the Secretary with a "description of the agency's plan for informing eligible beneficiaries of the feasible alternatives available under the waiver and allow[] beneficiaries to choose either institutional services or home and community-based services."  42 C.F.R. § 441.303(d).  In the context of this plan, the Defendants must assure that "when a beneficiary is determined to be likely to require the level of care provided in . . . [an ICF], the beneficiary or his or her legal representative will be—(1) [i]nformed of any feasible alternatives available under the waiver; and (2) [g]iven the choice of either institutional or home and community-based services."  42 C.F.R. § 441.302(d).

## V.     STATEMENT OF FACTS

### A.     People with Intellectual and Developmental Disabilities

131.    Ohio's definition of "developmental disability" encompasses intellectual disability, cerebral palsy, Down syndrome, autism, and many other conditions.  People with intellectual and developmental disabilities may have a range of medical and behavior needs which bring varying degrees of complexity to their care and treatment.  People with intellectual and developmental disabilities typically benefit from a variety of residential, vocational, medical, behavioral, communication, and personal care services in order to maximize their independence and realize their personal goals.  With appropriate services and supports even individuals with complex conditions can be safely and effectively served in integrated, community-based settings.

132.    People with intellectual and developmental disabilities also possess a variety of strengths and abilities.  Access to appropriate, individualized long-term services and supports creates opportunities for people with intellectual and developmental disabilities to lead satisfying and meaningfully integrated lives—forming personal relationships, choosing and directing services and supports, participating in their communities, and engaging in work alongside non-

disabled peers.  Inadequate access to home and community-based services results in a lack of choice between institutional and community living and the most significant barrier to their integration in the community.

133.    Estimates place the total number of Ohio residents with intellectual and developmental disabilities at approximately 113,000 and as high as 250,000.  Rather than administer its service system for people with intellectual and developmental disabilities at the state or regional level, Ohio established local county boards of developmental disabilities. These entities are charged with carrying out a number of critical functions in the service system for people with intellectual and developmental disabilities, including assisting individuals and families in understanding and accessing the range of institutional and community-based service options. County boards are responsible for serving over 90,000 individuals each year, about half of whom are adults.

**B.    Ohio Administers and Maintains a System of Highly Segregated Residential, Employment, and Day Services**

**Ohio's reliance on the institutional large ICF service model**

134.    In 1971 Congress adopted Public Law 92-223, which provides Medicaid reimbursement for ICFs, defined under federal law as institutions for four or more persons whose primary purpose is to deliver health or rehabilitative services consistent with the standards prescribed by the Secretary of HHS.  42 U.S.C. § 1396d(d).

135.    ICFs are recognized nationally and under federal Medicaid law as a restrictive, institutional level of care for people with intellectual and developmental disabilities.  See 42 C.F.R. § 441.300, 42 C.F.R. § 441.301(c)(5).  Despite national trends to the contrary, Ohio continues to invest in and rely heavily upon this outdated service model.  In 2012, Ohio ranked sixth out of the 50 states for the highest number of both publicly- and privately-operated ICFs,

fifth for the total number of people served in both publicly- and privately-operated ICFs, and third for the number of people served in private ICFs.  In the same year, ten states operated without a single public ICF for people with intellectual and developmental disabilities, while nine states had only one.  Three states (Alaska, Michigan, and Oregon) operated without any ICFs at all.

> a) *Thousands of people are placed in Ohio's vast network of restrictive large ICF settings.*

136.    There are approximately 6,437 people with intellectual and developmental disabilities in Ohio's vast ICF system.  Within that system, almost 4,900 individuals are institutionalized in one of 300 privately-operated ICFs with eight or more beds.  These private ICFs are licensed and overseen by the Defendants and funded with federal Medicaid-matching money.  In addition, DODD operates ten large ICFs known as developmental centers, all of which have significantly more than eight beds.  Nearly 900 people with intellectual and developmental disabilities are institutionalized in these publicly-operated ICFs.  In total, approximately 5,800 people in Ohio reside in publicly- or privately-operated large ICFs.

137.    Admission into the Ohio ICF system requires an evaluation and level of care determination conducted by DODD.  Ohio Admin. Code § 5123:2-8-01.  An adult is eligible for the level of care necessary to receive either ICF or home and community-based services when he or she has been diagnosed with a severe, chronic disability attributable to a mental or physical impairment (other than one caused solely by mental illness) that manifests before age 22, is likely to continue indefinitely, and that results in substantial functional limitations in at least three of the following areas of major life activities:  self-care, receptive and expressive communication, learning, mobility, self-direction, capacity for independent living, and economic self-sufficiency.

138.     This level of care evaluation and corresponding determination of individual service needs must be made prior to a person's admission to an ICF and annually thereafter, or upon a significant change in his or her condition.  The DODD must notify the person or his or her guardian regarding the outcome of the level of care determination and the right to appeal the decision.  Also, according to 42 C.F.R. § 456.380, a physician must establish a written plan of care before a person can be admitted to an ICF.  This plan of care must be reviewed at least every 90 days thereafter.

> b)        *Once segregated in the large ICF system, there are few options to leave.*

139.     In Ohio, both private and public ICFs operate based on a common service model and are defined by a shared statutory and regulatory scheme.  They share common characteristics, consistent with their federal origins and institutional character.  The segregation that results from placement in these settings, with its negative outcomes for people with intellectual and developmental disabilities, is particularly evident in large ICFs.  Large ICF providers control most aspects of people's daily lives, including with whom they live, how they spend their day, when and what they eat, where they can go, and who delivers their care.  Large ICFs offer few opportunities for community involvement and are typically unable to facilitate the pursuit of individualized activities consistent with people's unique interests, abilities and preferences.  Once placed in institutional settings, individuals frequently become isolated from their families, friends, and social networks.  They often have little or no contact with their non-disabled peers, other than paid staff.  These substantial limitations on personal liberty, choice, privacy, and autonomy all contribute to the  discriminatory segregation that permeates nearly every aspect of life in a large ICF.

140.     Individuals who wish to leave large ICFs and return to the community have very few options.  In 2013, over 40,000 individuals throughout Ohio remained on waiting lists for

home and community-based waiver services. Approximately 2,500 people on these lists reside in ICFs; the median wait time for them to access the home and community-based services they need to move out is 13 years. These numbers likely downplay the extent of unmet need in the State. If Ohio's waiting lists moved at a reasonable pace, such that individuals and their families believed that placement on the list would result in the timely provision of services, the number of individuals stuck on waiting lists would likely be much higher.

141. Ohio provides ICF services as a benefit under its Medicaid program, funded by a combination of federal dollars and state matching money. Ohio Rev. Code § 5124.05; Ohio Rev. Code § 5164.03. As part of Ohio's Medicaid state plan, these settings are subject to the requirements of federal Medicaid law. In order to receive Medicaid reimbursement, ICF providers must have valid provider agreements with ODM, be certified by the Ohio Department of Health, and be licensed by DODD.

142. Pursuant to Section 1915(c) of the Social Security Act, the Defendants also must assure that individuals who are determined to be likely to require the level of care provided in an ICF are informed of feasible alternatives, and given an opportunity to choose between available community-based services and institutionalization. 42 U.S.C. § 1396n(c)(2)(B)-(C).

**The lack of integrated employment and day services for people in large ICFs**

143. As a result of being institutionalized in large ICFs, members of the Plaintiff class are largely confined to segregated, facility-based sheltered workshops and do not have access to supported employment or vocational rehabilitation services through Ohio's systems. This is due both to funding structures in Ohio's employment service system that exclude members of the Plaintiff class, as well as to the Defendants' failure to provide employment services in integrated settings. Similarly, because of the structure of the Defendant's system, people in large ICFs do

not have access to integrated, non-work day services and therefore spend much of their time in segregated, facility-based day programs.

> a)      *Supported employment services provide the most integrated work services for people with intellectual and developmental disabilities.*

144.    Sheltered workshops are an outdated service model based upon the stereotype that people with disabilities cannot engage in competitive employment and are not capable of succeeding at real work.  Sheltered work programs take place in facility-based settings where only people with intellectual and developmental disabilities work, almost always for much less than minimum wage.  These individuals have little choice in the tasks they perform.  Commonly, workshop participants are asked to do repetitive manual tasks, such as sorting materials or light assembly.  Sheltered workshops in Ohio are often co-located, and operated in conjunction, with other segregated facilities, including large ICFs.

145.    For many employees of sheltered workshops, the unchanging daily routine of performing mundane work causes social skills to atrophy and denies opportunities to develop meaningful workplace skills.  This leads to an even lower likelihood that these individuals will ever transition to work in the community and further removes them from community life.

146.    In contrast, supported employment services enable people with intellectual and developmental disabilities to obtain and maintain competitive employment in integrated settings, at or above the minimum wage and alongside non-disabled workers, and to learn valuable skills, earn competitive wages, and achieve greater self-sufficiency and independence.

147.    Unlike sheltered workshops, which tend to use a "one size fits all" approach to employment by assigning individuals with a wide range of abilities and interests to identical tasks, supported employment services use a person-centered planning model that assesses each individual's unique skills, needs and preferences.

      b)       *The Ohio Department of Developmental Disabilities, the Ohio Department of Medicaid, and Opportunities for Ohioans with Disabilities are the state agencies responsible for Ohio's employment system for people with intellectual and developmental disabilities.*

148.     Opportunities for Ohioans with Disabilities ("OOD") is Ohio's federally designated state vocational rehabilitation agency. Together with DODD and ODM, OOD is responsible for the planning, funding, oversight, and delivery of employment services for people with intellectual and developmental disabilities in Ohio. These agencies determine the amount and allocation of funding for these services and the employment service system, the range of employment services to be provided, the licensing of employment providers, and the level of funding for sheltered workshops versus supported employment programs.

149.     As the state vocational rehabilitation agency, OOD has a primary responsibility for delivery of supported employment services to people with intellectual and developmental disabilities, yet it has failed to provide these services to people living in large ICFs in violation of its statutory mandates.

      c)       *Federal and Ohio laws require provision of integrated employment services.*

150.     Numerous federal laws establish requirements for state vocational rehabilitation agencies like OOD, including the obligation to provide integrated employment services.

151.     OOD, the state vocational rehabilitation agency, was created in accordance with Title I of the Rehabilitation Act. In enacting this federal law, Congress found that work "is a valued activity, both for individuals and society" and "fulfills the need of an individual to be productive, promotes independence, enhances self-esteem, and allows for participation in the mainstream of life." 29 U.S.C. § 720(a). Congress also recognized that individuals with disabilities, even those with the most significant disabilities, have the ability to achieve gainful

employment in integrated settings if appropriate services and supports are provided.  29 U.S.C. § 720(a)(1)(C).

152.    Despite the demonstrated ability and desire of people with disabilities to work, Congress recognized that significant numbers of individuals with disabilities do not have opportunities to work at levels commensurate with their capabilities.  Reasons for the lack of opportunities include discrimination and lack of education, as well as the failure to provide adequate training and supports to enable them to meet job qualification standards necessary to secure, retain, regain, or advance in employment.  29 U.S.C. § 720(a)(1)(D).

153.    To ensure that all individuals with disabilities have access to meaningful employment, Congress included in Title I of the Rehabilitation Act the presumption that all individuals can benefit from vocational rehabilitation services unless a State can demonstrate by clear and convincing evidence that an individual is incapable of working due to the severity of the individual's disability.  29 U.S.C. § 722(a)(2)(A).

154.    In 2001, the Rehabilitation Services Administration (RSA), the federal agency that oversees states' vocational rehabilitation services programs, affirmed these congressional findings by eliminating all funding for the permanent placement of people with disabilities in sheltered workshops.  The RSA instead endorses and funds supported employment services for clients of state vocational rehabilitation programs.

155.    Congress' most recent amendment to the Rehabilitation Act, the Workforce Innovation and Opportunity Act (WIOA), 29 U.S.C. § 701, *et seq.*, imposes a number of new mandates on state vocational rehabilitation agencies that enhance the Rehabilitation Act's requirement that federal vocational rehabilitation funds be used to assist individuals with disabilities to achieve competitive integrated employment.  29 U.S.C. § 720(a).

156.    For instance, WIOA places limitations on the payment of below-minimum wages and mandates that state vocational rehabilitation agencies provide all individuals working in a sheltered workshop with "career counseling, and information and referrals . . . delivered in a manner that facilitates independent decision-making and informed choice . . . ."  29 U.S.C. § 794g(c).  Further, WIOA establishes that, for purposes of a vocational rehabilitation eligibility assessment, all applicants are "presumed to have a goal of an employment outcome."  29 U.S.C. § 722(a)(1).

157.    Recognizing the obligations of federal law, Ohio endorsed and promoted the principle that every person with intellectual and developmental disabilities can work.  In 2012, Defendant Kasich signed an Executive Order creating an "Employment First" policy in Ohio, emphasizing the importance of community-based, integrated employment and establishing that "[c]ommunity employment shall be the priority and the preferred outcome for . . . Ohioans with disabilities."  Executive Order, 2012-05K.  This principle was subsequently codified in state law in 2012.  Ohio Rev. Code § 5123.022(B).  Ohio law was further amended in 2013 to incorporate WIOA's requirements regarding wages and interaction with people without disabilities and to define community employment as "competitive employment that takes place in an integrated setting."  Ohio Rev. Code § 5123.022(A).

> d)    *The Defendants administer and fund a system of employment services that unnecessarily relies upon segregated, facility-based sheltered workshops and that fails to meet the requirements of federal and state law.*

158.    Ohio's employment system funds delivery of supported employment services to people with intellectual and developmental disabilities in two ways: (1) through Medicaid home and community-based waiver programs, and (2) through OOD.  Waiver services include an individualized vocational assessment and a person-centered planning process used to determine the person's employment goals, strengths, abilities, and interests.

159.    Despite Ohio's own laws and federal mandates to vocational rehabilitation agencies to deliver employment services in an integrated setting, the Defendants continue to operate an employment system that is overly reliant on segregated settings for people in large ICFs.

160.    Ohio ranks third highest nationally in the percentage of its residents with intellectual and developmental disabilities receiving services in facility-based settings.  Further, Ohio is one of only five states that relegate more than half of its residents with intellectual and developmental disabilities to sheltered workshops.  John Butterworth et al., Inst. for Cmty. Inclusion, Univ. of Massachusetts Boston, *StateData: The National Report on Employment Services and Outcomes 2014* 21 (2014), http://www.statedata.info/sites/statedata.info/files/files/statedatabook_2015_F.pdf (hereinafter "StateData 2014").

161.    The most recent on-site review of OOD by its federal oversight agency, RSA, found that Ohio's vocational rehabilitation agency violated federal law in numerous ways, while at the same time failing to achieve desired outcomes.  Rehab. Servs. Admin., U.S. Dep't of Educ., *Fiscal Year 2013 Monitoring Report on the Opportunities for Ohioans with Disabilities Agency Vocational Rehabilitation Program* (2014), http://www2.ed.gov/rschstat/eval/rehab/107-reports/2013/vr/oh.pdf (hereinafter "RSA Monitoring Report 2013").  RSA concluded that OOD violated federal law and put federal funds at risk of going to waste because OOD lacked proper internal fiscal controls.  RSA Monitoring Report 2013 at 33-34.

162.    The federal monitoring also found that OOD relinquished $56,238,430 in federal vocational rehabilitation services funds over a four-year period and, at the same time, was

additionally penalized $5,941,948 for a deficit in the State's required maintenance of effort. RSA Monitoring Report 2013 at 12.

163. RSA found that OOD spent federal vocational rehabilitation funds on numerous program expenditures that were prohibited by federal law and regulations. *Id.* at 27-29. RSA found that OOD improperly spent vocational rehabilitation funds received through Social Security Administration reimbursement on unallowable services that did not assist eligible individuals in obtaining employment. *Id.* at 40.

164. RSA identified a number of programmatic weaknesses at OOD. In fact, nationally OOD has the fourth lowest rehabilitation rate of the 31 vocational rehabilitation agencies that are similarly structured. Rehab. Servs. Admin., U.S. Dep't of Educ., *FY 2014 State Vocational Rehabilitation Performance* (2014), http://www2.ed.gov/programs/rsabvrs/resources/fy2014-state-voc-rehab-performance.pdf.

165. Despite such poor outcomes for people with intellectual and developmental disabilities, in FY2014 OOD spent more than twice the national mean cost for vocational rehabilitation services. *Id.*

e) *Ohio's failures in administration of vocational rehabilitation services have prevented the Individual Plaintiffs and the members of the Plaintiff class from accessing community employment.*

166. The Individual Plaintiffs and the members of the Plaintiff class are particularly vulnerable to the negative impacts of DODD, OOD, and ODM's operational failures because they cannot access home and community-based waiver funding for long-term employment supports and because local funding is inadequate to pay for such services.

167. Virtually no person in a large ICF in Ohio has access to or receives vocational rehabilitation services through OOD. In fact, at one point recently the OOD's official case closure forms listed among the reasons for closure: "You are receiving primary services in an

institutional setting." The case closure form now lists the unavailability of supported employment services, though one would benefit from such services, as a reason to close his or her case with OOD.

168.    Moreover, virtually all residents of large ICFs are excluded from the Defendants' Employment First initiative and its promise to provide integrated, supported employment services. As a result, the "best" employment opportunity for these ICF residents is assignment to facility-based sheltered workshops.

169.    DODD and OOD have acknowledged their failure to provide access to employment services for individuals with intellectual and developmental disabilities living in large ICFs. In September 2015, DODD and OOD issued an RFP to fund three pilots intended to result in "an increase in integrated community based employment and day services." Emp't First Initiative, Ohio Dep't of Developmental Disabilities, *Intermediate Care Facility Employment Pilots Request for Proposals*, 5,

http://www.ohioemploymentfirst.org/up_doc/ICF_Employment_Pilots_RFP_Final_8-26-15.pdf (last visited March 30, 2016). However, the RFP provides only $400,000 in funding to be spread among three organizations over a period of more than 20 months, an amount that is insufficient to address the needs of the thousands of residents of large ICFs who are members of the Plaintiff class.

170.    In addition, the Defendants' efforts to expand Ohio's employment service system for people with intellectual and developmental disabilities are focused almost entirely on services for individuals already enrolled in existing waiver programs, which does not include individuals in large ICFs.

    *f)*  *The absence of integrated day services for people in large ICFs causes them to spend much of their time in segregated, facility-based day programs.*

  171.  As a result of the Defendants' operation, administration, and funding of the service system for people with intellectual and developmental disabilities, nearly all funding for non-work day programs is directed to congregate, facility-based settings.  These settings are typically segregated and rarely offer any individualized, integrated community services.

  172.  Participants in Ohio's home and community-based waiver programs have some opportunities to access and select from among integrated days services and activities.  This access enables them to increase their independence and expand involvement in their communities.

  173.  In contrast, class members in large ICFs typically have little or no choice as to where and how they spend their days.  Some participate in day programs operated by the ICF provider on or adjacent to the grounds of the facility.  Others must attend the segregated day programs with which the ICF has chosen to contract.

  174.  In facility-based day programs, people with intellectual and developmental disabilities typically engage in non-work activities, including recreational or leisure activities.  In these congregate settings, class members rarely interact with non-disabled peers.  Day program schedules are typically pre-planned and routinized.  To the extent these programs offer community outings, they often are pre-planned, group activities that are not determined by individual participants' unique goals or expressed interests or preferences.

  175.  As a result of the Defendants' administration, operation, and funding of the service system for people with intellectual and developmental disabilities, people in large ICFs are unable to access to the kinds of integrated day services necessary to facilitate their transition to community-living, or avoid their unnecessary institutionalization.

C. **Ohio's Provision of Home and Community-Based Services is Insufficient to Remedy and Prevent the Unnecessary Institutionalization and Segregation of the Individual Plaintiffs and the members of the Plaintiff class.**

176. Over the past several decades, the federal government has created alternatives to institutional care, offering federal Medicaid resources designed to encourage states to develop more comprehensive home and community-based service systems and to rebalance their long-term care programs away from segregated institutional settings. One such incentive program is Section 1915(c) of the Social Security Act.

177. Section 1915(c) allows states to submit a request to the U.S. Secretary of Health and Human Services ("Secretary") to "waive" certain federal Medicaid requirements in order to offer a broader range of home and community-based services, and particularly services needed to avoid unnecessary institutionalization, thus enabling waiver program participants to live in their own homes and to be integrated in their communities. 42 C.F.R. § 441.300.

178. DODD operates four Section 1915(c) home and community-based services waiver programs, offering varying levels and intensity of service for people who meet the level of care criteria for admission to an ICF: the Individual Options, Transitions Developmental Disabilities (TDD), Level One, and Self Empowered Life Funding (SELF) waiver programs. These waiver programs have a demonstrated history of supporting individuals with intellectual and developmental disabilities in home and community-based settings, including individuals in need of intensive 24-hour residential services and supports.

179. Ohio currently serves over 35,000 people with intellectual and developmental disabilities in these waiver programs. Despite the size of this system, more than 40,000 others across the state are waiting for community-based services.

180. The Defendants have designed the Level One and SELF waivers with strict individual funding limitations. As a result, these waivers can support only those people with

minimal service needs. The State is phasing out its TDD waiver, and over the coming years

current enrollees to that waiver will be transferred to other waiver programs, primarily the

Individual Options waiver program.

181. The Individual Options waiver, which currently serves approximately 18,000

people with intellectual and developmental disabilities, has no individual funding limit, allowing

for the participation of individuals with more significant service needs. Although this waiver

previously failed to cover intensive behavior supports or nursing services, the Defendants have

recently proposed adding these services to the waiver program, further broadening the population

which can be successfully served in the community. With these and other reasonable

modifications to the Individual Options waiver program, virtually any person institutionalized or

at serious of institutionalization in a large ICF can be served safely and successfully in an

integrated, home and community-based setting.

182. Services currently available under the Individual Options waiver include

residential services, such as assistance with activities of daily living (personal hygiene, dressing,

meal preparation, ambulation and transfers, grocery shopping, and homemaker assistance),

medication administration, development of independent living skills, and supervision and

monitoring to ensure the person's health and welfare; funding for home modifications (such as

installation of a ramp or grab bars); social work and nutrition services; transportation; and

adaptive equipment.

183. Supported employment services as well as informal access to integrated day

activities are also currently covered under the Individual Options waiver.

184. The Defendants have chosen to delegate a significant amount of oversight for

home and community-based waiver programs to county boards of developmental disabilities.

These local entities are responsible for conducting most of the operational and administrative day-to day functions associated with the Medicaid home and community-based waiver programs for people with intellectual and developmental disabilities, including maintaining waiting lists for home and community-based services, conducting waiver eligibility determinations, and providing certain waiver-funded services, including case management.

185.    In addition, the Defendants require that the local county boards fund the non-federal share of Medicaid expenditures under the home and community-based waiver programs. The Defendants' decision to administer and fund the service system in this way creates regional and local disparities in access to waiver services, and can prevent counties with fewer resources or more fiscal constraints from meeting their residents' service needs and supporting their preference for community living.

186.    In contrast, Ohio matches Medicaid's contribution to ICF services with State dollars, relieving county boards of any ongoing financial obligation for its citizens with intellectual and developmental disabilities in large ICFs.  By establishing and maintaining this system of financial disincentives, Ohio increases the risk that individuals with more significant service needs will be referred to, and experience unnecessary institutionalization in, the State-funded ICF system.

**D.    The Defendants Acknowledge the Need for Major System Reform But Consistently Fail to Remedy and Prevent the Ongoing Segregation Experienced by the members of the Plaintiff class.**

187.    For decades, Ohio has administered and maintained a vast system of segregated residential, vocational, and day services for people with intellectual and developmental disabilities.  Recognizing the level of segregation in its service system, and its substantial reliance on institutional settings, the State recently put forth several initiatives and proposals to adjust its service system. However, even if successfully implemented, these efforts  are not

49

sufficient to meaningfully alter the discriminatory segregation and serious risk of segregation experienced by the Individual Plaintiffs and the members of the Plaintiff class.

188.    In the last several years, the Defendants have publicly acknowledged the extent to which Ohio's residential service system for people with intellectual and developmental disabilities remains dependent on institutional care.  In various public documents, the Defendants have described the need to "rebalanc[e] in the state of Ohio, through both the downsizing of large facilities and the conversion of ICF-IID funded beds (and smaller homes) to home and community based waiver services," and "increase the number of individuals who have the option to receive services in home and community-based settings."  Ohio Dep't of Developmental Disabilities, *The Future of the ICF-IID Program* 1-2 (2012), http://dodd.ohio.gov/Medicaid/Documents/ICF%20White%20Paper.pdf.

189.    Furthermore, the Defendants recognize that most recipients of employment and day services in Ohio receive those services in segregated settings that restrict individual choice, whereas home and community-based settings provide individuals with "greater ability to choose where they receive employment or day services."  *Id.* at 5.

190.    Despite these public acknowledgements and Ohio's expanded use of federal Medicaid programs, discriminatory segregation and unnecessary institutionalization persist in Ohio, harming the Individual Plaintiffs and the members of the Plaintiff class.

    a)  *The Defendants' recent policy and budgetary initiatives are insufficient to remedy discriminatory segregation experienced by the members of the Plaintiff class.*

191.    As described above, Ohio currently relies on federal Medicaid programs to facilitate its delivery of home and community-based services.  These programs include the section 1915(c) waivers and the demonstration program known as Money Follows the Person.

Research consistently has demonstrated spending on these two national programs leads to a decline in institutional spending and long-term costs.

192.     Ohio also received one-time administrative funds under the federal Budget Incentive Program.  These federal resources are specifically targeted at states with less than 50% of their long-term care services located in community settings.  Yet despite these initiatives, thousands of people continue to reside in large ICFs, and waiting lists for home and community-based services have continued to increase.

193.     Similarly, and despite three years of implementation efforts, Ohio's Employment First Policy has yet to correct the segregation experienced by the members of the Plaintiff class, as evidenced by the Defendants' continued reliance on sheltered workshops and other segregated employment settings for those in large ICFs.  Moreover, the Defendants' deliberate decision to limit implementation of the policy to those enrolled in home and community-based waiver programs ensures that most class members, due to their placement in large ICFs, will not have access to the benefits of such policy changes.

194.     In 2014, Ohio, like all other states, became subject to new federal regulations from the Centers for Medicaid and Medicare Services ("CMS"), which established new outcome-based requirements for all Medicaid waiver programs, including residential and non-residential settings.  As a result, any residential, employment, and day program funded through a waiver program must be delivered in an integrated setting which "supports full access of individuals . . . to the greater community, including opportunities to seek employment and work in competitive integrated settings, engage in community life, control personal resources, and receive services in the community."  42 C.F.R. § 441.301(c)(2)(i).  CMS further defines an integrated setting as one that ensures "an individual's rights of privacy, dignity and respect, and

freedom from coercion and restraint" and that "[o]ptimizes, but does not regiment, individual

initiative, autonomy, and independence in making life choices, including but not limited to, daily

activities, physical environment, and with whom to interact." 42 C.F.R. §

441.301(c)(4)(iii)&(iv).

195.    These new federal regulations mandate that Ohio develop a transition plan to

ensure that its waiver programs for people with intellectual and developmental disabilities come

into compliance with CMS standards by March 17, 2019.  Ohio acknowledges in its proposed

initial and revised transition plan that its employment and day services for people with

intellectual and developmental disabilities "have a significant bias toward facility-based

supports" and carry "the greatest risk of being provided in settings with institutional qualities."

196.    For this reason, Ohio's proposed transition plan suggests a redesign of

employment and day services for people with intellectual and developmental disabilities already

enrolled in waiver programs.  It does not extend to individuals receiving ICF services who are

not enrolled in home and community-based waiver programs.  Thus, Ohio's transition plan,

which has yet to be approved by CMS, is unlikely to reach those currently institutionalized in

large ICFs.

197.    Finally, recent state budget initiatives plan to offer some residents of large ICFs

integrated, community-based service options that would reduce the statewide census of people in

private ICFs and state-operated developmental centers by 523 over a two-year period. Yet this

limited service expansion cannot adequately meet the needs of thousands of class members in

institutions who prefer and are qualified for community living.  The Defendants are unwilling to

make a firm commitment to continue these efforts.

198.    The Defendants also acknowledge the need to divert individuals with intellectual and developmental disabilities from unnecessary ICF admission, so that those who transition to the community are not immediately replaced by people at serious risk of institutionalization. However, the State has designated only a limited number of home and community-based waiver slots for this purpose, without offering a long-term solution to prevent future ICF admissions by meeting the needs of those at serious risk of institutionalization.

199.    Furthermore, recognizing that Ohio's ICF "footprint is one of the largest in the United States," the Defendants have recently contracted with a non-profit entity to provide "pre-admissions counseling" to people who are seeking admission to an ICF and "options counseling" to those currently institutionalized in ICFs.  However, this counseling is limited to those entering or already placed in an ICF with nine or more beds.  Somewhat inexplicably, it is designed to focus on ICF residents who have already expressed an interest in community living, as opposed to those who may have never been informed about community options or presented with alternatives to institutionalization.

200.    People with intellectual and developmental disabilities and their families need and should receive individualized information regarding the feasibility of community-based alternatives to institutional care.  Although the Defendants' new "counseling" initiative recognizes the importance of face-to-face meetings as the standard for effective notice and information, it remains significantly limited in both scope and content.  This and other recent initiatives fall short of remedying the discriminatory segregation of the Individual Plaintiffs and the members of the Plaintiff class.

201.    These violations, compounded by the lack of transitional assistance for individuals and families who do express interest in community living, perpetuate the unnecessary

institutionalization of people segregated in large ICFs and those at serious risk of institutionalization in these facilities. Without a comprehensive plan to address the needs of tens of thousands of class members who are now or will become unnecessarily institutionalized, discriminatory segregation will remain a prominent feature in the Defendants' service system, and a continuing source of injury to the members of the Plaintiff class.

> b)      *The Defendants are capable of enacting the comprehensive, long-term system reforms required to effectively remedy and prevent the ongoing discriminatory segregation of the members of the Plaintiff class.*

202.    The Defendants' recent rebalancing efforts and associated policy and funding initiatives – while insufficient to remedy the segregation experienced by the members of the Plaintiff class – illustrate the potential for a more comprehensive reform of the service system for people with intellectual and developmental disabilities. They also underscore the Defendants' capacity to identify and implement the strategies needed to ensure the Individual Plaintiffs and the members of the Plaintiff class receive services in the most integrated settings appropriate to their individual needs.

203.    Ohio's infrastructure and delivery system for home and community-based services are capable of supporting people with intellectual and developmental disabilities in integrated, community-based settings and could be expanded to remedy and prevent the unnecessary and discriminatory institutionalization of tens of thousands of individuals with intellectual and developmental disabilities by providing access to integrated residential, employment, and day services required under federal law.

204.    As long as the Defendants continue to maintain and rely upon segregated residential, employment, and day services, without a clear, measurable, long-term plan for achieving compliance with federal law, the Defendants' administrative, operational, and funding

decisions will fail to realize legal mandates under the ADA, Section 504, the Social Security Act, and the U.S. Supreme Court's decision in *Olmstead*.

## VI.  LEGAL CLAIMS

### A.  First Claim for Relief:  Violation of Title II of the Americans with Disabilities Act (ADA)

205.    The allegations of paragraphs 1 through 204 are hereby re-alleged and incorporated by reference.

206.    The Individual Plaintiffs and the members of the Plaintiff class have disabilities that substantially limit one or more major life activities, such as self-care, learning, working, and brain function.  42 U.S.C. §§ 12102(1)(A), 12102(2).  They are qualified to participate in the Defendants' system of home and community-based programs and services, with or without reasonable modifications to the state's rules, policies, or practices.  42 U.S.C. § 12131(2).

207.    The Defendants, acting in their official capacities, are public entities within the meaning of Title II of the ADA.  42 U.S.C. § 12131(1)(A)&(B); 28 C.F.R. § 35.104.

208.    The Defendants are violating Title II of the ADA and its implementing regulations by failing to provide access to the home and community-based services required to remedy or prevent unnecessary institutionalization of the Individual Plaintiffs and the members of the Plaintiff class and by segregating them, or subjecting them to serious risk of segregation, in large ICFs where they are often relegated to facility-based employment settings and day programs.

209.    The Defendants are violating Title II of the ADA and its implementing regulations by administering, funding, and operating their service system for people with intellectual and developmental disabilities in a manner that fails to make residential,

55

employment, and day services available in the most integrated setting appropriate to the needs of the Individual Plaintiffs and the members of the Plaintiff class.

210.    Providing the Individual Plaintiffs and the members of the Plaintiff class with access to the integrated residential, employment, and day services required to remedy or prevent their unnecessary institutionalization would not fundamentally alter the Defendants' service system for people with intellectual and developmental disabilities.

211.    The Defendants lack a comprehensive and effectively working plan designed to provide the level of integrated home and community-based services required to remedy or prevent class members' institutionalization.

**B.      Second Claim for Relief:  Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794**

212.    The allegations of paragraphs 1 through 211 are hereby re-alleged and incorporated by reference.

213.    The Individual Plaintiffs and the members of the Plaintiff class have disabilities that substantially limit one or more major life activities, such as self-care, learning, working, and brain function.  29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102.  They are qualified to participate in the Defendants' system of home and community-based programs and services, with or without reasonable modifications to the state's rules, policies, or practices.  29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102.

214.    The Defendants receive federal financial assistance for their programs and activities within the meaning of Section 504 of the Rehabilitation Act of 1973.  29 U.S.C. § 794(b).

215.    The Defendants are violating Section 504 of the Rehabilitation Act of 1973 and its implementing regulations by failing to provide access to the home and community-based

services required to remedy or prevent their unnecessary institutionalization and by segregating them, or subjecting them to serious risk of segregation, in large ICFs where they are often relegated to facility-based employment settings and day programs.

216.    The Defendants are violating Section 504 of the Rehabilitation Act of 1973 and its implementing regulations by administering, funding, and operating their service system for people with intellectual and developmental disabilities in a manner that fails to make residential, employment, and day services available in the most integrated setting appropriate to the needs of the Individual Plaintiffs and the members of the Plaintiff class.  28 C.F.R. § 41.51(d).

217.    Providing the Individual Plaintiffs and the members of the Plaintiff class with access to the integrated residential, employment, and day services required to remedy or prevent their unnecessary institutionalization would not fundamentally alter the Defendants' service system for people with intellectual and developmental disabilities.

218.    The Defendants lack a comprehensive and effectively working plan designed to provide the level of integrated home and community-based services required to remedy or prevent class members' institutionalization.

**C.    Third Claim for Relief:  Violation of the Social Security Act's "Free Choice" Provision under 42 U.S.C. § 1396n(c)(2)(B)&(C)**

219.    Paragraphs 1 through 218 are hereby re-alleged and incorporated by reference.

220.    The Individual Plaintiffs and the members of the Plaintiff class are Medicaid-eligible individuals with intellectual and developmental disabilities who are likely to meet ICF level of care criteria, which qualifies them for either ICF or home and community-based waiver services.

221.    The State of Ohio is required to operate its Medicaid program in compliance with the Social Security Act, 42 U.S.C. § 1396 and its implementing regulations governing level of care determinations and freedom of choice.

222.    Defendants Kasich, Martin, and McCarthy have failed to meaningfully inform individuals who are determined to be likely to require an ICF level of care of the feasible alternatives to institutional placement, including their eligibility for, and the availability of, home and community-based services which could prevent or avoid their continued and unnecessary institutionalization in violation of 42 U.S.C. § 1396n(c)(2)(B)&(C).

223.    As a result of this failure, the Individual Plaintiffs and the members of the Plaintiff class are denied the opportunity to make an informed decision regarding alternatives to institutionalization in large ICFs and opportunities for discharge from these facilities.

## VII.    PRAYERS FOR RELIEF

WHEREFORE, the Individual Plaintiffs respectfully request that this Court do all of the following:

A.    Certify this case as a class action pursuant to Fed. R. Civ. P. 23(b)(2);

B.    Issue a declaratory judgment that the Defendants are violating Title II of the ADA and Section 504 of the Rehabilitation Act of 1973 by failing to provide the Individual Plaintiffs and the members of the Plaintiff class with services in the most integrated setting appropriate to their needs, causing them to be institutionalized in large ICFs, or at serious risk of such institutionalization, and by virtue of residing therein, segregated in vocational and day programs;

C.    Issue a declaratory judgment that Defendants Kasich, Martin, and McCarthy are violating the Social Security Act, 42 U.S.C. § 1396n(c)(2)(B)&(C), by failing to inform the Individual Plaintiffs and the members of the Plaintiff class about feasible alternatives to institutional care available through Ohio's home and community-based waiver programs;

D.      Grant permanent, injunctive relief to remedy the Defendants' violations of the ADA and Section 504 of the Rehabilitation Act of 1973, including the expansion of home and community-based services required by the members of the Plaintiff class to avoid or prevent unnecessary institutionalization, and to provide access to integrated residential, employment, and day services;

E.      Grant permanent, injunctive relief to remedy Defendants Kasich, Martin, and McCarthy's violations of the Social Security Act, 42 U.S.C. § 1396n(c)(2)(B)&(C), including the provision of information to members of the Plaintiff class to enable them to choose between institutional care and home and community-based services;

F.      Award the Individual Plaintiffs and members of the Plaintiff class their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 12205, 29 U.S.C. § 794a, 42 U.S.C. § 1988, and any other applicable provision of law; and

G.      Grant any other relief which is necessary and proper to protect the federal rights of the Individual Plaintiffs and the members of the Plaintiff class they represent.

Respectfully Submitted,

s/Kerstin Sjoberg-Witt
Kerstin Sjoberg-Witt (0076405)
ksjoberg-witt@disabilityrightsohio.org
Trial Attorney
Kevin J. Truitt (0076405)
ktruitt@disabilityrightsohio.org
Alison McKay (0088153)
amckay@disabilityrightsohio.org
DISABILITY RIGHTS OHIO
50 West Broad Street, Suite 1400
Columbus, Ohio  43215
Telephone:  614-466-7264
Facsimile:  614-644-1888

Counsel for Plaintiffs

Neil R. Ellis
nellis@sidley.com
SIDLEY AUSTIN LLP
1501 K Street N.W.
Washington, DC  20005
Telephone:  202-736-8075
Facsimile:  202-736-8711

Kristen E. Rau
krau@Sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois  60603
Telephone:  312-853-9274
Facsimile:  312-853-7036

Cathy E. Costanzo
ccostanzo@cpr-ma.org
Kathryn L. Rucker
krucker@cpr-ma.org
Anna Krieger
akrieger@cpr-ma.org
CENTER FOR PUBLIC REPRESENTATION
22 Green Street
Northampton, Massachusetts  01060
Telephone:  413-586-6024
Facsimile:  413-586-5711

Samuel R. Bagenstos
sbagen@gmail.com
625 South State Street
Ann Arbor, Michigan  48109
Telephone:  734-647-7584

Of Counsel