## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

PHYLLIS BALL, by her General Guardian, PHYLLIS BURBA, et al.,

    Plaintiffs,

    v.

JOHN KASICH, Governor of Ohio, in his official capacity, et al.,

    Defendants.

Case No. 2:16-cv-282

JUDGE EDMUND A. SARGUS

MAGISTRATE JUDGE ELIZABETH A. PRESTON DEAVERS

---

## MOTION TO DISMISS OF DEFENDANTS JOHN MARTIN, DIRECTOR OF THE OHIO DEPARTMENT OF DEVELOPMENTAL DISABILITIES AND JOHN McCARTHY, DIRECTOR OF THE OHIO DEPARTMENT OF MEDICAID

For decades the State of Ohio has refined and implemented a system designed to give people with developmental disabilities who need long-term supports meaningful opportunities to live in their communities. Plaintiffs and the agency that represents them have actively participated in the establishment of that effort. In a previous lawsuit that lasted nearly twenty years, the State, Plaintiffs, and their attorneys agreed to the very course of action that Ohio is now implementing. Because of that agreement, Ohioans with developmental disabilities have more choices for community living than they have ever had. Yet, despite the agreement, the consent order signed by this Court, and Plaintiffs' release of all claims against the State, Plaintiffs now seek to circumvent the agreement that this Court ratified.

This attempt must fail. It violates this Court's consent order and is barred by the doctrine of res judicata. But even if Plaintiffs brought this action on a blank slate—which they did not— their claims would fail for three other reasons: *First*, two Plaintiffs bring disability discrimination

claims that are not ripe. *Second*, plaintiff the Ability Center of Greater Toledo lacks standing. And *third*, the provisions of the Medicaid Act on which Plaintiffs rely are not privately enforceable, and in any event, they lack standing to seek to enforce them.

For these reasons, Defendants, John Martin, Director of the Ohio Department of Developmental Disabilities and John McCarthy, Director of the Ohio Department of Medicaid (hereinafter "Defendants") move that this Court dismiss all claims against the Defendants pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6).

Respectfully submitted,

CRABBE BROWN & JAMES, LLP

/s/_____
**LARRY H. JAMES  (0021773)***
*Trial Attorney
**ROBERT C. BUCHBINDER (0039623)**
500 South Front Street
Suite 1200
Columbus, Ohio 43215
Phone: (614) 229-4567
ljames@cbjlawyers.com
RBuchbinder@cbjlawyers.com
*Counsel for Defendant John Martin*

MICHAEL DEWINE
Ohio Attorney General

/s/  Jeffrey Jarosch_____
**JEFFREY JAROSCH (0091250)***
*Trial Attorney
**ALLAN SHOWALTER (0084032)**
Assistant Attorneys General
30 East Broad Street, 26th Floor
Columbus, Ohio 43215
(614) 644-8946 — phone
(866) 471-2611 — fax
jeffrey.jarosch@ohioattorneygeneral.gov
allan.showalter@ohioattorneygneral.gov
*Counsel for Defendant John McCarthy*

# TABLE OF CONTENTS

MEMORANDUM IN SUPPORT OF MOTION ................................................................. 1

I. BACKGROUND OF THE CASE ............................................................................... 2

    A. Ohio has long been committed to providing community options for people with developmental disabilities. ...................................................................................... 2

In the past quarter-century, the State of Ohio has radically increased the opportunities available for individuals who need long-term services to choose to receive those services in community settings. Because of these efforts, 85% of people in this population receive Medicaid waiver services in the community. This is a remarkable change in a short period of time. In 1999, only 41% of individuals with developmental disabilities received long-term, Medicaid-waiver funded support in the community.

    B. The issues raised by Plaintiffs' complaint have been the subject of extensive litigation. ...................................................................................................................... 5

Despite the progress made to provide greater choice to individuals with developmental disabilities, the issue of where individuals with develpmental disabilities live has been the subject of extensive litigation. Between 1989 and 2007, *Martin v. Taft*, No. 89-CV-0362, was pending before this Court. That litigation ended in a consent order that provided relief to a class of "all mentally retarded or developmentally disabled Ohioans who are, or will be, in need of community housing and services which are normalized, home-like and integrated, and a subclass who in addition to being members of the class, are or will be, Medicaid recipients." *Martin v. Taft*, No. 89-CV-0362, (S.D. Ohio Mar. 5, 2007) (consent order) (attached as Ex. A.).

    C. Current Litigation ............................................................................................... 7

Plaintiffs in the present litigation are individuals with intellectual and developmental disabilities who reside in intermediate care facilities that provide services to 8 or more people, and individuals who allege they are at serious risk of being placed in an intermediate care facility. Plaintiffs seek to force the Defendants to put Plaintiffs in community-based settings or to ensure that they never will have to enter an intermediate care facility; precisely the issues in *Martin*.

II. STANDARD OF REVIEW ..................................................................................... 7

**III. PLAINTIFFS' COMPLAINT VIOLATES THE *MARTIN* CONSENT ORDER AND SEEKS AN IMPROPER REMEDY** .......................................................................... 8

In the *Martin* consent order, the certified plaintiff class expressly released the Defendants "from current and future claims or actions regarding any and all matters that are or could have been brought as part of this litigation." *Martin v. Taft*, No. 89-CV-0362, (S.D. Ohio Mar. 5, 2007) (consent order at 8) (attached as Ex. A.). Plaintiffs seek to bring claims from which they have released defendants.

**A. Plaintiffs' allegations show that at the time of the Consent Order, Plaintiffs Ball, Butler, and Mason were developmentally disabled and lived in ICFs** ......................... 8

Plaintiffs Ball, Butler, and Mason were members of the class certified in *Martin*. The claims they bring here are the same claims they litigated years ago as members of the *Martin* class.

**B. Plaintiffs Walters, Narowitz, and Hamilton, too, fit within the broad scope of the class certified by this Court in *Martin*** .......................................................................... 9

Plaintiffs Walters, Narowitz, and Hamilton are members of the *Martin* class. Their allegations show that, at the time of the consent order, they were developmentally disabled individuals who "will be in need" of community housing.

**C. Defendants Martin and McCarthy are successors to *Martin* Defendants** ............... 9

The Director of the Ohio Department of Mental Retardation and Developmental Disabilities and the Director of the Ohio Department of Job and Family Services were defendants in *Martin*. Directors Martin and McCarthy are successors to the heads of those agencies.

**IV. PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED UNDER THE DOCTRINE OF *RES JUDICATA*** .......................................................................... 11

The consent order issued by this Court in *Martin* is a final resolution of claims that were or could have been brought in that case. That decision is final, and Plaintiffs cannot revisit it years later.

**A. This action is precluded by the *Martin* Settlement and Consent Order.** .............. 12

Each element of claim preclusion is satisifed and this action must be dismissed. *See Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 805 F.3d 701, 708-09 (6th Cir. 2009). The consent order is a final decision on the merits; this is a subsequent action between the same parties present in *Martin* or their privvies; the same issues raised

here were litigated or should have been litigated in *Martin*; and the causes of action are the same.

**V. ADA CLAIMS BROUGHT BY PLAINTIFFS NAROWITZ AND HAMILTON ARE NOT RIPE AND MUST BE DISMISSED**....................................................................... **17**

**A. It is speculative that Narowitz or Hamilton will ever move into a large ICF**....... **17**

Plaintiffs Narowitz and Hamilton allege that they face a serious risk of institutionalization. But that risk cannot come to fruition without many intervening events, and it is speculative that the harm they allege will ever come to pass. Even if their current community living situations become untenable, there are many options other than moving into an intermediate care facility that provides a home for 8 or more people--and this is the outcome they seek to avoid. Because the harm alleged by Plaintiffs Narowitz and Hamilton is speculative, their claim is not ripe, and this court should not engage in "premature adjudication." *Abbott Labs. v. Gardner*, 387 U.S. 136,148 (1967); *see also Amundson v. Wisconsin Dep't of Health*, 721 F.3d 871, 872 (7th Cir. 2013).

**B. Because Narowitz and Hamilton's claims are not ripe, this Court cannot conduct the analysis required by the Supreme Court in *Olmstead***........................................... **19**

In considering Plaintiffs' claims, this Court must consider whether granting relief to Mr. Narowitz and Mr. Hamilton "can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999). But because the claims brought by Mr. Narowitz and Mr. Hamilton rest on a speculative future harm, the Court cannot conduct that analysis. Their claims could become ripe in days, months, years, or never. Given that uncertainty, the Court cannot conduct the concrete analysis required by *Olmstead*.

**C. Cases in which courts have allowed *Olmstead* claims to proceed based on a serious risk of institutionalization are distinguishable from this case. The risks faced by Plaintiffs in those cases are concrete and caused by state action.**.............. **21**

Neither the Supreme Court nor the Sixth Circuit has considered whether a plaintiff may state an *Olmstead* claim based on a risk of institutionalization. But this Court need not weigh into that abstract question. When other courts have allowed such cases to proceed, Plaintiffs have faced concrete risks of institutionalization caused by State action. Here, Plaintiffs do not and cannot allege why or under what circumstances Mr. Narowitz or Mr. Hamilton may someday enter an institution.

**VI. THE ABILITY CENTER DOES NOT HAVE STANDING TO BRING THIS SUIT AS AN ASSOCIATION**.................................................................................................. **24**

An association may only bring an action to enforce its members' rights if those members would have standing to bring the action on their own; the action is related to the organization's purpose; and individual participation of the members is not necessary to resolution of the action. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). Not only does the Ability Center lack members who could bring the claims Plaintiffs assert, even if they did, they fail the third prong of the *Hunt* test. Plaintiffs cannot prevail on their claims without allegations and evidence about individual Plaintiffs. For example, the first and second claims alleging disability discrimination require proof that individual Plaintiffs want to and can safely receive services in the community. This cannot be resolved in the abstract for a group of people potentially associated with the Ability Center.

**VII. PLAINTIFFS' CANNOT ENFORCE THEIR MEDICAID ACT CLAIMS HERE, AND THEY LACK STANDING TO BRING THEM.**......................................................27

The Medicaid act provisions under which Plaintiffs seek relief are not privately enforceable, as they are not "phrased with an unmistakable focus on the benefitted class." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002). But even if they were privately enforceable, Plaintiffs lack standing as they were not harmed. Plaintiffs claim that they should have been told about alternatives to care in an intermediate care facility, but because each plaintiff is on the waiting list for such an alternative, it is clear they have the information they claim they should have been given.

**IX. CONCLUSION**.............................................................................................**30**

**CERTIFICATE OF SERVICE** ......................................................................**32**

## MEMORANDUM IN SUPPORT OF MOTION

This case represents Plaintiffs' attempt to revive claims made and settled in *Martin v. Taft*, Southern District of Ohio Case No. 89-CV-0362. Plaintiffs in the present action were members of the plaintiff class that was party to this Court's consent order in *Martin*. Four individual Plaintiffs seek declaratory and injunctive relief to allow them to move out of the Intermediate Care Facilities for Individuals with Intellectual Disabilities (ICFs) in which they live. Complaint, doc. 1 ¶ 1. Two other individual Plaintiffs who do *not* live in ICFs want the state to eliminate any risk that they will ever live in an Intermediate Care Facility that provides a home to 8 or more people. *Id.*

Plaintiffs' Complaint must be dismissed for five independent reasons. *First,* the Plaintiffs explicitly released Defendants in this Case from all claims that they brought or could have brought in a prior action.  In the *Martin* Consent Order issued on March 5, 2007, the plaintiff class released the current Defendants from any and all liability. *See* Consent Order at 8 (attached as Ex. A). Plaintiffs in this case were members of that class, and Defendants are successors to the defendants in *Martin*. Consequently, all parties to the present litigation are bound by the terms of the Consent Order including the release. Plaintiffs cannot agree to a broad release, then seek another go at the same litigation a few years later.

*Second,* Plaintiffs' claims are barred under the doctrine of *res judicata* or claim preclusion. The *Martin* Litigation reached a final disposition of the same claims Plaintiffs assert here. The Consent Order approved by this Court represented a comprehensive statewide plan to expand opportunities for qualified persons with developmental disabilities to choose to live in community settings. Since the named putative plaintiff class members were also parties to the *Martin* Consent Order, they cannot now relitigate the Martin case against these Defendants.

*Third,* two Plaintiffs bring discrimination claims under the Americans with Disabilities Act ("the ADA") and the Rehabilitation Act alleging that they are at serious risk of institutionalization.

1

But it is entirely speculative that they will ever face the alleged harm from which they seek protection—a move into an Intermediate Care Facility that provides a home to 8 or more people. Their discrimination claims are not ripe.

*Fourth*, plaintiff the Ability Center of Greater Toledo lacks standing to bring this action as an association. An association may not bring an action on behalf of its members when individual participation of those members would be necessary to resolve their claims. Here, the association's members' claims require, among other things, a showing that the members want and can safely receive services in the community. Such a showing requires individual participation of the people whose desires the Court must consider.

*Fifth*, Plaintiffs' Medicaid Act claims are not privately enforceable and they lack standing to bring them. The Medicaid laws invoked in Plaintiffs third claim lacks "an unmistakable focus on the benefitted class" and are not enforceable under Section 1983. In any event, Plaintiffs' allegations demonstrate that they have not been harmed by any alleged violation of the laws they seek to enforce, so they lack standing to do so.

I.    **BACKGROUND OF THE CASE**

    A.    **Ohio has long been committed to providing community options for people with developmental disabilities.**

For over twenty-five years, the Ohio Department of Developmental Disabilities in partnership with the Ohio Department of Medicaid has sought to expand community integration and meaningful choices for individuals with developmental disabilities who need long-term services and supports. The department has done so primarily by providing access to Medicaid funding for alternatives to receiving services in an intermediate care facility for individuals with intellectual disabilities. Through certain large-scale Medicaid programs called home and community-based services waivers, the department can provide individuals with developmental

disabilities opportunities to live by themselves, to live with family or other care providers, or to live in other community-based settings. These waivers allow Medicaid funding while relaxing, or "waiving," certain Medicaid requirements. They pay for the services and supports an individual requires to live in these settings, but do not cover the cost of room and board. Waivers also pay for services and supports an individual requires to have a job or to participate in non-work activities such as going to the library or to the gym.

The Ohio Department of Developmental Disabilities has developed and expanded waiver programs to provide choices to people with developmental disabilities. In 1990, the year Congress enacted the American with Disabilities Act, the Department of Developmental Disabilities established its first home and community-based services waiver for individuals with developmental disabilities. That first waiver sought to help people with developmental disabilities in nursing homes move into other, less-institutional settings, if they wanted to. The next year, the Department of Developmental Disabilities created the Individual Options Waiver. It provides a full-service benefit package with no individual cost cap. It can meet the needs of individuals who require assistance up to 24 hours per day, seven days per week. In addition to the Individual Options Waiver, the Department of Developmental Disabilities administers three other waivers. These waiver programs vary in the services they provide, but each has the same basic goal: to provide a plethora of community living options for individuals with developmental disabilities. These waivers are paid for through Ohio's Medicaid program. The federal government provides approximately 60% of the funding and the rest comes from a combination of state general revenue funds and local funds provided by county boards of developmental disabilities.

3

These waivers serve a large number of people and that number is growing.  Since 1999, the number of individuals served through waivers has increased from 5,527 to 35,191 individuals in 2015, an increase of 537%.[1]  By comparison, the number of individuals receiving services in ICFs during this period decreased by 20% from 7,917 to 6,367.  In 2015, 85% of individuals with developmental disabilities receiving Medicaid-funded long-term services and supports received waiver services, and 15% were in ICFs.  This is a dramatic change from 1999, when 59% received services in ICFs and 41% were enrolled in waivers.

These trends continue today as the Department of Developmental Disabilities seeks to enable greater community integration and choice for individuals with developmental disabilities.  The Ohio General Assembly appropriated funding for approximately 3,000 new waiver enrollees in the department's current two-year budget period, which runs from July 1, 2015 to June 30, 2017.  This funding is in addition to the local funds that county boards of developmental disabilities provide to enroll new individuals in waivers.  400 of the new waiver slots will be used for diversions.  Diversion waiver slots are available to individuals who are contemplating admission to an ICF with nine or more residents.  Before an individual may be admitted to an ICF with nine or more residents, he or she must receive pre-admission counseling.  *See* Ohio Rev. Code §§ 5124.68, 5124.01(MM).  Diversion waiver slots are offered to those individuals who choose a waiver in lieu of admission to the ICF.  These waiver slots will help ensure that only those who want to will be admitted to ICFs.  Another 736 of the new waiver slots will available to residents of an ICF of any size who want to leave.  *See* R.C. 5124.69.  The department has contracted with an outside organization to provide individuals living in ICFs with

---

[1] The expansion of waivers did not end with the *Martin* Consent Order.  To the contrary, in the six years after the settlement was fully implemented in 2009, the number of individuals enrolled in waivers increased by 33% from 26,408 to 35,191.

options counseling and information about the availability of a waiver. The remaining 1,864 new

waiver slots are for individuals on waiver waiting lists.

**B.     The issues raised by Plaintiffs' complaint have been the subject of extensive litigation.**

This is not the first action in which individuals with developmental disabilities have sought

changes in the care that is available to them. In 1989, Plaintiffs with developmental disabilities

sought to represent a class of "all mentally retarded or developmentally disabled Ohioans who are,

or will be, in need of community housing and services which are normalized, home-like, and

integrated." *Martin v. Taft*, No. 89-CV-0362, (S.D. Ohio Mar. 5, 2007) (consent order) (attached

as Ex. A). The defendants in *Martin* were (1) the Governor of Ohio; (2) the director of the Ohio

Department of Mental Retardation and Developmental Disabilities; and (3) the director of the Ohio

Department of Job and Family Services ("ODJFS"), a state agency that was then responsible for

administration of the federal Medicaid program in Ohio and the successor to the Ohio Department

of Human Services. *Id.*

In June of 1999, the United States Supreme Court held in *Olmstead v. L.C.*, 527 U.S. 582

(1999), that under Title II of the Americans with Disabilities Act of 1990, 104 Stat. 337, 42 U.S.C.

§ 12132, individuals with intellectual and developmental disabilities receiving state-funded care

in institutions must be given the option of receiving that care in the community:

> When the State's treatment professionals have determined that community
> placement is appropriate, the transfer from institutional care to a less restrictive
> setting is not opposed by the affected individual, and the placement can be
> reasonably accommodated, taking into account the resources available to the State
> and the needs of others with mental disabilities.

*Id.* at 587.

Prior to the Supreme Court's decision in *Olmstead*, the *Martin* parties had engaged in "slow

and difficult" settlement negotiations. *Martin v. Taft*, 222 F.Supp.2d 940, 948 (S.D. Ohio 2002)

(order granting summary judgment in part). Following *Olmstead*, litigation continued until the *Martin* parties finally reached a resolution which culminated in a Consent Order on March 5, 2007. The Consent Order detailed the State's progress towards reducing its reliance on ICFs and the defendants agreed:

(1)     to seek 1500 new "Individual Options Waiver Slots" from the Ohio legislature and seek Medicaid funding that enables class members to live in the community,

(2)     One hundred slots per fiscal year are to be available for "persons currently residing in ICFs/MR,"

(3)     Forty slots must be available for persons currently residing in Nursing Facilities,

(4)     Allocation of all other waiver slots pursuant to a formula developed by ODMR/DD, which includes a factor for consideration of the person's position on the waiting lists maintained by county boards of MR/DD,

(5)     ODMR/DD and ICFs/MR were to conduct surveys of residents of DCs and ICFs/MR to determine which resident may wish to choose a community waiver if such placement would be available, and

(6)     The Director of ODMR/DD committed to seeking the release of over $4 million in funds from his agency's capital budget to County Boards of MR/DD for participation in the various community placement program options.

*See* Consent Order, Defendants' Exhibit A, at 6-8.

The Consent Order benefitted and bound the entire certified class, defined as: "all mentally retarded or developmentally disabled Ohioans who are, or will be, in need of community housing and services which are normalized, home-like and integrated, and a subclass who in addition to being members of the class, are or will be, Medicaid recipients."

6

The Consent Order contained provisions allowing the court to retain jurisdiction and reinstate the case if there was not substantial compliance with the Consent Order. Defendants' Exhibit A, at 8. No motion was ever filed to reinstate the *Martin* litigation and jurisdiction terminated in June of 2009 without dispute. *See* Exhibit A, at 8.

### C.     Current Litigation

Plaintiffs in the present litigation are individuals with intellectual and developmental disabilities who reside in ICFs that provide services to 8 or more people, and individuals who allege they are at serious risk of being placed in an ICF that provides a home to 8 or more individuals.[2] The putative class seeks an order from this Court finding that Defendants are in violation of Title II of the ADA of 1990; the Rehabilitation Act of 1973 as amended, 29 U.S.C. § 794(a); and the Social Security Act, 42 U.S.C. §1396, and its implementing regulations. *See* Plaintiffs' Complaint at 1. Plaintiffs seek to force the Defendants to put Plaintiffs in community based settings or to ensure that they never will have to enter an ICF; precisely the issues in *Martin*.

The Defendants in this case are various Ohio agencies responsible for overseeing and implementing Ohio's intellectual and developmental disability programs and Medicaid program. Defendants Martin and McCarthy are successors to defendants in the *Martin* litigation.

### II.     STANDARD OF REVIEW

Defendants Martin and McCarthy request dismissal pursuant to Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) operates to test the sufficiency of the complaint by asking

---

[2] Plaintiffs are individuals with profound developmental and intellectual disabilities requiring substantial specialized care. For example, Ms. Ball is identified as a 49-year-old woman who has been diagnosed with intellectual disabilities, cerebral palsy, spastic quadriplegia, asthma and seizure disorder. *See* Complaint, doc. 1 ¶ 19. She uses a power wheelchair for mobility, and required assistance with virtually all aspects of daily living such as, eating, dressing, and preparing medications and meals. *Id.* She is non-verbal and uses sounds, gestures and facial expressions in a communication device to interact with others. *Id.* The other Plaintiffs face developmental and intellectual disabilities to a similar or even greater extent.

"whether a cognizable claim has been pleaded in the complaint." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir.1988); *Greater Heights Acad. v. Zelman*, 439 F. Supp. 2d 827, 829 (S.D. Ohio 2006), aff'd, 522 F.3d 678 (6th Cir. 2008). In considering a 12(b)(6) motion, the court will construe the complaint in a light most favorable to the non-moving party and accept all factual allegations as true. *Wiles v. Ascom Transp. Sys., Inc.*, 478 F. App'x 283, 286 (6th Cir. 2012). Dismissal under Rule 12(b)(6) streamlines litigation by "dispensing with needless discovery and fact-finding" on claims that are legally untenable in the first place. *Neitzke v. Williams*, 490 U.S. 319, 326–27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *see also Jackie S. v. Connelly*, 442 F. Supp. 2d 503, 513 (S.D. Ohio 2006).

## III. PLAINTIFFS' COMPLAINT VIOLATES THE *MARTIN* CONSENT ORDER AND SEEKS AN IMPROPER REMEDY

Plaintiffs' Complaint violates the *Martin* Consent Order, which expressly released all of the Defendants in this case from any and all future claims related in any way to the *Martin* litigation. Defendants' Exhibit A, at 8. This alone serves as a sound basis by which to dismiss Plaintiffs' Complaint. By its terms, the consent order binds anyone who, at the time it was issued in 2007, was "mentally retarded or developmentally disabled" who was then or "will be, in need of community housing and services which are normalized, home-like and integrated." Consent Order, Exhibit A, at 1.

### A. Plaintiffs' allegations show that at the time of the Consent Order, Plaintiffs Ball, Butler, and Mason were developmentally disabled and lived in ICFs.

Plaintiffs Ball, Butler, and Mason are all part of the plaintiff class certified in *Martin* and are bound by the terms of the Consent Order including the liability release. Each of these Plaintiffs

alleges that they were developmentally disabled and resided in an ICF at the time the consent order was issued. For example, Plaintiffs allege that Ms. Ball has moved into an ICF in 1998, when "her stepfather experienced health problems [and] her parents became concerned about their ability to continue providing physical care to Ms. Ball." Doc. 1 ¶ 18; *see also id.* ¶ 26 (Mr. Butler); *id.* ¶ 35 (Ms. Mason). As adults with intellectual or developmental disabilities seeking community-based housing and services, these Plaintiffs fall squarely within the scope of the *Martin* consent order.

**B. Plaintiffs Walters, Narowitz, and Hamilton, too, fit within the broad scope of the class certified by this Court in *Martin*.**

In addition to the Plaintiffs named in Section III(A) above, there are three additional Plaintiffs (Mr. Walters, Mr. Narowitz, and Mr. Hamilton) who do not allege that they lived in an ICF at the time the consent order was issued. They fit within the second part of the certified class, developmentally disabled individuals who "will be in need" of community housing. Plaintiffs allege that Mr. Walters has entered an ICF and is now in need of community housing, and that Mr. Narowitz and Mr. Hamilton are at risk of having to enter an ICF in the future, though they live in the community now. Complaint, doc. 1 ¶¶ 44-46 (Mr. Walters); 53 (Mr. Narowitz); 61 (Mr. Hamilton).

The plaintiff class definition in *Martin* was broadly worded to include "all mentally retarded or developmentally disabled Ohioans who are, *or will be*, in need of community housing and services." This broad definition captured future Plaintiffs with the same interests as the *Martin* Plaintiffs; namely, to get community based services and care. Mr. Walters, Mr. Narowitz, and Mr. Hamilton were precisely the future Plaintiffs that the *Martin* Consent Order foresaw. Accordingly, these Plaintiffs are bound by the terms of the *Martin* Consent Order and must abide by its terms—including the liability release.

**C. Defendants Martin and McCarthy are successors to *Martin* Defendants.**

In addition to the Plaintiffs to the present action being bound by the terms of the *Martin* Consent Order, so too are the Defendants. The Consent Order provides: "Defendants, Defendants' successors, and any other successor agencies are released from current and future claims or actions regarding any and all matters that are or could have been brought as part of this litigation." *See* Defendants' Exhibit A, at 8. Defendants Martin and McCarthy are successors of defendants in *Martin*. In *Martin*, the defendants were:

      (1)     The Governor of the State of Ohio;

      (2)     The Director of the Ohio Department of Mental Retardation and Developmental Disabilities (ODMR/DD); and

      (3)     The Director of the Ohio Department of Job and Family Services.

Defendant Martin is the Director of the Ohio Department of Developmental Disabilities, the successor agency acting in the same role as the former director of the ODMR/DD. Defendant McCarthy is the Director of the Ohio Department of Medicaid, which is now serving the same role as the Ohio Department of Job and Family Services as the State's Medicaid agency. Defendants Martin and McCarthy are entitled to the protections afforded to them by the liability release in the *Martin* Consent Order.

If Plaintiffs had felt the Defendants did not comply with the *Martin* Consent Order, their remedy was to file a motion seeking to enforce the Consent Order or to opt out of the plaintiff class certified in *Martin*. In fact, this precise issue arose in prior litigation in *D.M. v. Butler Cty. Bd. of Mental Retardation & Developmental Disabilities*, No. 08-399, 2008 WL 4916306, at *4 (S.D. Ohio Nov. 14, 2008). In *D.M.*, the Plaintiffs sought to relitigate the issues raised in *Martin* even though the Court had retained jurisdiction over the *Martin* Consent Order through June of 2009. This Court held that the *D.M.* plaintiff's claims were precluded by the doctrine of *res judicata* as

they were or could have been litigated in Martin. *D.M.*, at *4. The Court further stated that if Plaintiffs contend the defendants were not complying with the *Martin* Consent Order, "their remedy is to file a motion seeking to enforce the Consent Order." *Id.* The *D.M.* Plaintiffs subsequently did not attempt to enforce the *Martin* Consent Order, and the Court's jurisdiction over that order ended in June of 2009. Plaintiffs do not claim that the defendants failed to keep their end of the deal struck in *Martin*, nor can they simply wait until the Court's jurisdiction ends and give the same litigation another try by bringing a new lawsuit after the jurisdiction over the Consent Order terminated.

Courts and parties alike have a significant interest in preserving the finality and certainty of judgments. The present lawsuit reflects the second attempt since 2008 to certify a new class to litigate the same issues raised in *Martin*. The *Martin* case took eighteen years to resolve. It was carefully and methodically tried, litigated, and settled between parties with interests identical to those in the present case. If this Court were to indulge the present case, which raises the same exact causes of action as *Martin*, then the interest in finality of judgments would be damaged. Further, the cost to parties of reopening finished litigation could extend far beyond this case. Defendants should not be forced to relitigate the *Martin* case, and therefore respectfully request this Court enforce the terms of the *Martin* Consent Order—including the liability release—which is binding on all the parties to the present litigation.

## IV.    PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED UNDER THE DOCTRINE OF *RES JUDICATA*

In addition to being barred by the *Martin* Consent Order, Plaintiffs' claims violate the well settled doctrine of *res judicata*. The doctrine of *res judicata*, or claim preclusion, is a fundamental rule of jurisprudence that "ensures the finality of decisions." *Brown v. Felsen*, 442 U.S. 127, 131, 99 S. Ct. 2205, 2209, 60 L. Ed. 2d 767 (1979). The doctrine "encourages reliance on judicial

decisions, bars vexatious litigation, and frees the courts to resolve other disputes." *Id.*; *see also Westwood Chem. Co. v. Kulick*, 656 F.2d 1224, 1227 (6th Cir. 1981).

Plaintiffs, ignoring the prior settlement and adjudication in *Martin*, seek to contravene this well settled doctrine of jurisprudence and have filed a new case raising identical legal claims on behalf of individuals who were members of the *Martin* class. Plaintiffs' attempts to circumvent the doctrine of res judicata are not even well disguised; they assert the same claims against the successors of the same defendants who were party to the *Martin* Consent Order.

### A.     This action is precluded by the *Martin* Settlement and Consent Order.

The doctrine of *res judicata* includes two separate concepts: claim preclusion and issue preclusion. *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 528 (6th Cir. 2006). Under the doctrine of claim preclusion, a final judgment on the merits by a court of competent jurisdiction bars any subsequent litigation on the same claim between parties or non-parties in privity, with respect to every ground for recovery asserted in the first proceeding and every ground for recovery which the parties could have raised but did not. *Heike v. Cent. Michigan Univ. Bd. of Trustees*, 573 F. App'x 476, 480 (6th Cir. 2014). Claim preclusion has four elements:

> (1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their privies; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action.

*Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 805 F.3d 701, 708-09 (6th Cir. 2015); *see also Christian Separatist Church Soc'y of Ohio v. Ohio Dep't of Rehab. & Corr.*, No. 2:15-CV-2757, 2016 WL 2585648, at *3 (S.D. Ohio May 5, 2016). Each of these elements is met in the present case and Plaintiffs are consequently barred from asserting their claims.

> 1.     There is a final decision on the merits of Plaintiffs' claims against the defendants by a court of competent jurisdiction.

This case is subject to the final disposition reached in the *Martin* case by virtue of a Consent Order. *See* Exhibit A. A decision is final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *RSM Richter, Inc. v. Behr Am., Inc.*, 729 F.3d 553, 556 (6th Cir. 2013). A consent decree is accorded the same status as a judgment or a final disposition when applying the doctrine of *res judicata. See Huguley v. Gen. Motors Corp.*, 999 F.2d 142, 146 (6th Cir. 1993) (noting that principles of *res judicata* apply not only to judgments, but also to consent decrees and that "[a] consent decree has preclusive effect over issues that were fully and fairly addressed in the proceedings below.").

The *Martin* Consent Order created a settlement between class Plaintiffs and the *Martin* Defendants in that case. The Order further contained a release of all current or future claims regarding "any and all matters that are or could have been brought as part of this litigation." Exhibit A, at 8. The Defendants have complied with the Order, but Plaintiffs now seek a way out of the release it established.

## 2. *This action is between the same parties as* Martin.

Plaintiffs in the present litigation are part of the plaintiff class that was represented in the *Martin* litigation. An individual who is a member of a class that is certified under Fed. R. Civ. P. 23 is a plaintiff to whom *res judicata* will apply in any subsequent action on the same cause of action against the same defendants. *See generally, King v. S. Cent. Bell Tel. & Tel. Co.*, 790 F.2d 524, 530 (6th Cir. 1986). The Consent Order certified the plaintiff class thereby satisfying the second element of *res judicata.* Exhibit A, at 1.

As stated earlier, the *Martin* Consent Order defined the class of Plaintiffs benefiting from the Consent Order as developmentally disabled Ohioans who "are, *or will be*, in need of community housing," or "*are or will be* Medicaid Recipients." Exhibit A at 1 (emphasis added).

All of the Plaintiffs in the present case are described in the Complaint as: "adults with intellectual and developmental disabilities who are institutionalized, or at serious risk of institutionalization, in [ICFs] throughout Ohio. Each of the Individual Plaintiffs would prefer to reside in an integrated, community-based setting and receive integrated, community based employment or day services." *See* Plaintiffs' Complaint at ¶ 1. Clearly, the present Plaintiffs—who are seeking placement and opportunities in community based settings—are precisely the developmentally disabled individuals living in ICFs captured by the class definition in *Martin*. As noted earlier, the parallels between the present individual Plaintiffs and the individual Plaintiffs in *Martin* are telling. In light of the foregoing, it is clear the present Plaintiffs have had their claims adjudicated and their interests represented in the *Martin* litigation

The moving Defendants' predecessors were also parties to the *Martin* litigation. In fact, nearly every defendant in *Martin* was a predecessor of the currently named Defendants. *See* Section III *supra*.

Accordingly, the second element of *res judicata* is satisfied given that the parties involved in the present case are substantially identical to those in *Martin*. Plaintiffs were members of the *Martin* plaintiff class and the moving Defendants are successors to the original defendants in *Martin*.

> 3. *The Plaintiffs actually litigated the issues in the instant case in Martin, and to the extent they did not, they could have done so.*

One of the central purposes of claim preclusion is to encourage litigants to bring all related or similar claims in a single lawsuit. *Heike v. Cent. Michigan Univ. Bd. of Trustees*, 573 F. App'x 476, 482 (6th Cir. 2014). Thus, the third element of res judicata not only prohibits claims parties have already brought, but also those claims the parties should have brought. *Id.* This lawsuit arises out of a dispute over the availability of resources for individuals with intellectual and

developmental disabilities located in ICFs that provide homes to eight or more individuals. Plaintiffs' goal is to establish a standard of care by which no one lives or receives services in these ICFs. To effectuate this purpose, Plaintiffs have brought the same three claims that were brought by Plaintiffs in *Martin* alleging that the Defendants have failed to fund and facilitate community placement and community based opportunities for ICF residents. Similarly, the *Martin* case was brought to enforce the rights of "people in Ohio with mental retardation or other developmental disabilities to appropriate, meaningful and integrated services in the community." *See* Exhibit B, Third Amended Complaint, ¶ 6, p.2.

In addition to seeking the same overall remedy for the harms alleged, Plaintiffs' factual allegations in the Complaint mirror, in several respects, the Complaint filed by Plaintiffs in *Martin*. For example, Plaintiffs here include residents of ICFs alleging that there has been discriminatory institutionalization, that support services are not offered in a community based setting, and that there must be a rebalance of Ohio's service system to provide for greater access to home and community based service options for people with intellectual and developmental abilities. *See* Plaintiffs' Complaint at ¶¶ 9, 11-12. In *Martin*, the complaint alleged that plaintiff class members were living in ICFs. *See* Exhibit B, Third Amended Complaint, ¶3, p. 1. The *Martin* Plaintiffs alleged the *Martin* Defendants failed to evaluate and provide for the Plaintiffs' residential and community needs. *Id.* at ¶ 4, p. 2. Finally, the *Martin* Plaintiffs alleged failure by the *Martin* Defendants to offer community based support services. *Id.* On its face, the present Plaintiffs' Complaint is not discernably different from the complaint brought by the class in *Martin*.

To the extent that Plaintiffs here allege slight variations from the facts presented in *Martin*, their claims are still precluded. The Plaintiffs here allege violations under the ADA, Section 504 of the Rehabilitation Act, and the Social Security Act, each of which was a claim in the *Martin*

case. Thus, even if Plaintiffs' allegations deviate slightly from those presented in *Martin*, they are still precluded. The allegations and claims in this case are based on the same causes of action as the facts in *Martin*. They could and should have been raised during the *Martin* litigation. *Martin* provided a clear resolution or opportunity for resolution on all the present Plaintiffs' facts and claims. Thus, the third element of *res judicata* is satisfied.

        4.     *All of the causes of action cited by Plaintiffs were raised in Martin.*

The Plaintiffs here assert identical claims to those raised in *Martin*. In order to constitute a bar under the doctrine of claim preclusion, "there must also be an identity of the causes of action." *Heike v. Cent. Michigan Univ. Bd. of Trustees*, at 482-83. An identity is established when "two suits are for or [are] in respect to the same claim ... [or] if they are based on substantially the same operative facts, regardless of the relief sought in each suit." *Id.*

The Plaintiffs here raised three causes of action in their complaint: (1) Title II of the Americans with Disabilities Act (ADA) of 1990; 42 U.S.C. §§12131 et. seq.; (2) The Rehabilitation Act of 1973, as amended, 29 U.S.C. §794(a); and (3) The Social Security Act, 42 U.S.C. §1396, and its implementing regulations. *See* Plaintiffs Complaint at ¶ 1. Each and every one of the aforementioned causes of action were raised in *Martin*. Since each of the claims brought by the present Plaintiffs was also brought by class Plaintiffs in *Martin*, and since such claims arise from substantially the same conduct that was at issue in *Martin*, the fourth element of res judicata is satisfied.

As the foregoing analysis and argument demonstrate, all the elements of res judicata have been met. The *Martin* court resolved the present matters in a final disposition via a Consent Order. The parties to the present suit are the same parties represented in *Martin*. The issues raised in this case were actually litigated in *Martin*, and the causes of action alleged by Plaintiffs are identical

to those in *Martin*. Accordingly, the Plaintiffs' Complaint should be dismissed with prejudice.

## V. ADA CLAIMS BROUGHT BY PLAINTIFFS NAROWITZ AND HAMILTON ARE NOT RIPE AND MUST BE DISMISSED.

In their first and second claims for relief, Plaintiffs Narowitz and Hamilton allege that defendants have "subject[ed] them to serious risk of segregation, in large ICFs . . . ." Complaint, doc. 1 ¶ 208. But neither Narowitz nor Hamilton have entered a large ICF, and their allegations show that it is entirely speculative that they will do so in the near or even distant future. Their claims that the State has subjected them to a "serious risk of segregation" are not ripe.

Federal courts should avoid "premature adjudication" of unripe claims. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967). They should not "entangl[e] themselves in abstract disagreements over administrative policies" and should "protect . . . agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* at 148-49. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998).

### A. It is speculative that Narowitz or Hamilton will ever move into a large ICF.

Here, Narowitz and Hamilton seek greater access to "home and community-based services required to . . . prevent unnecessary institutionalization . . . in large ICFs . . . ." Doc. 1 ¶ 208. But the "risk of institutionalization" that Narowitz and Hamilton allege that they face cannot lead to institutionalization in a large ICF without many intervening events—it is speculative that Narowitz or Hamilton will ever enter a large ICF. The Seventh Circuit Court of Appeals recently held that similar claims were not ripe and should be dismissed. In *Amundson ex rel. Amundson v. Wisconsin*

*Department of Health*, that Court considered a decision by the State of Wisconsin to reduce funding for disabled people living in group homes. 721 F.3d 871, 872 (7th Cir. 2013). The Plaintiffs claimed that the "reduction in the state's payments increase[d] the risk that they [would] be moved from group homes to institutions." *Id.* Judge Easterbrook held that because no one had been placed in an institution and the State had protections in place that could prevent their institutionalization, the dispute was not ripe: "Plaintiffs fear the worst, but their fears may be unwarranted." *Id.* at 874.

In this case, the chances that Narowitz or Hamilton will ever be placed in a large ICF are even more attenuated. The Plaintiffs in *Amundson* lived in community settings paid for by the State, and Wisconsin reduced the funding available for the services they received. But neither Narowitz nor Hamilton are receiving a service that they allege is being cut back. Instead, they fear that a change in their personal circumstances will render current options insufficient to keep them out of a large ICF. Those personal changes and the consequences that may flow from them are speculative. Plaintiffs allege that Mr. Narowitz lives at home with his 62- and 66-year-old parents "who are his primary caregivers." Doc. 1 ¶ 52. They allege that "[h]is parents worry about their continued ability to provide adequate care for Mr. Narowitz at home." *Id.* ¶ 58. Plaintiffs do not allege what change from the status quo would lead him to move out of his home and into a large ICF—nor could they without speculating.

Similarly, Plaintiffs allege that Mr. Hamilton lives at home with his 56-year-old mother. Plaintiffs allege only that she "is concerned about her continued ability to care for Mr. Hamilton at home due to her age and level of exhaustion and limited financial resources." *Id.* ¶ 60. But it is unclear if or when Mr. Hamilton's mother will decide not to care for her son in her home due to

"her age and level of exhaustion and limited financial resources," or if some other circumstance will require Mr. Hamilton to move out of his home. *Id.* ¶ 60.

Where Plaintiffs may move someday is also speculative. Plaintiffs simply assert that Narowitz and Hamilton face a "serious risk of institutionalization," but offer no facts to support that claim. Even if it does someday come to pass that Mr. Narowitz or Mr. Hamilton must move out of their parents' homes—and it may not—it is far from certain that they will move into a large ICF, the outcome they seek to avoid. Both Mr. Narowitz and Mr. Hamilton allege that they are on waiting lists for waivers that could pay for them to live in community settings other than their parents' homes. *Id.* ¶¶ 55, 62. But they do not allege that now or any time in the past they have wanted or needed to move into a different community setting. If their needs change or if their families can no longer take care of them, Narowitz and Hamilton will likely be given priority or emergency status on the waiting lists that they allege they are already on, and may get access to a different community living setting or different community supports quickly. *See* Ohio Rev. Code § 5126.042(A).

Of course, should Narowitz or Hamilton need to leave their parents' homes, and they do not like the other community living options available, they could choose to move into an ICF, as many do. Even in the unlikely scenario that an ICF is, at some future time, the only choice available to Narowitz or Hamilton, it is purely speculative that they would move into a large ICF— the setting they seek to avoid. There are more than 100 ICFs in Ohio that can accommodate 7 or fewer residents, and Plaintiffs do not claim that moving into one of these smaller settings represents discrimination under the Americans with Disabilities Act.

**B.** **Because Narowitz and Hamilton's claims are not ripe, this Court cannot conduct the analysis required by the Supreme Court in *Olmstead*.**

The Supreme Court has carefully described the analysis that this Court must conduct in assessing Plaintiffs' claims, but because Narowitz and Hamilton's claims are not ripe, this court will not be able to do so. In *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999), the Supreme Court recognized that the ADA "may require placement of persons with mental disabilities in community settings rather than in institutions." In *Olmstead*, the Court considered the claims of two Plaintiffs with mental disabilities who wished to receive necessary medical care in the community, rather than in the State institutions in which they resided. The Court held that the State of Georgia must provide the Plaintiffs with care in the community in narrow circumstances:

> [W]hen the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Id.* Because Narowitz and Hamilton's claims are not ripe, this Court will not be able to conduct the last step of the analysis required by *Olmstead* and determine whether a hypothetical community placement could be reasonably accommodated. Neither Narowitz nor Hamilton alleges that he wants a different community placement *now*. But, circumstances could change, and either could desire to move elsewhere in the community in the future. For example, their parents' physical, mental, or financial circumstances could change, requiring Narowitz or Hamilton to move. Or, they could experience a decline in physical or mental health, making their current living situations unworkable. Either of these changes could, in theory, happen in a few days, a few years, or never.

But *Olmstead* requires a concrete analysis of whether a *specific* community placement can be reasonably accommodated in light of "the resources available to the State and the needs of others." *Id.* Narowitz or Hamilton could seek a different community placement because of

declining health years in the future.  But this Court cannot estimate what Plaintiffs' hypothetical needs will be years down the line, nor can it speculate as to what resources will be available to the State in ten, fifteen, or twenty years, or what other needs the State will need to account for at that time.

Because it is premised on a concrete analysis of a Plaintiffs' present needs and desires, *Olmstead* also requires that the "State's treatment professionals have determined that community placement is appropriate." *Id.*  Neither Narowitz nor Hamilton allege that any such determination has occurred.  And why would the State have conducted any such analysis?  Neither Narowitz nor Hamilton wants, right now, to live anywhere other than where they are—in their parents' homes.  When there is any non-speculative likelihood that they will want to live somewhere else, then the State will conduct that analysis, and the dispute—if there is any—will be based on facts, not guesses.

> **C.     Cases in which courts have allowed *Olmstead* claims to proceed based on a serious risk of institutionalization are distinguishable from this case.  The risks faced by Plaintiffs in those cases are concrete and caused by state action.**

Four United States Courts of Appeals have held that, in some cases, Plaintiffs may state a claim under *Olmstead* without alleging that they have been institutionalized.  These courts have considered cases where Plaintiffs meet the other *Olmstead* elements and, because of a change in state policy, they face a serious risk of unjust institutionalization.  Neither the Supreme Court nor the Sixth Circuit has considered such a case, but this Court need not speculate as to whether either court would extend *Olmstead* to new factual scenarios.  When courts have allowed *Olmstead* claims to proceed based on a risk of institutionalization, they have not done so when the risk is potential, contingent, or speculative, but when a change in state policy causes the recipient to face a present risk that could foreseeably lead to the plaintiff's institutionalization in the future.

For example, in *Fisher v. Oklahoma Health Care Authority*, 335 F.3d 1175, 1177-78 (10th Cir. 2003), the Tenth Circuit considered a change in Oklahoma policy in which Plaintiffs receiving home and community based services could, going forward, only receive five medically-necessary drug prescriptions, but nursing facility residents could continue to receive coverage for an unlimited number. The Plaintiffs lived in the community, and asserted that "imposition of the five-prescription cap will force them out of their communities and into nursing homes in order to obtain the care that is medically necessary." *Id.* The Plaintiffs faced a *present* risk of institutionalization that was caused by the state. The Tenth Circuit concluded that "*Olmstead* does not imply that disabled persons who, by reason of a change in state policy, stand imperiled with segregation, may not bring a challenge to that state policy . . . without first submitting to institutionalization." *Id.* at 1182.

Similarly, in *Pashby v. Delia*, 709 F.3d 307, 314 (4th Cir. 2013), the Fourth Circuit considered North Carolina's decision to impose new eligibility criteria on assistance with tasks of daily living provided to people in the community, but not upon those in institutions. The court found that the policy "effectively relegates" Plaintiffs to institutions because they "could not live on their own without in-home [personal care services] or . . . it would be unsafe for them to do so." *Id.* at 321, 322. Like the Court in *Fisher*, the Fourth Circuit allowed the case to proceed where the policy change would cause, but had not yet caused, Plaintiffs to move into institutions. *Id.* at 322; *see also Davis v. Shah*, No. 14-543-cv, 2016 WL 1138768 at *24 (2d Cir. Mar. 24, 2015) ("It is undisputed that at least some of the Plaintiffs suffer from disabilities, which could be ameliorated by the services New York now denies to them, and that, without those services, would lead to their institutionalization."); *M.R. v. Dreyfus*, 697 F.3d 706, (9th Cir. 2012) ("[A] plaintiff need only

show that the challenged state action *creates* a serious risk of institutionalization." (emphasis added)).

These cases stand for the proposition that the risk of institutionalization alleged by a plaintiff asserting an *Olmstead* claim must be *caused by a state action or a change in state policy*. But Plaintiffs Narowitz and Hamilton do not know and do not allege *why* they will face a future risk of institutionalization. They could face a risk of institutionalization because their parents' physical or financial characteristics change and they can no longer provide them with care; they could face a risk of institutionalization because their own health declines; or they could never face a serious risk of institutionalization. Unlike the Plaintiffs in *Fisher*, *Pashby*, *Davis*, and *M.R.*, Narowitz and Hamilton do not identify any change in state policy that has caused their alleged risk of institutionalization. Nor do they meet the standard advocated by the Department of Justice, which also argues that a substantial risk of institutionalization is sufficient for an *Olmstead* claim: "For example, a plaintiff could show sufficient risk of institutionalization to make out an *Olmstead* violation if a public entity's failure to provide community services or its cut to such services will likely *cause* a decline in health, safety, or welfare that *would lead to the individual's eventual placement in an institution*." United States Department of Justice, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.*, available at http://www.ada.gov/olmstead/q&a_olmstead.htm (emphasis added).

Narowitz and Hamilton want the State to guarantee that they will *never* face a substantial risk of entering a large ICF for *any reason*. But in *Olmstead*, the Supreme Court held that the ADA provides no such guarantee: "We do not in this opinion hold that the ADA imposes on the States a standard of care for whatever medical services they render, or that the ADA requires States

to provide a certain level of benefits to individuals with disabilities." 527 U.S. at 603 n. 14 (internal quotation marks omitted); *see also M.R. v. Dreyfus*, 697 F.3d at 713 (Bea, J. dissenting from denial of rehearing en banc) ("What *Olmstead* did not hold—indeed what it specifically stated it was *not holding*—was that any sort of a level of services must be provided to *prevent* institutionalization, else the recipient would suffer discrimination."). But a standard of care is what Narowitz and Hamilton seek. Instead of considering whether the State can reasonably accommodate their needs and help them remain in the community, Narowitz and Hamilton want the State to guarantee they will not *ever* enter an institution, no matter what future challenges they may face. But they can only speculate as to how any risk of entering an institution will come to fruition. This speculation at the heart of their case demonstrates why Narowitz's and Hamilton's claims are not ripe.

## VI. THE ABILITY CENTER DOES NOT HAVE STANDING TO BRING THIS SUIT AS AN ASSOCIATION.

To the extent it alleges standing based on the standing of its associational members, the Ability Center must be dismissed as a plaintiff in this action. An organization only has standing to bring a lawsuit on behalf of its members if, among other requirements, it has members and the individual participation of those members is unnecessary to resolve the complaint. The Ability Center does not have members, and even if it did, the *Olmstead* claim brought here requires the individual participation of members to resolve. These two factors defeat any claim the Ability Center may have to association standing in this case.

The Supreme Court has established a three-prong test for associational standing: "An association has standing to bring suit on behalf of its members when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested require the

participation of the individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 343 (1977).

The first prong of the test requires the association to have members, or at least, if not formal members, constituents with indicia of membership. *Hunt* at 344-45. The *Hunt* Court concluded that the Washington State Apple Advertising Commission, a state agency charged with the promotion and protection of the State's apple industry on behalf of apple growers and dealers, did not have members but nevertheless satisfied the first prong of the test. *Id*. The Court reasoned that, although the Commission did not have "members" in the "traditional" sense, its "constituency" possessed "all the indicia of membership." *Id*. Specifically, the Court noted as indicia of membership that the apple growers and dealers "alone elect the members of the Commission, they alone may serve on the Commission; they alone finance its activities, including the cost of this lawsuit, through assessments levied on them." *Id*.

Individuals with intellectual or developmental disabilities, a subset of the Ability Center's constituents, do not meet the *Hunt* standard because they are not members of the Ability Center, and they have none of the indicia of membership identified by the Court in *Hunt*. They do not elect members of the Ability Center Board of Trustees, they alone do not serve on the Board, they do not have a controlling presence on the Board, and there is no reference in the complaint to how the Ability Center is financed. Comp. at ¶75-78. Indeed, the only reference to the role that individuals with intellectual or developmental disabilities play in the Ability Center is a mention in the complaint that four members of the Center's Board of Trustees are individuals with intellectual and developmental disabilities or parents of people with intellectual or developmental disabilities. Complaint, doc. 1 ¶ 75. The indicia of membership that existed in *Hunt* do not exist here.

The Second Circuit reached a similar conclusion in *Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc*, 675 F.3d 149 (2nd Cir. 2012), and the same reasoning should apply here. In *Disability Advocates, Inc.*, a contractor to New York's Protection and Advocacy System brought suit against State entities for an alleged *Olmstead* violation. *Id.* at 152. The court concluded that because Disability Advocates, Inc. did not have the indicia of membership required of nonmembership organizations for associational standing, it failed to satisfy the standing requirements of Article III of the United States Constitution. *Id.* Specifically, the court noted that there was scant evidence in the record that individuals with mental illnesses, whom Disability Advocates, Inc., claimed to represent had "the power to elect its directors, make budget decisions, or influence [its] activities or litigation strategies." *Id.* at 159. The same deficiencies mar the complaint here. There is no evidence that individuals with intellectual or developmental disabilities are so involved in the operation and management of the Ability Center to create the indicia of membership for these constituents.

The Ability Center also fails the third prong of the *Hunt* test because the *Olmstead* claim brought here requires the individual participation of its members. As an example, a complaint that raises "a pure question of law" might be resolved without considering the unique circumstances of an association's individual members. *See International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Brock*, 477 U.S. 274, 287 (1986). But that is not the case here. Each of Plaintiffs' claims requires some specific allegations and evidence about individual Plaintiffs. For example, the first and second claims alleging disability discrimination under the ADA and Rehabilitation Act, require the plaintiff to allege and prove that they want to and can safely receive services in the community. *See Olmstead*, 527 U.S. at 587. Similarly, Plaintiffs' third claim rests on the idea that individuals have been "denied the opportunity to make

an informed decision regarding alternatives to institutionalization in large ICFs." Complaint, doc. 1 ¶ 223. Individuals associated with the Ability Center could not prevail as Plaintiffs without individual participation in this case—they need to provide evidence of the individual-specific facts necessary to prevail.

Because the Ability Center has no members, and no associates with indicia of membership, and because Plaintiffs' individual participation in the lawsuit is indispensable, the Ability Center lacks associational standing.

## VII.   PLAINTIFFS' CANNOT ENFORCE THEIR MEDICAID ACT CLAIMS HERE, AND THEY LACK STANDING TO BRING THEM.

Plaintiffs allege that the Defendants violated two provisions of the Medicaid Act by failing to evaluate and inform Plaintiffs of their eligibility for a more integrated placement. But they cannot enforce those claims here. Assuming that Plaintiffs seek to enforce these provisions under section 1983, this argument should fail because the statutes do not contain sufficient rights-creating language and are not privately enforceable. But even if these statutes were privately enforceable, Plaintiffs lack standing to challenge them. Plaintiffs complain that they were not told about alternatives to placement in ICFs, yet each plaintiff alleges that he or she is on a waiver waiting list, so they clearly did learn of the existence of alternatives, and were not harmed by not being given information at a specific moment.

Privately-enforceable federal rights can be created only by Congress, and Congress does this through the statutory language. See *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002). In *Gonzaga*, the U.S. Supreme Court explicitly adopted this logic and applied it to Section 1983 cases:

> We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983. Section 1983 provides a remedy only for the deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. Accordingly, it is *rights,*

not the broader or vaguer "benefits" or "interests," that may be enforced under the authority of that section.

*Gonzaga*, 536 U.S. at 283 (emphasis in original).

In order to create a federal right, a federal statute "must be phrased in terms of the persons benefited," such as language found in Title VI of the Civil Rights Act of 1964 and in Title IX of the Education Amendments of 1972—which contain provisions starting with "No person in the United States shall…be subjected to discrimination…." See *Gonzaga*, 536 U.S. at 284 (citation omitted). The Court noted that these provisions are "phrased 'with an unmistakable focus on the benefited class.'" See *id.* (citations omitted). This unmistakable focus is necessary for a court to find a privately-enforceable right.

While the Sixth Circuit, in a pre-*Gonzaga* case, *Wood v. Tompkins*, 33 F.3d 600, 611 (6th Cir. 1994), did find 42 U.S.C. 1396n(c)(2)(B) and (C) privately enforceable, analysis under the *Gonzaga* standard would reach the opposite conclusion. *Wood v. Tompkins* analyzed the question of whether section 1983 created a private cause of action for violations of federal statutes by using the *Wilder* test, which asked first "[w]as the provision in question intended to benefit the plaintiff?" *Wood*, 33 F.3d at 604 (citing *Wilder v. Virginia Hosp. Ass'n*, 496 US. 498, 506 (1990)). But *Gonzaga* rejected the notion that a person who merely benefits from a law has enforceable rights under section 1983 and "any cases premised upon a 'benefits' analysis must be reexamined in light of *Gonzaga*." *Johnson v. City of Detroit*, 446 F.3d 614, 624 (6th Cir. 2006). The statutes at interest here may provide benefits to Plaintiffs but they do not provide enforceable rights.

The text of 42 U.S.C. 1396n(c)(2) begins with this phrase: "[a] wavier shall not be granted under this subsection unless the State provides assurances satisfactory to the Secretary that –." "Assurances satisfactory to the Secretary" is not the type of unambiguous rights-creating language required by *Gonzaga*. Indeed, "the 'assurances' that the state must provide are no less fuzzy or

28

amorphous than the 'reasonable efforts' held not to create a private right of action in *Suter*." *Wood*, 33 F.3d 614 (Batchelder, dissenting). "A waiver shall not be granted" also does not make this rights-creating language. In fact, that phrase is comparable to the "[n]o funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice" language in the Family Educational Rights and Privacy Act that the Court found not to be rights-creating language in *Gonzaga*. *Gonzaga*, 466 F.3d at 279.

And while the specific provisions of 1396n(c)(2)(B) and (C) come closer to being focused on the individual, they still fall short. The kind of language that the U.S. Supreme Court found to be "phrased in terms of the persons benefited" and "phrased with an unmistakable focus on the benefited class" was essentially this: "No person shall be subject to discrimination." See *Gonzaga*, 536 U.S. at 284. "Where a statute does not include this sort of explicit 'right- or duty-creating language' we rarely impute to Congress an intent to create a private right of action." *Gonzaga*, 536 U.S. 284 n.3 (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 690 n. 13 (1979). A statute that tells a State that a waiver will not be approved by the Secretary unless it makes assurances that individuals will receive information about feasible alternatives does not rise to this rights-creating level. *See M.A.C. v. Betit*, 284 F. Supp. 2d 1298, 1307 (D. Utah 2003) (holding that "the freedom of choice provisions do not contain the unambiguous rights-creating language of Gonzaga, and consequently, there is no private right of action based on these provisions."); *Gaines v. Hadi*, No. 06-60129-CIV-SEITZMC, 2006 WL 6035742, at *23-24 (S.D. Fla. Jan. 30, 2006) (disagreeing with *Wood v. Tompkins* and holding that "with all due respect to the Wood court's conclusion, this Court finds that section 1396n(c)(2) provides no private right of action.")

Even if these provisions were privately enforceable, and they are not, Plaintiffs would not have standing to enforce them. 42 U.S.C. § 1396n(c)(2)(C) requires the State to give assurances

that it inform people who are "likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility . . . of the feasible alternatives, if available under the waiver . . . ." To have standing, each plaintiff must allege "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334, 2341 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Plaintiffs fail the first element. They claim that defendants should have told them about Medicaid waivers. But, if they were not told, they suffered no harm from that omission—they all allege that they have known for years that waiver services may be available. For example, plaintiff Phyllis Ball alleges that she was told that "she could place herself on a waiting list for home and community-based waiver services" nearly twenty years ago. Doc. 1 ¶ 18. She does not allege that she did so. But every other individual plaintiff did. *See id.* ¶¶ 26, 40,47, 55, 62. Plaintiffs Butler, Mason, Walters, Narowitz, and Hamilton all allege that they are on a waiting list for home and community-based waiver services. Given that they have taken steps to seek waiver services, they cannot claim that they are harmed by not knowing about such services.

## VIII.  CONCLUSION

For the foregoing reasons, Defendants Martin and McCarthy request that this Court dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

Respectfully submitted,


CRABBE BROWN & JAMES, LLP

MICHAEL DEWINE
Ohio Attorney General


/s/ *Larry James*

**LARRY H. JAMES  (0021773)\***
\*Trial Attorney
**ROBERT C. BUCHBINDER (0039623)**
500 South Front Street
Suite 1200
Columbus, Ohio 43215
Phone: (614) 229-4567
ljames@cbjlawyers.com
RBuchbinder@cbjlawyers.com
*Counself or Defendand John Martin*

/s/ *Jeffrey Jarosch*

**JEFFREY JAROSCH (0091250)\***
\*Trial Attorney
**ALLAN SHOWALTER (0084032)**
Assistant Attorneys General
30 East Broad Street, 26th Floor
Columbus, Ohio 43215
(614) 644-8946 — phone
(866) 471-2611 — fax
jeffrey.jarosch@ohioattorneygeneral.gov
allan.showalter@ohioattorneygneral.gov
*Counsel for Defendant John McCarthy*

31

### Certificate of Service

The undersigned herein certifies that a true and accurate copy of the foregoing MOTION TO DISMISS was filed electronically on June 27, 2016.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic fling receipt.  Parties may access this filing through the Court's system.

*/s/  Larry H. James*
**LARRY H. JAMES (0021773)**