IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

PHYLLIS BALL, *et al.*,                    :          Case No.: **2:16-cv-282**

       **Plaintiffs,**                            :          **Judge Sargus**

**v.**                                     :          **Magistrate Judge Deavers**

**JOHN KASICH**, *et al.*,                 :

       **Defendants.**                            :

---

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

---

Kerstin Sjoberg-Witt (0076405)
ksjoberg-witt@disabilityrightsohio.org
Trial Attorney
Kevin J. Truitt (0078092)
ktruitt@disabilityrightsohio.org
Alison McKay (0088153)
amckay@disabilityrightsohio.org
DISABILITY RIGHTS OHIO
50 West Broad Street, Suite 1400
Columbus, Ohio 43215
Telephone: 614-466-7264
Facsimile: 614-644-1888

Counsel for Plaintiffs

Neil R. Ellis
nellis@sidley.com
Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: 202-736-8075
Facsimile: 202-736-8711

Kristen E. Rau
krau@sidley.com
Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603
Telephone: 312-853-9274
Facsimile: 312-853-7036

Cathy E. Costanzo
ccostanzo@cpr-ma.org
Anna M. Krieger
akrieger@cpr-ma.org
Kathryn Lesley Rucker
krucker@cpr-ma.org
Center for Public Representation
22 Green Street
Northampton, Massachusetts 01060
Telephone: 413-586-6024
Facsimile: 413-586-5711

Samuel R. Bagenstos
sbagen@gmail.com
625 South State Street
Ann Arbor, Michigan 48109
Telephone: 734-647-7584

*Pro hac vice* Counsel for Plaintiffs

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ................................................................................. viii

INTRODUCTION..................................................................................................... 1

STATEMENT OF THE CASE ............................................................................... 2

    I.   OHIO'S RELIANCE ON SEGREGATED RESIDENTIAL PLACEMENTS CONTINUED AFTER THE TERMINATION OF THE *MARTIN* CONSENT ORDER ........................................................................................................................ 3

    II.  DEFENDANTS CONTINUE TO RELY OVERWHELMINGLY ON SEGREGATED EMPLOYMENT AND DAY SETTINGS, A MATTER THAT THE *MARTIN* CONSENT ORDER DID NOT ADDRESS ........................................ 5

    III. DEFENDANTS' EFFORTS, UNDERTAKEN SINCE PLAINTIFFS' COUNSEL SENT A DEMAND LETTER ANTICIPATING THIS LAWSUIT, ARE INSUFFICIENT TO ADDRESS THE ONGOING UNNECESSARY SEGREGATION ........................................................................................................................ 7

STANDARD OF REVIEW ..................................................................................... 9

ARGUMENT ............................................................................................................ 10

    I.   NEITHER THE *MARTIN* CONSENT ORDER NOR GENERAL *RES JUDICATA* PRINCIPLES BAR THE CLAIMS IN THIS SUIT, WHICH CHALLENGE ONGOING LEGAL VIOLATIONS................................................................. 10

    A.   Under Basic *Res Judicata* Principles, A Prior Judgment Does Not Bar Plaintiffs From Seeking Relief For Continuing Violations Of The Law. ....................................... 11

Because the *Martin* Consent Order was a consent judgment, it had only claim-preclusive, and not issue-preclusive, effect. *Arizona v. California*, 530 U.S. 392, 414 (2000). And as *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 (1955) held, and the Sixth Circuit reaffirmed in *Bronson v. Bd. of Ed. of City Sch. Dist. of Cincinnati*, 525 F.2d 344, 349 (6th Cir. 1975), and *Pram Nguyen ex rel. U.S. v. City of Cleveland*, 534 Fed. Appx. 445, 453 (6th Cir. 2013), the continuation of unlawful conduct following the conclusion of a prior action creates a new claim that is not barred by *res judicata*.

    B.   The *Martin* Consent Order, Which Expired In 2009, Is Consistent With Basic *Res Judicata* Principles. ....................................................................................... 13

The *Martin* Consent Order was entered in 2007 and terminated in 2009, and by its plain terms imposed obligations on the State for only a two-year period and provided a one-time expansion of Ohio's community-based services system. Defendants seek to read that Consent Order as foreclosing claims of ongoing violations forever into the future. But it did not seek to resolve, for all time, all claims by all adults with intellectual and developmental disabilities that they are inappropriately denied community-based services. The Consent Order's release provision explicitly applies to "current and future claims or actions"—but only "regarding any and all matters that are or could have been brought as part of this litigation." Doc. 27-1 at 9 ¶ 6. Claims that the State continues to violate federal law after termination of the *Martin* Consent Order could not have been brought as part of that litigation since it had already concluded. *See Pram Nguyen*, 534 F. App'x at 452.

**C.     This Case Concerns Defendants' Ongoing Violations Of The Law And Thus Is Not Barred By _Res Judicata_ Or The _Martin_ Consent Order.**...........................................18

The Complaint in this case does not base its claims on discrete, past actions. Rather, it alleges continuing violations of the Plaintiffs' rights. This case is thus controlled by two cases in which the Sixth Circuit applied the Supreme Court's Lawlor principle and allowed the plaintiffs to challenge ongoing violations notwithstanding earlier judgments involving earlier iterations of the same conduct: Bronson, supra, and Cellar Door Productions, Inc. of Michigan v. Kay, 897 F.2d 1375 (6th Cir. 1990).

**D.     This Case's Focus On Segregation In Employment And Day Services, As Well As Salient Factual And Legal Developments Since _Martin_, Provide An Independent Basis For Concluding That The _Martin_ Consent Order Does Not Bar This Suit**.........21

The _Martin_ litigation challenged the State's unnecessary segregation in residential placements; it did not challenge unnecessary segregation in employment settings and other day services. This case, by contrast, squarely challenges Plaintiffs' employment and day segregation and relies on numerous post-2009 developments in that area. The Complaint also notes recent changes to the relevant Medicaid regulations, and underlying facts continue to change. These differences present an independent reason to deny the motion.

**II.  THE CLAIMS OF THE AT-RISK PLAINTIFFS ARE RIPE FOR ADJUDICATION.**...............................................................................................23

**A.     State Policies And Practices That Create A Serious Risk Of Unnecessary Institutionalization Give Rise To A Ripe _Olmstead_ Claim, Even If Institutionalization Is Not Imminent**...............................................................................................23

The authoritative Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the ADA and _Olmstead v. L.C._ (2011), and the holdings of numerous courts of appeals make clear that Plaintiffs need not be on the doorstep of institutional placement, or allege that their risk of admission is a near certain outcome, in order for their claims to be ripe. _See, e.g., Steimel v. Wernert_, 2016 WL 2731505 (7th Cir.) (May 10, 2016); _Davis v. Shah_, 821 F.3d 231 (2nd Cir. 2016); _Pashby v. Delia_, 709 F.3d 307 (4th Cir. 2013); _M.R. v. Dreyfus_, 663 F.3d 1100 (9th Cir. 2011); _Fisher v. Oklahoma Health Care Authority_, 335 F.3d 1175 (10th Cir. 2003).

**B.     Neither Case Law Nor Authoritative DOJ Pronouncements Limit _Olmstead_ At-Risk Claims To Instances In Which The State Makes A Cut To Pre-Existing Services.** ..................................................................................................................................28

Defendants concede, and the Department of Justice has made clear, that a cut to services is only one way in which a plaintiff could show sufficient risk of institutionalization to make out an _Olmstead_ violation. Other courts have allowed at-risk claims to proceed when a state's ongoing administration of its service system, and its failure to provide adequate community-based services, placed the plaintiffs at serious risk of institutionalization. _See, e.g., O.B. v. Norwood_, 2016 WL 1086535 (N.D. Ill. March 21, 2016); _Kenneth R. v. Hassan_, 293 F.R.D. 254 (D.N.H. 2013); _Lane v. Kitzhaber_, 283 F.R.D. 587 (D. Or. 2012).

**C.     Plaintiffs Narowitz And Hamilton Have Sufficiently Alleged That They Face A Serious Risk Of Institutionalization Because Of The State's Failure To Provide Sufficient Community-Based Services, Making Dismissal Under Fed. R. Civ. P. 12(b)(1) Inappropriate.**...............................................................................................32

Like thousands of at-risk class members, Plaintiffs' continuing, unmet needs are outpacing the capacity of aging caregivers, forcing them to choose between living at home without sufficient services or going to an ICF. Plaintiffs' Complaint and supplemental pleadings connect this risk of unnecessary institutionalization with identified actions by the Defendants, including their funding and maintenance of segregated ICF facilities and corresponding limitations on access to integrated, community-based services. In addition, Plaintiffs' allegations of segregation in existing work programs are sufficient to establish a present and cognizable legal injury pursuant to the Integration Mandate under Title II of the Americans with Disabilities Act (ADA). *Steimel v. Wernert*, 2016 WL 2731505 (7th Cir. May 10, 2016).

**III. THE ABILITY CENTER HAS STANDING TO SUE.** ........................................... 35

**A.     The Ability Center** ................................................................................... 36

**B.     Defendants Fail To Challenge The Ability Center's Standing To Sue On Its Own Behalf.** ................................................................................................................... 37

The Ability Center has devoted significant resources to identifying and counteracting Defendants' unlawful service system for people with intellectual and developmental disabilities, which impedes its capacity to carry out its mission to ensure community integration for people with disabilities. It has suffered direct harm as a result of Defendants' unlawful system and therefore has standing to sue on its own behalf. *American Canoe Ass'n, Inc. v. City of Louisa Water and Sewer Comm'n*, 389 F.3d 536, 544 (6th Cir. 2004).

**C.     The Ability Center Has Standing To Sue On Behalf Of Its Constituents.** .......... 38

The Ability Center also has standing to redress the injuries Defendants' unlawful service system causes its constituents. It has pled sufficient facts to demonstrate associational standing, which requires that it demonstrate that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

**1.     The Ability Center Has Sufficient "Indicia Of Membership" To Satisfy The *Hunt* Test.** ........................................................................................................ 39

Despite not being a traditional membership organization, the Ability Center nevertheless has constituents who "possess the means to influence the priorities and activities [it] undertakes." *Oregon Advocacy Center v. A.J. Madison*, 322 F.3d 1101, 1112 (9th Cir.2003). The Complaint alleges that its constituents include people with intellectual and developmental disabilities in large ICFs and those at serious risk of admission to such facilities. Furthermore, people with disabilities make up the majority of the Ability Center's Board of Trustees and a majority of its staff and also perform leadership functions. The Ability Center also regularly collaborates with local disability organizations and taskforces, maintains a grievance process, and relies on surveys from constituents to inform the work it does.

**2.     The Claim Does Not Require Individual Participation Of The Ability Center's Members.** ................................................................................................................... 43

The Sixth Circuit has held that, when an organization is seeking prospective or injunctive relief on behalf of its members, their individual participation is unnecessary. *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004). Despite Defendants' assertion that specific allegations and evidence are needed about each individual, this reasoning has been rejected by another case involving the Ability Center. *Ability Center of Greater Toledo v. Lumpkin*, 808 F.Supp.2d 1003, 1019 (N.D. Ohio 2011). "While the facts of each individual constituent's [case] may differ, the same flawed … process affects all subject to it; relief would likewise benefit all those members." *Id.* at 1020.

**3.     The Ability Center Has Previously Established Associational Standing In Factually Similar Circumstances.**...................................................................................... 44

The Ability Center was explicitly found to have met the test for associational standing in *Ability Ctr. of Greater Toledo v. Lumpkin*, 808 F. Supp. 2d 1003 (N.D. Ohio 2011), and its standing was not challenged at any level of the proceedings, either at the district court level or at the Sixth Circuit, in *Ability Ctr. Of Greater Toledo v. Sandusky et al.*, 385 F.3d 901 (6th Cir. 2004), a class action lawsuit challenging a city's failure to ensure accessible sidewalks and street curbs for people with disabilities.

**IV.  PLAINTIFFS HAVE STANDING AND A 42 U.S.C. § 1983 RIGHT OF ACTION TO PURSUE THEIR CLAIMS UNDER THE SOCIAL SECURITY ACT.** ................ 45

**A.     The Provisions Of The Social Security Act On Which Plaintiffs Rely Are Enforceable Through 42 U.S.C. § 1983.**............................................................................. 45

An examination of precedent from the Sixth Circuit and other federal courts applying the Supreme Court's decision in *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002), as well as the actual text of 42 U.S.C. § 1396n(c)(2)(B) and (C), demonstrate that these statutory provisions are individually focused and contain sufficient "rights-creating language." Plaintiffs' claims under the Social Security Act are therefore privately enforceable through 42 U.S.C. § 1983

**B.     Plaintiffs Have Standing To Pursue Their Medicaid Claim, Because The State Has Never Provided Them A Meaningful Choice Between Institutional Care And Home And Community-Based Services.** ........................................................................... 49

Plaintiffs not only have a right to information about feasible alternatives to institutional care available through Defendants' waiver programs, but also a right to choose between these two alternatives. *Ball v. Rodgers*, 492 F.3d 1094, 1107 (9th Cir. 2007); 42 C.F.R. § 441.302(d); 42 C.F.R. § 441.303(d). Plaintiffs in large ICFs have alleged sufficient facts that they have been harmed by the Defendants' failure to provide them information about these options and a meaningful choice between the two, both before entering the ICF and also as their institutionalization continues. Plaintiffs at serious risk of institutionalization have been harmed by their current segregation and by Defendants' failure to provide information about alternatives which may prevent their unnecessary institutionalization. Dismissal of Plaintiffs' claims is not warranted before a fuller development of the facts on these matters can occur. *Steward v. Abbott*, No. 5:10-CV-1025-OLG, slip. op. (W.D. Tex. May 17, 2016).

**V.   GOVERNOR KASICH IS A PROPER DEFENDANT** ........................................... 53

**A.     The Claims Against Defendant Kasich Are Properly Brought Under *Ex parte Young***................................................................................................................................ 53

Ex parte Young, as an exception to the Eleventh Amendment, permits private plaintiffs to bring cases against state officials in their official capacities that "seek prospective relief to end a continuing violation of federal law." Diaz v. Mich. Dep't of Corr., 703 F.3d 956, 964 (6th Cir. 2013); Ex parte Young, 209 U.S. at 155-56. For Ex parte Young to apply, the state official "must have, by virtue of the office, some connection with the alleged unconstitutional act or conduct of which the plaintiff complains." Floyd v. Cty. of Kent, 454 F. App'x 493, 499 (6th Cir. 2012). Plaintiffs have sued Governor Kasich in his official capacity and for injunctive relief and have alleged he has sufficient connection to the violations of federal law described in the Complaint.

**1.  Many Courts, Including This One, Permit Actions Like Plaintiffs' To Proceed Under *Ex parte Young*** ................................................................................ 54

There is ample precedent in the Sixth Circuit for Defendant Kasich's inclusion as a defendant in this litigation because of his connection to, and involvement in, the service system for people with intellectual and developmental disabilities. *See, e.g.*, *Lawson v. Shelby Cty.*, 211 F.3d 331, 335 (6th Cir. 2000). Notably, the Governor of Ohio was both a defendant and signatory to the *Martin* Consent Order. *See Martin v. Taft*, 222 F. Supp. 2d 940, 952 and 962 (S.D. Ohio 2002); Doc. 27-1 at 11. There was no discussion in that case whether the Governor was a proper defendant and no challenge to his inclusion. *Id.* at 957-60.

**2.  Defendant Kasich Exercises Significant Control Over Key Aspects Of The Systems At Issue In This Case.** ........................................................................ 56

Defendant Kasich has a significant and central role in the service system for people with intellectual and developmental disabilities, including through the creation of his own Office for Health Transformation to ensure compliance with *Olmstead* and to "address Medicaid spending issues." Exec. Order 2011-02K; Doc. 28, Ex. A; Doc. 1 ¶ 82. Additionally, his unique role in the state budget process; his appointment responsibilities; his legal responsibility for ensuring funding for the State's vocational rehabilitation agency, Ohio Rev. Code § 3304.18; and his issuance of an executive order that directly affects Plaintiffs' ability to receive integrated, community-based employment or day services, Exec. Order, 2012-05K, *see* Doc. 1 ¶ 82, 157, 193, are sufficient to warrant his inclusion as a defendant in this matter. *See, e.g.*, *Allied Artists Pictures Corp. v. Rhodes*, 473 F. Supp. 560, 567 (S.D. Ohio 1979), *on reexamination*, 496 F. Supp. 408 (S.D. Ohio 1980), *modified on other grounds*, 679 F.2d 656 (6th Cir. 1982).

**3.  Any Argument That Defendant Kasich Should Be Dismissed As Redundant Is Baseless.** ............................................................................................................ 62

Defendant Kasich should not be dismissed as "redundant" in this lawsuit because the concept of "redundant claims" pertains to claims brought "against agents in their official capacities when the principal entity is also named as a defendant in the suit." *McGath v. Hamilton Local Sch. Dist.*, 848 F. Supp. 2d 831, 838 (S.D. Ohio 2012) (citation omitted). Plaintiffs have sued all Defendants in their official capacities and have not brought claims against the principal entities they represent.

**B.  Immunity Does Not Bar The Rehabilitation Act Claim, And Plaintiffs Have Sufficiently Pled A Rehabilitation Act Claim Against Defendant Kasich.** .................... 63

Plaintiffs have alleged in their Complaint that Defendant Kasich is a recipient of federal funding under Section 504 of the Rehabilitation Act. 29 U.S.C. § 794(b). Where a

v

jurisdictional motion makes a facial challenge to a plaintiff's complaint, as Defendant Kasich's Motion does here, Rule 12(b)(6) standards apply, and all factual allegations must be accepted as true. *See Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

**VI. THE LIMITATIONS ON DISABILITY RIGHTS OHIO'S USE OF CLIENT ASSISTANCE PROGRAM FUNDS PROVIDE NO BASIS FOR DISMISSAL** .......... 67

**A.     Disability Rights Ohio Is Complying With Its Responsibilities As The Protection And Advocacy System And Client Assistance Program**. ................................................. 68

Disability Rights Ohio is the entity designated by the Governor of the state of Ohio to serve as both Ohio's protection and advocacy system and its Client Assistance Program (CAP) agency. Ohio Rev. Code § 5123.60; Ohio Exec. Order No. 2015-10K.  Disability Rights Ohio administers seven protection and advocacy program grants, including the Protection and Advocacy for Individuals with Developmental Disabilities (PADD) program, as well as the CAP grant. Consistent with the Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. § 15001 et. seq., Disability Rights Ohio represents Plaintiffs and the proposed Plaintiff class through its responsibilities under the PADD program and is using the PADD program grant to fund its activities.  It is neither using its CAP grant to fund this litigation nor representing Plaintiffs in this action as part of its CAP responsibilities.

**B.     An Asserted Violation Of The CAP Program's Funding Conditions Does Not Provide A Basis for Dismissing This Action**. ................................................................... 72

Defendant Miller's Motion to Dismiss must be denied since it does not challenge the legal sufficiency of Plaintiffs' Complaint. Furthermore, Disability Rights Ohio, one of Plaintiffs' counsel, is fully complying with the CAP statute since it is using CAP funds for this litigation; regardless, resolution of this question must be determined by the Department of Education, not this Court.

**1.     Because Defendant Miller's Motion Does Not Challenge The Legal Sufficiency Of the Plaintiffs' Claims For Relief, It Offers No Basis For Dismissal** ..................... 72

Defendant Miller moves to dismiss Plaintiffs' Complaint through Federal Rule of Civil Procedure 12(b)(6). A Rule 12(b)(6) motion attacks the sufficiency of the pleadings. *See e.g., Coomes v. Allstate Ins. Co.*, No. 1:10-CV-905, 2011 WL 4005325, at *7 (S.D. Ohio Aug. 9, 2011); *Ndiaye v. CVS Pharmacy 6081*, 547 F. Supp. 2d 807, 810 (S.D. Ohio 2008).  Defendant's Motion does not challenge the sufficiency of the pleadings, but challenges the ability of some of Plaintiffs' counsel to participate in the lawsuit on some of the claims brought by some of the Plaintiffs.  Because this argument is not an appropriate subject of a Rule 12(b)(6) motion, it provides no basis for dismissal.

**2.     The Question Whether Disability Rights Ohio Has Complied With The Terms Of Its CAP Grant Is A Matter To Be Determined By The Department Of Education, Rather Than In This Litigation.** ............................................................................... 74

The CAP statute does not create any right in Defendant Miller, enforceable in this litigation, against any action that is alleged to exceed the terms of the CAP grant. *See* 29 U.S.C. § 732.  Instead, the statutory scheme provides for the Department of Education to review and evaluate the performance of the CAP agency, *see e.g.,* 29 U.S.C. § 710(b); 29 U.S.C. § 711; 29 U.S.C. § 727; 29 U.S.C.§ 732(g)(4), and take action when the grant recipient fails to comply with grant conditions.  20 U.S.C. § 1234c; 20 U.S.C. § 1234, *et seq.*; 34 C.F.R. § 370.40(d); 34 C.F.R. § 75.901, *et seq.*; 34 C.F.R. Part 81, *et seq.*

3.      Because Disability Rights Ohio Is Not Using CAP Funds In This Lawsuit, It Is Fully Complying With The Terms Of The CAP Statute. .................................................. 76

The CAP statute limits the CAP agency from bringing a class action only insofar as it is "carrying out its responsibilities under this section." 29 U.S.C § 732(d); *see also* 34 C.F.R. § 370.45. In representing Plaintiffs in this case, Disability Rights Ohio is not "carrying out its responsibilities under [29 U.S.C. § 732]" because it is not using CAP funds.  *See* 34 C.F.R. § 370.4; 34 C.F.R. § 370.5.  Therefore, the CAP statute has no bearing on this action.  A contrary interpretation would violate congressional intent, the purposes of the PADD program, and the Department of Education's long-standing interpretation of legal requirements under the CAP program.  *See, e.g., Phillips v. Court of Common Pleas, Hamilton Cty., Ohio*, 668 F.3d 804, 810 (6th Cir. 2012); 42 U.S.C. § 15043; *see also* 45 C.F.R. § 1326.21(c); Client Assistance Program, 58 FR 52614-01 (1993).

**CONCLUSION** ...................................................................................................... 79

**CERTIFICATE OF SERVICE** ............................................................................ 80

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ability Ctr. of Greater Toledo v. Lumpkin*,
    808 F. Supp. 2d 1003 (N.D. Ohio 2011).....................................................................38, 43, 44

*Ability Ctr. Of Greater Toledo v. Sandusky*,
    385 F.3d 901 (6th Cir. 2004) ...............................................................................................44

*Allied Artists Pictures Corp. v. Rhodes*,
    473 F. Supp. 560 (S.D. Ohio 1979) ......................................................................................60

*Am, Canoe Ass'n, Inc. v. City of Louisa Water and Sewer Comm'n*,
    389 F.3d 536 (6th Cir. 2004) ...............................................................................................37

*Am. Greetings, Corp. v. Cookie Jar Entm't., Inc.*,
    No. 1:09-CV-1056, 2009 WL 3713686 (N.D. Ohio Nov. 3, 2009)........................................11

*Amundson ex rel. Amundson v. Wis. Dep't of Health Servs.*,
    721 F.3d 871 (7th Cir. 2013) ...............................................................................................26

*Appleton v. First Nat'l Bank of Ohio*,
    62 F.3d 791 (6th Cir.1995) ..................................................................................................76

*Arizona v. California*,
    530 U.S. 392 (2000).......................................................................................................11, 12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................................9, 10, 72

*Auer v. Robbins*,
    519 U.S. 452 (1997)..............................................................................................................24

*Ball v. Rodgers*,
    492 F.3d 1094 (9th Cir. 2007) ...............................................................................46, 47, 48, 49

*Bd. of Pub. Educ. for City of Savannah & Cty. of Chatham v. State of Ga.*,
    No. CV 490-101, 1990 WL 608208 (S.D. Ga. Sept. 24, 1990)..............................................55

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).........................................................................................................9, 10

*Bronson v. Bd. of Ed. of City Sch. Dist. of Cincinnati*,
    525 F.2d 344 (6th Cir. 1975) ......................................................................................12, 19, 20

*Brooklyn Ctr. for Independence of the Disabled v. Bloomberg*,
    290 F.R.D. 409 (S.D.N.Y. 2012) ...................................................................40, 41

*Brown v. Ferro Corp.*,
    763 F.2d 798 (6th Cir. 1985) ..............................................................................32

*Brown v. Strickland*,
    No. 2:10-CV-166, 2010 WL 2629878 (S.D. Ohio June 28, 2010).........................61

*Buchanan v. Me.*,
    469 F.3d 158 (1st Cir. 2006)...............................................................................31

*Carten v. Kent State Univ.*,
    282 F.3d 391 (6th Cir. 2002) ..............................................................................65

*Carter v. Del. Cty. Bd. of Comm'rs*,
    No. 2:07-cv-1189, 2009 WL 544907 (S.D. Ohio Mar. 3, 2009) ..........................63

*Caspar v. Snyder*,
    77 F. Supp. 3d 616 (E.D. Mich. 2015)................................................................55

*In re Cassim*,
    594 F.3d 432 (6th Cir. 2010) ..............................................................................32

*Cellar Door Prods., Inc. of Mich. v. Kay*,
    897 F.2d 1375 (6th Cir. 1990) ............................................................................20

*Chicago v. Envtl. Def. Fund*,
    511 U.S. 328 (1994)............................................................................................78

*Children's Healthcare is a Legal Duty, Inc. v. Deters*,
    92 F.3d 1412 (6th Cir. 1996) ..............................................................................61

*Confederated Tribes & Bands of the Yakama Indian Nation v. Locke*,
    176 F.3d 467 (9th Cir. 1999) ..............................................................................62

*Conn. Ass'n of Health Care Facilities, Inc. v. Rell*,
    No. 3:10CV136(PCD), 2010 WL 2232693 (D. Conn. June 3, 2010)....................62

*Coomes v. Allstate Ins. Co.*,
    No. 1:10-CV-905, 2011 WL 4005325 (S.D. Ohio Aug. 9, 2011) .........................73

*Crawford v. Hagel ex rel. U.S. Dept. of Def.*,
    No. 1:14-CV-539, 2014 WL 5343803 (W.D. Mich. Oct. 20, 2014) .....................66

*Creamery v. Dean Milk Co.*,
    383 F.2d 358 (6th Cir. 1967) ..............................................................................20

*Crowe v. Miss. Div. of Medicaid*,
  No. 3:11-CV-00366-CWR, 2012 WL 4062798 (S.D. Miss. Sept. 14, 2012) ........................31

*D.M. v. Butler County Bd. of Mental Retardation & Developmental Disabilities*,
  No. 08-399, 2008 WL 4916306 (S.D. Ohio Nov. 14, 2008) ...................................................16

*Dansby-Giles v. Jackson State Univ.*,
  638 F. Supp. 2d 698 (S.D. Miss. 2009)...................................................................................65

*Davis v. Shah*,
  821 F.3d 231 (2nd Cir. 2016)..............................................................................23, 24, 26, 30

*Dendinger v. Ohio*,
  No. 2:04CV367, 2005 WL 2614889 (S.D. Ohio Oct. 13, 2005), *aff'd in part*,
  *vacated in part*, *remanded*, 207 F. App'x 521 (6th Cir. 2006) (vacated in part
  on other grounds) ...................................................................................................................65

*Diaz v. Mich. Dep't of Corr.*,
  703 F.3d 956 (6th Cir. 2013) .................................................................................................53

*S.D. ex rel. Dickson v. Hood*,
  391 F.3d 581 (5th Cir. 2004) .................................................................................................49

*Dillon-Barber v. Regents of Univ. of Mich.*,
  51 F. App'x 946 (6th Cir. 2002) ............................................................................................65

*Directv, Inc. v. Treesh*,
  487 F.3d 471 (6th Cir. 2007) .................................................................................................10

*Disability Advocates, Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.*,
  675 F.3d 149 (2d Cir. 2012)...........................................................................................41, 42

*Disability Rights N.J., Inc. v. Velez*,
  Civil No. 05–4723, 2010 WL 5055820 (D. N.J. Dec. 2, 2010) .............................................52

*Doe v. Nebraska*,
  345 F.3d 593 (8th Cir. 2003) ...........................................................................................65, 66

*Doe v. Stincer*,
  175 F.3d 879 (11th Cir. 1999) ...............................................................................................40

*Everett H. v. Dry Creek Joint Elementary Sch. Dist.*,
  5 F.Supp.3d 1167 (E.D. Cal. 2014)........................................................................................65

*Fednav, Ltd. v. Chester*,
  547 F.3d 607 (6th Cir. 2008) .................................................................................................43

*Fisher v. Oklahoma Health Care Auth.*,
 335 F.3d 1175 (10th Cir. 2003) ..................................................................24, 26

*Floyd v. Cty. of Kent*,
 454 F. App'x 493 (6th Cir. 2012) ...............................................................54, 62

*Gaines v. Hadi*,
 No. 06-60129-CIV.SEITZMC, 2006 WL 6035742 (S.D. Fla. Jan. 30, 2006)........................48

*Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*,
 280 F.3d 98 (2nd Cir. 2001)......................................................................65

*Gentry v. Summit Behavioral Healthcare*,
 197 F. App'x 434 (6th Cir. 2006) ...............................................................65

*Gonzaga Univ. v. Doe*,
 536 U.S. 273 (2002)............................................................................45

*Green v. Mansour*,
 474 U.S. 64 (1985)............................................................................53

*Haas v. Quest Recovery Servs., Inc.*,
 338 F. Supp. 2d 797 (N.D. Ohio 2004), *aff'd*, 174 F. App'x 265 (6th Cir.
 2006), *cert. granted, judgment vacated on other grounds*, 549 U.S. 1163
 (2007)........................................................................................65

*Hamilton's Bogarts, Inc. v. Michigan*,
 501 F.3d 644 (6th Cir. 2007) ...................................................................11

*Harris v. Olszewski*,
 442 F.3d 456 (6th Cir. 2006) (finding 42 U.S.C. § 1396a(a)(23), which
 requires a state's Medicaid plan to provide that "any individual" eligible for
 Medicaid to obtain assistance or services from any qualified agency or person,
 to be enforceable through § 1983) ...............................................................47

*Havens Realty Corp. v. Coleman*,
 455 U.S. 363 (1982)............................................................................37

*Heike v. Cent. Mich. Univ. Bd. of Trustees*,
 573 F. App'x 476 (6th Cir. 2014) ...............................................................20

*Hendricks v. Kasich*,
 No. 2:12-CV-729, 2013 WL 2243873 (S.D. Ohio May 21, 2013)..........................................62

*HRPT Props. Trust v. Lingle*,
 715 F. Supp. 2d 1115 (D. Haw. 2010) .............................................................55

*Huguely v. Gen. Motors Corp.*,
    52 F.3d 1364 (6th Cir. 1995) .......................................................................17

*Huguley v. Gen. Motors Corp.*,
    35 F.3d 1052 (6th Cir. 1994) .......................................................................17

*Huguley v. Gen. Motors Corp.*,
    999 F.2d 142 (6th Cir. 1993) ...................................................................16, 17

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)..........................................................................38, 39, 43

*Jacobs v. Bd. of Sch. Comm'rs of Indianapolis*,
    349 F.Supp. 605 (S.D. Ind. 1972), *aff'd*, 490 F.2d 601 (7th Cir. 1973), *vacated
    as moot on other grounds*, 420 U.S. 128 (1975)...........................................75

*Rosie D. ex rel. John D. v. Swift*,
    310 F.3d 230 (1st Cir. 2002).......................................................................55

*Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*,
    555 U.S. 285 (2009)...................................................................................78

*Kirby v. Brown*,
    No. 2:13-CV-00021 LKK JFM (PS), 2013 WL 4780767 (E.D. Cal. Sept. 5,
    2013) ..........................................................................................................66

*Klein v. United States*,
    No. 3:15-CV-134, 2015 WL 6736114 (S.D. Ohio Nov. 4, 2015) ...........................66

*Kobe v. Haley*,
    No. CA 3:11-1146-TMC, 2012 WL 3269221 (D.S.C. Aug. 10, 2012) ...................62

*L.A. Branch NAACP v. L.A. Unified Sch. Dist.*,
    714 F.2d 946 (9th Cir. 1983) .......................................................................61

*L.A. Cty. Bar Ass'n v. Eu*,
    979 F.2d 697 (9th Cir. 1992) .......................................................................60

*Lane v. Kitzhaber*,
    283 F.R.D. 587 (D. Or. 2012) ...................................................................24, 29

*Lane v. Kitzhaber*,
    No. 3:12-CV-00138-ST, 2014 WL 2807701 (D. Or. June 20, 2014).....................59

*Lawlor v. Nat'l Screen Serv. Corp.*,
    349 U.S. 322 (1955)..................................................................10, 11, 12, 13

*Lawson v. Shelby Cty.*,
   211 F.3d 331 (6th Cir. 2000) ........................................................................54

*Lindquist v. Bangor Mental Health Inst.*,
   770 A.2d 616 (Me. 2001).............................................................................75

*Luckey v. Harris*,
   860 F.2d 1012 (11th Cir. 1988) .............................................................55, 61

*M.A.C. v. Betit*,
   284 F. Supp. 2d 1298 (D. Utah 2003)........................................................47

*M.R. v. Dreyfus*,
   663 F.3d 1100 (9th Cir. 2011) ..............................................................24, 25

*Martin v. Taft*,
   222 F. Supp. 2d 940 (S.D. Ohio 2002) .......................................14, 55, 61, 64

*Masterman v. Goodno*,
   No. Civ.03-2939, 2004 WL 51271 (D. Minn. Jan. 8, 2004) (holding that,
   under *Gonzaga*, 42 U.S.C. § 1396n(c)(2)(C) contains "sufficient 'rights-
   creating' language to allow a cause of action under § 1983")...............................46

*Matthews v. Drug Enf't Admin.*,
   629 F. App'x 723 (6th Cir. 2015) ................................................................9

*McAuliffe v. U.S. Dept. of Veterans Affairs*,
   No. C 06-07353 WHA, 2007 WL 2123690 (N.D. Cal. July 23, 2007) .................66

*McGath v. Hamilton Local Sch. Dist.*,
   848 F. Supp. 2d 831 (S.D. Ohio 2012) .......................................................63

*Miami Valley Fair Housing Center, Inc. v. The Conner Group*,
   725 F.3d 571 (6th Cir. 2013) .....................................................................37

*Michelle P. v. Holsinger*,
   356 F. Supp. 2d 763 (E.D. Ky. 2005) .........................................................46

*Nat'l Coal. For Students With Disabilities Educ. And Legal Def. Fund v. Bob
Taft*,
   No. C2-00-1300, 2001 WL 1681115 (S.D. Ohio Sept. 24, 2001) .........................62

*Nat'l. R.R. Passenger Corp. v. Morgan*,
   536 U.S. 101 (2002)...................................................................................18

*Ndiaye v. CVS Pharmacy 6081*,
   547 F. Supp. 2d 807 (S.D. Ohio 2008) .......................................................73

*Nihiser v. Ohio E.P.A.*,
    269 F.3d 626 (6th Cir. 2001) ...................................................................64

*O.B. v. Norwood*,
    2016 WL 1086535 (N.D. Ill. Mar. 21, 2016)...................................................27, 28

*Ohio Nat'l Life Ins. Co. v. United States*,
    922 F.2d 320 (6th Cir.1990) ...................................................................9, 39, 65

*Olmstead v. L.C.*,
    527 U.S. 581 (1999)...................................................................1, 19, 24, 27, 30

*Oregon Advocacy Center v. Mink*,
    322 F.3d 1101 (9th Cir. 2003) ...................................................................40, 43

*Oster v. Lightbourne*,
    No. C 09-4668, 2012 WL 685808 (N.D. Cal. Mar. 2, 2012)...................................................24

*Parson v. Homer*,
    No. 1:12CV948, 2013 WL 5441734 (S.D. Ohio Sept. 27, 2013)...................................................63

*Parsons v. Wilkinson*,
    No. C2-05-527, 2006 WL 2266254 (S.D. Ohio Aug. 8, 2006) ...................................................72

*Pashby v. Delia*,
    709 F.3d 307 (4th Cir. 2013) ...................................................................23, 24, 31

*Peter B. v. Sanford*,
    No. CA 6:10-767-TMC, 2012 WL 2149784 (D.S.C. June 13, 2012)...................................................61

*Phillips v. Court of Common Pleas, Hamilton Cty., Ohio*,
    668 F.3d 804 (6th Cir. 2012) ...................................................................78

*Planned Parenthood Arizona, Inc. v. Betlach*,
    899 F. Supp. 2d 868 (D. Ariz. 2012) ...................................................................48

*Rawe v. Liberty Mut. Fire Ins. Co.*,
    462 F.3d 521 (6th Cir. 2006) ...................................................................11

*Robinson v. Univ. of Akron Sch. of Law*,
    307 F.3d 409 (6th Cir. 2002) ...................................................................65

*Rolland v. Cellucci*,
    52 F.Supp. 2d 231 (D. Mass. 1999) ...................................................................52, 54

*Makin ex rel. Russel v. Hawaii*,
    114 F.Supp.2d 1017 (D. Haw. 1999) ...................................................................24

*Sabree v. Houston*,
   245 F. Supp. 2d 653 (E.D. Pa. 2003) .................................................................47

*Sabree ex rel. Sabree v. Richman*,
   367 F.3d 180 (3d Cir. 2004)................................................................................47

*Sandusky Cty. Democratic Party v. Blackwell*,
   387 F.3d 565 (6th Cir. 2004) ..............................................................................43

*Shaw v. Total Image Specialists, Inc.*,
   No. 2:07-CV-00717, 2009 WL 369817 (S.D. Ohio Feb. 12, 2009) .......................12

*Stanley v. Darlington Cty. Sch. Dist.*,
   879 F. Supp. 1341 (D.S.C. 1995), *rev'd in part on other grounds*, 84 F.3d 707
   (4th Cir. 1996).....................................................................................................55

*Steimel v. Wernert*,
   Nos. 15-2377, 15-2389, 2016 WL 2731505 (7th Cir.May 10, 2016) ........23, 24, 27, 30, 31, 35

*Steward v. Abbott*,
   No. 5:10-CV-1025-OLG, slip. op. (W.D. Tex. May 17, 2016) ..............................23,34, 46,52

*Steward v. Janek*,
   No. 5:10-CV-1025-OLG, 2016 WL 3960919 (W.D. Tex. May 20, 2016)..............28

*Suter v. Artist M.*,
   503 U.S. 347 (1992).............................................................................................48

*Sweeney v. City of Steubenville*,
   147 F. Supp. 2d 872 (S.D. Ohio 2001) ...............................................................73

*Taaffe v. Drake*,
   No. 2:15-CV-2870, 2016 WL 1713550 (S.D. Ohio Apr. 29, 2016) .......................54

*Tarazi v. Oshry*,
   No. 2:10-CV-793, 2010 WL 5013819 (S.D. Ohio Dec. 1, 2010)...........................72

*Tohono O'odham Nation v. Ducey*,
   130 F. Supp. 3d 1301 (D. Ariz. 2015) .................................................................62

*Treesh v. Taft*,
   122 F.Supp.2d 881 (S.D. Ohio 2000) ..................................................................32

*Kenneth R. ex rel. Tri-County CAP, Inc./GS v. Hassan*,
   293 F.R.D. 254 (D.N.H. 2013) ......................................................................24, 27, 28

*Pram Nguyen ex rel. U.S. v. City of Cleveland*,
   534 Fed.Appx. 445 (6th Cir. 2013)......................................................................13

*United Black Firefighters Ass'n v. City of Akron*,
    976 F.2d 999 (6th Cir. 1992) ..............................................................17

*Vergos v. Gregg's Enters., Inc.*,
    159 F.3d 989 (6th Cir. 1998) ..............................................................76

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)................................................................40, 43

*C.C. ex rel. Ward v. State of Tenn.*,
    No. CIV. 3:09-0246, 2010 WL 3782232 (M.D. Tenn. Sept. 21, 2010)...................65

*Warth v. Seldin*,
    422 U.S. 490 (1975)................................................................37, 41

*Westside Mothers v. Olszewski*,
    454 F.3d 532 (6th Cir. 2006) ..............................................................47

*Whole Woman's Health v. Hellerstedt*,
    136 S. Ct. 2292 (2016)........................................................11, 13, 22

*Wilborn ex rel. Wilborn v. Martin*,
    965 F. Supp. 2d 834 (M.D. Tenn. 2013), *vacated*, No. 3:13-CV-00574, 2014
    WL 7893050 (M.D. Tenn. June 13, 2014)....................................................31

*Wilburn v. United States*,
    616 F. App'x 848 (6th Cir. 2015) ........................................................10

*Wood v. Tompkins*,
    33 F.3d 600 (6th Cir. 1994) ..............................................................46

*Woods v. Ohio*,
    No. 5:11CV565, 2011 WL 4730529 (N.D. Ohio Oct. 7, 2011)...............................61

*Ex parte Young*,
    209 U.S. 123 (1908)......................................................................53

**Federal Statutes**

20 U.S.C. § 1234 ................................................................................74

20 U.S.C. § 1234c ...............................................................................74

29 U.S.C. § 702 .................................................................................71

29 U.S.C. § 709(a) ..............................................................................71

29 U.S.C. § 710(b) ...........................................................................71, 74

xvi

29 U.S.C. § 711 ............................................................................................................71, 74

29 U.S.C. § 727 ............................................................................................................71, 74

29 U.S.C. § 732 ............................................................................................................74, 79

29 U.S.C. § 732(a) ........................................................................................................70, 77

29 U.S.C. § 732(c)(1)(A) ...................................................................................................70

29 U.S.C. § 732(d) ..............................................................................................70, 76, 77

29 U.S.C. § 732(e)(1)(E)(i) ..............................................................................................78

29 U.S.C.§ 732(g)(4) ....................................................................................................71, 74

29 U.S.C. § 794(a) ........................................................................................................30, 63

29 U.S.C. § 794(b) .............................................................................................................64

29 U.S.C. § 794e ................................................................................................................68

29 U.S.C. § 794e(f)(2), (3) ................................................................................................69

29 U.S.C. § 796 ..................................................................................................................36

29 U.S.C. § 796f-4(b)(1)(A) ..............................................................................................36

29 U.S.C. § 796f-4(c)(2) ...................................................................................................36

29 U.S.C. §§ 796f-4(c)(5)-(6) ...........................................................................................36

29 U.S.C. § 3004 ................................................................................................................68

29 U.S.C. § 3004(a)(1) ......................................................................................................70

29 U.S.C. § 3004(a)(2) ......................................................................................................69

42 U.S.C. § 300d-53 ..........................................................................................................68

42 U.S.C. § 300d-53(b) .....................................................................................................69

42 U.S.C. § 1320a-2 .....................................................................................................48, 49

42 U.S.C. § 1320b-21 ........................................................................................................68

42 U.S.C. § 1320b-21(b) ..............................................................................................69, 70

42 U.S.C. § 1396a(a)(23)(A) .............................................................................................47

42 U.S.C. § 1396n(c) ..................................................................................................19

42 U.S.C. § 1396n(c)(2)(B) .....................................................................................45, 47

42 U.S.C. § 1396n(c)(2)(C) ...........................................................................46, 47, 49, 52

42 U.S.C. § 1983 ............................................................................................45, 46, 47, 48

42 U.S.C. § 2000d–7 .................................................................................................64

42 U.S.C. § 10801 *et seq.* ...........................................................................................68

42 U.S.C. § 10805(a) .................................................................................................69

42 U.S.C. § 10805(a)(1) .............................................................................................69

42 U.S.C. § 12132 *et seq.* .............................................................................................1

42 U.S.C. § 12134(a) .................................................................................................19

42 U.S.C. § 15001(b) .................................................................................................72

42 U.S.C. § 15001 *et. seq.* ..........................................................................................68

42 U.S.C. § 15003 .....................................................................................................71

42 U.S.C. § 15004(a) .................................................................................................71

42 U.S.C § 15005(1) ...................................................................................................69

42 U.S.C. § 15043(a) .................................................................................................68

42 U.S.C. § 15043(a)(2)(A)(i) ..................................................................................69, 71

42 U.S.C. §§ 15043(a)(2)(A), (B) ...............................................................................69

42 U.S.C. § 15044(e) ...............................................................................................69, 71

52 U.S.C. § 21061(a) .................................................................................................70

52 U.S.C. § 21061 *et seq.* ..........................................................................................68

52 U.S.C. § 21062(a) .................................................................................................69

**State Statutes**

Ohio Rev. Code § 107.03 .............................................................................................58

Ohio Rev. Code § 126.05 .............................................................................................58

Ohio Rev. Code § 3304.18........................................................................................59

Ohio Rev. Code § 5123.022.......................................................................................6

Ohio Rev. Code § 5123.022(B) ...............................................................................59

Ohio Rev. Code § 5123.60........................................................................................71

**Federal Rules**

Fed. R. Civ. P. 12(b)(1).........................................................9, 23, 32, 34, 35, 53

Fed. R. Civ. P. 12(b)(6).........................................9, 10, 39, 65, 72, 73, 74

**Federal Regulations**

2 C.F.R. 200.501 .....................................................................................................71

2 C.F.R. § 200.328(e).............................................................................................71

2 C.F.R. § 200.336 .................................................................................................71

20 C.F.R. § 411 *et. seq.* ........................................................................................68

28 C.F.R. § 35.130(b)(7)........................................................................................27

28 C.F.R. § 35.130(d) .........................................................................19, 26, 30, 31

28 C.F.R. § 41.51(a)...............................................................................................30

28 C.F.R. § 41.51(d) .......................................................................................19, 30

34 C.F.R. Part 75 ....................................................................................................74

34 C.F.R. Part 81 and § 81.30................................................................................74

34 C.F.R. § 75.901 *et seq.*......................................................................................74

34 C.F.R. § 370.4 ....................................................................................................70

34 C.F.R. § 370.4(a)...............................................................................................77

34 C.F.R. §§ 370.5, 370.5(b) ................................................................................77

34 C.F.R. § 370.20(c)(3)........................................................................................71

34 C.F.R. § 370.40(d).............................................................................................74

34 C.F.R. § 370.44 ..................................................................................................71

34 C.F.R. § 370.45 ...................................................................................................76

34 C.F.R. § 370.48(d), (e)(1) ..................................................................................71

34 C.F.R.§ 381 *et. seq.* ..........................................................................................68

42 C.F.R. § 51 *et. seq.* ...........................................................................................68

42 C.F.R. § 441.302(d) ...............................................................................49, 50, 51

42 C.F.R. § 441.303(d) ............................................................................................49

45 C.F.R. § 75.1 et seq. ...........................................................................................71

45 C.F.R. § 84.4(b)(4) .............................................................................................30

45 C.F.R. § 1325.7 ...........................................................................................69, 71

45 C.F.R. § 1325.9 ...................................................................................................71

45 C.F.R. § 1326.21(c) ............................................................................................78

45 C.F.R. § 1326.22 .........................................................................................69, 71

45 C.F.R. § 1326.24 .................................................................................................69

**State Regulations**

Ohio Admin. Code 5123:2-1-08 ...............................................................................29

Ohio Admin. Code 5123:2-1-08(B) ..........................................................................27

Ohio Admin. Code 5123:2-1-08(B)(5)(a)-(e) ...........................................................30

Ohio Admin. Code 5123:2-1-08(D)(8) ......................................................................30

**Constitutional Provisions**

Eleventh Amendment.............................................................53, 55, 64, 65, 66

Ohio Const. art. III, § 5 ...........................................................................................58

Ohio Const. art. III, § 21 .........................................................................................60

## INTRODUCTION

This case is about six individuals and a disability advocacy organization who are seeking opportunities for themselves and others with intellectual and developmental disabilities to live, work, and spend their days in the community. But Defendants administer their service systems in ways that prevent Plaintiffs, and thousands of other Ohioans, from achieving these goals. Plaintiffs have come to the Court for relief from Defendants' ongoing violations of Title II of the Americans with Disabilities Act ("ADA"); 42 U.S.C. § 12132 *et seq.*; Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794 *et seq.*, the United States Supreme Court's decision in *Olmstead v. L.C.*, 527 U.S. 581 (1999), and the Social Security Act, 42 U.S.C. §§ 1396n(c)(2)(B) and (C).

Rather than respond directly to these claims, Defendants seek to avoid them. Defendants argue that the *Martin v. Taft* Consent Order, which by its terms expired in 2009, forever immunizes them from answering allegations that they continue to violate the law. But that argument reflects a basic misunderstanding of both the *Martin* Consent Order and the principles governing *res judicata*.

Defendants also assert that the claims of individuals who are at risk of institutionalization, including Plaintiffs Hamilton and Narowitz, are not ripe. That argument ignores the segregation that both Hamilton and Narowitz currently face. It would also delay, until it is too late, any responsibility for the institutionalization that Defendants' current actions will predictably cause. Under well-established legal principles, Plaintiffs need not be institutionalized, or on the doorstep of the institution, to seek relief from the Court.

Finally, Defendants attempt to evade substantive review of Plaintiffs' claims by challenging the standing of some Plaintiffs, denying a right of action on others, asserting the immunity of one Defendant, and even attacking the conduct of some of the counsel representing

Plaintiffs in this action.  None of these issues has merit.  For the reasons discussed below, the arguments of Defendants should be rejected.

## STATEMENT OF THE CASE

Defendants unnecessarily institutionalize thousands of individuals with intellectual and developmental disabilities in segregated Intermediate Care Facilities ("ICF"); Defendants' policies place thousands more at serious risk of unnecessary placement in those segregated residential settings.  Complaint ¶ 11 [*hereinafter* Doc. 1].[1]  Moreover, thousands of Ohioans with intellectual and developmental disabilities—both those who live in ICFs and those who live in the community—are currently denied access to appropriately integrated employment and day programs.  Doc. 1 ¶¶ 160; 166-168; 171-175.

Defendants assert that Ohio has steadily increased its provision of community-based services to people with intellectual and developmental disabilities and in turn decreased its reliance on ICFs.  Doc. 27 at 10.  But Defendants offer no citations, to the Complaint or anywhere else, for any facts supporting these assertions.  And the facts alleged in the Complaint and reported in public documents tell a very different story:  any significant progress that the State achieved in avoiding unnecessary institutionalization occurred while the *Martin v. Taft* litigation remained pending.  That litigation concluded with a two-year agreement providing for a one-budget-cycle increase in Medicaid home and community-based waiver slots.  *See infra* at 10-23.  After the *Martin* Consent Order terminated in 2009, there has been virtually no change in the ICF population, with one leading measure showing that Ohio's ICF population has actually *increased*.  *See infra* at 3-5.  The State has only recently demonstrated interest in changing this pattern, after Plaintiffs' counsel sent a demand letter prior to commencing the current case.  *See*

---

[1] References throughout this document to the Complaint and Declarations use paragraph numbers.  References to other documents filed in the case use the PageID numbers applied at the time of filing by the CM/ECF system.  However, references to the *Martin* Consent Order (Doc. 27-1) uses both Page ID numbers and paragraph numbers.

*infra* at 7-10.  Even so, Defendants' recent actions are woefully insufficient to address the

continuing unnecessary *residential* segregation in the State, *see id.*, and they do even less to

address the continuing unnecessary segregation in *employment and day services*.  *See infra* at 5-

7.

## I.    OHIO'S RELIANCE ON SEGREGATED RESIDENTIAL PLACEMENTS CONTINUED AFTER THE TERMINATION OF THE *MARTIN* CONSENT ORDER

Defendants assert, without citation, that Ohio's ICF population has decreased from 7,917

to 6,367 between 1999 and 2015.  Doc. 27 at 10.  However, since the termination of the *Martin*

Consent Order, there has been virtually no change in the State's ICF population.  According to

one national study, Ohio's ICF population has decreased by a mere five percent (from 7,119 to

6,792) between 2010 and 2013,[2] while another nationally recognized study shows the number of

people in Ohio's ICFs actually *increased* by twelve percent after the termination of the *Martin*

Consent Order, from an historical low of 5,984 in 2010 to 6,678 in 2013.[3]  At the time the

Complaint was filed, the ICF population was 6,437,[4] which, by one measure, was a decrease of

just 682 persons, or ten percent, since 2010.[5]  The other data set shows that the population

---

[2] The State of the States in Developmental Disabilities, Univ. of Colo., *State Profiles for I/DD Spending During Fiscal Years 1977-2013, Ohio* 3 (2015) http://www.stateofthestates.org/documents/Ohio.pdf.

[3] *See* Sheryl Larson et al., Inst. on Cmty Integration, Univ. of Minn., *In-Home and Residential Long-Term Supports and Services for Persons with Intellectual or Developmental Disabilities: Status and trends through 2013* 78 (Table 3.6) (2016)  [hereinafter *Residential Data* (2016)].  The Complaint relied on the 2014 edition of this report, which contained data through 2012.  Doc. 1 ¶ 135; *see* Sheryl Larson et al., Inst. on Cmty. Integration, Univ. of Minn., *In-Home and Residential Long-Term Supports and Services for Persons with Intellectual or Developmental Disabilities: Status and trends through 2012* (2014), https://risp.umn.edu/media/download/cms/media/risp/RISP_2012_report/RISP_FINAL_2012.pdf  [hereinafter *Residential Data* (2014)].  The more recent report, *Residential Data* (2016), contains data through 2013, which is cited here.

[4] Doc. 1 ¶ 136 (relying on data from Ohio Dep't. of Developmental Disabilities, *Annual Report* 9 (2015), http://dodd.ohio.gov/About/Documents/DODDAnnualReportFY2015.pdf (as of June 2015, there were 5,549 ICF residents, and 888 residents of Developmental Centers, or public ICFs, amounting to 6,437 total ICF residents)).

[5] The State of the States in Developmental Disabilities, Univ. of Colo., *State Profiles for I/DD Spending During Fiscal Years 1977-2013, Ohio* 3 (2015) http://www.stateofthestates.org/documents/Ohio.pdf.

actually *increased* by 453 persons, or eight percent, compared to 2010.[6]  Defendant Martin

acknowledged in a 2013 presentation that the State's private ICF population had increased in

defiance of national trends:  "Nationally, over the past 10 years, the number of people living in

private facilities larger than 16 beds has decreased by 33%.  In Ohio, we have actually increased

by 6%."[7]

The state of Ohio has long acknowledged its large ICF "footprint."  Doc. 1 ¶ 8; Doc. 1 ¶

199 (quoting from Ohio Department of Developmental Disabilities, *Request for Proposal:*

*Targeted Options Counseling for Residents of Intermediate Care Facilities*, 2 (May 2015),

https://procure.ohio.gov/PDF/529201515284ICF%20Options%20Counseling.pdf  ("Ohio's ICF-

IID footprint is one of the largest in the United States, particularly in regards to facilities of more

than 8 beds.")).  According to public data, in both 2012 and 2013 Ohio ranked sixth in the nation

for the highest number of publicly-and privately-operated ICFs[8] and third for the number of

people served in private ICFs.[9]  In 2012, Ohio ranked fifth among all states for the total number

of people served in both publicly-and privately-operated ICFs.[10]  And, the following year, rather

than improving its ranking, Ohio had the fourth highest number of people served in all types of

ICFs.[11]  By comparison, during those years a number of states had an ICF population of zero,[12]

and ten states and the District of Columbia operated without a single publicly-operated ICF.[13]

---

[6] *Residential Data* (2016) at 78 (Table 3.6).
[7] John L. Martin, Director, Ohio Dep't. of Developmental Disabilities, "Budget Symposium" PowerPoint presentation, slide 15 (Aug. 21, 2013), www.oacbdd.org/clientuploads/Docs/2013/Symposium/symposium-directormartin.ppt [hereinafter *Martin Budget Symposium*].
[8] Doc. 1 ¶ 135; *see Residential Data* (2016) at 48 (Table 2.4); *Residential Data* (2014) at 68 (Table 3.2).
[9] Doc. 1 ¶ 135; *see Residential Data* (2016) at 49 (Table 2.5); *Residential Data* (2014) at 70 (Table 3.3).
[10] Doc. 1 ¶ 135; *see Residential Data* (2014) at 70 (Table 3.3).
[11] *See Residential Data* (2016) at 49 (Table 2.5).
[12] Doc. 1 ¶ 135; *see Residential Data* (2014) at 70 (Table 3.3); *Residential Data* (2016) at 78 (Table 3.6), 49 (Table 2.5).
[13] Doc. 1 ¶ 135; *see Residential Data* (2016) at 48 (Table 2.4); *Residential Data* (2014) at 68 (Table 3.2).

In 2015, Defendant Martin expressly acknowledged that despite recent increases in community-based services and reductions in the number of people in publicly-operated ICFs, "Ohio continues to have significantly more people living in large private institutions than other states, including residents who are waiting for home and community-based services."[14] For years, State officials have acknowledged the need to "rebalance" Ohio's long-term service system for people with intellectual and developmental disabilities and to reduce its reliance on segregated residential, employment and day programs. Doc. 1 ¶¶ 10, 188.

## II. DEFENDANTS CONTINUE TO RELY OVERWHELMINGLY ON SEGREGATED EMPLOYMENT AND DAY SETTINGS, A MATTER THAT THE *MARTIN* CONSENT ORDER DID NOT ADDRESS

Defendant Martin has acknowledged that "[t]here are more people receiving services in sheltered workshops in Ohio than any other state."[15] Defendant Martin observed in 2013 that 93 percent of the State's employment services for individuals with intellectual and developmental disabilities took place in segregated sheltered work or enclave settings, and nearly 17,000 people in Ohio received services in segregated, sheltered workshops—more than in any other state in the nation.[16] And Defendant Kasich noted in 2012 that "Ohio's developmental disability system currently spends less than 6% of available adult service funding on placing and supporting individuals with developmental disabilities in the general workforce." Exec. Order No. 2012-05K (2012); *see* Doc. 1 ¶ 157.

---

[14] Governor's Office of Health Transformation, *Enhance Community Developmental Disabilities Services* 2, (Feb. 2, 2015), http://www.healthtransformation.ohio.gov/LinkClick.aspx?fileticket=e0syoWSGQ9k%3D&tabid=252 (cited by Doc. 1 ¶ 103).
[15] *Martin Budget Symposium*, at slide 18.
[16] *Martin Budget Symposium*, at slides 17-18, 20.

Ohio ranks third highest nationally in the percentage of its residents with intellectual and developmental disabilities receiving services in (segregated) facility-based work.[17]  In 2013, Ohio was one of only five states that relegated at least half of its residents with intellectual and developmental disabilities to sheltered workshops.  *Id.*  Although Defendants have stated a presumption that "[e]very individual with a developmental disability is . . . capable of community employment," that statement of policy has not led to meaningful practical change for people with intellectual and developmental disabilities.[18]  Recent data found that only 21 percent of individuals with intellectual and developmental disabilities in Ohio received integrated employment services, despite a definition of such services that is highly favorable to the Defendants.[19]

Further, the State continues largely to exclude individuals who live in ICFs from community-based supported employment.  Doc. 1 ¶ 193.  Indeed, a recent OOD case closure form listed among the reasons for closure, and the concomitant decision to deny any such individual integrated employment services, that the individual is "receiving primary services in an institutional setting."  Doc. 1 ¶ 167.[20]  By denying Plaintiffs integrated *employment* opportunities simply because they live in segregated *residential* facilities, Defendants thus compound Plaintiffs' segregation.

---

[17] Doc. 1 ¶ 160 (citing John Butterworth et al., Inst. for Cmty. Inclusion, Univ. of Mass. Boston, *StateData: The National Report on Employment Services and Outcomes 2014* at 21 (2014), http://www.statedata.info/sites/statedata.info/files/files/statedatabook_2015_F.pdf [hereinafter *StateData 2014*]).
[18] Exec. Order No. 2012-05K (2012); Ohio Rev. Code § 5123.022; Doc. 1 ¶ 157.
[19] *StateData 2014* at 21.
[20] *See also* Ohio Dep't. of Developmental Disabilities, *Vocational Rehabilitation Case Closure*, 80-VR-02-01, (Apr. 7, 2014).

III.   **DEFENDANTS' EFFORTS, UNDERTAKEN SINCE PLAINTIFFS' COUNSEL
       SENT A DEMAND LETTER ANTICIPATING THIS LAWSUIT, ARE
       INSUFFICIENT TO ADDRESS THE ONGOING UNNECESSARY
       SEGREGATION**

On July 1, 2014, Plaintiffs' counsel sent the State a demand letter describing the

continuing unnecessary segregation in Ohio's disability services system.[21]  Defendants

responded by requesting additional Medicaid waiver slots in the State Fiscal Year ("SFY") 2016-

17 State Budget.[22]  Although the Motion to Dismiss highlights these new waivers (Doc. 27 at 10-

11), they are woefully insufficient to address the underlying violations.  The insufficiency is

evident from the face of the budget legislation, as well as from facts that have developed during

that legislation's implementation.

The Complaint alleges that approximately 6,437 people with intellectual and

developmental disabilities reside in ICFs, and of these at least 2,500 people are on waitlists for

integrated, community-based services with a median wait time of 13 years.  Doc. 1 ¶¶ 136, 140.

Despite this massive shortfall, the SFY 2016-17 State Budget includes funds for only 523 new

waiver slots for ICF residents.  Doc. 1 ¶ 197.  In addition, among the group of people with

developmental disabilities who do not (yet) live in an ICF, Defendants have identified

approximately 22,000 with unmet service needs who are waiting for home and community-based

services waivers.  Doc. 1 ¶ 103.  Yet the SFY 2016-17 State Budget allocates only 400 diversion

waivers to the prevention of unnecessary institutionalization of people with intellectual and

developmental disabilities and only 1,864 for those on waiting lists that currently number over

---

[21] Letter from Disability Rights Ohio, et al. to John Kasich, Gov. of Ohio, et al. (July 1, 2014), *available at*
http://files.ctctcdn.com/141902ea301/348c248b-9c0f-4785-9902-c95cfd0d566a.pdf (posted by Ohio Department of
Developmental Disabilities).
[22] *See FY16-17 Budget Senate Testimony  on H.B. 64 Before Ohio Senate Committee on Medicaid*, 131st Session
(May 14, 2015) (statement of John L. Martin, Director, Ohio Dep't. of Developmental Disabilities).
http://dodd.ohio.gov/NewsRoom/Documents/FY16-17SenateTestimony.pdf; *see also* Doc. 1 ¶ 197.

40,000.  Doc. 1 ¶ 7.[23]  These one-time increases are not remotely sufficient to meet the need, and

the State has made no enforceable commitment to follow up on these increases with new waivers

in the future.

Further, there are indications that Defendants' limited measures are not even being

promptly implemented.  According to the Ohio Department of Developmental Disabilities' May

2016 "Third Quarter Scorecard," while 144 people have been approved for exit waivers, only

*three* people have actually been enrolled.  *DODD Scorecard*; *see also DODD Slow Progress*.

*Nine* people have been approved for diversion waivers, and just *two* people have been enrolled.

*Id.*  One community group observed that "Ohio is one-third of the way through the budget cycle,

but total enrollment in these new waivers has reached just 4 percent."  *DODD Slow Progress.*

Defendants' recent initiatives also include the provision "pre-admissions counseling" to

people who are seeking admission to an ICF and "options counseling" to those currently

institutionalized in ICFs.  Doc. 1 ¶¶ 199-200.  However, this counseling is significantly limited

in both scope and content.  For example, Defendants' options counseling program provides

counseling only to individuals who have already expressed an interest in living in the

community.  *Id.*  It does nothing to reach individuals who have never been informed about

community options or presented with alternatives to institutionalization.  The pre-admissions

counseling is equally inadequate as evidenced by the very limited success Defendants have

demonstrated in diverting people from institutionalization.  *See DODD Slow Progress*.

Defendants' recent employment initiatives also fail to come close to being sufficient to

avoid unnecessary segregation in employment and day services.  The first and only integrated

---

[23] *See* Ohio Dep't. of Developmental Disabilities, *Third Quarter Scorecard* 4,
http://dodd.ohio.gov/OurFuture/Documents/Q3.FINAL.pdf (last visited July 12, 2016) [hereinafter *DODD Scorecard*].  *See also* Rose Frech, Ctr. for Cmty. Solutions, "DODD Scorecard Suggests Progress on Budget Initiatives has been Slow" (May 5, 2016), http://goo.gl/1hIlbb  [hereinafter *DODD Slow Progress*].

employment initiative for people in ICFs was proposed in September 2015, when DODD and OOD issued a request for proposals to fund three pilots intended to result in "an increase in integrated community based employment and day services."[24]  But that RFP provides only $400,000 in funding to be spread among three organizations over a period of more than 20 months.  *Id.*  This amount is insufficient to address the needs of the thousands of residents of large ICFs who are members of the Plaintiff class.

## STANDARD OF REVIEW

A motion to dismiss for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1) involves either a facial or a factual challenge to the court's jurisdiction.  *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir.1990).  When a motion challenges the factual existence of subject matter jurisdiction, the court has wide discretion regarding the materials it may consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings, such as affidavits or documents.  *Id.*  When a motion raises a facial challenge to the sufficiency of the pleading, the Court accepts the allegations in the complaint as true and construes them in the light most favorable to the nonmoving party, as it does when reviewing a motion under Fed. R. Civ. P. 12(b)(6).  *Id.*

A motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) tests the "'formal sufficiency of the statement of the claim for relief.'" *Matthews v. Drug Enf't Admin.*, 629 F. App'x 723, 726 (6th Cir. 2015) (citing 5B C. Wright & A. Miller, Federal Practice and Procedure § 1356, p. 354 (3d ed. 2004)).  "[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

---

[24] Doc. 1 ¶ 169; (citing Emp't First Initiative, Ohio Dep't of Developmental Disabilities, Intermediate Care Facility Employment Pilots Request for Proposals at 5, http://www.ohioemploymentfirst.org/up_doc/ICF_Employment_Pilots_RFP_Final_8-26-15.pdf (last visited March 30, 2016)).

U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). Under Fed. R. Civ. P. 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Wilburn v. United States*, 616 F. App'x 848, 852 (6th Cir. 2015) (citing *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)).

**ARGUMENT**

## I.      NEITHER THE *MARTIN* CONSENT ORDER NOR GENERAL *RES JUDICATA* PRINCIPLES BAR THE CLAIMS IN THIS SUIT, WHICH CHALLENGE ONGOING LEGAL VIOLATIONS.

The *Martin* Consent Order, entered in 2007, imposed obligations on the State for only a two-year period. By its plain terms, it terminated in 2009. *See* Doc. 27-1 at 10 ¶ 11 ("The Order shall terminate on June 30, 2009."). Yet Defendants seek to read that Consent Order as foreclosing, forever into the future, any claim that the State continues to violate the ADA, the Rehabilitation Act, and the Social Security Act, so long as that claim is brought by Ohioans with developmental disabilities who need community housing or Medicaid. *See* Doc. 27 at 15-16, 19-20 (arguing that the *Martin* Consent Order forecloses the claims of anyone who lived in an ICF at the time of that Order or who "will be in need" of Medicaid or community housing in the future).

Defendants' argument directly conflicts with the plain terms of the *Martin* Consent Order. It also conflicts with basic principles of *res judicata*. The Supreme Court long ago established that resolution of a case brought at an earlier time cannot "confer on [defendants] a partial immunity from civil liability for *future* violations." *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 (1955) (emphasis added). The Court reaffirmed the *Lawlor* principle in a case

10

decided on the very same morning that Defendants Martin and McCarthy, joined by Defendant

Kasich, filed their Motion to Dismiss here.  *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct.

2292, 2304-2305 (2016) (prior challenge to a Texas statute regulating abortions did not bar a

subsequent challenge by the same plaintiffs to the same statute).  For the reasons discussed

below, Defendants' challenge must fail.

### A. Under Basic *Res Judicata* Principles, A Prior Judgment Does Not Bar Plaintiffs From Seeking Relief For Continuing Violations Of The Law.

*Res judicata* involves two distinct concepts, claim preclusion (sometimes itself referred to

as *res judicata*) and issue preclusion (also referred to as collateral estoppel).  *See Rawe v. Liberty*

*Mut. Fire Ins. Co.*, 462 F.3d 521, 528 n.5 (6th Cir. 2006).  Under claim preclusion, "a judgment

'on the merits' in a prior suit involving the same parties or their privies bars a second suit based

on the same cause of action," while under issue preclusion, "such a judgment precludes

relitigation of issues actually litigated and determined in the prior suit, regardless of whether it

was based on the same cause of action as the second suit."  *Lawlor*, 349 U.S. at 326.  "[T]he

party advocating preclusion bears the burden of showing that it applies."  *Am. Greetings,*

*Corp. v. Cookie Jar Entm't., Inc.*, No. 1:09-CV-1056, 2009 WL 3713686, at *11 (N.D. Ohio

Nov. 3, 2009) (citing *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 650 (6th Cir. 2007)).

Consent orders are judgments.  But because "none of the issues is actually litigated" in a

case resolved by consent judgement; these judgements "ordinarily occasion no *issue preclusion*

(sometimes called collateral estoppel), unless it is clear . . . that the parties intend their agreement

to have such an effect."  *Arizona v. California*, 530 U.S. 392, 414 (2000) (emphasis in original,

internal quotation marks omitted) (quoting Restatement (Second) of Judgments § 27, Comment e

(1982)).  As the Supreme Court has explained,

> [i]n most circumstances, it is recognized that consent agreements
> ordinarily are intended to preclude any further litigation on the

> claim presented but are not intended to preclude further litigation
> on any of the issues presented.  Thus consent judgments ordinarily
> support claim preclusion but not issue preclusion.

*Id.* (internal quotation marks omitted) (quoting 18 Charles Alan Wright, Arthur R. Miller, &

Edward H. Cooper, Federal Practice and Procedure § 4443, pp. 384–385 (1981)); *see also Shaw*

*v. Total Image Specialists, Inc.*, No. 2:07-CV-00717, 2009 WL 369817, at *5 (S.D. Ohio

Feb. 12, 2009) (reaffirming that a settlement "has no issue preclusive effect, absent a clear

intention by the parties otherwise") (citing *Arizona v. California*, *supra*).

Because nothing in the *Martin* Consent Order so much as suggests that the parties agreed

to resolve any of the legal or factual *issues* in the case, *see* (Doc. 27-1 at 6, ¶ 13) (noting that the

Defendants continued to deny liability), the only question here is whether that Order bars this

action based on claim preclusion.  And as the Supreme Court's decision in *Lawlor, supra*,

highlights, where a "substantially single course of activity" continues "through the life of a first

suit and beyond," the "basic claim-preclusion result is clear: a new claim or cause of action is

created as the conduct continues."  18 Charles Alan Wright, Arthur R. Miller, & Edward H.

Cooper, Federal Practice and Procedure § 4409 (2d ed.).

The Sixth Circuit has long applied this principle—including in the context of illegal

segregation claims.  *See, e.g.*, *Bronson v. Bd. of Ed. of City Sch. Dist. of Cincinnati*, 525 F.2d

344, 349 (6th Cir. 1975).  In *Bronson*, the court noted that a 1965 judgment in a desegregation

case barred pre-1965 claims, but it held that a second complaint "alleg[ing] continuing wrongful

acts subsequent to 1965 declares a different cause of action . . . , one to which estoppel does not

apply."  *Id.*  As *Bronson* shows, that an initial and a subsequent suit involved "essentially the

same course of wrongful conduct is not decisive.  Such a course of conduct—for example, an

abatable nuisance—may frequently give rise to more than a single cause of action."  *Lawlor*, 349

12

U.S. at 327-328 (internal quotation marks omitted).  "If wrongful conduct persists, plaintiffs can file successive complaints," for if plaintiffs "were forever barred from asserting claims based on conduct that occurs after a prior suit is decided, defendants could continue a course of unlawful conduct undeterred."  *Pram Nguyen ex rel. U.S. v. City of Cleveland*, 534 Fed.Appx. 445, 453 (6th Cir. 2013) (citing *Lawlor*, 349 U.S. at 329).[25]

The viability of this principle is evidenced by the fact, noted above, that it was reaffirmed by the Supreme Court as recently as last month.  *See Whole Woman's Health, supra*, 136 S. Ct. at 2305-2306 (citing *Lawlor*, 349 U.S. at 328).

## B.  The *Martin* Consent Order, Which Expired In 2009, Is Consistent With Basic *Res Judicata* Principles.

Although Defendants treat the *Martin* Consent Order as foreclosing all future challenges to the State's illegal segregation of adults with intellectual and developmental disabilities, the Order itself was much more limited.  The Consent Order did not seek to resolve, for all time, all claims by all adults with intellectual and developmental disabilities that they are inappropriately denied community-based services.  To the contrary, it sought to provide a one-time, two-year expansion of Ohio's community services system.  Based on that expansion, and the expectation that it would catalyze a further move away from the State's highly segregated system, the *Martin* plaintiffs agreed not to pursue their then-current claims.  But they did not surrender their right to challenge the State's illegal segregation in the future should it continue beyond the termination of the Consent Order.  Indeed, it is doubtful that this Court would have approved any such surrender of all future claims on behalf of an expansive class of individuals with intellectual and

---

[25] As *Pram Nguyen* notes, where a challenge to the defendants' conduct is fully litigated, **issue preclusion** may bar subsequent challenges by the same plaintiff to that conduct.  *See id.*  But issue preclusion is not available here, because *Martin* was resolved by consent judgment.

developmental disabilities who might need or want community supports, with such indefinite effect, in exchange for a mere one-time incremental step toward compliance.

The temporary, one-time nature of the obligations imposed by the *Martin* Consent Order is evident from the terms of the Order itself.  The Consent Order explicitly stated that it took effect on the date it was approved (March 5, 2007), (Doc. 27-1 at 10 ¶ 9), that judicial supervision over the order would terminate on June 30, 2009, (*id.* at 9 ¶ 7), and that not only judicial supervision but the order itself "shall terminate on June 30, 2009."  *Id.* at 10 ¶ 11.  The Consent Order's principal substantive provision required the State to request "funding for an additional 1500 IO waiver slots . . . in the FY08-09 executive budgets" and to make good-faith efforts to fill those slots by June 30, 2009.  *Id.* at 7-8 ¶ 1.  The Consent Order also required the State to complete certain surveys by June 30, 2007, (*see id.* at 8 ¶¶ 2-3), and to allocate certain funds from the 2005-2006 budget.  *See id.* at 7-8 ¶ 4.  All of these obligations were expressly tied to the 2008-2009 or earlier budget cycles.  Crucially, the Consent Order imposed ***no*** new or continuing obligations on the State after June 30, 2009.

If the *Martin* Consent Order had sought to resolve the question of Ohio's illegal segregation of adults with intellectual and developmental disabilities for all time, it would not have been so closely tied to the 2008-2009 budget cycle, and it would not have terminated all of its obligations on June 30, 2009.  It certainly would not have extinguished all future claims in exchange for a one-time addition of 1,500 Medicaid waiver slots—an addition that would serve only a fraction of the members of the *Martin* class.  *See Martin v. Taft*, 222 F. Supp. 2d 940, 946 (S.D. Ohio 2002) (noting that class consisted of "about 12,000 people").  Rather, the plain terms support the contemporaneous interpretation in the papers seeking approval of the settlement— that the Consent Order provided for services and the "allocation of a specific number of waiver

slots over a limited period, ***at which time the case will be dismissed and Ohio's compliance with Title II can be reassessed.***" Pls.' Supplemental Mem. Supporting Mot. for Approval of Settlement, *Martin v. Strickland*, (No. C2-89-362), Doc. 795 at 4 (emphasis added). Plaintiffs' counsel offered the same interpretation at the fairness hearing, at which he described as "an added benefit" that the settlement would be "limited to two years": "If it works, we're done, ***and we can reassess where Ohio is in terms of its obligations under Title II.***" Tr. of Fairness Hr'g (March 5, 2007), *Martin v. Strickland*, Doc. 803 at 5 (statement of Michael Kirkman, Esq.) (emphasis added), (attached as Exhibit 1). Notably, defendants' counsel did not contradict that interpretation at the hearing.

The release provision of the *Martin* Consent Order, (Doc. 27-1 at 9 ¶ 6), is fully consistent with these principles. As a component of the *Martin* Consent Order, the release provision expired in 2009. And by its terms, that provision released "Defendants, Defendants' successors, and any other successor agencies" from "current and future claims or actions"—but only "regarding any and all matters ***that are or could have been brought as part of this litigation***." *Id.* (emphasis added). Claims that the State continued to violate the law after the termination of the *Martin* Consent Order could not "have been brought as part of [that] litigation," for the simple reason that the *Martin* litigation had concluded by the time they arose. As the Sixth Circuit explained in *Pram Nguyen*:

> [i]f a plaintiff sues a defendant more than once based on an ongoing course of conduct, the doctrine of claim preclusion will typically not prevent the plaintiff from asserting a cause of action that arose after the first suit was decided. ***Because it did not yet exist, such a cause of action literally could not have been brought in the first suit***.

534 F. App'x at 452 (emphasis added; citation omitted).

As noted above, *res judicata* law treats the continuation of unlawful conduct as creating a new claim. That there is a legal or factual overlap between the 2007 or 2009 claims of some class members and their claims today, does not make them the same claims. Nothing in the 2007 Consent Order suggests that it departs from this standard preclusion principle. To the contrary, its expressly time-limited nature and the contemporaneous interpretation offered by the plaintiffs demonstrate that the Consent Order incorporated that principle. In this context, the function of the release of "future claims or actions" is clear—to bar new claims that arose *after* the March 2007 entry of the Order but *before* its June 2009 termination.

This Court addressed just such a case in *D.M. v. Butler County Bd. of Mental Retardation & Developmental Disabilities*, No. 08-399, 2008 WL 4916306 (S.D. Ohio Nov. 14, 2008)—a case on which Defendants rely. Doc. 27 at 16-17. The *D.M.* case was filed in 2008. Because the *Martin* case was still pending at the time *D.M.* was filed, and the *D.M.* plaintiffs were concededly members of the *Martin* plaintiff class, this Court correctly determined that the *D.M.* plaintiffs' only available "remedy [was] to file a motion seeking to enforce the Consent Order." *D.M.* at *2; Doc. 27 at 17.. But here, where plaintiffs challenge continuing federal-law violations seven years *after* the termination of the *Martin* Consent Order, that remedy is both unavailable and nonsensical. Rather, both basic preclusion principles and the text of the *Martin* Consent Order itself make clear that the proper remedy is a fresh lawsuit challenging the continuing violations.

The Sixth Circuit's decision in *Huguley v. Gen. Motors Corp.*, 999 F.2d 142 (6th Cir. 1993), cited by Defendants (Doc. 27 at 19), similarly applied a release provision to pre-decree conduct only. The consent decree there contained a release of claims related to race discrimination "occurring prior to the date of this Decree ***and any future effect of such prior***

*occurrences*." *Huguley,* 999 F.2d at 147 (emphasis added). Despite that release, a member of the plaintiff class filed a separate action alleging that the defendant discriminated against her. Because she challenged acts of discrimination that occurred prior to the date of the decree—even if they had effects after the decree's entry—the Sixth Circuit found the claim barred by the broad terms of the release. *See id.* at 148-149. Even so, the court suggested that the plaintiff could proceed, notwithstanding the release, if she could "allege[] facts sufficient to establish" that she was "*currently* being discriminated against." *Id.* at 149 (emphasis added). Indeed, in a subsequent appeal the Sixth Circuit held that she *had* properly pleaded a claim of post-decree discrimination, and that the *Huguley* release did *not* bar that claim. *See Huguley v. Gen. Motors Corp.*, 35 F.3d 1052, 1056 (6th Cir. 1994). In yet a later appeal by a different member of the plaintiff class, the Sixth Circuit made clear that the release did not bar challenges based on "post-decree conduct," *Huguely v. Gen. Motors Corp.*, 52 F.3d 1364, 1373 (6th Cir. 1995), but that "during the [five-year] life of the decree," certain claims would have to be pursued through the dispute-resolution procedures set forth in the consent order, *id.* at 1372-1373; *see also United Black Firefighters Ass'n v. City of Akron*, 976 F.2d 999, 1005 (6th Cir. 1992) (1986 consent decree that "was concerned with remedying alleged racial discrimination prior to 1986" did not bar later action and consent decree designed to address discrimination "which occurred after the 1986 consent decree became effective").

Notably, the release in *Martin* does not contain the broad "and any future effect" language of the *Huguley* release. Yet Defendants read the *Martin* release as being even broader than that in *Huguley*—as foreclosing all possible future claims not just for the ongoing *effects* of past violations, but for ongoing violations themselves suffered by an indeterminate class of all persons with intellectual and developmental disabilities in Ohio—whether or not currently

17

institutionalized or at serious risk of such institutionalization—who might benefit from community services. *Cf. Nat'l. R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-119 (2002) (distinguishing discrete violations with continuing effects from continuing violations). Indeed, Defendants' interpretation would treat the *Martin* Consent Order as extraordinarily one-sided— as providing, in defiance of basic preclusion principles, that a one-time, one-budget-cycle agreement to create 1,500 waiver slots bars any consideration at any point in the future of whether the State's subsequent conduct violates the rights of tens of thousands of Ohioans with developmental disabilities to be free from unnecessary segregation. There is no reason to think this Court would have approved, as fair, adequate, and reasonable, a Consent Order that forever foreclosed the claims of all but the lucky few members who received waivers during the two-year period covered by the Order.

### C. This Case Concerns Defendants' Ongoing Violations Of The Law And Thus Is Not Barred By *Res Judicata* Or The *Martin* Consent Order.

The Complaint in this case does not base its claims on discrete, past actions. Rather, it alleges continuing violations of the Plaintiffs' rights. Even if some of the Plaintiffs experienced the same or similar violations of their rights prior to the 2009 termination of the *Martin* Consent Order, each day that those violations have continued has created "a new claim or cause of action." 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4409 (2d ed.). Accordingly, neither the *Martin* Consent Order nor general *res judicata* principles bar this action.

The Complaint asserts claims under three statutes: the ADA, the Rehabilitation Act, and the Social Security Act. Each of these statutes imposes continuing obligations on Defendants— obligations that Defendants continue to fail to satisfy. The relevant regulations implementing the ADA and the Rehabilitation Act require states to "administer services, programs, and activities

18

in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); *accord* 28 C.F.R. § 41.51(d).[26] As the text of the regulation makes clear, that requirement imposes a continuing obligation on states to "administer" their programs in the "most integrated setting appropriate." *Id.* Each day that the State is providing services in a way that requires individuals to live or work in a setting that is unnecessarily segregated is a day in which the Plaintiffs have experienced a violation of their rights under these provisions.

Similarly, the Social Security Act requires the State both to evaluate individuals referred for ICF admission and to periodically re-evaluate ICF residents to determine whether they are eligible for home and community-based services, as well as to inform them, after the evaluation or re-evaluation, of the availability of alternatives to institutional placement. *See* 42 U.S.C. § 1396n(c); Doc. 1 ¶¶ 127-130. The State's ongoing failure to evaluate or re-evaluate an individual, and its ongoing failure to provide the free choice of alternative placements required by the statute, constitute new and continuing violations of the law.

This case is thus controlled by two cases in which the Sixth Circuit applied the Supreme Court's *Lawlor* principle and allowed the plaintiffs to challenge ongoing violations notwithstanding earlier judgments involving earlier iterations of the same conduct. The first is *Bronson, supra*. There, the Sixth Circuit held that a 1965 judgment holding that the defendant had not segregated its schools did not bar a subsequent challenge to "alleged continuing wrongful acts subsequent to 1965." *Bronson*, 525 F.2d at 349.[27] Indeed, the current case is even

---

[26] Because this requirement appeared in the "coordination regulations" of the Department of Health, Education, and Welfare, Congress specifically endorsed this requirement when it adopted the ADA. *See* 42 U.S.C. § 12134(a) (requiring the Attorney General to issue regulations to implement Title II of the ADA), (b) (requiring the relevant portions of the ADA regulations to "be consistent with this chapter and with the coordination regulations under part 41 of title 28, Code of Federal Regulations (as promulgated by the Department of Health, Education, and Welfare on January 13, 1978)"); *see generally Olmstead*, 527 U.S. at 591-592.

[27] *Bronson* observed that some members of the class in that case had not been able to participate in the prior action, because they had not yet started school in 1965. *See id.* at 352. So too here, some members of the proposed class in

stronger than *Bronson*, because the prior judgment in that case had been fully *litigated*, and thus had an *issue*-preclusive effect barring the plaintiffs from relitigating the question whether defendants had segregated their schools prior to 1965. *See id.* Here, by contrast, the *Martin* judgment was a *Consent Order*, which was not litigated and has no issue-preclusive effect—and which, by its terms, terminated seven years ago.

The second case is *Cellar Door Prods., Inc. of Mich. v. Kay*, 897 F.2d 1375 (6th Cir. 1990). In *Cellar Door*, the plaintiff concert promoter sued a competing concert promoter and an arena operator in 1983 for engaging in collusive conduct in violation of the antitrust laws; the parties entered into a stipulated agreement dismissing that action with prejudice. *See id.* at 1376. The same plaintiff later filed a second action alleging that the same defendants continued to collude in violation of the same antitrust laws. *See id.* at 1378. The Sixth Circuit held that the second action was not barred by *res judicata*, because the ongoing conduct created a new claim: "Each time the arrangement precluded Cellar Door from competitively bidding for an event, a cause of action may have accrued to Cellar Door. Therefore, as in *Lawlor* and *Cream Top* [*Creamery v. Dean Milk Co.*, 383 F.2d 358 (6th Cir. 1967)], those causes of action that arose subsequent to the 1983 dismissal are not barred by *res judicata*." *Id.* The Sixth Circuit's decision in *Cellar Door* controls here and requires this Court to reject Defendants' *res judicata* arguments.[28]

---

this case did not yet need or receive community-based services in Ohio in 2009. As Defendants note, this is true of some of the Individual Plaintiffs. Doc. 27 at 15.

[28] *Heike v. Cent. Mich. Univ. Bd. of Trustees*, 573 F. App'x 476 (6th Cir. 2014), cited by Defendants (Doc. 27 at 20, 22), does not support a contrary result. There, the events that formed the basis for the second suit all "pre-dated Heike's initial complaint"; in other words, there was no ongoing violation following the conclusion of the first suit. *Id.* at 482.

**D.  This Case's Focus On Segregation In Employment And Day Services, As Well As Salient Factual And Legal Developments Since *Martin*, Provide An Independent Basis For Concluding That The *Martin* Consent Order Does Not Bar This Suit.**

As explained in the previous sections of this response, there would be no basis for a *res judicata* dismissal even if the claims presented in this suit were carbon copies of the claims raised in *Martin*.  Because the claims here involve the continuation of discriminatory conduct by Defendants following the termination of the *Martin* Consent Order, they are new claims for *res judicata* purposes—claims that could not have been brought while *Martin* was pending.  But this case is not a carbon copy of *Martin*.  There are salient differences between this suit and *Martin*— and between the facts and law today and those in 2009.

First, the *Martin* litigation challenged the State's unnecessary segregation in *residential* placements; it did not challenge unnecessary segregation in *employment* settings and other day services.  Indeed, the *Martin* Consent Order focused entirely on ensuring that (some) members of the plaintiff class could move out of ICFs and into waiver settings, as well as on financing "affordable community housing to individuals with MR/DD."  Doc. 27-1 at 7-9 ¶¶ 1-4.  Not a word of that Consent Order addressed segregation in employment and day services.

This case, by contrast, squarely challenges Plaintiffs' employment and day services segregation.  *See* Doc. 1 ¶¶ 143-175.  The Complaint relies on numerous post-2009 developments demonstrating that Ohio fails to provide employment and day services in the most integrated setting appropriate.  These include:  (1) 2014 data revealing that "Ohio ranks third highest nationally in the percentage of its residents with intellectual and developmental disabilities receiving [employment] services in facility-based settings" and that "Ohio is one of only five states that relegate more than half of its residents with intellectual and developmental disabilities to sheltered workshops" (Doc. 1 ¶ 160); (2) a 2013 on-site review, which "found that

21

Ohio's vocational rehabilitation agency violated federal law in numerous ways, while at the same time failing to achieve desired outcomes" (*id.* ¶ 161); (3) relevant changes in federal law with the passage of the Workforce Innovation and Opportunity Act (WIOA) in 2014 (*see id.* ¶¶ 155-156); and (4) recent Department of Justice pronouncements making clear that the integration mandate applies to employment and day programs, and not just to residential settings (*see id.* ¶ 123).

The Complaint also notes recent changes to the relevant Medicaid regulations that impose enhanced requirements for integration in both residential and non-residential programs provided under Medicaid waivers.  *See id.* ¶ 194 (describing 2014 regulations from the Centers for Medicare and Medicaid Services).  And as this case proceeds, facts will continue to change.  For example, Defendants note that the Ohio legislature funded a new set of waiver slots in its recent budget, shortly before Plaintiffs brought this action.  Doc. 27 at 10.  But since Plaintiffs filed the Complaint, an independent report found that the State has placed individuals into only four percent of those new waiver slots, even though it is a third of the way through the SFY 2016-17 budget cycle.[29]

As in *Whole Woman's Health*, both the underlying facts and the surrounding regulatory regime have changed since the prior judgment.  136 S. Ct. at 2304  "Where 'important human values—such as the lawfulness of continuing personal disability or restraint—are at stake, even a slight change of circumstances may afford a sufficient basis for concluding that a second action may be brought.'"  *Id.* at 2305 (quoting Restatement (Second) of Judgments § 24, Comment f (1980)).  These changes, and the differences between the Complaint here and the *Martin* litigation, provide an additional reason for this Court to deny Defendants' Motion to Dismiss.

---

[29] *See* Rose Frech, Ctr. for Cmty. Solutions, "DODD Scorecard Suggests Progress on Budget Initiatives has been Slow" (May 5, 2016), http://goo.gl/1hIlbb; Ohio Department of Developmental Disabilities, *Third Quarter Scorecard* 4, http://dodd.ohio.gov/OurFuture/Documents/Q3.FINAL.pdf (last visited July 12, 2016).

## II.     THE CLAIMS OF THE AT-RISK PLAINTIFFS ARE RIPE FOR ADJUDICATION.

Defendants argue that the *Olmstead* claims of Plaintiffs Narowitz and Hamilton, and

presumably all class members who are at risk of institutionalization, are not ripe and should be

dismissed under Fed. R. Civ. P. 12(b)(1).  Doc. 27 at 2, 23.  Defendants' argument in this regard

applies only to Plaintiffs Narowitz and Hamilton—and it applies only to their claim for

segregation in *residential* services.  Defendants overlook that, as to their claim of segregation in

employment and day services, Narowitz and Hamilton are not merely *at risk* of unnecessary

institutionalization; they are actually experiencing segregation today.  Moreover, a long line of

decisions from numerous courts of appeals and district courts makes clear that plaintiffs can

allege a ripe *Olmstead* claim if a state is administering its service system in a way that places

them at serious risk of institutionalization, even if their institutionalization is not imminent, and

even if the state has not recently cut back on pre-existing services.  Under those precedents,

Plaintiffs Narowitz and Hamilton have raised claims ripe for adjudication.

### A.     State Policies And Practices That Create A Serious Risk Of Unnecessary Institutionalization Give Rise To A Ripe *Olmstead* Claim, Even If Institutionalization Is Not Imminent.

A long line of cases has consistently concluded that persons "at risk" of unnecessary

institutionalization under the ADA may state a claim for discrimination under Title II's

Integration Mandate.  *See, e.g.*, *Steimel v. Wernert*, Nos. 15-2377, 15-2389, 2016 WL 2731505,

at **9 (7th Cir.May 10, 2016) (holding that "the integration mandate is implicated where the

state's policies have either (1) segregated persons with disabilities within their homes, or (2) put

them at serious risk of institutionalization."); *see also Steward v. Abbott*, No. 5:10-CV-1025-

OLG, slip. op. at 16-17 (W.D. Tex. May 17, 2016), attached as Exhibit 2; *Davis v. Shah*, 821

F.3d 231, 263-264 (2nd Cir. 2016); *Pashby v. Delia*, 709 F.3d 307, 321-322 (4th Cir. 2013);

*Kenneth R. ex rel. Tri-County CAP, Inc./GS v. Hassan*, 293 F.R.D. 254, 263 (D.N.H. 2013);

*Lane v. Kitzhaber*, 283 F.R.D. 587, 598 (D. Or. 2012); *Oster v. Lightbourne*, No. C 09-4668,

2012 WL 685808, at *5 (N.D. Cal. Mar. 2, 2012); *M.R. v. Dreyfus*, 663 F.3d 1100, 1116-1117

(9th Cir. 2011); *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1182 (10th Cir. 2003);

*Makin ex rel. Russel v. Hawaii*, 114 F.Supp.2d 1017, 1033 (D. Haw. 1999).

These holdings are consistent with authoritative statements of the Department of Justice.

*See* Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II

of the Americans with Disabilities Act and *Olmstead v. L.C.* at 5 (2011) available at

https://www.ada.gov/olmstead/q&a_olmstead.pdf [hereinafter "Statement of Department of

Justice"] ("[T]he ADA and the *Olmstead* decision extend to persons at serious risk of

institutionalization or segregation and are not limited to individuals currently in institutional or

other segregated settings.").  Because the Department of Justice issued the ADA's integration

regulation pursuant to an express delegation from Congress, *see Olmstead*, 527 U.S. at 591-592,

its interpretations of that regulation are entitled to deference.  *See, e.g.*, *Steimel*, 2016 WL

2731505, at **6 ("The DOJ's interpretation of the [integration] mandate 'warrant[s] respect'

because Congress gave it the task of issuing the relevant regulation.") (quoting *Olmstead*, 527

U.S. at 597-598); *Davis*, 821 F.3d at 236 (DOJ's interpretation of the integration regulation is

"controlling unless plainly erroneous or inconsistent with the regulation") (internal quotation

marks omitted; quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)); *M.R.*, 663 F.3d at 1117

("We also defer to an agency's reasonable interpretation of its own statutorily authorized

regulations") (internal citations omitted); *Pashby*, 709 F.3d at 322 ("Because Congress instructed

the DOJ to issue regulations regarding Title II, we are especially swayed by the DOJ's

determination that 'the ADA and the *Olmstead* decision extend to persons at serious risk of

institutionalization or segregation and are not limited to individuals currently in institutional or segregated settings.'").

Defendants concede that individuals need not be currently institutionalized to have a ripe *Olmstead* claim. They even cite the Department of Justice's own conclusion that "a plaintiff could show sufficient risk of institutionalization to make out an *Olmstead* violation if a public entity's *failure to provide community services* or its cut to such services will likely cause a decline in health, safety, or welfare that *would lead to the individual's eventual placement* in an institution." Doc. 27 at 29; citing Statement of Department of Justice at 5 (emphasis added). The Ninth Circuit has specifically endorsed DOJ's interpretation and held that "an ADA plaintiff need not show that institutionalization is 'inevitable' or that she has 'no choice' but to submit to institutional care in order to state a violation of the integration mandate. Rather, a plaintiff need only show that the challenged state action creates a serious risk of institutionalization." *M.R.*, 663 F.3d at 1116.

Plaintiffs have sufficiently pled the existence of a present and serious risk of institutionalization as interpreted by the Department of Justice, and they have connected this risk with identified state actions and inactions. They need not be on the doorstep of institutional placement, or allege that their risk of admission is a near certain outcome of a specific change in state policy. Individuals' claims are ripe for adjudication if their risk of decline in health, safety or welfare is foreseeable given the state's "failure to provide community services" and that failure is "likely" to lead to "eventual" placement in an institution. Statement of Department of Justice at 5.

By its terms, the integration regulation imposes a broad obligation on states: to "administer services, programs, and activities in the most integrated setting appropriate to the

needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Those protections would be meaningless if plaintiffs were required to subject themselves to segregation by actually entering, or arriving at the doorstep of an institution, before challenging an allegedly discriminatory law or policy. *Fisher*, 335 F.3d at 1181; *see also Davis*, 821 F.3d at 263 ("Unsurprisingly, against this backdrop, courts of appeals applying the disability discrimination claim recognized in *Olmstead* have consistently held that the risk of institutionalization can support a valid claim under the integration mandate.").

Defendants misread the Seventh Circuit's decision in *Amundson ex rel. Amundson v. Wis. Dep't of Health Servs.*, 721 F.3d 871, 873 (7th Cir. 2013), to require evidence of actual institutionalization before an *Olmstead* claim is ripe. Doc. 27 at 23-24. The plaintiffs in *Amundson* challenged the state's decision to reduce the rates it paid to group homes under its Medicaid waiver program, alleging that new rates would make them unable to find group home providers willing to serve them. However, they presented no evidence that *any* named plaintiff, or indeed *any* person with developmental disabilities in the State, had experienced unnecessary and unwanted placement in an institution as a result of the rate reductions, or that they faced a serious risk of displacement from their current residential settings. *Amundson*, 721 F.3d at 873-874. But the facts in Ohio are very different. Plaintiffs allege an ongoing pattern and practice of over-reliance on ICFs, which has led to the unnecessary institutionalization of thousands of individuals, including several Individual Plaintiffs, and left thousands more at serious risk of institutionalization due to significant, unmet services needs and the anticipated loss of primary caregivers. Doc. 1 ¶¶ 97-98, 103.

Subsequent cases in the Seventh Circuit have made clear that *Amundson* does not require that institutionalization be imminent or unavoidable before an *Olmstead* at-risk claim ripens. In

*Steimel*, *supra*, the state argued—as do Defendants here (Doc. 27 at 25)[30]—that a Medicaid waiver "slot" might be available to the plaintiffs if it became necessary to avoid institutionalization.  But the Seventh Circuit concluded that the "hypothetical availability" of such a waiver did not make the plaintiffs' at-risk claim unripe, where the state had decided that the plaintiffs were "currently ineligible" for such a waiver.  *Steimel*, 2016 WL 2731505 at **8. The lack of current eligibility was sufficient, the court held, "enough to raise a genuine question of fact about the adequacy of the [ ] waiver as a safeguard against a serious risk of institutionalization."  *Id.*[31]

Finally, Defendants argue that until institutionalization is imminent, it is impossible to "conduct the last step of the analysis required by *Olmstead* and determine whether a hypothetical community placement could be reasonably accommodated."  Doc. 27 at 26.  That is incorrect. The "last step" of the *Olmstead* analysis focuses not on the individual's service needs, but on "the resources available to the State and the needs of others with mental disabilities."  *Olmstead*, 527 U.S. at 587; *see also* 28 C.F.R. § 35.130(b)(7); *Kenneth R. v. Hassan*, 293 F.R.D. 254, 262, n.3 (D.N.H. 2013) (noting that the fundamental alteration defense "involves an inquiry into the needs of all persons served by the state's mental health system").  This "last step" of the *Olmstead* analysis, as characterized by Defendants, comes last for a reason.  Indeed, virtually all *Olmstead* at-risk cases involve systemic claims that the state has put a class of people at serious

---

[30] Defendants currently choose to limit their waiting lists' "emergency status" to those cases which require immediate action within 30 calendar days.  However, this strict temporal limitation is not the test of serious risk applied in federal case law.  Nor is it consistent with the Department of Justice's interpretation of its own implementing regulations.  *See* Ohio Admin. Code 5123:2-1-08(B).
[31] Similarly, in *M.A. v. Norwood*, the district court explicitly rejected defendants' broad reading of *Amundson*, and concluded that plaintiffs need not allege actual institutionalization to state ADA and Rehabilitation Act claims where "the threat of their institutionalization is real."  2015 WL 5612597, at *10-11 (N.D. Ill. Sept. 23, 2015); *see also O.B. v. Norwood*, 2016 WL 1086535, at *5 (N.D. Ill. Mar. 21, 2016) (favorably citing *M.A.* and denying defendants' motion to dismiss and concluding that children for whom the state agency failed to provide adequate in-home shift nursing were not required to experience actual institutionalization in order to allege a viable claim under the ADA and Rehabilitation Act).

risk of institutionalization.  Defendants do not point to a single case in which a court sought to

examine the facts behind a particular plaintiff's placement under the last step of the *Olmstead*

analysis.  The merits of the State's affirmative defenses, and specifically any fundamental

alteration allegedly caused by reasonably accommodating the Plaintiff class, is a fact-specific

inquiry that cannot be resolved without discovery, and therefore is not an appropriate basis for

dismissal.

>   **B.**     **Neither Case Law Nor Authoritative DOJ Pronouncements Limit *Olmstead* At-Risk Claims To Instances In Which The State Makes A Cut To Pre-Existing Services.**

Defendants again misstate the law in arguing that an *Olmstead* at-risk claim can ripen

only "when a change in state policy" increases a particular person's risk of institutionalization.

Doc. 27 at 27.  As noted above, Defendants concede, and the Department of Justice has made

clear, that a cut to services is only one way in which a plaintiff could show sufficient risk of

institutionalization to make out an *Olmstead* violation.  *Supra* at 25.  Courts have allowed at-risk

claims to proceed in numerous cases in which the plaintiffs alleged that the state's ongoing

administration of its service system, and failure to provide adequate community services, placed

them at serious risk of institutionalization.  *See, e.g.*, *O.B. v. Norwood*, 2016 WL 1086535

(denying motion to dismiss where defendants' alleged failure to arrange for necessary in-home

nursing services created a likelihood that reduced services to children who remained at home

would cause their institutionalization); *Steward v. Janek*, No. 5:10-CV-1025-OLG, 2016 WL

3960919, (W.D. Tex. May 20, 2016) (certifying a class of Medicaid-eligible persons with

intellectual or developmental disabilities who currently or will in the future reside in nursing

facilities, or who are being, will be, or should be screened for admission to nursing facilities as a

result of  state agencies' failure to provide reasonable access to community-based services and

Medicaid PASSR screenings); *Kenneth R.*, 293 F.R.D. at 263 (certifying a class of persons with

serious mental illness who are unnecessarily institutionalized or at serious risk of
institutionalization as a result of defendants' failure to provide adequate community-based
services); *Lane*, 283 F.R.D. at 602 (certifying a class of persons with developmental disabilities
in or referred to segregated workshops, where the plaintiffs challenge the defendants' planning,
funding, and administering of their employment services system).

Defendants further suggest that a risk of institutionalization cannot be attributed to the
State if it is precipitated by a change in parents' ability to provide care or a deterioration in the
medical condition of an individual with a disability. Doc. 27 at 29. This position ignores both
the reality, and the purpose, of human service systems. The entire reason the State provides
residential services to individuals with disabilities—whether in institutions or in community
settings—is that the State recognizes that those individuals may, because of their disabilities and
the absence of other caregivers, require services and supports to live safely and free of
unreasonable restrictions or isolation. While a challenged State action must be reasonably
related to the risk of institutionalization, it need not be the sole cause. Other factors, such as the
deterioration of an individual's medical condition, or the loss of a primary caregiver, may affect
an individual's risk of institutionalization, justifying reasonable accommodation in the provision
of community services.[32] If a state provides those services in segregated settings such as ICFs,

---

[32] Defendants' waiting list regulations, found at Ohio Admin. Code 5123:2-1-08, specifically acknowledge the
extent to which these factors, and other significant unmet needs, may increase individuals' risk of institutionalization
and therefore the urgency of providing home and community-based services. In addition to specific priority
categories, Defendants enumerate a non-exhaustive list of factors which can lead to an emergency need for home
and community-based services. These include the following:

(a) Loss of present residence for any reason, including legal action;
(b) Loss of present caretaker for any reason, including serious illness of the caretaker, changes in the
caretaker's status, or inability of the caretaker to perform effectively for the individual;
(c) Abuse, neglect, or exploitation of the individual;
(d) Health and safety conditions that pose a serious risk to the individual or others of immediate
harm or death; or
(e) Change in emotional or physical condition of the individual that necessitates substantial
accommodation that cannot be reasonably provided by the individual's existing caretaker.

but fails to provide them sufficiently in community settings, that is a decision for which the state—and not the individual—is responsible, and one that predictably forces individuals with disabilities into inappropriate institutionalization. The State's decision thus reflects a present failure to "administer services, programs, and activities in the most integrated setting appropriate" in violation of the ADA. 28 C.F.R. § 35.130(d).

Defendants distort the Complaint to argue that Plaintiffs "want the State to guarantee that they will *never* face a substantial risk of entering a large ICF for *any reason*." Doc. 27 at 29 (emphasis in original). To the contrary, Plaintiffs request nothing more than what federal law mandates—that the State administer its programs in the most integrated settings appropriate to them, and not put them at serious risk of *unnecessary* institutionalization.[33] Contrary to Defendants' suggestion, (Doc. 27 at 29-30), this claim does not seek to impose a standard of care. Rather, Plaintiffs seek to enforce *Olmstead*'s requirement that Defendants "adhere to the ADA's nondiscrimination requirements with regard to the services they in fact provide." *Olmstead*, 527 U.S. at 603 n.14.[34] Although Defendants attempt to reframe *Olmstead's* footnote

---

Ohio Admin. Code 5123:2-1-08(B)(5)(a)-(e).

Notably, a finding of emergency status does not automatically result in the provision of appropriate home and community-based services. Rather, individuals move to the top of the waiting list and receive "first priority" for home and community-based services. Ohio Admin. Code 5123:2-1-08(D)(8).

[33] In order to comply with Title II's Integration Mandate, states are obliged to provide services to qualified individuals in the most integrated setting appropriate for their needs. 28 U.S.C. §35.130(d). The Rehabilitation Act and its regulations similarly prohibit discrimination on the basis of disability, 29 U.S.C. § 794(a) and 28 C.F.R. § 41.51(a); require that services be provided in the most integrated setting, 28 C.F.R. §§ 41.51(d); and make it a violation of the Act to use methods of administration that subject individuals to discrimination. 28 C.F.R. § 41.51(b)(3), 45 C.F.R. § 84.4(b)(4). For individuals who are unnecessarily institutionalized, or at serious risk of unnecessary institutionalization, the state must make reasonable accommodations to avoid their discriminatory segregation. *Olmstead*, 527 U.S. at 607.

[34] Other federal courts have concluded that *Olmstead's* footnote 14 only forecloses ADA challenges which seek to compel the creation of new benefits or services. It does not provide a valid defense when assessing liability under the Integration Mandate, even when an expansion of services is required to avoid unnecessary institutionalization. *See generally Steimel*, 2016 WL 2731505, at **8 (rejecting defendants' level of benefits and standard of care arguments and concluding that in challenging their receipt of fewer hours in the community plaintiffs are not seeking the creation of new services, but rather access to existing waiver services that are provided to others); *Davis*, 821 F.3d at 265 (emphasizing language in *Olmstead* footnote 14 that requires nondiscrimination in services

30

14 as one which relieves them from their obligations under federal law, the State's underlying responsibility to avoid unjustified isolation is a fundamental requirement of Title II's integration mandate, as interpreted by *Olmstead* and its progeny.[35]

As in *Steimel*, Plaintiffs do not argue that they have an "absolute entitlement" to any particular services or programs.  2016 WL 2731505 at **8.  Rather, they seek reasonable access to integrated residential, employment, and day services currently available to some persons with disabilities, but not to them.  *Id*.  As the Seventh Circuit concluded in *Steimel*, defendants may not:

> . . . by invoking the rules of its waiver program, limit qualified persons to only 12 hours in the community each week.  That fails to 'administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

*Id.* at **9 (quoting 28 C.F.R. §35.130(d)).

Defendants know how to serve persons with intellectual and developmental disabilities in the community, and they have done so for some people by providing limited access to home and community-based service waivers.  However, Defendants have not adequately addressed the risk of unnecessary institutionalization faced by the Plaintiffs or the thousands of similarly-situated class members across the state of Ohio.

---

provided, and finding that state provision of orthopedic services to some disabled Medicaid beneficiaries means it cannot deny the services to others, as this places them at risk of institutionalization in violation of *Olmstead*); *Pashby*, 709 F.3d at 321 (approving injunction that prohibits service reductions that place persons at risk of institutionalization, over dissent's argument that this is a demand for a specific level of benefits); *Crowe v. Miss. Div. of Medicaid*, No. 3:11-CV-00366-CWR, 2012 WL 4062798, at *2-*4 (S.D. Miss. Sept. 14, 2012) (rejecting state's "narrow framing" of plaintiff's claims of reduced waiver hours as an issue of level of benefits and, instead, emphasizing that the ADA prohibits discrimination within what services a public entity does provide) (citing *Buchanan v. Me.*, 469 F.3d 158, 174 (1st Cir. 2006)); *Wilborn ex rel. Wilborn v. Martin*, 965 F. Supp. 2d 834, 844 (M.D. Tenn. 2013), *vacated*, No. 3:13-CV-00574, 2014 WL 7893050 (M.D. Tenn. June 13, 2014) (citing footnote's limitation on level of benefits in overall description of *Olmstead* in decision that granted preliminary injunction for provision of waiver services to allow the individual to remain at home and avoid institutionalization).

[35] *See, e.g.*, Statement of the Department of Justice at 5 ("A state's obligations under the ADA are independent from the requirements of the Medicaid program.  Providing services beyond what a state currently provides under Medicaid may not cause a fundamental alteration, and the ADA may require states to provide those services, under certain circumstances.")

**C.    Plaintiffs Narowitz And Hamilton Have Sufficiently Alleged That They Face A Serious Risk Of Institutionalization Because Of The State's Failure To Provide Sufficient Community-Based Services, Making Dismissal Under Fed. R. Civ. P. 12(b)(1) Inappropriate.**

Plaintiffs Narowitz and Hamilton, and the class they seek to represent, are at serious risk of institutionalization, and their claims are sufficient to establish this Court's jurisdiction. Although Defendants characterize the risk as "speculative" in nature, both the allegations in the Complaint and supplemental declarations[36] from the two at-risk Plaintiffs demonstrate that their risk of unnecessary segregation is foreseeable and real and, like the plaintiff in *In re Cassim*, evidence of a substantial controversy ripe for adjudication.  594 F.3d 432, 437-438 (6th Cir. 2010) (question of whether student's loan debt is dischargeable was constitutionally ripe for review despite having yet to receive a discharge since there existed a substantial controversy between the parties).

As the Complaint makes clear, both Nathan Narowitz and Ross Hamilton live in the community, have significant disabilities, and need constant care which is tenuously provided by their families. Doc. 1 ¶¶ 52-53, 58, 59-61.  They want to remain in the community, but they need ongoing community residential, employment, and day supports, provided in an integrated setting through a waiver program, to do so.  *Id.* ¶¶ 52-65.   In the absence of timely access to such services, they are at serious risk of institutionalization in a segregated ICF.  *Id.* ¶¶ 58, 65.  The declarations filed herewith further elaborate on those allegations.

---

[36] In reviewing a 12(b)(1) motion to dismiss, the trial court is not confined to the allegations of the complaint when determining its subject matter jurisdiction, but may consider other pertinent material submitted as supporting evidence.  *PNC Bank, Nat'l. Assn. v. Botts*, Slip Copy, 2012 WL 5868891, at *6; see also*, *Treesh v. Taft*, 122 F.Supp.2d 881, 883 (S.D. Ohio 2000) ("the Court has wide discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve disputed jurisdictional facts.") (internal citations omitted).  As the Sixth Circuit has explained, "[t]he ripeness doctrine not only depends on the finding of a case and controversy and hence jurisdiction under Article III, but it also requires that the court exercise its discretion to determine if judicial resolution would be desirable under all of the circumstances."  *In re Cassim*, 594 F.3d 432, 437-438 (6th Cir. 2010) quoting *Brown v. Ferro Corp.*, 763 F.2d 798, 801 (6th Cir. 1985).

Ross Hamilton's mother and primary caregiver is intimately familiar with the physical, emotional, and financial burdens which jeopardize her ability to continue to support her son at home. Decl. of Sherry Hamilton, attached as Exhibit 3, ¶¶ 1-7,11-13, 17-18. She has made fruitless efforts to seek help from the developmental disability system, while her son's unmet needs increased. *Id.* ¶¶ 8-12. Only weeks after the filing of this Complaint, after years of waiting, she received an unexpected offer of a Level One waiver and additional segregated, facility-based day services. *Id.* ¶ 14. But financial limitations associated with that waiver, and the segregated nature of the facility-based day program, continue to deny her son meaningful opportunities for community participation and contact with non-disabled peers. *Id.* ¶¶ 15-17. His lack of access to integrated services, combined with the significant burdens of caregiving placed on his mother, left her no choice but to request information about ICF placement from her local County Board. *Id.* ¶¶ 18-19.

Nathan Narowitz's aging parents face similarly overwhelming responsibilities in providing for his day-to-day needs. Decl. of Jeanne Narowitz, attached as Exhibit 4, ¶¶ 1-4, 9-12. Ms. Narowitz waited years for any kind of integrated, community-based service, watching helplessly as her son's need for specialized interventions went unmet. *Id.* at ¶ 6-7. Suddenly, shortly after the commencement of this litigation, Ms. Narowitz was informed that her son had been referred to Defendants' vocational rehabilitation program. *Id.* ¶ 8. Although Ms. Narowitz and her son desire integrated employment services, she fears this limited, short-term intervention will not be sufficient to support Nathan's employment goals. *Id.* These service limitations, paired with her recent mini-stroke and her husband's hospitalization for high blood pressure, have led the Narowitz family to question whether they can continue to care for their son and have increased his serious risk of institutionalization in an ICF. *Id.* ¶¶ 9-12. Without reasonable

access to integrated community services, like those available under the Individual Options waiver, both Mr. Narowitz and Mr. Hamilton will remain at serious risk of institutionalization— a risk that only increases in significance as their parents' age, finances, and medical conditions further impede their ability to provide constant supervision and care.  *Id*. ¶¶ 9-11; Decl. Hamilton at ¶¶ 11-13,18-19.

The risk of institutionalization faced by Mr. Narowitz, Mr. Hamilton, and other similarly situated persons, is directly related to the State's actions.  These actions include the manner in which Defendants fund and maintain segregated ICF facilities, and the corresponding limitations Defendants have placed on access to integrated services.  Like thousands of at-risk class members, Plaintiffs Narowitz and Hamilton have spent years on waiting lists in the hope of receiving the services they needed to live integrated lives in the community and to avoid unnecessary institutionalization.  While they wait, the likelihood increases that their medical and behavioral conditions will deteriorate and that their continuing, unmet needs will outpace the capacity of aging parents and caregivers, forcing them to choose between living at home without sufficient services or entering an ICF.  When confronted with a similar set of pleadings, including plaintiffs at risk of nursing home placement and allegedly "detained on a years-long waiting list" for home and community services, the court in *Steward* concluded that plaintiffs had demonstrated an injury-in-fact, making dismissal under Fed. R. Civ. P. 12(b)(1) "premature."  *Steward v. Abbott*, No. 5:10-CV-1025-OLG, slip. op. at 11, 16-17 (W.D. Tex. May 17, 2016).  Even if it is impossible to predict the exact date and time when Plaintiffs will experience an ICF admission, it is certain that these conditions—significant unmet needs, limited

access to services, and the anticipated loss of a primary caregiver—present a serious risk of institutionalization sufficient to provide standing.[37]

Finally, it bears emphasis that Plaintiffs Hamilton and Narowitz are not merely *at risk* of segregation. Although they currently live in the community, they are forced to spend their days in segregated settings. The hours they spend stuck in their own homes or in segregated, facility-based day and sheltered workshop settings leave them isolated from other non-disabled peers. Decl. Hamilton, ¶ 9,15-17; Decl. Narowitz, ¶ 4-5, 7. Plaintiffs' allegations of community isolation and segregation in day and work programs are sufficient to establish a cognizable legal injury under Title II's Integration Mandate. *See Steimel,* 2016 WL 2731505, at ** 8-**9. Just as the *Steimel* plaintiffs' limited community access gave rise to a claim for discriminatory segregation, Plaintiffs also have a ripe claim based on their current discriminatory segregation.[38]

Taken together, Plaintiffs' Complaint and supplemental pleadings are sufficient to demonstrate the ripeness of their at risk claims under the ADA and Rehabilitation Act, and to avoid dismissal under Fed. R. Civ. P. 12(b)(1).

## III. THE ABILITY CENTER HAS STANDING TO SUE.

Defendants challenge the standing of the organizational Plaintiff, the Ability Center. Doc. 27 at 30. But Defendants entirely fail to challenge the Ability Center's standing to sue on its own behalf, and they misconstrue the law governing the Ability Center's standing to sue on

---

[37] Plaintiffs Narowitz, Hamilton, and those similarly situated, plainly are qualified to raise an *Olmstead* claim. They have already demonstrated that they prefer to reside in the community and are able to handle and benefit from what community services they do receive. Further, Plaintiffs' Complaint, and the supplemental declarations discussed above, allege that their needs can be reasonably accommodated through the provision of existing home and community-based services in integrated settings.

[38] The Statement of Department of Justice confirms this interpretation of the Integration Mandate, describing "segregated settings" as including "(1) congregate settings populated exclusively or primarily with individuals with disabilities; (2) congregate settings characterized by regimentation in daily activities, lack of privacy or autonomy, policies limiting visitors, or limits on individuals' ability to engage freely in community activities and to manage their own activities of daily living; or (3) settings that provide for daytime activities primarily with other individuals with disabilities." *Id*. at 3.

behalf of its constituents.  Because the Ability Center has standing on both of these bases,

Defendants' Motion should be rejected.

A.    **The Ability Center**

The Ability Center is a consumer-controlled center for independent living whose purpose

is "to promote a philosophy of independent living . . . in order to maximize the leadership,

empowerment, independence, and productivity of individuals with disabilities, and the

integration and full inclusion of individuals with disabilities into the mainstream of American

society."  29 U.S.C. § 796; Doc. 1 ¶¶ 66-67.  According to its authorizing statute, the Ability

Center must "promote and practice the independent living philosophy of consumer control of the

center regarding decision-making, service delivery, management, and establishment of the policy

and direction of the center." 29 U.S.C. § 796f-4(b)(1)(A).  Doc. 1 ¶ 75.  Federal law also requires

that the Ability Center, as a center for independent living, "be designed and operated within local

communities by individuals with disabilities" and to "have a Board that is the principal

governing body of the center…, a majority of which [must] be composed of individuals with

significant disabilities."  29 U.S.C. § 796f-4(c)(2).  Furthermore, it must take "affirmative action

to employ and advance in employment qualified individuals with significant disabilities" and

"ensure that the majority of the staff, and individuals in decision[-]making positions, … are

individuals with disabilities."  29 U.S.C. §§ 796f-4(c)(5)-(6).

As a result, people with disabilities and their families perform a variety of critical

functions for the Ability Center, including participation on the Board of Trustees, carrying out

day-to-day program operations, and collaborating regularly with local disability organizations

and task forces.  Doc. 1 ¶¶ 75-76.  The Ability Center also maintains a grievance process and

constituent surveys that are used to inform financial and programmatic decisions regarding the

delivery of services and the allocation of resources for future advocacy.  *Id*. ¶ 77.  Defendants'

administration, operation, and funding of the service system for people with intellectual and developmental disabilities, and the resulting discriminatory segregation of the Plaintiff class, impedes the Ability Center's capacity to carry out its mission and causes it to suffer direct economic injury.  *Id.* ¶¶ 71-73.

### B. Defendants Fail To Challenge The Ability Center's Standing To Sue On Its Own Behalf.

"Unquestionably an association may have standing to assert an injury to itself regardless of whether its members also have standing."  *Am, Canoe Ass'n, Inc. v. City of Louisa Water and Sewer Comm'n*, 389 F.3d 536, 544 (6th Cir. 2004) (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)).  Whether an organization has standing to sue on its own behalf depends on whether it has experienced injury-in-fact that is fairly traceable to the defendants' action and likely redressable by the court's judgment.  *See Am, Canoe Ass'n, Inc.*, 389 F.3d 536.  Where an organization has alleged that it has devoted significant resources to identifying and counteracting the defendants' illegal practices, those allegations are sufficient to create a concrete and demonstrable injury to the organization's activities, which is redressable by court action, thereby satisfying the elements required to plead organizational standing.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("If … petitioners' steering practices have perceptibly impaired [the organization's] ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact."); *Miami Valley Fair Housing Center, Inc. v. The Conner Group*, 725 F.3d 571, 576 (6th Cir. 2013) (finding standing where an organization alleged that it "'had to divert its resources, its staff time and energy to identify the ad and then to bring the ad to the attention of the appropriate authorities' thereby suffering a harm of $5,292.15 in costs").

Defendants have not challenged the Ability Center's standing to sue to redress its own injuries. The Complaint adequately pled such organizational standing. The Ability Center alleged that Defendants' administration, operation, and funding of the service system for people with intellectual and developmental disabilities, and the resulting discriminatory segregation of the Plaintiff class, impedes its capacity to carry out its mission and causes it to suffer direct economic injury. Doc. 1 ¶ 71-73. The Ability Center further alleged that it "has been forced to expend significant monetary and staffing resources advocating for increased access to home and community-based services for its constituents with intellectual and developmental disabilities," including "direct[ing] funding towards the grassroots organizing of people with intellectual and developmental disabilities, facilitating trainings on self-advocacy skills, meetings with federal and State legislators and policymakers, participation in the Ohio Olmstead Task Force, and the hiring of a staff attorney." Doc. 1 ¶ 72. Further, by asking this Court for a declaratory judgment and permanent injunctive relief, Doc. 1 § VII ¶¶ B-E, the Ability Center has shown that the injuries it has suffered are redressable by this Court. Indeed, in similar circumstances, *see* Section C.1 *infra*, the Ability Center was explicitly found to have standing to sue to redress its own injuries. *Ability Ctr. of Greater Toledo v. Lumpkin*, 808 F. Supp. 2d 1003, 1018 (N.D. Ohio 2011).

### C.     The Ability Center Has Standing To Sue On Behalf Of Its Constituents.

Independent of its standing to sue for its own injuries, the Ability Center has standing to sue to redress the injuries of its constituents. To demonstrate associational standing, the Ability Center must show that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977).

38

Defendants have not challenged the second element, essentially conceding that the interests the Ability Center seeks to protect are germane to its purpose. And, contrary to Defendants' contentions, the Ability Center fully satisfies the first and third parts of the *Hunt* test.

**1.     The Ability Center Has Sufficient "Indicia Of Membership" To Satisfy The *Hunt* Test.**

The first prong of the *Hunt* test allows associations that are not membership organizations to establish standing by demonstrating that their constituents are the functional equivalent of a traditional membership organization. The Ability Center has alleged that Plaintiff class members are among the constituents who are served by, and who inform the work of, the Ability Center, and their interest in remedying discriminatory segregation goes to the heart of the Center's mission. Doc. 1 ¶ 70, 74-78. Defendants do not dispute these allegations;[39] rather, Defendants assert that the Ability Center's constituents lack sufficient indicia of membership. Doc. 27 at 31. This argument misconstrues the relevant standard in *Hunt*. It also ignores the critical factual context of this case—namely, that the Ability Center, a center for independent living, is a consumer-controlled, community-based organization providing an array of independent living services to people with disabilities.

*Hunt* itself rejected any formalistic understanding of the concept of organizational membership. In holding that the Commission of apple growers and dealers had standing, the Supreme Court concluded that although "the apple growers and dealers are not 'members' of the Commission in the traditional trade association sense," the Commission, "for all practical purposes, *performs the functions* of a traditional trade association representing the Washington apple industry." *Hunt*, 432 U.S. at 344 (emphasis added). Accordingly, the *Hunt* "indicia of

---

[39] Because Defendants are making only a facial attack on the Ability Center's standing, the allegations in the Complaint are taken as true, and reviewed as the Court would review a motion under Fed. R. Civ. P. 12(b)(6), *i.e.* construing the facts in the light most favorable to the Plaintiffs. *See Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

membership" test has been explicitly characterized as looking to see whether the constituents are the "functional equivalent" of members. *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1112 (9th Cir. 2003).

Various federal courts have applied this functional membership test. For example, in *Oregon Advocacy Center*, the Ninth Circuit applied the test and held that a federally funded protection and advocacy system[40] had authority to sue on behalf of its constituents with mental illness, even though they did not "actually control [the association]'s activities and finances." *Id.*. Rather than looking to the constituents' formal voting rights, the court focused on whether the constituents "possess the means to influence the priorities and activities the Advocacy Center undertakes." *Id.* The court concluded that the constituents in *Oregon Advocacy Center* "possess[ed] many indicia of membership" and demonstrated through these indicia that they "satisfy the purposes that undergird the concept of associational standing: that the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a 'personal stake in the outcome of the controversy.'" *Id.* at 1111 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977)); *see also Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999) (holding a protection and advocacy organization had standing because its constituents, "[m]uch like members of a traditional association, . . . possess the means to influence the priorities and activities the [organization] undertakes" through requirements under federal law, including representation by people with mental illness or family members on the organization's board and advisory council, the existence of a grievance procedure, and consideration of constituents' input on the organization's priorities and activities); *Brooklyn Ctr.*

---

[40] The establishment by Congress and the legal authorities of a protection and advocacy system are discussed in full in section VI of this brief. It is important to note the distinction between a protection and advocacy system representing an individual or class as counsel, and a protection and advocacy system that proceeds as a party in order to pursue legal interests on behalf of their constituents. In this action, Disability Rights Ohio, the protection and advocacy system for Ohio, is acting as counsel for the Plaintiffs.

*for Independence of the Disabled v. Bloomberg*, 290 F.R.D. 409, 416-17 (S.D.N.Y. 2012) (holding an organization had sufficient indicia of membership because its mission was to serve the community of people with disabilities in New York and over half of its board members and over 70 percent of its staff were people with disabilities).

Similarly, in *Liberty Resources, Inc. v. Philadelphia Housing Authority*, a case involving plaintiffs with disabilities, the court concluded that the plaintiff organization had demonstrated sufficient indicia of membership where "a majority of [its] directors and members of key committees are people with disabilities."  528 F. Supp. 2d 553, 563 (E.D. Pa. 2007).  The Court explained that "[t]his degree of decision-making responsibility given to LRI's constituents is a strong indicia of membership."  *Id.*  The *Liberty Resources* court rejected defendant's argument that, because not all of LRI's consumers and decision-makers participated in its programs, LRI lacked standing; the court explained that "standing does not require that every individual in an organization, nor every decision-maker in an association, suffers the precise, direct injury allegedly caused by the defendant."  *Id.* (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)).

Contrary to Defendants' position, the outcome here is not controlled by the Second Circuit's decision in *Disability Advocates, Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149 (2d Cir. 2012); Doc. 27 at 32.  Disability Advocates was only a contractor to New York State's protection and advocacy system, whereas the Ability Center is not a contractor; it directly represents individuals with intellectual and developmental disabilities in their pursuit of independent living arrangements.  Hence, the key facts underlying the holding in *Disability Advocates* are not applicable to the present case.  In finding that Disability Advocates did not have associational standing, the Second Circuit relied on the fact that, as a contractor, it was not bound by the protection and advocacy agency's statutory requirements.  As a result, the court

concluded that there was "no evidence that the individuals with mental illness on behalf of whom DAI brought this case have anything approaching the indicia of membership that is required under *Hunt*." *Disability Advocates,* 675 F.3d at 159.

In contrast here, the Ability Center has pled sufficient facts to establish indicia of membership under *Hunt*. The purpose of the Ability Center is "to promote a philosophy of independent living . . . in order to maximize the leadership, empowerment, independence, and productivity of individuals with disabilities, and the integration and full inclusion of individuals with disabilities into the mainstream of American society." Doc. 1 ¶ 67. "The Ability Center's constituents "include individuals with intellectual and developmental disabilities currently institutionalized in large ICFs or at serious risk of institutionalization in these facilities." *Id.* ¶ 70. As pled in the Complaint, "[p]eople with disabilities make up the majority of members of the Ability Center's Board of Trustees, which sets the overall policy direction of the organization." *Id.* ¶ 75. Additionally, the Board has four members with intellectual or developmental disabilities or who are the parents of individuals with intellectual or developmental disabilities. *Id.* A majority of the Ability Center's staff are people with disabilities, and these staff work directly with the Ability Center's constituents. *Id.* ¶ 76.

People with disabilities perform a variety of other critical functions for the Ability Center, including collaborating regularly with local disability organizations and taskforces. *Id.* The Ability Center also maintains a grievance process and relies on constituent surveys to inform financial and programmatic decisions regarding the delivery of services and the allocation of resources for future advocacy. *Id.* ¶ 77. And many individuals with disabilities perform leadership functions within the organization. *Id.* ¶ 76. As a result, people with disabilities have a direct influence on the day-to-day work of the Ability Center. *Id.* ¶ 78. Like the constituents in

*Oregon Advocacy Center,* the Ability Center has shown that as an organization it "is sufficiently identified with and subject to the influence of those it seeks to represent as to have a 'personal stake in the outcome of the controversy.'" *Oregon Advocacy Center*, 322 F.3d at 1111 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977)).

### 2. The Claim Does Not Require Individual Participation Of The Ability Center's Members.

Defendants assert that the Ability Center lacks standing because the suit's *Olmstead* claim requires the individual participation of the Ability Center's members, and thus fails the third prong of *Hunt*, which requires that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt,* 432 U.S. at 343.  Doc. 27 at 30-31.

Defendants again misstate the law.  The Sixth Circuit has held that "[t]he individual participation of an organization's members is not normally necessary when an association seeks prospective or injunctive relief for its members." *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004) (internal quotation marks omitted).  Typically, associations satisfy *Hunt*'s third prong by seeking only injunctive or declaratory relief benefiting the association and its members, *Fednav, Ltd. v. Chester*, 547 F.3d 607, 615 (6th Cir. 2008), as the Ability Center has done here.  Defendants argue that "[e]ach of Plaintiffs' claims requires some specific allegations and evidence about individual Plaintiffs," and that therefore "the Ability Center could not prevail as Plaintiffs without individual participation in this case." Doc. 27 at 32-33.  But the court rejected this very argument in *Ability Center of Greater Toledo v. Lumpkin*, 808 F.Supp.2d 1003, 1019 (N.D. Ohio 2011).  In concluding that the Ability Center satisfied *Hunt's* associational standing test, the court held that "[w]hile the facts of each individual constituent's disability claim may differ, the same flawed determination process affects all

43

subject to it; relief would likewise benefit all those members." *Id.* This same reasoning applies here. Defendants' administration, management, and funding of Ohio's service system for people with intellectual and developmental disabilities affects all members, and prospective, injunctive relief from this Court would likewise benefit all members.

>        3.    **The Ability Center Has Previously Established Associational Standing In Factually Similar Circumstances.**

In at least two other cases the Ability Center has either explicitly been found to have associational standing or its standing has not been challenged. *See Ability Ctr. of Greater Toledo v. Lumpkin*; 808 F, Supp. 2d 1003 (N.D. Ohio 2011); *Ability Ctr. Of Greater Toledo v. Sandusky*, 385 F.3d 901 (6th Cir. 2004).

*Lumpkin* involved a challenge by the Ability Center and nine individually-named plaintiffs who had applied for Medicaid and who had, in violation of federal law, received no determination on their claim within ninety days. *Lumpkin*, 808 F. Supp. at 1009. The defendants argued that the Ability Center could not meet the third prong of the *Hunt* test. As just noted, the court rejected that argument. *See id.* at 1019.

Additionally, in *Sandusky*, the Ability Center's standing was not challenged during the district court litigation or on appeal in the Sixth Circuit. *See Sandusky*, 385 F.3d at 903 (describing procedural posture and litigation history). The Ability Center filed a class action lawsuit challenging the defendants' failure to install proper accommodations for individuals with physical disabilities in the course of renovating the city of Sandusky's sidewalks and street curbs. The Sixth Circuit affirmed the district court's decision, and at no time was standing raised. *Id.*

As in *Lumpkin* and *Sandusky*, the Ability Center has standing to sue on behalf of its constituents here.

IV.   **PLAINTIFFS HAVE STANDING AND A 42 U.S.C. § 1983 RIGHT OF ACTION TO PURSUE THEIR CLAIMS UNDER THE SOCIAL SECURITY ACT.**

Defendants maintain that the Medicaid provisions of the Social Security Act on which Plaintiffs rely, namely 42 U.S.C. §§ 1396n(c)(2)(B) and (C), are not enforceable through 42 U.S.C. § 1983.  However, an examination of the text of these provisions and the relevant cases upholding a private right of action under § 1983 demonstrates that they are individually focused and privately enforceable.  Alternatively, Defendants argue that Plaintiffs do not have standing because they were not harmed by the Defendants' alleged legal violations.  However, the record demonstrates a sufficient injury in fact to avoid dismissal.

A.   **The Provisions Of The Social Security Act On Which Plaintiffs Rely Are Enforceable Through 42 U.S.C. § 1983.**

42 U.S.C. § 1983 creates a cause of action against a person who, under color of state law, deprives "any citizen of the United States . . . of any rights, privileges, or immunities secured by the Constitution and laws."  The Supreme Court has held that § 1983 provides a cause of action to enforce federal statutes that "confer[] an individual right."  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002).  The Medicaid provisions of the Social Security Act on which Plaintiffs rely here, 42 U.S.C. §§ 1396n(c)(2)(B) and (C), fully satisfy *Gonzaga*'s requirements.

Both 42 U.S.C. §§ 1396n(c)(2)(B) and (C) employ "individually focused terminology" that "confer[s] the sort of *individual* entitlement that is enforceable under § 1983."  *Gonzaga*, 536 U.S. at 287 (internal quotation marks omitted).  Subparagraph (B) requires a state, "with respect to individuals" who "are entitled to" Medicaid institutional services and may be eligible for home and community-based services under its waiver program, to provide an evaluation of the need for institutional care.  42 U.S.C. § 1396n(c)(2)(B).  Notably, the statute declares that the state "will provide" such an evaluation.  *Id.*  That language satisfies the *Gonzaga* standard by "unambiguously confer[ring] a mandatory benefit focusing on the individual."  *Gonzaga*, 536

U.S. at 280 (internal quotation marks and brackets omitted).  Similarly, subparagraph (C) requires a state to inform "individuals who are determined to be likely to require the level of care provided" in an ICF of feasible alternatives to institutional care available under a waiver program, "at the choice of such individuals."  42 U.S.C. § 1396n(c)(2)(C).

As Defendants note, (Doc. 27 at 34), the Sixth Circuit held prior to *Gonzaga* that 42 U.S.C. §§ 1396n(c)(2)(B) and (C) are enforceable through § 1983.  *See Wood v. Tompkins*, 33 F.3d 600 (6th Cir. 1994).  Since *Gonzaga*, a number of federal courts have reached the same conclusion.  They have specifically held that 42 U.S.C. §§ 1396n(c)(2)(B) and (C) establish individual rights which are "unambiguously conferred" by "rights-creating language" and thus are enforceable through § 1983.  *See Ball v. Rodgers*, 492 F.3d 1094, 1116-1117 (9th Cir. 2007) (citing *Gonzaga* and, after thorough analysis, holding that 42 U.S.C. § 1396n(c)(2)(C) contains sufficient rights-creating language and is enforceable through § 1983); *Steward v. Abbott*, No. 5:10-CV-1025-OLG, slip. op. at 23 (W.D. Tex. May 17, 2016) (holding that 42 U.S.C. §§ 1396n(c)(2)(B) and (C) are enforceable because these provisions exhibit "an individual rather than an aggregate focus" and because they reflect "a congressional intent to create a right" for certain individuals to receive evaluations of their need for institutional care and information about home and community-based alternatives); *Masterman v. Goodno*, No. Civ.03-2939, 2004 WL 51271, at *10 (D. Minn. Jan. 8, 2004) (holding that, under *Gonzaga*, 42 U.S.C. § 1396n(c)(2)(C) contains "sufficient 'rights-creating' language to allow a cause of action under § 1983"); *Michelle P. v. Holsinger*, 356 F. Supp. 2d 763, 769 (E.D. Ky. 2005) (citing *Gonzaga* and holding that the "individually focused terminology [of 42 U.S.C. § 1396n(c)(2)(C)] confers the sort of individual entitlement enforceable under § 1983").

46

As the Ninth Circuit explained, 42 U.S.C. § 1396n(c)(2)(C), is specifically "constructed in such a way as to stress that these 'individuals' have two explicitly identified rights—(a) the right to be informed of alternatives to traditional, long-term institutional care, and (b) the right to *choose* among those alternatives." *Ball*, 492 F.3d at 1107. The statute is not concerned "solely with an aggregated institutional policy and practice.'" *Id.*(internal quotation marks omitted). Section 1396n(c)(2)(B) has the same structure and focus. Indeed, an "examination of the overall context of the [home and community-based services] waiver program, including the relevant statutes, implementing regulations, and legislative history, underscores [the] view that Congress consciously used 'explicit rights-creating terms'" when enacting these provisions. *Id.* at 1115.

Although the Sixth Circuit has not had an opportunity to revisit the enforceability of 42 U.S.C. §§ 1396n(c)(2)(B) and (C) since *Gonzaga*, it has applied the *Gonzaga* test to hold that other, similarly-worded Medicaid provisions are enforceable through § 1983. *See Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006) (finding 42 U.S.C. § 1396a(a)(23), which requires a state's Medicaid plan to provide that "any individual" eligible for Medicaid to obtain assistance or services from any qualified agency or person, to be enforceable through § 1983)[41]; *Westside Mothers v. Olszewski*, 454 F.3d 532, 543-544 (6th Cir. 2006) (upholding the district court's decision that 42 U.S.C. § 1396a(a)(43)(A), which says that a state's Medicaid plan must provide for "informing all persons . . . who are under the age of 21 [eligible for Medicaid] of the availability of early and periodic screening, diagnostic, and treatment services," is enforceable

---

[41] Defendants rely on *M.A.C. v. Betit*, 284 F. Supp. 2d 1298, 1307 (D. Utah 2003), but that case merely asserted, without further analysis, that subparagraph (C) does not contain "rights-creating language." Notably, *M.A.C.* reached the same conclusory holding regarding 42 U.S.C. § 1396a(a)(23)(A), *id.* at 1307—a Medicaid provision that the Sixth Circuit specifically held to be enforceable through § 1983 in *Harris*. *M.A.C.* also relied on *Sabree v. Houston*, 245 F. Supp. 2d 653, 659 (E.D. Pa. 2003), a decision that was subsequently overturned by the Third Circuit. *See Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 183 (3d Cir. 2004) (analyzing *Gonzaga* and holding that several Medicaid provisions, including 42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10), and 1396d(a)(15), "unambiguously confer rights vindicable under § 1983"). *M.A.C.* has no persuasive power here.

through § 1983 and finding that the plaintiffs' complaint states a claim for relief). These cases demonstrate that the Sixth Circuit would reaffirm *Wood* today.

Defendants argue that these statutory provisions do not create enforceable rights because they merely regulate states' Medicaid plans. Doc. 27 at 34-35. But the Sixth Circuit has specifically rejected the identical argument in its post-*Gonzaga* cases addressing the enforceability of Medicaid provisions under § 1983. In both *Harris* and *Westside Mothers*, the provisions that the court held enforceable also regulated the contents of a state Medicaid plan. The crucial point there, as here, was that once a state submits a plan or obtains a waiver, eligible Medicaid recipients obtain an individual entitlement to the benefits set forth in the statute.[42]

Congress too has specifically rejected Defendants' argument. In 42 U.S.C. § 1320a-2, Congress provided that "[i]n an action brought to enforce a provision of [the Social Security Act, which includes 42 U.S.C. §§ 1396n(c)(2)(B) and (C)], such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan." Congress enacted that provision explicitly to supersede *Suter v. Artist M.*, 503 U.S. 347 (1992), a decision cited by the Defendants. Doc. 27 at 34-35. "Since the adoption of this statute, courts around the country have relied on it in holding some Medicaid Act rights enforceable under § 1983 even where the statute's 'rights-creating' language is embedded within a requirement that a state file a plan or that that plan contain specific features." *Ball*, 492 F.3d at 1112. *See also Planned Parenthood Arizona, Inc. v. Betlach*, 899 F. Supp. 2d 868, 878 (D. Ariz. 2012) (holding that, according to §1320a-2, the statutory structure of Medicaid provisions under the Social Security Act requiring states to

---

[42] The decision in *Gaines v. Hadi*, No. 06-60129-CIV.SEITZMC, 2006 WL 6035742 at *23-*24 (S.D. Fla. Jan. 30, 2006), on which Defendants rely, held that subsection (C) is unenforceable because, in lieu of private enforcement, the Secretary must not grant a waiver to a state that fails to make the required assurances under this provision. Because the Sixth Circuit rejected that reasoning in *Harris* and *Westside Mothers*, the Southern District of Florida's decision carries no weight here.

submit plans to the Secretary for approval does not supersede "rights-creating language"
Congress used in enacting specific provisions); *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 602-
604 (5th Cir. 2004) (relying on §1320a-2 to find Medicaid early periodic screening, diagnostic,
treatment services provisions of the Social Security Act created an enforceable right).

> **B.    Plaintiffs Have Standing To Pursue Their Medicaid Claim, Because The
> State Has Never Provided Them A Meaningful Choice Between Institutional
> Care And Home And Community-Based Services.**

Defendants also contend that, because Plaintiffs are already on waiting lists for home and
community-based waiver services, they have not been harmed by Defendants' violations of 42
U.S.C. § 1396n(c)(2)(C).  Doc. 27 at 36.  That argument misconstrues subparagraph (C).  As the
Ninth Circuit explained, that provision creates "two explicitly identified rights- (a) the right to be
informed of alternatives to traditional, long-term institutional care, and (b) the right to *choose*
among those alternatives."  *Ball*, 492 F.3d at 1107.  Individuals thus "retain the right to make a
choice based on this information" about feasible alternatives to institutional care.  *Id.* at 1111.
Plaintiffs have not only a right to information regarding feasible alternatives to institutional care
available under Ohio's waiver programs, but also a right to choose between the two alternatives.

Subparagraph (C)'s implementing regulations underscore the point.  Pursuant to 42
C.F.R. § 441.303(d), states must provide to the federal government "[a] description of the
agency's plan for informing eligible beneficiaries of the feasible alternatives available under the
waiver and ***allowing beneficiaries to choose either institutional services or home and
community-based services***" (emphasis added).  Furthermore, 42 C.F.R. § 441.302(d) requires
states to provide assurances that "when a beneficiary is determined to be likely to require the
level of care provided in [an ICF], the beneficiary or his or her legal representative will be—(1)
[i]nformed of any feasible alternatives available under the waiver; and (2) [g]iven the choice of
either institutional or home and community-based services."

49

Plaintiffs who reside in ICFs have standing because they have suffered harm as a result of Defendants' failure to provide them individualized information and an opportunity to select a home and community-based services waiver program *before* they entered the ICF. They continue to suffer from this violation because of Defendants' ongoing failure to evaluate their eligibility for home and community-based services and to offer them an informed choice between remaining in the ICF or transitioning to a home and community-based services waiver program. Similarly, Plaintiffs at serious risk of institutionalization are harmed by their current segregation and Defendants' failure to provide individualized information about alternatives which might prevent their unnecessary ICF placement.

Defendants respond to these alleged harms by arguing that simply being told about the waiting list or discovering this information through other sources constitutes adequate notice of community alternatives and results in a meaningful choice for Ohio residents otherwise eligible for admission to an ICF. Defendants then go on to assert that waiting for years, and in some cases decades, for the opportunity to make a real and informed choice with regard to community alternatives does not result in any harm to Plaintiffs. Plaintiffs' Complaint and supplemental pleadings demonstrate that a lack of meaningful information about, and choices regarding, alternative community-based services are sufficient to demonstrate an injury in fact.

Plaintiff Phyllis Ball was not provided with individualized information on community-based alternatives at the time of her ICF placement, leaving her family, with whom she had lived for over 30 years, "no choice but to place Ms. Ball in her current ICF." Doc. 1 at ¶18. After reluctantly admitting their daughter, the Ball family was told only that she could place herself on a waiting list for home and community-based services. *Id.* Despite her preference for living in

50

the community, and her interest in considering alternatives to ICF placement, Ms. Ball has remained in that ICF for over 20 years. *Id.* ¶¶ 17, 23-24.

Plaintiffs Antonio Butler and Caryl Mason also have spent decades unnecessarily institutionalized in ICFs, and a collective 34 years on the waiting list for home and community-based services. Doc. 1 ¶¶ 26, 35, 40. During her 14 years on the waiting list, Ms. Mason and her family were not informed about or afforded the opportunity to make meaningful choices regarding alternatives to her continued ICF placement. *Id.* ¶ 40. Similarly, Mr. Butler does not recall receiving information about, or a chance to choose between, his various ICF placements and the community. *Id.* ¶ 26. Despite multiple expressions of interest in integrated, community-based living, he remains unnecessarily segregated due to inadequate community-based services. *Id.* ¶¶ 29-31.

Plaintiff Richard Walters entered an ICF when his aging parents were afforded no choice other than institutional placement for their son. *Id.* ¶ 45. Although he later experienced a period of community living, a change in his medical needs and subsequent hospitalization caused his community provider to discontinue services. *Id.* ¶ 45-46. Although she wanted her brother to remain in the community, Ms. Walters was presented with no alternatives other than continued nursing facility placement or ICF admission. *Id.*

Both in the Complaint, and through declarations by their mothers and guardians, Plaintiffs Narowitz and Hamilton describe the extent of their unmet service needs, and the resulting isolation and segregation they experience today. *Id.* ¶ 55-57, 62-64; Decl. Narowitz ¶¶ 4-8; Decl. Hamilton ¶¶ 5-10, 15-17. Despite repeated requests for help, neither Ms. Narowitz nor Ms. Hamilton received information about alternative community-based services that meet their sons' needs—not when they were first placed on the waiting list, nor during the many years

51

they waited for needed services from Defendants.  Decl, Narowitz ¶¶ 6-8; Decl. Hamilton  ¶¶ 8-

10.  Although, following the filing of this case, Mr. Narowitz's County Board of Developmental

Disabilities referred him to Opportunities for Ohioans with Disabilities, the State's vocational

rehabilitation agency, his family was not informed about, or given an opportunity to choose,

other community services that might mitigate his risk of ICF placement.  Narowitz Decl. at ¶ 8.

Even when Ms. Hamilton called her county board of developmental disabilities in desperation,

asking for information about ICF placement options, she did not receive any other information

about alternatives to institutional placement for her son.  Hamilton Decl. at ¶ 19.

As the court in *Steward* recently held, the current and ongoing harm experienced by the

individual Plaintiffs, and the class they represent, is sufficient to confer standing to assert a claim

under the Medicaid freedom-of-choice provisions of the Social Security Act.  At the very least,

there is no basis for dismissal before a fuller development of the facts.  *Steward v. Abbott*, No.

5:10-CV-1025-OLG, slip. op. at 11-12 (W.D. Tex. May 17, 2016) (denying motion to dismiss

the plaintiffs' claims under §§1396n(c)(2)(B) and (C) and finding that the defendants' failure to

adequately evaluate class members community service needs, and their relegation to a "years-

long waitlist," constituted an adequate showing of injury to preclude dismissal under Fed. R. Civ.

P. 12(b)(1)); s*ee also Disability Rights N.J., Inc. v. Velez*, Civil No. 05–4723, 2010 WL 5055820

at *4 (D. N.J. Dec. 2, 2010) (finding that questions of fact remain, including the availability of

home and community-based waiver services, before a state's compliance with 42 U.S.C. §

1396n(c)(2)(C) can be determined); *Rolland v. Cellucci*, 52 F.Supp. 2d 231, 241 (D. Mass. 1999)

(denying the defendants' motion to dismiss the plaintiffs' claims under 42 U.S.C. §

1396n(c)(2)(C) because it "remains to be demonstrated whether the programs which Plaintiffs

allege to have been denied are, in fact, feasible alternatives to nursing facility care").

Accordingly, there is no basis for dismissing Plaintiffs' subparagraph (C) claims for lack of standing.

## V.    GOVERNOR KASICH IS A PROPER DEFENDANT

Defendant Kasich moves for dismissal based on Eleventh Amendment immunity pursuant to Fed. R. Civ. P. 12(b)(1) and failure to state a claim under 12(b)(6).  His Motion, (Doc. 28), ignores established case law in Ohio and the Sixth Circuit, including *Martin v. Taft*, where the Governor was a proper defendant, and which is cited extensively throughout the Defendants Martin and McCarthy's Motion.  Doc. 27 at 7, 11-23.  As in *Martin*, Defendant Kasich is intimately involved in the administration of the Medicaid home and community-based waiver system that caused the segregation of the Plaintiffs.  Because of the direct connection between Defendant Kasich and the segregation alleged, he is essential to the remedy and is a proper defendant under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908).  Moreover, the State has waived its immunity against claims brought under the Rehabilitation Act specifically, and Plaintiffs' allegations are sufficient to state a Rehabilitation Act claim against Defendant Kasich.[43]

### A.    The Claims Against Defendant Kasich Are Properly Brought Under *Ex parte Young.*

Although the Eleventh Amendment generally bars suits by private plaintiffs against non-consenting states, *Ex parte Young* permits private plaintiffs to bring cases against state officials in their official capacities that "seek prospective relief to end a continuing violation of federal law."  *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013); *Ex parte Young*, 209 U.S. at 155-56.  As the Supreme Court explained in *Green v. Mansour*, 474 U.S. 64, 68 (1985), "…*Ex*

---

[43] With regard to Plaintiffs' Medicaid claim, Defendants also argue that Congress has failed to abrogate immunity under the Social Security Act, and therefore the Governor is immune to suit.  Doc. 28 at 11.  Because the Plaintiffs have sued Governor Kasich on this claim in his official capacity pursuant to *Ex parte Young*, it is not necessary for the Court to consider this third exception to Eleventh Amendment immunity.

*parte Young* gives life to the Supremacy Clause," because "[r]emedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law." For *Ex parte Young* to apply, the state official "must have, by virtue of the office, some connection with the alleged unconstitutional act or conduct of which the plaintiff complains." *Floyd v. Cty. of Kent*, 454 F. App'x 493, 499 (6th Cir. 2012).

### 1. Many Courts, Including This One, Permit Actions Like Plaintiffs' To Proceed Under *Ex parte Young*.

Defendant Kasich does not deny that the Plaintiffs seek prospective relief to end an ongoing violation of federal law. He merely argues that, because specific state agencies are responsible for managing Ohio's provision of services and funding to people with intellectual and developmental disabilities, he is not a proper defendant. In so arguing, Defendant Kasich ignores the many times that the Sixth Circuit and other courts have found a sufficient connection between a governor's duties and the claims alleged to warrant application of the exception, often in circumstances similar to these. *See, e.g.*, *Lawson v. Shelby Cty.*, 211 F.3d 331, 335 (6th Cir. 2000) (permitting governor as defendant where plaintiffs alleged violation of federal law when denied right to vote); *Rolland v. Cellucci*, 52 F. Supp. 2d 231, 243 (D. Mass. 1999) (governor was a proper defendant in ADA integration and Medicaid class action based on responsibility for budget and for directing state agencies, and observing that "[n]o case holds that the provision which empowers a single state agency to administer a state's Medicaid program was in any way promulgated with the intention of exonerating or limiting the liability of other governmental officials who fail to conform their required actions to federal law"); *see also Taaffe v. Drake*, No. 2:15-CV-2870, 2016 WL 1713550, at *5 (S.D. Ohio Apr. 29, 2016) ("Even the governor of a

state can be a proper defendant for purposes of obtaining prospective injunctive relief in the

proper circumstances based on the governor's duty to enforce the law.").[44]

     Perhaps the most relevant example is the *Martin* case, where the Governor of Ohio was

both a defendant and signatory to the Consent Order.  *See* Doc. 27-1 at 12; *Martin,* 222 F. Supp.

2d at 952 and 962.  In this Court's in-depth analysis of the application of the *Ex parte Young*

doctrine in *Martin*, there is no discussion of whether the Governor was a proper defendant,

demonstrating the clear cut nature of the issue.  *Martin*, 222 F. Supp. 2d at 957-960.  In fact, the

defendants in *Martin* never challenged the inclusion of the Governor as a party.  *See id.*  Yet,

here the Defendants devote sections of their Motion to Dismiss to arguing that Defendants

Martin and McCarthy are successors to *Martin* defendants, while conveniently omitting any

reference to the Governor—who was also a defendant in *Martin*.  Doc. 27 at 15-17, 19-20.

Defendant Kasich's Motion "fully joins" the Motion to Dismiss filed by Defendants Martin and

McCarthy and "incorporates it as if written here."  Doc. 28 at 3-4.  In doing so, Defendant

Kasich advances conflicting arguments: he asserts that *Martin* and this matter are identical for

*res judicata* purposes, and at the same time that his legal responsibility to the Plaintiffs is

somehow different from the Governor's in *Martin*.  This Court correctly found the Governor in

---

[44] *See also Rosie D. ex rel. John D. v. Swift*, 310 F.3d 230, 236-38 (1st Cir. 2002) (governor proper defendant in Medicaid class action); *Bd. of Pub. Educ. for City of Savannah & Cty. of Chatham v. State of Ga.*, No. CV 490-101, 1990 WL 608208, at *4 (S.D. Ga. Sept. 24, 1990) (governor proper defendant in desegregation class action because of responsibility for submitting appropriations bill to state legislature that allocates resources to state departments, appointment authority to state boards, and authority to issue payment from state treasury ); *Luckey v. Harris*, 860 F.2d 1012, 1016 (11th Cir. 1988) (governor proper defendant in civil rights case to compel indigent defense services because of responsibility for law enforcement and for executing laws, residual power to commence criminal prosecutions, and final authority to direct Attorney General to prosecute); *Stanley v. Darlington Cty. Sch. Dist.*, 879 F. Supp. 1341, 1362-1363 n. 9 (D.S.C. 1995), *rev'd in part on other grounds*, 84 F.3d 707 (4th Cir. 1996) (governor proper party in school desegregation suit where there was "evidence of discriminatory acts by the Governor's predecessors as well as a continuing failure to remedy the effects of the past acts"); *HRPT Props. Trust v. Lingle*, 715 F. Supp. 2d 1115, 1125-1126 (D. Haw. 2010) (governor proper defendant where governor required to approve all state agency regulations, and governor had authority to "direct or prohibit enforcement, or to advise agencies and individuals to issue regulations, standards, or directives relating" to challenged statute); *Caspar v. Snyder*, 77 F. Supp. 3d 616, 634 (E.D. Mich. 2015) (finding that the Governor had "some connection" to the unconstitutional policy which was "sufficient to satisfy the requirements of the Eleventh Amendment" (internal quotation marks omitted)).

*Martin* was responsible for the discriminatory operation of the disabilities service system.  The same is true here.  Inclusion of the Governor in *Martin* as a defendant and as a signatory to the Consent Order approved by this Court, (Doc. 27-1), indicates the Governor of Ohio has a singular responsibility and ultimate accountability for Ohio's Medicaid community-based waiver program, which is consistent with the substantial role Defendant Kasich has taken in the operation of this system, described *infra*.

> ## 2. Defendant Kasich Exercises Significant Control Over Key Aspects Of The Systems At Issue In This Case.

A significant aspect of this lawsuit involves Ohio's Medicaid home and community-based services waiver program.  Defendant Kasich is a central player in the provision of the services that Plaintiffs seek to enable them to avoid segregation.  Defendant Kasich has directly coordinated with the Ohio Department of Medicaid ("ODM") to expand this waiver program through the Governor's Office of Health Transformation.  *See* Doc. 1 ¶ 82.  Defendant Kasich created the Governor's Office of Health Transformation, an office whose dedicated function is to "address Medicaid spending issues," in 2011 by Executive Order.  Doc. 28-1 at 1; Doc. 1 ¶ 82. The Office also coordinates and implements planning and budget activities to ensure the State of Ohio's compliance with the U.S. Supreme Court's *Olmstead* decision.  Doc. 1 ¶ 82.  In the Executive Order, Defendant Kasich mandated that all Cabinet Agencies and their directors, including those of DODD, ODM, and the Office of Budget and Management, must comply with requests of the Governor's Office of Health Transformation.  Doc. 28-1 at 2.  This mandate contradicts Defendant Kasich's argument that the Governor's Office does not "usurp[s]" the roles of other agencies.  Doc. 28 at 8.

Since its inception, Defendant Kasich has used his Governor's Office of Health Transformation to influence and shape the size and scope of the Medicaid home and community-

based waiver services at issue in this case. The Office stated in budget documents that "the Governor's Office of Health Transformation has been working to rebalance Medicaid spending toward less expensive home and community based services" and that the Governor's "Executive Budget creates more choices for Ohioans with developmental disabilities to live and work in the community" by creating additional waiver slots. [45] The budget document even provides detailed information about the proposed changes to particular waivers. *Id.* at 4. These are the same changes touted in the Motion to Dismiss joined by Defendant Kasich. Doc. 27 at 4. Yet Defendant Kasich now seeks to distance himself from his role in this system that continues to segregate Plaintiffs.

As evidenced by its very name, the *Governor's* Office of Health Transformation is controlled by and an extension of Defendant Kasich (emphasis added). *See* Doc. 28 at 8; Doc. 28-1 at 1. In fact, according to publicly available information, the Governor's Office of Health Transformation is actually housed within Defendant Kasich's own physical offices and the staff of the Governor's Office of Health Transformation even uses email addresses with "@governor.ohio.gov," [46] unlike other state agencies. [47]

All the executive officials responsible for Ohio's disabilities service system must coordinate their activities with, and obtain approval from, the Governor's Office of Health

---

[45] Ohio Governor's Office of Health Transformation, *Prioritize Home and Community Based Services* 1, 3 (Feb. 2, 2015), http://www.healthtransformation.ohio.gov/LinkClick.aspx?fileticket=anAMaoNdxiA%3D&tabid=252; *see also* Ohio Governor's Office of Health Transformation, *Enhance Community Developmental Disabilities Services* 1 (Feb. 2, 2015), http://www.healthtransformation.ohio.gov/LinkClick.aspx?fileticket=e0syoWSGQ9k%3D&tabid =252 (quoted in Doc. 1 ¶ 103).

[46] Governor of Ohio, Contact, http://governor.ohio.gov/Contact/ContacttheGovernor.aspx (last visited July 16, 2016) (address of Governor of Ohio 77 South High Street 30th floor, Columbus); Governor's Office of Health Transformation, Contact Us http://www.healthtransformation.ohio.gov/Contact.aspx (last visited July 16, 2016) (address of Governor's Office of Health Transformation 77 South High Street, 30th Floor, Columbus; email addresses of staff ending with "@governor.ohio.gov").

[47] *See, e.g.*, *Ohio Commission on Minority Health, Commissioner Listing* (September 16, 2015) http://www.mih.ohio.gov/Portals/0/OCMH%20Board/BOARD%20MEMBER%20LISTING%20Revised%201%20 12%2016%20no%20cell%20numbers.pdf (email address for Medicaid director and other staff member ending with @medicaid.ohio.gov) (last visited July 16, 2016).

Transformation with respect to reforms to or expansion of their developmental disabilities programs.[48]  This coordination and approval authority applies equally to Ohio's Medicaid program and particularly to the Medicaid waivers that are Ohio's central vehicle for serving people with intellectual and developmental disabilities in the community.[49]

Defendant Kasich in fact uses the Office to exercise his ultimate executive branch authority over the budget to influence the funding of the home and community-based services at issue here.  *See* Ohio Const. art. III, § 5.  Although each agency is responsible for the initial preparation of its proposed budget in each biennial budget cycle, it is the Governor's Office that makes the final decisions about the Executive Budget proposals and the underlying priorities. Doc. 1 ¶ 81; *see also* Ohio Rev. Code § 107.03.  Therefore, Defendant Kasich ultimately controls decisions about the proposed budget submitted to the Legislature and specifically has discretion to seek funds to support community programs, just as he did in the most recent budget via his Governor's Office of Health Transformation.[50]  Defendant Kasich has authority to allocate those budget funds once appropriated, to cut those funds, and to repurpose funds when necessary to comply with federal law.  Ohio Rev. Code § 126.05.  For example, the Governor's Office of Health Transformation also coordinates with departments, including ODM, to exercise the

---

[48] His director of DODD determines, in direct consultation with and with the approval of the Governor and the Governor's Office of Health Transformation, whether to continue to rely upon segregated ICFs and sheltered workshops to serve individuals with intellectual and developmental disabilities, whether to expand integrated residential and employment alternatives, how to manage and reimburse community providers, the nature of the agency's oversight of County Boards, the policies and practices that govern the planning and administration of Ohio's developmental disability service system, and even whether to enter into settlement agreements to resolve ADA challenges to the State's segregated system, as reflected in the *Martin* Consent Order.  *See* Doc. 27-1 at 12; *see also* Doc. 1 ¶¶ 86-88; *see also* Doc. 27-1 at 12.
[49] The Governor's director of ODM determines, in direct consultation with the Governor's Office of Health Transformation and finally with the approval of the Governor, whether to expand the home and community-based waiver.  Defendant Kasich is responsible for appointing, firing, disciplining, and overseeing officials who will properly enforce federal Medicaid law.  *See* Doc. 1 ¶¶ 91-92.
[50] *See* Doc. 1 ¶ 103; Ohio Governor's Office of Health Transformation, *Enhance Community Developmental Disabilities Services* 2-3 (Feb. 2, 2015), http://www.healthtransformation.ohio.gov/LinkClick.aspx?fileticket=e0syoWSGQ9k%3D&tabid=252 (last visited July 18, 2016).

Governor's budget authority to reform programs and advance targeted policies identified as priorities by the Governor.[51]

Defendant Kasich has also created and attempted to implement a series of policies that directly affect Plaintiffs' ability to receive integrated, community-based employment or day services.  Doc. 1 ¶¶ 82, 193.  Through an Executive Order, Defendant Kasich created an "Employment First" policy in Ohio, establishing that "[c]ommunity employment shall be the priority and the preferred outcome for . . . Ohioans with disabilities," a principle later codified in state law.  Exec. Order, 2012-05K; *see* Doc. 1 ¶ 157 (citing Ohio Rev. Code § 5123.022(B)). Defendant Kasich created a statewide leadership taskforce made up of agency heads, tellingly called the *Governor's* Employment First Taskforce, to effectuate his policy goals, as well as an Advisory Committee, on which the Governor's Office serves as a member (emphasis added). *See id.*[52]  DODD, in coordination with the task force established by Defendant Kasich, must annually submit data on the implementation of these policies to the Office of the Governor. Ohio Rev. Code § 5123.022(B).

Defendant Kasich also has a statutorily mandated duty to provide funding for OOD:  if federal funds are not available to the state for vocational rehabilitation services, the Governor is required by law to include in his proposed budget a request for funds sufficient to support the activities of the agency.  Ohio Rev. Code § 3304.18.  This mandate, and his creation of these policies, demonstrates that he will be intimately connected to authorizing, developing, and effectuating any remedy in this case  *See Lane v. Kitzhaber*, No. 3:12-CV-00138-ST, 2014 WL

---

[51] Governor's Office of Health Transformation, Medicaid Reforms,
http://www.healthtransformation.ohio.gov/LinkClick.aspx?fileticket=cyT6N29l0sE%3d&tabid=84 (last visited July 18, 2016).
[52] *See also* Ohio Employment First, Advisory Committee,
http://www.ohioemploymentfirst.org/view.php?nav_id=12 (last visited July 18, 2016) (listing Governor's Office as member of committee).

2807701, at *1 (D. Or. June 20, 2014) (governor who similarly adopted an Employment First Policy by executive order was a proper defendant in case alleging segregation in employment settings in violation of the ADA).

In addition, Defendant Kasich has appointment responsibilities that directly affect the segregation experienced by Plaintiffs. *See also L.A. Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992) (governor has "specific connection" to statute concerning judicial appointments because of "duty to appoint judges"). Defendant Kasich is responsible for appointing the directors of the agencies responsible for Ohio's reliance on segregated ICFs, employment, and day service settings, including DODD, ODM, and OOD in accordance with Ohio Const. art. III, § 21. Doc. 1 ¶ 80. In fact, according to the OOD agency website, upon Defendant Kasich's appointment of Defendant Miller as the Executive Director of OOD in 2011, Defendant Miller "immediately began to implement the policies and procedures necessary to comply with *Governor John Kasich's charge* of eliminating the waiting list for those seeking services."[53] This statement further demonstrates Defendant Kasich's active role and involvement in establishing policy and setting the priorities and direction of this agency.

This case involves the implementation of policies that bear the Governor's own imprimatur and that directly bear on the Plaintiffs' segregation, which is far more than the Sixth Circuit has required to attach liability. *See, e.g.*, *Allied Artists Pictures Corp. v. Rhodes*, 473 F. Supp. 560, 567 (S.D. Ohio 1979), *on reexamination*, 496 F. Supp. 408 (S.D. Ohio 1980), *modified on other grounds*, 679 F.2d 656 (6th Cir. 1982) (liability based only on enforcement authority). It is ultimately within Defendant Kasich's authority to determine whether to use federal funds to meet the state's federal obligations. Defendant Kasich's actions are thus like

---

[53] Ohio Dep't of Developmental Disabilities, Director Biography, http://www.ood.ohio.gov/About-Us/Director-Biography (last visited July 16, 2016) (emphasis added).

60

those in cases where courts have found governors proper defendants, such as *Martin*, *Lane*, or *Luckey,* 860 F.2d at 1016.

Defendant Kasich's actions demonstrate that he is intimately connected to the administrative, operational, and policy setting decisions which impact the delivery of developmental disability services in Ohio.  As a result, Defendant Kasich has both the capacity to remedy the segregation experienced by Plaintiffs and the authority needed to coordinate and effectuate the remedy, as was the case with the Governor in *Martin*.  *Martin,* 222 F. Supp. 2d at 960.  These circumstances stand in contrast to cases cited by Defendant Kasich where the official was found unable to affect the remedy.  *See* Doc. 28 at 8. (*citing Peter B. v. Sanford*, No. CA 6:10-767-TMC, 2012 WL 2149784, at *5 (D.S.C. June 13, 2012) (holding that injunction on governor "would have no real effect")); *Id.* at 6 (*citing L.A. Branch NAACP v. L.A. Unified Sch. Dist.*, 714 F.2d 946, 953 (9th Cir. 1983) (dismissing governor because he lacked power to remedy segregation of plaintiffs)).

The nexus between Defendant Kasich's conduct and the harm alleged is much more concrete than the connection established in a number of cases he cites.  *See* Doc. 28 at 4-6; *see, e.g.*, *Brown v. Strickland*, No. 2:10-CV-166, 2010 WL 2629878, at *3 (S.D. Ohio June 28, 2010) (officials dismissed in challenge to criminal statute where plaintiff alleged no facts about governor's connection to enforcement); *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1416 (6th Cir. 1996) (insufficient connection because Attorney General had not threatened to enforce challenged statute, and where plaintiffs actually sought to *strike* particular statutory provisions to allow broader enforcement, which would "turn *Young* inside out"); *Woods v. Ohio*, No. 5:11CV565, 2011 WL 4730529, at *3 (N.D. Ohio Oct. 7, 2011) (dismissing governor in action challenging constitutionality of state gun law where only basis for including

61

was governor's general enforcement authority); *Conn. Ass'n of Health Care Facilities, Inc. v. Rell*, No. 3:10CV136(PCD), 2010 WL 2232693, at *5 (D. Conn. June 3, 2010) (governor dismissed where only involvement was general duty to enforce law and introduction of budget bill); *Tohono O'odham Nation v. Ducey*, 130 F. Supp. 3d 1301, 1311 (D. Ariz. 2015) (governor dismissed where only connection was letter from governor to agency that influenced denial of gambling certificate); *Hendricks v. Kasich*, No. 2:12-CV-729, 2013 WL 2243873, at *9 (S.D. Ohio May 21, 2013) (dismissing governor primarily because claim was for retroactive relief, and also observing that plaintiff failed to allege governor "has any responsibility for the enforcement of any law or policy relating to the provision of medical care for Ohio prison inmates").[54]

Unlike in those cases, Defendant Kasich has established policies and operated offices explicitly involved with the system at issue here.  Plaintiffs here allege that Defendant Kasich has harmed them in violation of federal law, and further establish that his involvement has gone far beyond general "enforcement authority."  Defendant Kasich is thus sufficiently connected to the claims alleged by Plaintiffs to fall within the *Ex parte Young* doctrine, making him a proper party to this lawsuit.

### 3.    Any Argument That Defendant Kasich Should Be Dismissed As Redundant Is Baseless.

Finally, Defendant Kasich should not be dismissed as "redundant" in this lawsuit because the concept of "redundant claims" concerns claims brought "against *agents* in their official

---

[54] *See also Confederated Tribes & Bands of the Yakama Indian Nation v. Locke*, 176 F.3d 467, 469-70 (9th Cir. 1999) (dismissing governor because lottery administered by independent commission operated by independent agency with no role for governor and no other evidence of involvement); *Floyd*, 454 F. App'x at 499 (*pro se* defendant alleged no facts showing connection between governor's acts or responsibility for inadequate indigent representation); *Nat'l Coal. For Students With Disabilities Educ. And Legal Def. Fund v. Bob Taft*, No. C2-00-1300, 2001 WL 1681115, at *3 (S.D. Ohio Sept. 24, 2001) (dismissing governor where he had designated enforcement authority and then was no longer involved, and rejecting argument that governor had ability to indirectly influence university officials he had appointed); *Kobe v. Haley*, No. CA 3:11-1146-TMC, 2012 WL 3269221, at *4 (D.S.C. Aug. 10, 2012) (governor dismissed where plaintiffs rested largely on governor's supervisory and appointment responsibility and only alleged minimal additional connections, such as name on agency letterhead and general media statements about working with agency heads to provide as much healthcare as possible).

capacities when the *principal entity* is also named as a defendant in the suit."  *McGath v. Hamilton Local Sch. Dist.*, 848 F. Supp. 2d 831, 838 (S.D. Ohio 2012) (emphasis added) (citation omitted); *Carter v. Del. Cty. Bd. of Comm'rs*, No. 2:07-cv-1189, 2009 WL 544907, at *15 (S.D. Ohio Mar. 3, 2009) (denying defendants' motion to dismiss claims against public officials sued in their official capacity as redundant because "the principal entity of which the Individual Defendants are agents—Delaware County—is not a named Defendant in this case."). Here, Plaintiffs have sued all Defendants in their official capacities and have brought no claims against the principal entities (such as the State of Ohio or their respective departments). Defendant Kasich misreads the cases he cites on this issue.[55]  *See* Doc. 28 at 11-12.  The fact that other agency officials are also parties has no bearing on whether Defendant Kasich is a proper defendant in this action.

### B. Immunity Does Not Bar The Rehabilitation Act Claim, And Plaintiffs Have Sufficiently Pled A Rehabilitation Act Claim Against Defendant Kasich.

Defendant Kasich's argument that Plaintiffs cannot bring a claim against him under the Rehabilitation Act seems to rest on his contention that he "does not receive the relevant federal funding."  Doc. 28 at 10. This argument is baseless.

Section 504 of the Rehabilitation Act prohibits "any program or activity receiving Federal financial assistance" from discriminating against a qualified individual with a disability. 29 U.S.C. § 794(a).  "Program or activity" is defined broadly:

> For the purposes of this section, the term "program or activity" means all of the operations of--(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government

---

[55] *See e.g. Parson v. Homer*, No. 1:12CV948, 2013 WL 5441734, at *3 (S.D. Ohio Sept. 27, 2013) (dismissing official capacity claims against city employees as redundant, given that the City—as principal entity—was also named as defendant in the suit).

> entity) to which the assistance is extended, in the case of assistance
> to a State or local government . . . any part of which is extended
> Federal financial assistance.

29 U.S.C. § 794(b).

There is no dispute that "States waive their Eleventh Amendment immunity with regard to Rehabilitation Act claims when they accept federal funds." *Nihiser v. Ohio E.P.A.*, 269 F.3d 626, 628 (6th Cir. 2001); *see also* 42 U.S.C. § 2000d–7 (1986) ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973."). Thus, the Sixth Circuit held in *Nihiser* that "a plaintiff may sue a State under Section 504 of the Rehabilitation Act." *Nihiser*, 269 F.3d 626, 628. Indeed, this Court has allowed such claims to proceed against the Governor and other entities based on this same waiver of immunity. *See Martin*, 222 F. Supp. 2d at 957 (rejecting the defendants' Eleventh Amendment argument against the Governor and other defendants as it applied to the plaintiffs' Rehabilitation Act claims).

This lawsuit concerns "the Defendants' system of home and community-based programs and services" for people with intellectual and developmental disabilities. Doc 1 ¶ 213. As described in detail above, Defendant Kasich is a central player in the provision of these services. Through his office, he exerts control over the funding to be allocated to DODD, ODM, and OOD for their provision, and his Governor's Office of Health Transformation in fact directly *receives* federal funding.[56] As alleged in the Complaint, "[t]he Defendants receive federal financial assistance for their programs and activities within the meaning of Section 504 of the Rehabilitation Act of 1973." Doc. 1 ¶ 214. Where a jurisdictional motion makes a facial challenge to a plaintiff's complaint, as Defendant Kasich's Motion does here,

---

[56] For example, the Governor received over $400,000 in federal appropriations in 2016 alone. "Budget In Detail: Main Operating Budget Bill (FY 2016 – FY 2017)," July 1, 2015, House Bill 64, 131st General Assembly, p.17, available at http://www.lsc.ohio.gov/fiscal/bid131/budgetindetail-hb64-en.pdf (last visited July 16, 2016).

Fed. R. Civ. P. 12(b)(6) standards apply, and all factual allegations must be accepted as true.  *See*

*Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir.1990).  This alone is

sufficient for Plaintiffs to state a claim against Defendant Kasich under Section 504 of the

Rehabilitation Act pursuant to *Nihiser*.  *See Haas v. Quest Recovery Servs., Inc.*, 338 F. Supp. 2d

797, 803-804 (N.D. Ohio 2004), *aff'd*, 174 F. App'x 265 (6th Cir. 2006), *cert. granted, judgment*

*vacated on other grounds*, 549 U.S. 1163 (2007) ("Plaintiffs allege that Ohio accepts federal

funds.  Viewing the facts in the light most favorable to Plaintiffs, the Court finds that Ohio

waived its immunity to Rehabilitation Act claims.").[57]

None of the cases cited by Defendant Kasich contradicts these points.  Defendant Kasich

cites several cases in support of the proposition that waiver of Eleventh Amendment immunity is

limited to the state agency that receives federal funding.[58]  Doc. 28 at 9.  But here the

Governor's office itself receives federal funding.  Moreover, none of these cases suggest that

Defendant Kasich cannot be sued under the Rehabilitation Act here.  In fact, *Doe v. Nebraska*,

345 F.3d 593, 604 (8th Cir. 2003), which Defendant Kasich cites, (Doc. 28 at 9), specifically

allowed claims against the governor to go forward.  In *Doe*, the plaintiff sued the state of

---

[57] *See also Robinson v. Univ. of Akron Sch. of Law*, 307 F.3d 409, 411 (6th Cir. 2002); *Carten v. Kent State Univ.*, 282 F.3d 391, 398 (6th Cir. 2002); *Gentry v. Summit Behavioral Healthcare*, 197 F. App'x 434, 437 (6th Cir. 2006); *Dillon-Barber v. Regents of Univ. of Mich.*, 51 F. App'x 946, 949 (6th Cir. 2002); *Dendinger v. Ohio*, No. 2:04CV367, 2005 WL 2614889, at *15 (S.D. Ohio Oct. 13, 2005), *aff'd in part, vacated in part, remanded*, 207 F. App'x 521 (6th Cir. 2006) (vacated in part on other grounds); *C.C. ex rel. Ward v. State of Tenn.*, No. CIV. 3:09-0246, 2010 WL 3782232, at *11 (M.D. Tenn. Sept. 21, 2010).

[58] Indeed, the cases are not even relevant for the proposition for which Defendant Kasich cites them.  For example, in *Dansby-Giles v. Jackson State Univ.*, 638 F. Supp. 2d 698, 699 (S.D. Miss. 2009), the court considered a claim under the Americans with Disabilities Act, not the Rehabilitation Act. In *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98 (2nd Cir. 2001), the Court of Appeals for the Second Circuit considered whether Title II of the ADA and Section 504 of the Rehabilitation Act validly abrogated state sovereign immunity.  *Id.* at 113-115.  The Court held that New York had *not* knowingly waived immunity, differentiating cases similar to *Nihiser* that held that a state's acceptance of federal funds did constitute a waiver of its sovereign immunity from suit under § 504 of the Rehabilitation Act. *Id.*  In *Everett H. v. Dry Creek Joint Elementary Sch. Dist.*, 5 F.Supp.3d 1167, 1181-1182 (E.D. Cal. 2014), the court dismissed claims against school district administrators named in their official capacity because local education agencies, as opposed to individual school officials, are listed as in the statutory language as "programs or activities." *Id.* This statutory interpretation issue is not applicable here; moreover, the Sixth Circuit has permitted suits to proceed against individuals in their official capacity in other contexts. *See, e.g., Carten* 282 F.3d at 398.

Nebraska, Department of Health and Human Services, the governor of the state in his official capacity, and other state officials in their official capacities, alleging a violation of Section 504 of the Rehabilitation Act. *Doe,* 345 F.3d 593 at 595-596. The Eighth Circuit affirmed the district court's denial of the defendants' sovereign immunity arguments. *Id*. at 604. The court noted that the state received federal grants for its social-service programs, and as a condition of the Department of Social Services receiving such funding for those programs, "Nebraska agreed to waive its Eleventh Amendment immunity." *Id.* at 599. The court permitted the suit to proceed against the defendants collectively, including the state of Nebraska and the governor. The current case is even stronger than *Doe*, because the Governor's office here receives federal funding directly.

Defendant Kasich also cites several cases for the proposition that a proper defendant in a Rehabilitation Act claim is "the head of the agency whose actions are in question," and, therefore, the Governor is not a proper defendant here. Doc. 28 at 10. But three of the cases he has cited involve federal employment discrimination claims with highly distinctive facts involving the employee/employer relationship, an issue that is wholly inapplicable here. *See Klein v. United States*, No. 3:15-CV-134, 2015 WL 6736114, at *5 (S.D. Ohio Nov. 4, 2015); *Crawford v. Hagel ex rel. U.S. Dept. of Def.*, No. 1:14-CV-539, 2014 WL 5343803, at *1 (W.D. Mich. Oct. 20, 2014); *Kirby v. Brown*, No. 2:13-CV-00021 LKK JFM (PS), 2013 WL 4780767, at *10 (E.D. Cal. Sept. 5, 2013). The fourth and final case, *McAuliffe*, involved disability discrimination claims against the Veterans Affairs and three Veterans Affairs hospital employees. The Court dismissed the claims against the employees, based on its determination that the Secretary for Veterans Affairs, as head of the agency, was the proper defendant. *McAuliffe v. U.S. Dept. of Veterans Affairs*, No. C 06-07353 WHA, 2007 WL 2123690, at *2

(N.D. Cal. July 23, 2007).  That determination is consistent with Plaintiffs' claims against the Governor, as head of the State with responsibility for the Office of Health Transformation and the executive departments of the state of Ohio, among other duties.  Doc. 1 ¶¶ 79-82.

Because Plaintiffs have sufficiently pled a Rehabilitation Act claim against Defendant Kasich, including the receipt of federal funding, this claim is not barred by any assertion of sovereign immunity.  There is a sufficient connection between the Governor and the challenged conduct to permit the lawsuit to proceed.  The Court should deny Defendant Kasich's Motion to Dismiss the Rehabilitation Act claim against him.

## VI.  THE LIMITATIONS ON DISABILITY RIGHTS OHIO'S USE OF CLIENT ASSISTANCE PROGRAM FUNDS PROVIDE NO BASIS FOR DISMISSAL

Defendant Miller asserts that Disability Rights Ohio would violate the limitations on its funding by participating as Plaintiffs' counsel in raising the claims against him.  Doc. 16 at 1, 3.  Defendant Miller provides no basis for dismissing this action.  His Motion says absolutely nothing about the validity of the claims of any Plaintiff.  Instead, Defendant Miller argues that (some of) the counsel in this action would violate a restriction on their federal funding by representing (some of) the Plaintiffs on (some of) the claims in this suit.  Defendant Miller is incorrect:  Disability Rights Ohio has not violated any restriction on the use of federal funds, because it has not used funds provided under the federal Client Assistance Program (CAP) to bring this lawsuit.  The relevant statute does not prohibit Disability Rights Ohio from bringing class actions; it simply cannot use CAP funds to do so.  Moreover, Defendant Miller's argument is not appropriate subject matter for a motion to dismiss.  To the extent that Defendant Miller seeks to debate Disability Rights Ohio's activities pursuant to its grants, its argument is properly addressed to the granting agency and not the courts.

**A.    Disability Rights Ohio Is Complying With Its Responsibilities As The Protection And Advocacy System And Client Assistance Program.**

Disability Rights Ohio is one of fifty-seven protection and advocacy systems throughout the United States and territories.  Many of these agencies, like Disability Rights Ohio, also operate CAPs.  Congress created the system of protection and advocacy agencies in 1975 to protect and advocate for the legal and human rights of people with developmental disabilities, prompted, in part, by investigations of inhumane living conditions at a residential institution for people with developmental disabilities, Staten Island's Willowbrook State School and Hospital.  *See* National Disability Rights Network, Our History, http://www.ndrn.org/about/26-our-history.html (last visited July 14, 2016).  The first protection and advocacy program, created by the Developmental Disabilities Assistance and Bill of Rights Act, was called Protection and Advocacy of Rights for Individuals with Developmental Disabilities (PADD).  42 U.S.C. § 15001 *et. seq.*  The statute authorized federal funding to states to enable protection and advocacy agencies to pursue legal, administrative, and other appropriate remedies to protect and advocate for the rights of individuals with developmental disabilities under all applicable federal and state laws.  42 U.S.C. § 15043(a).

During the decades that followed, Congress established several other protection and advocacy programs, the grants of which are automatically allotted to the same agency designated by the governor to operate the PADD program.[59]  With the exception of the Protection and Advocacy for Voting Access (PAVA) program, which explicitly prohibits *any* election-related

---

[59] The Protection and Advocacy for Individuals with Mental Illness (PAIMI) program, 42 U.S.C. § 10801 *et seq.*, was enacted in 1986; *see also* 42 C.F.R. § 51 *et. seq.* The Protection and Advocacy for Individual Rights (PAIR) program, 29 U.S.C. § 794e, was enacted in 1993; *see also* 34 C.F.R.§ 381 *et. seq.* The Protection and Advocacy for Assistive Technology (PAAT) program, 29 U.S.C. § 3004, was enacted in 1998. The Protection and Advocacy for Beneficiaries of Social Security (PABSS) program, 42 U.S.C. § 1320b-21, was enacted in 1999; *see also* 20 C.F.R. § 411 *et. seq.* The Protection and Advocacy for Individuals with Traumatic Brain Injury (PATBI) program, 42 U.S.C. § 300d-53, was enacted in 2002. The Protection and Advocacy for Voting Access (PAVA) program, 52 U.S.C. § 21061 *et seq.,*was enacted in 2003.

litigation using PAVA funds, none of the grant programs prohibit protection and advocacy agencies from bringing class actions.[60]  Indeed, in addition to the statutory authorization to pursue legal remedies, both Congress and the federal granting agencies have authorized the protection and advocacy agencies to engage in systemic change activities, which include class actions, in carrying out their responsibilities under those programs.[61]

Today, the protection and advocacy network is the nation's largest provider of legal advocacy services for people with disabilities. *See* National Disability Rights Network, Member Agencies, http://www.ndrn.org/ndrn-member-agencies.html (last visited July 13, 2016). Protection and advocacy agencies are charged by statute to provide independent legal advocacy for eligible clients; to pursue legal, administrative, or other appropriate remedies; investigate incidents of abuse and neglect; and provide information, advice, and referrals to programs and services.  *See, e.g.*, 42 U.S.C. §§ 15043(a)(2)(A), (B); 42 U.S.C. § 10805(a)(1); 42 U.S.C. § 300d-53(b).  These agencies' advocacy spans many issues, including access to inclusive educational programs, financial entitlements, healthcare, accessible housing, assistive

---

[60] Compare 52 U.S.C. § 21062(a) (PAVA) ("[N]one of the funds provided by this subsection shall be used to initiate or otherwise participate in any litigation related to election-related disability access, notwithstanding the general authorities that the protection and advocacy systems are otherwise afforded under subtitle C of title I of the Developmental Disabilities Assistance and Bill of Rights Act of 2000." ) with 42 U.S.C. § 15043(a)(2)(A)(i) (PADD) ("such system shall--(A) have the authority to--(i) pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of such individuals within the State who are or who may be eligible for treatment, services, or habilitation, or who are being considered for a change in living arrangements, with particular attention to members of ethnic and racial minority groups"); *see also* 42 U.S.C. § 10805(a); 29 U.S.C. § 794e(f)(2), (3); 29 U.S.C. § 3004(a)(2); 42 U.S.C. § 1320b-21(b); 42 U.S.C. § 300d-53(b).

[61] For example, the PADD regulations anticipate that grant funds can be used to fund class action litigation. *See* 45 C.F.R. § 1326.24 ("Allotments may be used to pay the otherwise allowable costs incurred by a Protection and Advocacy System in bringing lawsuits in its own right to redress incidents of abuse or neglect, discrimination and other rights violations impacting the ability of individuals with developmental disabilities to obtain access to records and when it appears on behalf of named plaintiffs *or a class of plaintiff for such purposes.*") (emphasis added). In addition, the protection and advocacy agency submits annual program performance reports to the federal agencies that describe the activities and expenditures of the system, including information about systemic change activities, as applicable to the program. *See, e.g.*, 42 U.S.C. § 15044(e); 45 C.F.R. § 1326.22; 45 C.F.R. § 1325.7. The federal agencies then report to Congress using the reported information from the protection and advocacy agencies, which includes examples of systemic change activities completed by the protection and advocacy agencies, as applicable to the program. *See* 42 U.S.C § 15005(1).

technology, employment services, and the electoral process. *See, e.g.*, 29 U.S.C. § 3004(a)(1); 42 U.S.C. § 1320b-21(b), 52 U.S.C. § 21061(a).[62]

The CAP was established by the Rehabilitation Amendments of 1984.  Public Law 98-221, codified at 29 U.S.C. § 732(a) ("From funds appropriated under subsection (h) of this section, the Secretary shall, in accordance with this section, make grants to States to establish and carry out client assistance programs . . .").  CAP agencies use grant funding to provide information and advice to individuals who are receiving or seeking services under the Rehabilitation Act of 1973, as amended, including assistance "in pursuing administrative, legal, and other appropriate remedies."  29 U.S.C. § 732(a); 34 C.F.R. § 370.4.  Unlike the statutes authorizing the various protection and advocacy programs, the statute that creates the CAP prohibits the designated CAP agency from "bring[ing] any class action in carrying out its responsibilities under this section."  29 U.S.C. § 732(d).

The CAP agency is designated by the governor, 29 U.S.C. § 732(c)(1)(A), and it need not be the same entity designated as the protection and advocacy agency.  But in 36 territories and states (including Ohio), the entity that carries out the CAP is also the state's protection and advocacy agency.[63]

Designated protection and advocacy and CAP agencies are accountable for each of their grants to federal agencies responsible for overseeing the programs,[64] and are required to prepare

---

[62] *See also* National Disability Rights Network, P&A/CAP Network, http://www.ndrn.org/en/about/paacap-network.html (last visited May 28, 2016).

[63] *See* Administration on Intellectual and Developmental Disabilities (AIDD), State Protection & Advocacy Systems: Program Contacts, http://acl.gov/Programs/AIDD/Programs/PA/Contacts.aspx (last visited May 28, 2016); *see also* Rehabilitation Services Administration, Client Assistance Program Awards, https://rsa.ed.gov/programs.cfm?pc=cap&sub=awards/ (last visited July 11, 2016).

[64] The Administration for Community Living at the U.S. Department of Health and Human Services oversees the PADD, PAVA, PATBI and PAAT programs.  *See* Administration for Community Living, State Protection & Advocacy Systems, http://www.acl.gov/Programs/AIDD/Programs/PA/index.aspx (last visited July 22, 2016); Administration for Community Living, Help America Vote Act, http://www.acl.gov/Programs/AIDD/Programs/HelpAmericaVoteAct/index.aspx (last visited May 28, 2016);

annual program performance reports for each of their programs.[65]  The federal agencies monitor

the protection and advocacy and CAP agencies through these reports, as well as through audits,

examinations of records, and on-site monitoring visits.[66]

Disability Rights Ohio is the entity designated by the Governor of the State of Ohio to

serve as both Ohio's protection and advocacy system and its CAP agency.  Ohio Rev. Code §

5123.60; Exec. Order No. 2015-10K.  As the designated protection and advocacy system and

CAP, Disability Rights Ohio administers the seven protection and advocacy program grants and

the CAP grant.  *See* Disability Rights Ohio, Programs http://www.disabilityrightsohio.org/

programs (last visited July 14, 2016).

Under the PADD program grant, Disability Rights Ohio has an obligation to pursue legal,

administrative and other appropriate remedies to protect and advocate for the rights of

individuals with developmental disabilities, 42 U.S.C. § 15043(a)(2)(A)(i), and "to assure that

individuals with developmental disabilities and their families participate in the design of and

have access to needed community services, individualized supports, and other forms of

---

Administration for Community Living, The Protection and Advocacy TBI Grant Program,
http://www.acl.gov/Programs/AoD/TBI-Grant-Program/Index.aspx (last visited May 28, 2016); Administration for
Community Living, Protection and Advocacy for Assistive Technology (PAAT),
http://www.acl.gov/Programs/AIDD/Programs/PAAT/index.aspx (last visited May 28, 2016). The Substance Abuse
and Mental Health Services Administration at the U.S. Department of Health and Human Services oversees the
PAIMI program. *See* SAMHSA, Civil Rights Protections, http://www.samhsa.gov/laws-regulations-guidelines/civil-
rights-protections  (last visited May 28, 2016). The Social Security Administration oversees the PABSS program.
*See* Social Security Administration, Protection & Advocacy for Beneficiaries of Social Security,
https://www.ssa.gov/work/protectionadvocacy.html (last visited May 28, 2016). The Rehabilitation Services
Administration, within the Office of Special Education and Rehabilitative Services at the U.S. Department of
Education, oversees the PAIR and CAP programs.  *See* U.S. Department of Education, Protection and Advocacy of
Individual Rights, http://www2.ed.gov/programs/rsapair/index.html (last visited May 28, 2016).  *See also* U.S.
Department of Education, Client Assistance Program, http://www2.ed.gov/programs/rsacap/index.html (last visited
May 28, 2016) and 29 U.S.C. § 702.

[65] *See, e.g.*, 29 U.S.C.§ 732(g)(4); 42 U.S.C. § 15044(e); 34 C.F.R. § 370.20(c)(3); 34 C.F.R. § 370.44; 45 C.F.R. §
1325.7; 45 C.F.R. § 1326.22.

[66]*See, e.g.*, 42 U.S.C. § 15003; 42 U.S.C. § 15004(a); 29 U.S.C. § 709(a); 29 U.S.C. § 710(b); 29 U.S.C. § 711; 29
U.S.C. § 727; 29 U.S.C.§ 732(g)(4); 45 C.F.R. § 1325.9; 45 C.F.R. § 75.1 et seq.; 34 C.F.R. § 370.48(d), (e)(1); 2
C.F.R. § 200.328(e); 2 C.F.R. § 200.336; 2 C.F.R. 200.501.  *See also* RSA-PD-14-05,
https://www2.ed.gov/policy/speced/guid/rsa/pd/2014/pd-14-05.pdf (last visited June 8, 2016); RSA-PD-13-03,
http://www2.ed.gov/policy/speced/guid/rsa/pd/2013/pd-13-03.pdf (last visited June 8, 2016).

assistance that promote self-determination, independence, productivity, and integration and inclusion in all facets of community life."  42 U.S.C. § 15001(b).

Consistent with the Developmental Disabilities Assistance and Bill of Rights Act, Disability Rights Ohio represents the Plaintiffs and proposed Plaintiff class through its responsibilities under the PADD program and is using the PADD program grant to fund its activities.  Disability Rights Ohio is not using its CAP grant to fund this litigation, and it is not representing the Plaintiffs in this action as part of its CAP responsibilities.[67]

**B.      An Asserted Violation Of The CAP Program's Funding Conditions Does Not Provide A Basis for Dismissing This Action.**

Defendant Miller's Motion does not challenge the sufficiency of the Complaint; nor has he the authority to raise the question of whether Disability Rights Ohio exceeded the limitations on its use of CAP funding.  Moreover, because Disability Rights Ohio is not using CAP funds in this lawsuit, it is fully complying with the terms of that statute.

**1.      Because Defendant Miller's Motion Does Not Challenge The Legal Sufficiency Of the Plaintiffs' Claims For Relief, It Offers No Basis For Dismissal.**

Nothing in Defendant Miller's Motion denies that the Plaintiffs have stated a claim upon which relief can be granted.  The Motion does not deny that the Complaint contains "factual content that allows the court to draw the reasonable inference that [Defendant Miller] is liable" to the Plaintiffs.  *Iqbal*, 556 U.S. at 678.  Because a Fed. R. Civ. P. 12(b)(6) motion tests the

---

[67] Defendant Miller filed a Motion to Dismiss for failure to state a claim, which merely tests the sufficiency of the pleadings.  Accordingly, Plaintiffs do not submit any evidence on this issue at this time.  See *Tarazi v. Oshry*, No. 2:10-CV-793, 2010 WL 5013819 (S.D. Ohio Dec. 1, 2010) ; *Parsons v. Wilkinson*, No. C2-05-527, 2006 WL 2266254 (S.D. Ohio Aug. 8, 2006).  However, Defendant Miller's Motion, rather than challenging the sufficiency of the pleadings, raises an argument that necessarily relies upon factual content outside of the Complaint, namely the premise that this litigation is being supported by CAP funds.  We accordingly offer our response to that factual premise here.  In the event that this Court believes it necessary, Plaintiffs are fully prepared to submit a declaration or other evidence demonstrating that this litigation is not being funded by CAP dollars.

legal sufficiency of the Plaintiffs' allegations, and Defendant Miller has not challenged the legal

sufficiency of the Plaintiffs' allegations, his Motion must be denied.

In the Sixth Circuit, "[i]t is well established that a Fed. R. Civ. P. 12(b)(6) motion attacks

the sufficiency of the pleadings." *Coomes v. Allstate Ins. Co.*, No. 1:10-CV-905, 2011 WL

4005325, at *7 (S.D. Ohio Aug. 9, 2011). The only issue a court may consider in evaluating a

Fed. R. Civ. P. 12(b)(6) motion is whether the complaint "contain[s] either direct or reasonable

inferential allegations that support all material elements necessary to sustain a recovery under

some viable legal theory." *Ndiaye v. CVS Pharmacy 6081*, 547 F. Supp. 2d 807, 810 (S.D. Ohio

2008). Indeed, this Court has rejected motions to dismiss that have attempted to raise issues that

go beyond a challenge to the "sufficiency of the pleading." *See e.g.*, *Sweeney v. City of

Steubenville*, 147 F. Supp. 2d 872, 882 (S.D. Ohio 2001) (refusing to consider an attachment to

the reply brief noting that the motion to dismiss "simply challenges the sufficiency of the

pleadings at this stage and the Court is not permitted to resolve disputed facts.").

Rather than challenge the sufficiency of the Plaintiffs' allegations, Defendant Miller

argues that some of Plaintiffs' attorneys (those who work for Disability Rights Ohio) are

exceeding restrictions on federal funding by participating as counsel on some of the claims

(those against the state vocational rehabilitation agency) brought by some of the Plaintiffs (the

individual Plaintiffs as class representatives).[68] This argument is simply not an appropriate

subject of a Fed. R. Civ. P. 12(b)(6) motion. Tellingly, Defendant Miller cites no cases in which

a court has considered such an argument, let alone granted dismissal on this basis. Even if

Defendant Miller were correct that Disability Rights Ohio is exceeding the restrictions on its

---

[68] Defendant Miller's argument does not reach any of the claims brought against Plaintiff Ability Center against any of the Defendants, nor does it reach the non-class claims brought by the Individual Plaintiffs against any of the Defendants, nor does it reach the class-action claims brought against any Defendant outside of the state vocational rehabilitation agency.

73

federal funding—and he is not—that would say nothing about the sufficiency of the Plaintiffs' allegations. This argument therefore provides no basis for granting a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

> **2.** **The Question Whether Disability Rights Ohio Has Complied With The Terms Of Its CAP Grant Is A Matter To Be Determined By The Department Of Education, Rather Than In This Litigation.**

The restrictions on the use of CAP funds are not for the Defendants to enforce, nor are they properly enforced in court. The statute creating the CAP, and barring the use of CAP funds for class actions, does not by its terms create any right in defendants who may be sued by a CAP recipient. To the contrary, its terms are entirely focused on the conduct of the funding agency (the United States Department of Education) and the CAP grant recipient. *See* 29 U.S.C. § 732. The statutory scheme provides for the Department of Education to periodically audit, review, report on, or evaluate the performance of the CAP. *See e.g.*, 29 U.S.C. § 710(b); 29 U.S.C. § 711; 29 U.S.C. § 727; 29 U.S.C.§ 732(g)(4). CAP agencies are bound by the terms of the "Education Department General Administrative Regulations (EDGAR)," including 34 C.F.R. Part 75 (Uniform Guidance) and specifically Subpart F (governing fiscal controls and accounting procedures) and Subpart G (governing remedies for noncompliance). When a CAP grant recipient fails to substantially comply with the grant conditions, the Department of Education is authorized to withhold further payments, issue a complaint to compel compliance through a cease and desist order, enter into a compliance agreement, require recovery of funds, or take other action. 20 U.S.C. § 1234c; 20 U.S.C. § 1234 *et seq*.; 34 C.F.R. § 370.40(d); 34 C.F.R. § 75.901 *et seq*.; 34 C.F.R. Part 81 and § 81.30. And the grant recipient has the right to contest such actions in a hearing before an administrative law judge. *See* 20 U.S.C. § 1234.

The statute thus gives Defendant Miller no right, enforceable in this litigation, against any action that is alleged to exceed the terms of Disability Rights Ohio's CAP grant.  Any such allegation is properly a matter for the Department of Education and not this Court.

In analogous circumstances, courts have refused to allow defendants to pursue allegations that plaintiffs' counsel exceeded the scope of representation authorized by government programs that finance attorney advocacy.  The decision in *Lindquist v. Bangor Mental Health Inst.*, 770 A.2d 616, 618 (Me. 2001), is a prime example.  The defendant argued that the case should be dismissed because counsel worked for a state-funded program that did not authorize the bringing of lawsuits like the one filed by the plaintiff.  *See id.*  Rejecting that argument, the Maine Supreme Judicial Court held that courts should not "reach[] and decid[e], in the context of a motion to dismiss, the issue of whether Lindquist's attorney had the authority to represent her." *Id.* at 618.  In support of its holding that "a court should not be drawn into resolving a collateral issue of whether the client is eligible to be represented in court by the agency's attorney pursuant to the agency's governing statute, rules, or by-laws," (*id.* at 618-619), the Court gave two essential reasons:

> Not only is it inefficient for courts to deal with the scope of representation of an attorney or the eligibility of a client as a collateral issue in individual cases, but it would also be an invitation to opposing parties to thwart the access to the courts by these clients if their attorneys had to constantly meet challenges to the scope of representation or eligibility for services.

*Id.* at 619.  The court noted that "[o]ther courts, when faced with challenges to the representation by legal services attorneys of their clients in court, have responded that such challenges are best addressed by the funding authorities." *Id.* (citing *Jacobs v. Bd. of Sch. Comm'rs of Indianapolis*, 349 F.Supp. 605, 607 (S.D. Ind. 1972), *aff'd*, 490 F.2d 601 (7th Cir. 1973), *vacated as moot on other grounds*, 420 U.S. 128, (1975)).

The same principles apply here. The question whether Disability Rights Ohio is exceeding the terms of its CAP grant is appropriately addressed to the Department of Education, not to the Court in this litigation.

> **3.**   **Because Disability Rights Ohio Is Not Using CAP Funds In This Lawsuit, It Is Fully Complying With The Terms Of The CAP Statute.**

Defendant Miller claims that 29 U.S.C. § 732(d) prohibits Disability Rights Ohio from representing the Individual Plaintiffs on their class claims against him. Defendant Miller's interpretation of the statute is incorrect. It is well established that "[i]n all cases of statutory construction, the starting point is the language employed by Congress." *Vergos v. Gregg's Enters., Inc.*, 159 F.3d 989, 990 (6th Cir. 1998) (quoting *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 801 (6th Cir.1995)). "Where the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *Id.* (internal quotation omitted).

The language of the statute at issue is unambiguous. The Rehabilitation Act states that the agency designated to conduct CAP activities "may not bring any class action in carrying out its responsibilities under this section." 29 U.S.C. § 732(d). The regulations contain nearly identical language. *See* 34 C.F.R. § 370.45 ("A designated agency may not bring any class action in carrying out its responsibilities under this part."). Defendant Miller asserts that this statutory language "prohibits attorneys associated with the Disability Rights Ohio agency from bringing any class action related to federally-funded vocational and rehabilitation services." Doc. 16 at 1. Defendant Miller does not point to any statutory or regulatory language that supports this interpretation. To the contrary, the statute limits the agency from bringing a class action only insofar as it is "carrying out its responsibilities under this section." *See* 29 U.S.C. § 732(d).

In representing the Plaintiffs in this case, Disability Rights Ohio is not "carrying out its responsibilities under [the CAP] section" for the simple reason that an agency does not "carry[] out its responsibilities" under CAP *if it is not using CAP funds*.  Section 732(a) of the statute outlines the responsibilities a grantee assumes under the CAP section.  Those responsibilities are, specifically, to use "funds appropriated under subsection (h) of this section" to perform certain information, assistance, and advocacy tasks:

> **From funds appropriated under subsection (h) of this section**, the Secretary shall, in accordance with this section, **make grants to States to establish and carry out client assistance programs** to provide assistance in informing and advising all clients and client applicants of all available benefits under this chapter. . . .

29 U.S.C. § 732(a) (emphasis added).

By the plain terms of this provision, an entity's responsibilities under the CAP section run entirely with the "funds appropriated under" it.  The implementing regulations for the CAP program underscore the point that a CAP grantee's responsibilities under the program are tied directly to the use of CAP funds.  *See* 34 C.F.R. §§ 370.5, 370.5(b) ("The following regulations apply to the expenditure of funds under the CAP . . . (b)  The regulations in this part 370."); *see also* 34 C.F.R. § 370.4(a) ("Funds made available under this part must be used for activities consistent with the purposes of this program, including . . .").

If Congress had intended to prohibit a designated agency from bringing a class action lawsuit with non-CAP funds, it would have simply stated that "[t]he agency designated under subsection (c) of this section may not bring any class action," instead of "[t]he agency designated under subsection (c) of this section may not bring any class action *in carrying out its responsibilities under this section*."  29 U.S.C. § 732(d)  Indeed, Congress has done precisely that in other appropriation statutes.  In the Omnibus Consolidated Rescissions and

Appropriations Act of 1996, for example, Congress specifically directed that Legal Services Corporation appropriations could not go "to any person or entity" that "initiates or participates in a class action suit." P.L. 104–134, § 504(a)(7); 110 Stat 1321, 1321-53 (1996). It is generally presumed that "Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *Phillips v. Court of Common Pleas, Hamilton Cty., Ohio*, 668 F.3d 804, 810 (6th Cir. 2012) (quoting *Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 338 (1994)) (internal quotation marks omitted). If Congress intended to prohibit a protection and advocacy agency from bringing a class action lawsuit with non-CAP funds, it would have made that intent explicit.[69]

Indeed, the PADD program regulations specifically prohibit a protection and advocacy agency from "implement[ing] a policy or practice restricting the remedies that may be sought on behalf of individuals with developmental disabilities or compromising the authority of the [protection and advocacy agency] to pursue such remedies through litigation, legal action or other forms of advocacy." 45 C.F.R. § 1326.21(c). Moreover, for the past 23 years, the Department of Education has consistently taken the position that "[t]he prohibition on class actions by a designated agency applies only to the use of CAP funds to support in whole or in part a class action. These regulations do not apply to a designated agency's use of non-CAP funds." Client Assistance Program, 58 Fed. Reg. 52614-01 (1993).[70] Congress has reauthorized the CAP program at least twice since 1993, in the Workforce Investment Act of 1998, P.L. 105-

---

[69] Notably, in reauthorizing the Rehabilitation Act, Congress demonstrated its intent that the distinct but equally important legal authorities of the CAP and protection and advocacy programs were compatible and could co-exist within the same entity by legislatively designating a Native American CAP within the existing protection and advocacy system serving the American Indian Consortium. *See* 29 U.S.C. § 732(e)(1)(E)(i).

[70] This interpretation, which superseded the Department of Education's earlier position to the contrary, see Client Assistance Program, 50 Fed. Reg. 9960-01 (1985), is entitled to deference, as the agency has adhered to it across three presidential administrations over more than two decades. See *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 296 n.7 (2009) (fact that agency changed its interpretation does not deprive new interpretation of deference absent "reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question") (internal quotation marks omitted).

220 and the Workforce Investment and Opportunity Act of 2014, P.L. 113-128, and it has not altered that longstanding administrative interpretation.

The outcome here is clear.  Because Disability Rights Ohio is not representing Plaintiffs using CAP dollars, but is doing so instead through the PADD program grant, in bringing this case it is not "carrying out its responsibilities under [29 U.S.C. § 732]."  As such, the CAP statute has no bearing on this action, and the prohibition against bringing a class action lawsuit does not apply.  Indeed, any application of the CAP statute to bar the class action here would be contrary to the purpose of the PADD program and a violation of Congress's intent for that program, which requires that a protection and advocacy agency have available to it all appropriate legal remedies to pursue on behalf of individuals with intellectual or developmental disabilities.

## CONCLUSION

For the foregoing reasons, the Motions to Dismiss of Defendants Miller, McCarthy, Martin, and Kasich should be denied.

Respectfully submitted,
s/Kerstin Sjoberg-Witt
Kerstin Sjoberg-Witt (0076405)
ksjoberg-witt@disabilityrightsohio.org
Trial Attorney
Kevin J. Truitt (0078092)
ktruitt@disabilityrightsohio.org
Alison McKay (0088153)
amckay@disabilityrightsohio.org
DISABILITY RIGHTS OHIO
50 West Broad Street, Suite 1400
Columbus, Ohio  43215
Telephone:  614-466-7264
Facsimile:   614-644-1888

Counsel for Plaintiffs

Neil R. Ellis
nellis@sidley.com

Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone:  202-736-8075
Facsimile:  202-736-8711

Kristen E. Rau
krau@sidley.com
Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603
Telephone:  312-853-9274
Facsimile:  312-853-7036

Cathy E. Costanzo
ccostanzo@cpr-ma.org
Anna M. Krieger
akrieger@cpr-ma.org
Kathryn Lesley Rucker
krucker@cpr-ma.org
Center for Public Representation
22 Green Street
Northampton, Massachusetts 01060
Telephone:  413-586-6024
Facsimile:  413-586-5711

Samuel R. Bagenstos
sbagen@gmail.com
625 South State Street
Ann Arbor, Michigan  48109
Telephone:  734-647-7584

*Pro hac vice* Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Plaintiffs' Response In Opposition to

Defendants' Motions to Dismiss was filed electronically on July 27, 2016.  Notice of this filing

will be sent by operation of the Court's electronic filing system to all parties indicated on the

electronic filing receipt.  Parties may access this filing through the Court's system.

s/Kerstin Sjoberg-Witt
Kerstin Sjoberg-Witt (0076405)