IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| PHYLLIS BALL, by her General Guardian, PHYLLIS BURBA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> JOHN KASICH, Governor of Ohio, in his official capacity, et al. <br><br> Defendants. | Case No. 2:16-cv-282 <br><br> JUDGE EDMUND A. SARGUS <br><br> MAGISTRATE JUDGE ELIZABETH A. PRESTON DEAVERS |

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**

**I.     INTRODUCTION**

Two of the individual plaintiffs in this action, Nathan Narowitz and Ross Hamilton ("plaintiffs"), allege that Ohio's administration, planning, and funding of its service system for people with intellectual and developmental disabilities puts them at serious risk of segregation and institutionalization, in violation of Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act, as interpreted by the Supreme Court's *Olmstead* decision. Compl. ¶¶ 1, 58, 65, ECF No. 1. In particular, plaintiffs allege that the failure of defendants, Ohio's governor and several state agencies, to provide them with home- and community-based services forces plaintiffs to rely on volunteer family caregivers to remain at home and places them at serious risk of institutionalization in a large Intermediate Care Facility ("ICF").[1] *Id*. ¶¶ 52-55, 58-63, 65.

---

[1]  Mr. Narowitz and Mr. Hamilton also allege that the state's administration of day services violates Title II of the ADA, Section 504, and the Social Security Act. Compl. ¶¶ 5, 11, 56-57,

Defendants John Martin, Director of the Ohio Department of Developmental Disabilities, and John McCarthy, Director of the Ohio Department of Medicaid, have moved to dismiss plaintiffs' claims on the ground of ripeness. Defendants also argue that at-risk *Olmstead* claims are only viable when the risk of institutionalization is "caused by a state action or a change in state policy," and that plaintiffs have not alleged risk attributable to a state action or change in state policy. Mot. to Dismiss 23, ECF No. 27. They further argue that plaintiffs' at-risk claims are inconsistent with *Olmstead*'s requirement that community placement must be appropriate and reasonably accommodated.

The United States files this Statement of Interest to clarify that non-institutionalized individuals with disabilities who are not currently receiving state-funded home- and community-based services may bring a claim that a public entity has placed them at risk of institutionalization or segregation in violation of the "integration mandate" of Title II of the Americans with Disabilities Act. *See* 28 U.S.C. § 517 (the Attorney General may send any officer of the Department of Justice "to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States."). The Attorney General has authority to enforce Title II, *see* 42 U.S.C. § 12133, and to promulgate regulations implementing its broad prohibition of discrimination. *See* 42 U.S.C. § 12134. One of those regulations requires that public entities "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); *see Olmstead v. L.C.*, 527 U.S. 581, 607 (1999).

The United States therefore has a particularly strong interest in ensuring the correct interpretation and application of the ADA in this context.

---

64. This Statement of Interest does not address defendants' motion to dismiss as it pertains to those allegations.

II.     **FACTUAL ALLEGATIONS**

The following facts are drawn from plaintiffs' Complaint (ECF No. 1).

Plaintiffs allege that defendants' administration, planning, and funding of Ohio's service system for people with intellectual and developmental disabilities discriminate by failing to provide residential, employment, and day services in the most integrated setting appropriate to plaintiffs' needs. Compl. ¶¶ 58, 65, 209. Although Ohio's disability service system offers Medicaid waiver programs to support individuals with intellectual and developmental disabilities in the community, *id.* ¶¶ 178-83, defendants have taken actions that limit the availability of these programs for individuals at serious risk of institutionalization in large Intermediate Care Facilities ("ICFs"). *See, e.g., id.* ¶¶ 179, 198-200. Consequently, ninety percent of Ohioans institutionalized in ICFs live in large ICFs with eight or more beds. *See id.* ¶ 136.

Plaintiffs Nathan Narowitz and Ross Hamilton are young adults with intellectual and developmental disabilities. *Id.* ¶¶ 52, 54, 59. They live in their parents' homes, *id.* ¶¶ 52, 60, and require assistance with medication administration, meal preparation, transportation, hygiene, dressing themselves, managing finances and public benefits, grocery shopping, housekeeping, laundry, and avoiding impulsive choices and negative behaviors. *Id.* ¶¶ 54, 63. Because the plaintiffs "cannot be left alone" and require "constant supervision," *id.* ¶¶ 57, 63, they rely on volunteer family caregivers, who donate significant time and pay out-of-pocket for limited supportive services. *Id.* ¶¶ 52, 57, 60.

Plaintiffs have been on a wait list to receive state-funded home- and community-based services for four and seven years, respectively.[2] *Id.* ¶¶ 55, 62. Although they could receive the services they need by submitting to institutionalization, they prefer to live, work, and recreate in

---

[2] Plaintiffs also allege that the median wait time for currently institutionalized individuals in Ohio to receive a waiver for home- and community-based services is 13 years. *Id.* ¶ 6.

3

the community. *Id.* ¶¶ 53-58, 62-65. Plaintiffs' aging and exhausted volunteer caregivers are concerned that they cannot continue to care for plaintiffs directly and cannot continue to pay out-of-pocket for supportive services. *Id.* ¶¶ 58, 61.

Plaintiffs have "immediate, unmet service needs, such as inadequate residential supports and aging primary caregivers." *Id.* ¶ 7. Because the defendants have denied plaintiffs "[]sufficient access to integrated home- and community-based services," plaintiffs allege that they "are at serious risk of institutionalization." *Id.* ¶¶ 7, 53, 65. Plaintiffs are appropriate for community placement, as each already lives in the community. *Id.* ¶¶ 1, 52, 59. They do not oppose—indeed, they affirmatively desire—a community placement with sufficient services to achieve community integration. *Id.* ¶¶ 54-57, 61-65. Plaintiffs allege that their community placement can be reasonably accommodated by expanding the availability of home- and community-based services. *Id.* ¶¶ 202-03, 210.

### III.      STATUTORY AND REGULATORY BACKGROUND

Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Congress found that, "historically, society has tended to isolate and segregate individuals with disabilities" and that "individuals with disabilities continually encounter various forms of discrimination, including . . . segregation." 42 U.S.C. §§ 12101(a)(2) and (5). Congress determined that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, *independent living*, and economic self-sufficiency for such individuals." 42 U.S.C. § 12101(a)(7) (emphasis added). Title II of the ADA prohibits disability discrimination in public services: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Congress directed the Attorney General to promulgate regulations to implement Title II. 42 U.S.C. § 12134.

Pursuant to this authority, the Attorney General issued the integration mandate: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The most integrated setting is "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, app. B at 690 (2015). The Attorney General also required that a public entity "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

In *Olmstead*, the Supreme Court held that, under the ADA and its regulations, "unjustified institutional isolation of persons with disabilities is a form of discrimination." *Olmstead v. L.C.*, 527 U.S. 581, 600 (1999). The Court reasoned that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id.* The Court also reasoned that "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 601. The Court concluded that individuals with disabilities are entitled to community-based services "when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably

accommodated, taking into account the resources available to the State and the needs of others with . . . disabilities." *Id.* at 607 (plurality opinion).

Since *Olmstead*, the Department has issued guidance regarding Title II's integration mandate. *See* DOJ *Olmstead* Statement.[3] In that guidance, the Department states that "the ADA and the *Olmstead* decision extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated settings. Individuals need not wait until the harm of institutionalization or segregation occurs or is imminent." *Id.* at Q & A No. 6. The guidance further explains that "a plaintiff could show sufficient risk of institutionalization to make out an *Olmstead* violation if a public entity's failure to provide community services . . . will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution." *Id*. As the agency Congress has charged with issuing regulations under Title II, the Department of Justice's regulations are "entitled to deference." *Bragdon v. Abbott*, 524 U.S. 624, 646 (1998); *see also Olmstead*, 527 U.S. at 597-98 ("Because the Department is the agency directed by Congress to issue regulations implementing Title II . . . its views warrant respect."). An agency's interpretation of its own regulation is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Steimel v. Wernert*, Nos. 15-2377, 15-2389, 2016 WL 2731505, at *6 (7th Cir. May 10, 2016) (granting *Auer* deference to the Department's *Olmstead* guidance).

---

[3] Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.* ("DOJ *Olmstead* Statement"), https://www.ada.gov/olmstead/q&a_olmstead.pdf (last updated June 22, 2011).

## IV. DISCUSSION

### A. A SERIOUS RISK OF INSTITUTIONALIZATION, EVEN WHEN NOT IMMINENT, STATES A CLAIM UNDER THE INTEGRATION MANDATE.

Individuals with disabilities need not wait until they are institutionalized to assert a claim under Title II of the ADA, 42 U.S.C. § 12132, and its integration mandate, 28 C.F.R. § 35.130(d).[4] By their terms, neither the statute nor the integration regulation applies only to institutionalized individuals. Instead, the plain text of each protects the rights of all "qualified individuals with a disability." 28 C.F.R. § 35. 130(d); 42 U.S.C. § 12132. No appeals court to squarely address the issue has held otherwise.[5] *See Steimel v. Wernert*, Nos. 15-2377, 15-2389,

---

[4] Defendants argue that plaintiffs' claims are not ripe because their institutionalization is "speculative." Mot. to Dismiss 17. But defendants conflate the ripeness requirement with the merits of plaintiffs' claims that they require waiver services to maintain their health and safety in the community. Compl. ¶¶ 54, 63. The relevant focus of a ripeness inquiry in an at-risk *Olmstead* case is a public entity's concrete decision to deny or reduce services that would allow plaintiffs to live, work, and recreate independently in the community. *See*, *e.g.*, *Steimel v. Wernert*, Nos. 15-2377, 15-2389, 2016 WL 2731505, at *8 (7th Cir. May 10, 2016) (holding that at-risk claims were ripe because the plaintiffs "have provided evidence that they need constant supervision and, despite their best efforts, the services [the state] provided . . . have proved inadequate to prevent life-threatening gaps in care."); *Pashby v. Delia*, 709 F.3d 307, 317 (4th Cir. 2013) (holding that at-risk claims were ripe even though plaintiffs had not perfected administrative appeals of service reductions because plaintiffs' claim focused not on the outcome of their individual appeals, but on the state's decision to reduce services); *Guggenberger v. Minnesota*, No. 15-3439, 2016 U.S. Dist. LEXIS 99039, *28-34 (D. Minn. July 28, 2016) (holding that the state's denial to young adults with disabilities living with parental caregivers of "essential Waiver Services based on Defendants' purported mismanagement and administration" presented a decision ripe for judicial review).

[5] In *Amundson v. Wisconsin Dep't of Health Servs.*, 721 F.3d 871 (7th Cir. 2013), the Seventh Circuit never reached the question of whether the integration mandate applies to at-risk claims. *Id.* at 873-874. Plaintiffs living in group homes challenged cuts to reimbursement rates for group home providers but did "not allege inability to find another group home willing to accept" the reduced rates. *Id.* at 873-74. The court credited the State's assertion that it had developed safeguards to ensure that the rates could operate "without landing any . . . disabled person in an institution." *Id.* Likewise, the Eight Circuit did not reach this question in *Bill M. v. Nebraska Dep't of Health and Human Servs. Finance and Support*, 408 F.3d 1096 (8th Cir. 2005), *vacated by* 126 S. Ct. 1826 (2006), disposing of the case on Eleventh Amendment grounds. *Id.* at 1100. The court held that plaintiffs had standing to bring an ADA claim because of allegations that the

2016 WL 2731505 at *6-7 (7th Cir. May 10, 2016); *Davis v. Shah*, 821 F.3d 231, 263 (2d Cir. 2015); *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013); *M.R. v. Dreyfus*, 663 F.3d 1100 (9th Cir. 2011), *amended by* 697 F.3d 706 (2012); *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003).

In *Fisher,* the Tenth Circuit held that "disabled persons who . . . stand imperiled with segregation" have standing to bring a claim "under the ADA's integration regulation without first submitting to institutionalization." 335 F.3d at 1182. The court held that the state's action placed the plaintiffs "at high risk for premature entry" to an institution. *Id.* at 1184 (internal quotation marks omitted). The *Fisher* plaintiffs did not allege that the state's action threatened them with immediate institutionalization; rather, they showed that it would lead many of them to remain in their homes "until their health ha[d] deteriorated," leading them "*eventually* [to] end up in a nursing home." *Id*. at 1185 (emphasis added) (internal quotation marks omitted).

In *M.R.*, the Ninth Circuit held that "[a]n ADA plaintiff need not show that institutionalization is 'inevitable' or that she has 'no choice' but to submit to institutional care to state a violation of the integration mandate. Rather, a plaintiff need only show that the challenged state action creates a serious risk of institutionalization." 663 F.3d at 1116. The *M.R.* court observed that the services plaintiffs stood to lose, including supervision and assistance with medication management, transportation, cleaning, shopping, and meal preparation, "relate[d] intimately to their mental and physical health," and held that deterioration was a "predictable consequence[]" of reducing services, placing them at serious risk of institutionalization. *Id*. at

---

State's service levels "jeopardize[d] . . . health and safety," while cautioning that a "mere risk" of institutionalization would not suffice. *Id.* at 1099. This accords with the view that a serious risk of institutionalization states an *Olmstead* claim.

1115. The court concluded that allowing at-risk *Olmstead* claims "is not only reasonable; it also better effectuates the purpose of the ADA." *Id.* at 1117-18.

In *Pashby*, the Fourth Circuit held that individuals who "face a risk of institutionalization" and "must enter institutions to obtain . . . services for which they qualify" have standing to bring an ADA claim. 709 F.3d at 322. Plaintiffs' claims that they "'may,' 'might,' 'probably' would, or were 'likely' to enter" an institution were sufficient to allege a serious risk of institutionalization. *Id*. The court also was "especially swayed by DOJ's determination that 'the ADA and the *Olmstead* decision extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated settings.'" *Id.* (quoting the DOJ *Olmstead* Statement).

In short, allegations that a public entity's actions have placed a plaintiff at serious risk of institutionalization or segregation state a claim under Title II and the integration mandate, even when institutionalization is not imminent. This standard best effectuates the broad prohibition of discrimination against individuals with disabilities in public services under Title II, the integration mandate, and *Olmstead*. The standard also implements the Department's reasonable interpretation of its own regulation and comports with the five courts of appeals decisions that have squarely addressed the issue.

### B. A STATE'S ADMINISTRATION OF SERVICES MAY GIVE RISE TO AN AT-RISK CLAIM.

Defendants correctly state that at-risk *Olmstead* claims are only viable when a serious risk of institutionalization is "caused by a state action or a change in state policy." Mot. to Dismiss 23. But defendants fail to apprehend that a state's administration, operation, and funding of services, including decisions to deny services, constitute state action. Defendants also attempt to distinguish the instant case from appellate case law upholding the viability of at-risk *Olmstead*

9

claims on the ground that those cases arose from service reductions rather than service denials. *Id.* 21-23.

Plaintiffs need not allege changes to pre-existing home- and community-based services to establish a claim that they are at serious risk of institutionalization. Nothing in the text of the Title II regulations suggests that they apply only to changes in a public entity's administration of services, programs, or activities. The regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities," 42 U.S.C. § 35.130(d). The regulations also prohibit discriminatory "methods of administration." *Id*. at § 35.130(b)(3). Similarly, the Department's interpretation of the integration mandate explains that it "is implicated where a public entity administers its programs in a manner that results in unjustified segregation of persons with disabilities," including by operating, financing, and planning a service system. DOJ *Olmstead* Statement, Q & A No. 2. The Department's *Olmstead* guidance further clarifies that "a plaintiff could show sufficient risk of institutionalization to make out an *Olmstead* violation if a public entity's failure to provide community services *or* its cut to such services will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution." *Id*., Q & A No. 6 (emphasis added). The conjunction "or" in the guidance makes clear that a state's ongoing administration of services, including a continuing denial of services, may give rise to an at-risk claim.

Claims that a state's ongoing denial of home- and community-based services places plaintiffs at serious risk of institutionalization inherently allege state action. Although the appellate decisions applying the integration mandate to individuals at serious risk of institutionalization arose from policy changes, these cases did not hold that at-risk claims are

10

limited to serious risks caused by policy changes. They offer no support for dismissing a plaintiff's at-risk claim that arose from a state's ongoing denial of services. To the contrary, the logic animating the courts of appeals' decisions, which permitted *Olmstead* claims by non-institutionalized individuals receiving waiver services, applies with equal force to claims brought by non-institutionalized individuals on wait lists for these services. *See*, *e.g*., *Fisher*, 335 F.3d at 1181 (holding that the integration mandate "would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation.").

Indeed, lower courts have recognized that, by placing individuals at serious risk of institutionalization, service denials may give rise to an *Olmstead* claim. *See*, *e.g.*, *Haddad v. Arnold*, 784 F. Supp. 2d 1284, 1291, 1295 (M.D. Fla. 2010) (holding that the plaintiff, who was on a wait list for home- and community-based services, was likely to succeed on the merits of her *Olmstead* claim because allegations that her volunteer family caregivers were "unable to provide . . . services to Plaintiff indefinitely" described "a real and immediate threat of future injury" "purportedly caused by the Defendants' actions."); *Cruz v. Dudek*, No. 10-cv-23088, 2010 WL 4284955, at *11-12 (S.D. Fla. Oct. 12, 2010) (holding that plaintiff on a wait list for home- and community-based services who relied on the support of friends and family to remain at home showed a likelihood of success on his at-risk *Olmstead* claim); *Long v. Benson*, No. 4:08-cv-26, 2008 WL 4571903 (N.D. Fla. Oct. 14, 2008), *aff'd* 383 Fed. Appx. 930 (11th Cir. 2010) (same); *Makin ex rel. Russell v. Hawaii*, 114 F.Supp.2d 1017, 1034 (D. Haw. 1999) (denying summary judgment and holding that "denying individuals [on a wait list for home- and community-based services] a choice between institutional and home-based care violates the ADA non-discrimination policy since it unnecessarily segregates the individuals."); *Ball v.*

*Rodgers*, No. 00-cv-67, 2009 WL 1395423, at *5 (D. Ariz. Apr. 24, 2009) (holding that the state's "failure to prevent unnecessary gaps in service and properly monitor the [home- and community-based services] program improperly discriminated against persons with disabilities by limiting their ability to maintain their social and economic independence and depriving them of a real choice between home and institutional care."); *M.A.C. v. Betit*, 284 F. Supp. 2d 1298, 1309 (D. Utah 2003) (denying motion to dismiss and holding that "placement of Plaintiffs on the [home- and community-based services] waiver waiting list threatens Plaintiffs with institutionalization because it forces Plaintiffs to choose between staying in the community without any services or entering an institution in order to receive services.").

### C. AT-RISK CLAIMS ARE NOT INCONSISTENT WITH *OLMSTEAD*'S "APPROPRIATE" AND "REASONABLE MODIFICATION" PRONGS.

Defendants argue that this Court is unable to perform a complete analysis of plaintiffs' claims because they do not identify a "*specific* community placement" they seek as a reasonable modification. Mot. to Dismiss 20-21. They also argue that, because the State's treatment professionals have not evaluated and deemed the plaintiffs appropriate for community placement, the Court cannot determine whether living in the community with waiver services is the most integrated setting appropriate to their needs. *Id*.

First, plaintiffs allege that they wish to remain at home, or to move into a home or apartment in the community, with the supportive services they need. Compl. at ¶ 58 ("Mr. Narowitz wants to continue living at home with his parents or in a home or apartment in his community."); ¶ 61 ("Mr. Hamilton wants to continue living with his mother or in a home or apartment in the community."); 59 (requesting a reasonable modification in the form of expanded home- and community-based services "as required by the members of the Plaintiff class to avoid or prevent unnecessary institutionalization . . . ."). A plaintiff's burden in pleading

12

a reasonable modification "need not be onerous. For the purposes of a prima facie showing, the plaintiff must merely suggest the existence of a plausible [modification], the costs of which, facially, do not clearly exceed its benefits." *Cehrs v. Northeast Ohio Alzheimer's Research Ctr*., 155 F.3d 775, 781 (6th Cir. 1998). Courts commonly hold that delivering services in the community is a reasonable modification of a disability service system. *See*, *e.g*., *Pa. Protection & Advocacy, Inc. v. Pa. Dep't of Public Welfare*, 402 F.3d 374, 384-85 (3d Cir. 2005); *Fisher*, 335 F.3d at 1182-83; *Disability Advocates, Inc. v. Paterson*, *et al*., 653 F. Supp. 2d 184, 301 (E.D.N.Y. Sept. 8, 2009), *vacated on other grounds*, 675 F.3d 149 (2d Cir. 2012). But the reasonableness of a proposed modification is a highly fact-specific inquiry, *Anderson v. City of Blue Ash*, 798 F.3d 338, 356 (6th Cir. 2015), not well-suited to resolution on a motion to dismiss. *Martin v. Taft*, 222 F. Supp. 2d 940, 974 (6th Cir. 2002).

Second, *Olmstead* does not limit the evidence that may establish an individual's appropriateness for community placement to the opinions of a state's treatment professionals. The *Olmstead* Court, in a case involving individuals residing in a state-operated psychiatric hospital, explained that "the State generally may rely on the reasonable assessments of its own professionals in determining whether an individual meets the essential eligibility requirements for habilitation in a community-based program." 527 U.S. at 602. This does not bar individuals from bringing an *Olmstead* claim until a state's treatment professional has found them appropriate for community placement. *See*, *e.g*., *Day*, *et al. v. D.C*., *et al*., 894 F. Supp. 2d 1, 23 (D.D.C. 2012) ("Since *Olmstead,* lower courts have universally rejected the absolutist interpretation proposed by defendants" that appropriateness can be determined only by the state's treatment professionals); *Disability Advocates, Inc*., 653 F. Supp. 2d at 259 (holding that, "as a matter of law," organizational plaintiff was "not required to provide determinations from its

13

constituents' treatment providers in order to show that its constituents are qualified to move" into the community); *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 291 (E.D.N.Y. 2008) (rejecting the argument that "*Olmstead* requires that the state's mental health professionals be the ones to determine that an individual's needs may be met in a more integrated setting.").

The Department's *Olmstead* guidance makes clear that "the ADA and its regulations do not require an individual to have had a state treating professional make such a determination." DOJ *Olmstead* Statement, at Q & A No. 4. The guidance explains that "[p]eople with disabilities can also present their own independent evidence of the appropriateness of an integrated setting, including, . . . evidence . . . from their own treatment providers, from community-based organizations that provide services to people with disabilities outside of institutional settings, or from any other relevant source." *Id*. Of course, individuals at serious risk of institutionalization can also rely on their history of community living to show appropriateness. *See*, *e.g*., *Long v. Benson*, No. 4:08-cv-26, 2008 WL 4571903 (N.D. Fla. Oct. 14, 2008), *aff'd*, 383 Fed. Appx. 930 (11th Cir. 2010) ("Mr. Griffin has in fact been receiving the care he needs in the community. The Secretary's argument that it cannot be done thus falls flat."); *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 612 (7th Cir. 2004) (observing that the plaintiff's complaint and the evidence in the record "suggest that with appropriate care [plaintiff] can live at home (he has in fact done so for a number of years) . . . .").

## V. CONCLUSION

The United States respectfully requests that the Court consider this Statement of Interest in this litigation.

Respectfully submitted this 22nd day of August, 2016.

VANITA GUPTA
Principal Deputy Assistant Attorney General
Civil Rights Division

EVE L. HILL
Deputy Assistant Attorney General
Civil Rights Division

REBECCA B. BOND
Chief
ANNE S. RAISH
Principal Deputy Chief
ELIZABETH S. WESTFALL
Deputy Chief
Disability Rights Section
Civil Rights Division

/s/ Julia M. Graff
JULIA M. GRAFF
D.C. Bar No. 983511
Trial Attorney
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. – NYA
Washington, D.C. 20530
Telephone: (202) 616-5319
julia.graff@usdoj.gov

Of counsel:

BENJAMIN C. GLASSMAN
Acting United States Attorney

MATTHEW J. HORWITZ (0082381)
Assistant United States Attorney
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Office: (513) 684-3711
Fax: (513) 684-6972
E-mail: Matthew.Horwitz@usdoj.gov

## CERTIFICATE OF SERVICE

  I hereby certify that this Statement of Interest, filed on this 22nd day of August 2016, will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

<u>/s/ Julia Graff</u>
Julia Graff
