## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

PHYLLIS BALL, by her General
Guardian, PHYLLIS BURBA, et al.,
      Plaintiffs,

                            Case No. 2:16-cv-00282
     v.                  CHIEF JUDGE EDMUND A. SARGUS, JR.
                            Magistrate Judge Elizabeth P. Deavers

JOHN KASICH, Governor of Ohio,
in his official capacity, et al.,

        Defendants.

### OPINION AND ORDER

Plaintiffs Phyllis Ball, Antonio Butler, Caryl Mason, Richard Walters, Ross Hamilton, and the Ability Center of Greater Toledo (collectively "Plaintiffs")[1] bring this class action on behalf of themselves and other similarly situated individuals with intellectual and developmental disabilities against Defendants John Kasich (in his official capacity as Governor of Ohio), Kevin Miller (in his official capacity as Director of Opportunities for Ohioans with Disabilities), John McCarthy (in his official capacity as Director of the Ohio Department of Medicaid), John Martin (in his official capacity as Director of the Ohio Department Developmental Disability), and the Ohio Association of County Boards Serving People with Developmental Disabilities (collectively, "Defendants"). Plaintiffs allege that Ohio's administration, management, and funding of its service system for people with intellectual and developmental disabilities such as themselves puts them at serious risk of segregation and institutionalization in violation of Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act as interpreted by the Supreme Court's decision in *Olmstead v. L.C.*, 527 U.S. 581 (1999), and the

---

[1] Plaintiff Nathan Narowitz was originally named as a party in the Complaint and this Motion. He has since withdrawn as plaintiff without prejudice to his rights to recover as a general member of the putative class.

Social Security Act, 42 U.S.C. § 1396n(c)(2)(B) & (C). This matter is before the Court for consideration of Defendant Kevin Miller's Motion to Dismiss (ECF No. 16), Defendant John Kasich's Motion to Dismiss (ECF No. 28), and Defendants John McCarthy's and John Martin's (joined by Defendant John Kasich) Motion to Dismiss (ECF No. 27). For the following reasons, Defendant Miller's Motion (ECF No. 16) is **DENIED**, Defendant Kasich's Motion (ECF No. 28) is **DENIED in part** with respect to the Rehabilitation Act claim and **GRANTED in part** with respect to the ADA and Social Security Act claims, and Defendant McCarthy and Martin's Motion (ECF No. 27) is **DENIED**.

## I.    BACKGROUND

Plaintiffs are adults with intellectual and developmental disabilities who are institutionalized, or at serious risk of institutionalization, in Intermediate Care Facilities ("ICFs") for individuals with intellectual disabilities with eight or more beds throughout Ohio. (Complaint ("Compl.") ¶ 1, ECF No. 1.) The Ability Center of Greater Toledo joins the named Plaintiffs on behalf of its constituents who also include people with intellectual and developmental disabilities. (*Id.* ¶ 3.) Plaintiffs assert that they would prefer to reside in an integrated, community-based setting and receive employment or day services, "but due to the Defendants' administration, management, and funding of Ohio's service system for people with intellectual and developmental disabilities, they are experiencing or at serious risk of experiencing pervasive and widespread isolation and segregation." (*Id.* ¶ 1.)

Placement in a large ICF, according to Plaintiffs, subjects individuals with intellectual or developmental disabilities to segregation and isolation from their non-disabled peers. (*Id.* ¶ 4.) In Ohio, ninety percent of individuals residing in an ICF live in large ICFs with eight or more beds. (*Id.* ¶ 136.) Arguing that such segregation is illegal under *Olmstead v. L.C.*, 527 U.S. 581

2

(1999), in which the Supreme Court held that individuals with developmental disabilities receiving state-funded care have the right to receive such care in the community if appropriate, Plaintiffs argue that they are entitled to be served in the most integrated, least restricted setting appropriate for their individual needs. (*Id.* ¶ 99.) They additionally challenge the segregation in employment and day services and argue that due to the limited access to such integrated services (as opposed to segregated facility-based programs), they are deprived of meaningful community interactions and the dignity of self-sufficiency.

Plaintiffs allege that in Ohio, approximately 2,500 out of 5,800 individuals currently housed in the state's network of public and private ICFs are on waiting lists for home and community-based services, with a median wait time of thirteen years. (*Id.* ¶ 6.) Another 40,000 individuals not placed in ICFs are also on waiting lists in Ohio awaiting such services. (*Id.* ¶ 7.) The source of this pent up demand for services, Plaintiffs allege, is Defendants' failure to make the requisite administrative and budgetary changes necessary to provide increased access to home and community-based services. (*Id.* ¶ 10.) The State primarily makes such services available through Medicaid funding and large-scale "waiver" programs in which the Department of Medicaid agrees to waive or relax certain Medicaid requirements to allow for individuals with developmental or intellectual disabilities to live by themselves or in other community-based settings. Ohio currently operates four waiver programs: the Individual Options, Transitions Developmental Disabilities (currently being phased out), Level One, and Self Empowered Life Funding ("SELF") waivers. (*Id.* ¶¶ 178–82). Funds for the Level One and SELF waivers are more strictly limited and therefore can only serve people with minimal needs, whereas the Individual Options waiver has no individual funding limit.

Plaintiffs allege that rather than investing in more waivers and funding for such services,

allegedly continue to maintain and invest in large institutional care, away from the national trend. (*Id.* ¶ 8–9.) Plaintiffs allege that local county boards of developmental disabilities are discouraged from providing waiver services over services through ICFs because of the way in which the State allocates its funding. They argue that because the state matches federal Medicaid funds for ICF services, but requires local boards to supplemental federal funding for waiver programs, ICF placement is less of a financial burden for county boards. (*Id.* ¶¶ 185–86.) Thus, Defendants have the ability to remedy the issue by expanding funding to the existing home and community-based waiver programs. Defendants disagree and contend that the number of individuals served through waivers has substantially increased from 5,527 in 1999 to 35,191 in 2015, and the number of individuals served in ICFs has decreased from 59% in 1999 to 15% in 2015. (Defendants Martin and McCarthy's Motion to Dismiss ("Defs.' Mot.") at 4, ECF No. 27.)

Plaintiffs assert that Defendants' actions (or inaction) violate the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, and the Social Security Act. They seek to bring a class action on behalf of approximately 27,800 similarly situated adults with intellectual and developmental disabilities throughout Ohio who are Medicaid eligible and also at risk of institutionalization or placement in a large ICF due to limited access to home and community based services. (*Id.* ¶ 2.) In their Complaint, Plaintiffs request that the Court certify this case as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2), issue a declaratory judgment that Defendants are in violation of federal law in their administration of services to intellectually and developmentally disabled individuals, and grant injunctive relief against defendants to remedy the alleged violations.

Now before the Court for decision are Defendants' three motions to dismiss. Defendant Kevin Miller seeks dismissal of Plaintiffs' claims, arguing that Disability Rights Ohio is

4

precluded under federal law from bringing this class action on behalf of Plaintiffs because it receives federal funds as Ohio's designated Client Assistant Program. (ECF No. 16.) Defendant Governor John Kasich seeks dismissal as a party, asserting Eleventh Amendment immunity and failure to state a claim. (ECF No. 28.) Finally, Defendants John McCarthy and John Martin challenge Plaintiffs' claims on various grounds. ECF No. 27.) The Court will consider each motion in turn.

## II.    STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (clarifying the plausibility standard articulated in *Twombly*). "A claim has facial plausibility when the plaintiff pleas factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The factual allegations of a pleading "must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555. "All of the well-pleaded allegations of the complaint must be treated as true and construed most favorably toward the non-movant, though we need not accept Plaintiff's legal conclusions or draw unwarranted factual inferences." *Thomas v. Publishers Clearing House, Inc.*, 29 F.App'x 319, 322 (6th Cir. 2002). The Court "need not, however, accept conclusory allegations or conclusions of law dressed up as facts." *Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 867 (6th Cir. 2012).

In ruling on a motion to dismiss, the court may consider written instruments that are

5

exhibits to a pleading, as those are considered part of the pleading for all purposes. *Campbell v. Nationstar Mortg.*, No. 14-1751, 611 Fed. App'x 288, 291-92, 2015 WL 2084023, at *3 (6th Cir. May 6, 2015) (citing Fed. R. Civ. P. 10(c)). A court may also consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

### III. DEFENDANT KEVIN MILLER'S MOTION TO DISMISS

Defendant Kevin Miller, in his official capacity as Director of Opportunities for Ohioans with Disabilities, moves to dismiss the putative class action on the grounds that Disability Rights Ohio—whose three attorneys filed and signed the instant Complaint—is precluded by federal law from bringing a class action on behalf of its clients. (Defendant Miller's Motion to Dismiss ("Miller Mot.") at 3, ECF No. 16.) He seeks dismissal of the action, or in the alternative, disqualification of the three Disability Rights Ohio attorneys from further participating in the case.

Under the Rehabilitation Act, Congress makes funds available to states to establish and carry out Client Assistance Programs ("CAPs") to provide information about vocational rehabilitation services available to individuals with disabilities. 29 U.S.C. § 732(a)–(b). CAPs are tasked with the "assistance and advocacy in pursuing legal, administrative, or other appropriate remedies to ensure the protection of the rights of such individuals under this chapter and to facilitate access to the services funded under this chapter through individual and systemic advocacy." *Id.* § 732(a). The statute permits the Governor of each state to designate a public or private agency to serve as the state's agency to receive the funds. § 732(c). Ohio's designated CAP is Disability Rights Ohio. (Miller Mot. at 4–5.) The statute further provides:

> (d) CLASS ACTION BY DESIGNATED AGENCY PROHIBITED
> The agency designated under subsection (c) of this section may not bring any class action in carrying out its responsibilities under this section.

§ 732(d). Miller argues that because all three attorneys who signed Plaintiffs' complaint are employed by Disability Rights Ohio and bring this action to carry out their responsibilities on behalf of their clients, they are in clear violation § 732(d).

The Department of Education is tasked with overseeing the CAP program and proposing regulations to the statute. 34 C.F.R. § 370.45 is the regulation that correlates with § 732(d) of the statute, and similarly provides: "A designated agency may not bring any class action in carrying out its responsibilities under this part." The Secretary of Education commented on this particular provision after the Rehabilitation Act was amended in 1992 and the Secretary proposed changes to the regulations thereafter. Despite a former remark stating the contrary,[2] the Secretary proposed that the text of the regulation would not change, but clarified that

> The prohibition on class actions by a designated agency applies only to the use of CAP funds to support in whole or in part a class action. These regulations do not apply to a designated agency's use of non-CAP funds.

Client Assistance Program, 58 FR 52614-01 (Oct. 8, 1993).

Thus, Plaintiffs maintain that Disability Rights Ohio does not violate § 732(d) by bringing this class action because it is not using CAP funds to finance the lawsuit. (Plaintiffs' Response to Defendants' Motions ("Pls. Resp.") at 67, ECF No. 34.) Instead, Plaintiffs state that they are bringing this action to fulfill its role as the designated "protection and advocacy agency" for Ohio. Disability Rights Ohio is currently the recipient of seven federal protection and advocacy grants in addition to its CAP grant. Specifically here, Disability Rights Ohio is using funds from its Protection and Advocacy of Rights for Individuals with Developmental Disabilities ("PADD") grant to fund this action. *See* 42 U.S.C. § 15043(a). Unlike the CAP

---

[2] The Secretary of Education previously commented that "The Secretary interprets [the statute] to prohibit a designated agency from bringing a class action, regardless of the funding sources, if the effect of the class action would be to carry out the agency's client assistance responsibilities. Client Assistance Program, 50 FR 9960-01 (Mar. 12, 1985).

program, the PADD program anticipates that its funds may be used to pursue class action litigation. 45 C.F.R. § 1326.24 ("Allotments may be used to pay the otherwise allowable costs incurred . . . in bringing lawsuits in its own right to redress . . . rights violations impacting the ability of individuals with developmental disabilities to obtain access to records and when it appears on behalf of named plaintiffs *or a class of plaintiff* for such purposes.") (emphasis added). Plaintiffs' arguments are well taken.

Nevertheless, Defendant argues that the plain language of the statute compels a different interpretation because it makes no reference to the particular funds, but simply provides that a CAP may not bring a class action "in carrying out its responsibilities under the statute." Plaintiffs contend that an agency is not "carrying out its responsibilities" as a CAP if it is not using CAP funds, consistent with the Secretary's position. Moreover, the introductory provision to the regulations of CAPs provides that "[t]he following regulations apply to the expenditure of funds and the administrative of the program under this part:" and lists "the regulations in this part 370." 34 C.F.R. § 370.5(c). The Court ultimately agrees that "any application of the CAP statute to bar the class action here would be contrary to the purpose of the PADD program and a violation of Congress' intent for that program." (Pls. Resp. at 79.)

Moreover, as Plaintiffs note, "a court should not be drawn into resolving a collateral issue of whether the client is eligible to be represented in court by the agency's attorney pursuant to the agency's governing statute, rules, or by-laws," and that "[o]ther courts . . . have responded that such challenges are best addressed by the funding authorities." *Lindquist v. Bangor Mental Health Inst.*, 770 A.2d 616, 618 (Me. 2001). In other words, the scope of representation of Disability Rights Ohio to represent Plaintiffs is a collateral issue that is best left to the governing agency. Accordingly, Defendant Miller's Motion to Dismiss (ECF No. 16) is **DENIED**.

8

## IV.  DEFENDANT KASICH'S MOTION TO DISMISS

Defendant John Kasich, in his official capacity as the Governor of Ohio, moves to dismiss all Plaintiffs' claims asserted against him, claiming that the Court lacks jurisdiction over their claims against him because he is entitled to sovereign immunity under the Eleventh Amendment to the United States Constitution, and alternatively that Plaintiffs fail to state a plausible claim for relief. (ECF No. 28.)

### A.  *Rule 12(b)(1) Standard*

Federal Rule of Civil Procedure 12(b)(1) is the proper vehicle to assert Eleventh Amendment immunity. *Lee Testing & Eng'g Inc. v. Ohio DOT*, 855 F.Supp.2d 722, 725 (S.D. Ohio 2012).Defendants moving under this Rule have two options—a facial attack of the pleadings, or a factual attack. *See DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). Defendant here dos not contest the facts laid out in the complaint and thus brings a facial attack. Specifically, Defendant argues that Plaintiff's complaint fails the requirement to establish this Court's jurisdiction under Rule 8(a), which mandates a complaint contain "a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support." In deciding the merits of a facial attack under 12(b)(1), "the court must take the material allegations of the petition as true and construed in the light most favorable to the nonmoving party." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). Thus, a facial attack on the pleading under Rule 12(b)(1) mirrors the standard of review on a motion brought under Rule 12(b)(6). In response to a challenge under Rule 12(b)(1), "the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Nichols v. Muskingum College*, 318 F.3d 674, 677 (6th Cir. 2003) (citations omitted) (internal quotation marks omitted).

### B.  *Discussion*

The Eleventh Amendment provides sovereign immunity for states from certain lawsuits. It reads: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI. The Supreme Court has held that this language forbids private lawsuits by citizens against their own state. *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 72–73 (2000); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). When suits are filed against state officials in their official capacities, they "should be treated as suits against the State," *Hafer v. Melo,* 502 U.S. 21, 25 (1991), because in an action against a state officer acting in an official capacity, "the plaintiff seeks damages not from the individual officer, but from the entity for which the officer is an agent." *Pusey v. City of Youngstown,* 11 F.3d 652, 657 (6th Cir.1993). Therefore, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Hendricks v. Kasich*, No. 2:12-CV-729, 2013 WL 2243873, at *7 (S.D. Ohio May 21, 2013) (quoting *Kentucky v. Graham,* 473 U.S. 159, 166 (1985)).

There are three exceptions to Eleventh Amendment immunity: (1) the State has consented to suit; (2) Congress has abrogated the State's immunity; or (3) the suit is for prospective relief against a state official in his official capacity under *Ex parte Young*, 209 U.S. 123 (1908). *See Thiokol Corp. v. Mich. Dep't of Treasury*, 987 F.2d 376, 381 (6th Cir. 1993).

1. Rehabilitation Act Claim

With respect to Plaintiffs' Rehabilitation Act claim, this Court has held before that there is no dispute that "States waive their Eleventh Amendment immunity with regard to Rehabilitation Act claims when they accept federal funds." *Martin v. Taft*, 222 F. Supp. 2d 940,

957 (S.D. Ohio 2002) (citing *Carten v. Kent State Univ.,* 282 F.3d 391, 398 (6th Cir.2002); *Nihiser v. Ohio EPA,* 269 F.3d 626, 628 (6th Cir. 2001)). In amending the Rehabilitation Act, Congress expressly provided: "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973." 42 U.S.C. § 2000d–7 (1986). In their Complaint, Plaintiffs allege that the Defendants receive federal financial assistance for their programs and activities within the meaning of Section 504 of the Rehabilitation Act. (Compl. ¶ 214.) They further allege that the Governor, though the Governor's Office of Health Transformation, received over $400,000 in federal appropriations in 2016. (Pls. Resp. at 64, n.56 (citing Budget in Detail, H.B. 64, 131st Gen. Assemb. (Ohio 2015)).)

Although Defendant argues that the "waiver of sovereign immunity is limited and applies only to the individual agency that receives the federal funds," the Court finds that Plaintiffs here have met their burden. (Defendant Kasich's Motion to Dismiss ("Kasich Mot.") at 9, ECF No. 28 (citing *Doe v. Nebraska*, 345 F.3d 593, 598 (8th Cir. 2003)).) Accepting all factual allegations as true, the Court finds that the Governor has waived his Eleventh Amendment immunity with respect to Plaintiffs' Rehabilitation Act claims by agreeing to accept federal funds. Therefore, with respect to Plaintiffs' Rehabilitation Act claim, Defendant Kasich's Motion to Dismiss is **DENIED**.

2. ADA and Social Security Act Claim

Unlike the Rehabilitation Act, which expressly abrogates state immunity, Plaintiffs assert jurisdiction over Defendant Kasich for their ADA and Social Security Act claims under the *Ex Parte Young* exception. In his Motion to Dismiss, Governor Kasich argues that he lacks a sufficient connection to the direct enforcement of the laws as required and instead only retains

broad authority to appoint officials, submit budgets, and oversee policy initiatives. (Kasich Mot. at 4.)

Under *Ex parte Young*, a federal court can issue prospective relief compelling a state official to comply with federal law because "it is beyond dispute that federal courts have jurisdiction over suits to enjoy state officials from interfering with federal rights." *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507–08 (6th Cir.2008). For the exception to apply, however, the officer named in the suit must have "some connection with the enforcement of the act.*" Ex parte Young*, 209 U.S. at 157; *see also Russell v. Lundrergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) ("Young does not reach state officials who lack a 'special relation to the particular statute' and '[are] not expressly directed to see to its enforcement.'" (quoting *Young*)). In other words, "The state official sued [] must have, by virtue of the office, some connection with the alleged unconstitutional act or conduct of which the plaintiff complains." *Floyd v. Cty. of Kent*, 454 F. App'x 493, 499 (6th Cir. 2012). Absent such connection, "General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1048 (6th Cir. 2015).

Courts have not read *Young* expansively. *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1415 (6th Cir. 1996) (citing *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 104 (1984)). Generally, a state executive's role in appointing and supervising officials, setting policy, and making budget recommendations fail to meet the sufficient connection requirement under *Young*. *See, e.g.*, *Hendricks v. Kasich*, No. 2:12-cv-729, 2013 WL 2243873, at *9 (S.D. Ohio May 21, 2013) (Governor's executive and budget authority not sufficient to show responsibility for enforcement of any law or policy relating to the claim); *Peter B. v. Sanford*, No. 6:10-767, 2012 WL 2149784 (D.S.C. June 13, 2012) (general authority

12

over state Medicaid program was insufficient to waive governor's immunity in suit alleging *Olmstead* violations).

Here, Defendant Kasich is "charged with seeing that the laws of the State of Ohio are faithfully executed" and "is responsible for directing, supervising, controlling, and setting policy for the executive departments of state government." (Compl. ¶ 79–81.) Specifically, Plaintiffs assert that by virtue of his role as Governor, "Defendant Kasich ultimately controls decisions about the proposed budget submitted to the Legislature and specifically has discretion to seek funds to support community programs . . ." (Pls. Resp. at 58.) He is also responsible for appointing the directors of the Ohio Department of Developmental Disabilities, Ohio Department of Medicaid, and Opportunities for Ohioans with Disabilities, whose directors are also named as Defendants in this suit. (*Id.* at 60.) As other courts have held, such general supervisory powers are insufficient to subject an official to suit. *See, e.g.*, *Sanford*, 2012 WL 2149784 at *5 (noting that while the governor has the power to review and comment on a state's Medicaid plan, "this does not create any enforcement rights in the governor"). The Court finds that these general powers fail to provide a sufficient connection to the direct enforcement over the expansion of community-based services here. Indeed, "[w]ere the law otherwise, the exception would always apply. Governors who influence state executive branch policies (which virtually all governors do) would always be subject to suit under *Ex parte Young*. The exception would become the rule" *Tohono O'odham Nation v. Ducey*, 130 F. Supp. 3d 1301, 1311 (D. Ariz. 2015).

Plaintiffs further argue that Governor Kasich's Executive Order 2011-02K, which created the Governor's Office for Health Transformation, establishes a closer connection between the Governor and the laws at issue. (*Id.* ¶ 82.) The Office for Health Transformation is tasked with carrying out "the immediate need to address Medicaid spending issues, plan for the long-term

13

efficient administration of Ohio's Medicaid program, and act to improve overall health system performance in Ohio." (*Id.*) Plaintiffs allege that since its creation, "the Office for Health Transformation has coordinated and implemented planning and budget activities for the State of Ohio's compliance with the U.S. Supreme Court's decision in *Olmstead v. L.C.*, 527 U.S. 581 (1999). (*Id.*) The Office's annual budget documents states that the office "has been working to rebalance Medicaid spending toward less expensive home and community based services." (Pls. Resp. at 57 n.45.) Yet, similar to the other state agencies whose directors are named in this suit, the Governor appoints a director to the Office to oversee its day-to-day operation and thereafter retains broad oversight authority to help coordinate policies among the various agencies. (Kasich Mot. at 8.) While the Governor may direct broad policy initiatives to the various state agencies through his Office of Health Transformation, the agencies retain responsibility for the direct enforcement of those policies. Plaintiffs have failed to show any responsibility by the Governor for the direct enforcement over such policies beyond his general executive authority.

Finally, Plaintiffs rely on *Martin v. Taft*, 222 F. Supp. 2d 940, 957 (S.D. Ohio 2002) to argue that the governor is a proper defendant. In *Martin*, a similar class of plaintiffs brought suit against various state officials in their official capacities, including former Governor Taft, to likewise challenge the State's provision of services to individuals with intellectual and developmental disabilities. (Pls. Resp. at 55.) Plaintiffs assert that because "the defendants in *Martin* never challenged the inclusion of the Governor as a party" and the court never discussed the issue, that he must be a proper party here. However, the lack of discussion on an issue that was not raised is not particularly instructive. The Court's position on a matter on which it did not speak cannot be gleaned one way or another. The issue was simply not raised in *Martin* as it is here. This argument is not well taken.

Keeping in mind Defendant's own affirmation that the official capacity claim against Governor Kasich is redundant because "Plaintiffs bring claims against the state agencies responsible for managing Ohio's developmental disability services," the Court finds that Defendant Kasich is entitled to immunity under *Ex parte Young* and that the remaining Defendants are capable of providing the relief sought by Plaintiffs without his inclusion. Accordingly, Defendant Kasich Motion to Dismiss with respect to Plaintiffs' ADA and Social Security Act claims is **GRANTED**.

In sum, Defendant Kasich's Motion to Dismiss is **GRANTED in part** on Plaintiffs' ADA and Social Security Act claims and **DENIED in part** on Plaintiffs' Rehabilitation Act claim. Accordingly, Plaintiffs' ADA and Social Security claims against Defendant Kasich are **DISMISSED.**

## V. DEFENDANT MCCARTHY'S AND MARTIN'S MOTION TO DISMISS

Defendants John McCarthy and John Martin, in their official capacities, move to dismiss Plaintiffs' claims on several grounds, each of which are addressed in turn. (Defendants Martin and McCarthy's Motion to Dismiss ("Defs.' Mot."), ECF No. 27.) Defendant John Kasich in his official capacity as Governor of Ohio also fully joins and incorporates Defendants Martin and McCarthy's motion as applying equally to him (now solely with respect to the Rehabilitation Act claim).

### A. *Effect of* Martin *Consent Decree and Res Judicata on Plaintiffs' Claims*

Defendants argue Plaintiffs' Complaint violates the contractual terms of a previous class action settlement reached in *Martin v. Taft*, Case No. 89-cv-362 (S.D. Ohio) in 2007 in which the plaintiffs agreed to waive any future claims that they could have brought in the prior action. Defendants further contend that principles of res judicata compel the dismissal of Plaintiffs'

claims for similar reasons.

1. *Martin* Consent Decree

In *Martin*, a class of plaintiffs with developmental disabilities brought an action on behalf of "all mentally retarded or developmentally disabled Ohioans who are, or will be, in need of community housing and services which are normalized, home-like, and integrated, and a subclass who, in addition to being members of the class, are or will be, Medicaid recipients" against the Governor of Ohio, the director of the Ohio Department of Mental Retardation and Developmental Disabilities, and the director of the Department of Job and Family Services, each in their official capacity. (Consent Order, Ex. A. to Defs.' Mot., ECF No. 27-1.)

While the litigation was ongoing, the Supreme Court issued its decision in *Olmstead v. L.C.*, 527 U.S. 582 (1999). In *Olmstead*, the Court held that the unnecessary institutionalization of mentally disabled persons is a form of discrimination in that "placing mentally disabled persons in institutions when they are capable of living in the community perpetuates the stereotypes that such individuals are unworthy or incapable of participating in community life," and because "confinement in an institution deprives the individual of participation in a broad spectrum of important activities . . ." *Id.* at 970. Acknowledging that under 28 C.F.R. § 35.130(d), "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities," the Court concluded that mentally disabled individuals receiving state-funded care have the right to receive that care in the community "when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated." *Id.* at 587.

Guided by the *Olmstead* decision, and after nearly two decades of litigation, the parties

reached an agreement outlined in a Consent Order on March 5, 2007. Per the terms of the Consent Order, the defendants agreed to seek 1500 additional waiver slots and $ 4.2 million in Medicaid funding for community-based housing in the 2008–2009 fiscal year, for which plaintiffs agreed to release Defendants and their successors "from current and future claims or actions regarding any and all matters that are or could have been brought as part of this litigation." (Consent Order ¶ 6.) However, the Order also stated that "The Order shall terminate on June 30, 2009," until which time the Court had jurisdiction over its enforcement. (*Id.* ¶¶ 7, 11.)

Defendants argue that Plaintiffs here are attempting to re-litigate *Martin* because they were dissatisfied with the deal they struck. They argue that "Plaintiffs live in the world that they bargained for in Martin" and cannot now renegotiate the outcome. (Defendants' Reply in Support of Defs.' Mot. ("Defs.' Reply") at 12, ECF No. 43.) Contrary to the assertion that the *Martin* plaintiffs agreed to forever waive all claims in exchange for the one-time two-year increase, the plain language of the Order clearly states that the entire Consent Order would terminate on June 30, 2009, which rationally includes the release provision as well. An interpretation to the contrary could lead to the termination provision to be read out of the agreement. Instead, the release provision can be reasonably interpreted to prohibit any further claims during the duration of the Consent Order, meaning between March 5, 2007 and June 30, 2009. This is plausible given that the one-time bargained-for adjustment was made in the context of the preceding eighteen years of protracted litigation. According to Plaintiffs, this interpretation reflects the mutual understanding the parties held. At a fairness hearing held the same day the Consent Order was approved, Plaintiff's counsel described the settlement as limited to two years, after which point "if it works, we're done, and we can reassess where Ohio is in terms of its

17

obligations under Title II." (Pls. Resp. at 15 (citing Transcript of Mar. 5, 2007 Fairness Hearing at 5, *Martin v. Strickland* Case No. 2:89-cv-362, ECF No. 803.) Defendants did not object to this statement. Thus, Plaintiffs have pled sufficient facts showing that the Consent Order does not prohibit the instant suit against Defendants based on new allegations that arose after the termination of the agreement.

## 2. Res Judicata

Defendants further argue that even if the specific terms of the *Martin* Consent Order do not prohibit Plaintiffs' suit, the principles of res judicata based on the *Martin* case do. The Doctrine of res judicata, or claim preclusion, prohibits successive litigation of the very same claim by the same parties. *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001). Res judicata has four elements that the moving party has the burden of showing: (1) there was a final decision on the merits by a court of competent jurisdiction; (2) there is a subsequent action between the same parties or their privies; (3) an issue in the subsequent action was litigated or should have been litigated in the prior action; and (4) an identify of the causes of action. *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 805 F.3d 701, 709–09 (6th Cir. 2015); *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 650 (6th Cir.2007).

The parties apparently do not dispute that the Consent Order in *Martin* represented a final decision on the merits[3] or that it involved the same parties or their privies as the parties here. Thus, the issue here is whether the current litigation raises the same issue that was either litigated or should have been litigated in the prior action, and whether the causes of action are the same. The third and fourth elements of claim preclusion "require much the same inquiry:" whether the second action arises out of the same transaction out of which the first action arose. *Pram Nguyen*

---

[3] Consent orders are judgments and thus confer claim preclusion, but because the issues were not actually litigated in cases resolved by consent orders, these judgments do not ordinarily confer issue preclusive effect unless it was clear that the parties intend their agreement to have such an effect. Arizona v. California, 530 U.S. 392, 414 (2000)

*ex rel. United States v. City of Cleveland*, 534 F. App'x 445, 451 (6th Cir. 2013) (citing Restatement (Second) of Judgments § 24(1)).

Plaintiffs here allege that despite *Martin*, the State has still failed to make the requisite administrative and budgetary changes providing greater access to integrated services under *Olmstead*, and by failing to do so continues to violate Plaintiffs' rights. Essentially they allege a theory of a continuing violation by Defendants.  In *Lawlor v. National Screen Service Corp.*, 349 U.S. 322 (1955), the Supreme Court recognized that even when a subsequent claim involves "essentially the same course of wrongful conduct," res judicata cannot extinguish claims that did not exist when the previous suit was brought. *Id.* at 327–28. In other words, new wrongful conduct, even if it is the same conduct previously alleged, may establish a new cause of action. The Sixth Circuit has elaborated on the continuing violation theory for when a plaintiff alleges an ongoing course of conduct:

> Ordinarily, the "transaction" that gives rise to a cause of action will be clearly delineated. A car accident victim, for example, must bring all tort claims related to the accident in a single suit or be barred from raising them later. However, when a plaintiff alleges an ongoing course of harmful conduct, as with a nuisance or pattern of harassment, the task of pinpointing the transaction becomes more challenging. On the one hand, a plaintiff should not be permitted to repeatedly challenge the same conduct over and over, but neither should a defendant have perpetual immunity from suit based on a single adjudication that may have ended in settlement or a decision in the plaintiff's favor. A successful plaintiff should not be forever barred from asserting new claims based on continuous wrongful conduct, even if that conduct is identical to the subject of a prior suit.
>
> The solution to this dilemma can be found in the interplay between the doctrines of claim and issue preclusion. If a plaintiff sues a defendant more than once based on an ongoing course of conduct, the doctrine of claim preclusion will typically not prevent the plaintiff from asserting a cause of action that arose after the first suit was decided. Because it did not yet exist, such a cause of action literally could not have been brought in the first suit. However, once a court actually litigates the merits of an issue, the doctrine of issue preclusion will prevent a plaintiff from relitigating the issue in a subsequent suit.

*Nguyen*, 534 F. App'x at 451–52 (citations omitted). The Sixth Circuit in *Nguyen* determined that the defendant was subject to a new cause of action under the Clean Air Act because it continued to violate the Act by operating without the required permit, and not just for failing to secure the permit initially. *Id.* at 452–53. Other cases have similarly declined to apply res judicata to cases that allege new actions that arose after the previous judgment. *See e.g.*, *Huguley v. Gen. Motors Corp.*, 52 F.3d 1364, 1373 (remanding for determination of whether continuing acts that occurred post-decree stated a claim for disparate treatment); *Bronson v. Bd. of Educ. of City Sch. Dist. of Cincinnati*, 525 F.2d 344, 349 (6th Cir. 1975) (1965 judgment in school desegregation case barred pre- but not post-1965 claims in second action based on continuing wrongful acts).

Arguing that Defendants have a continuing obligation under the ADA, Rehabilitation Act, and Social Security Act to administer the relevant programs in the most integrated setting, Plaintiffs contend that the State continues to violate these statutes by providing such services in settings that are unnecessarily segregated. As outlined in *Olmstead*, the relevant regulations require states to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Thus, as in *Nguyen*, each day they experience a violation of their rights creates "a new claim or cause of action." (Pls. Resp. at 18 (citing 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4409 (2d ed. 2002).) In their Complaint, Plaintiffs allege that they are currently being segregated or are at risk of segregation in large ICFs in violation of the Olmstead mandate that individuals with developmental or intellectual disabilities be offered care and services in a more integrated setting. They allege that despite Defendants' efforts over the years, approximately 5,800 individuals still reside in the state's network of public

and private ICFs, 2,500 of whom (in addition to 40,000 not in ICFs) are on waiting lists for home and community-based services with a median wait time of thirteen years. (Compl. ¶ 6, 7.) At this stage, Plaintiffs have sufficiently pled that, with the *Martin* Consent Order no longer in effect, the State's subsequent violation of the law could trigger a new claim.

In addition to alleging that Defendants have continued to violate the law post-*Martin*, Plaintiffs also assert that the underlying facts and surrounding regulatory regime have changed since the Consent Order terminated. "Where 'important human values—such as the lawfulness of continuing personal disability or restraint—are at stake, even a slight change of circumstances may afford a sufficient basis for concluding that a second action may be brought.'" (Pls. Resp. at 22 (citing *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2305 (2016) and the Restatement (Second) of Judgments § 24 cmt. f).) While the plaintiffs in *Martin* challenged the segregation of individuals with developmental disabilities in residential settings, here Plaintiffs additionally challenge the segregation of Plaintiffs in employment and day services. Though Defendants argue that the *Martin* plaintiffs could have brought these additional claims at the time, federal law has since clarified that the integration mandate that applies to residential services applies to employment and day programs as well. (*Id.* (citing the Workforce Innovation and Opportunity Act of 2014, 29 U.S.C. § 701, *et.seq.* and new federal regulations from the Centers for Medicaid and Medicare Services enacted in 2014, 42 C.F.R. § 441.301(c)(2)(i).).) For instance, new regulations from CMS regarding Medicaid waiver programs clarify that services funded through waiver programs must be delivered in an integrated setting that "supports full access of individuals . . . to the greater community, including opportunities to seek employment and work . . ." 42 C.F.R. § 441.301(c)(2)(i).

The Court finds that Plaintiffs have sufficiently stated a claim for relief. Given that the

Consent Order in Martin terminated in 2009 in addition to Plaintiffs' new allegations herein, the causes of action that arose subsequent to the 2009 termination of the Consent Order are not barred by res judicata or the terms of the Consent Order, which by its own terms expired on June 30, 2009.

### C. *Ripeness of Plaintiff Hamilton's Claims*

Defendants next move to dismiss the claims of Plaintiff Ross Hamilton[4] pursuant to Rule 12(b)(1) as not ripe because he is not currently residing in an ICF and has shown that he is at serious risk of institutionalization.

In accordance with the limitations on judicial power under Article III, the ripeness doctrine prevents federal courts from prematurely adjudicating cases. *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998). With respect to cases brought alleging violations of *Olmstead*, however, the Department of Justice ("DOJ") has issued a statement making clear, at least in its view, that *Olmstead* relief is not limited to individuals currently institutionalized but also applies to persons *at serious risk* of institutionalization or segregation. *See* Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.* (June 22, 2011), https://www.ada.gov/olmstead/q&a_olmstead.htm. The DOJ explains that:

> [T]he ADA and the Olmstead decision extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated settings. Individuals need not wait until the harm of institutionalization or segregation occurs or is imminent. For example, a plaintiff could show sufficient risk of institutionalization to make out an *Olmstead* violation if a public entity's failure to provide community services or its cut to such services will likely cause a decline in health, safety or welfare that would

---

[4] Plaintiff Nathan Narowitz was previously included in this section of Defendant's Motion prior to his withdrawal as a plaintiff to the action. Any arguments regarding his particular status as a plaintiff will be omitted from the discussion.

lead to the individual's eventual placement in an institution.

*Id.* Given that Congress expressly delegated the DOJ to issue the relevant regulation, most courts give deference to this interpretation. *See, e.g., Davis v. Shah*, 821 F.3d 231, 263 (2d Cir. 2016) ("DOJ's interpretation of [the integration] provision is 'controlling unless plainly erroneous or inconsistent with the regulation.'" (internal citation omitted)); *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013) ("Because Congress instructed the DOJ to issue regulations regarding Title II, we are especially swayed by the DOJ's determination that 'the ADA and the Olmstead decision extend to persons at serious risk of institutionalization . . .").

Plaintiffs contend that the State's failure to provide sufficient community-based services is likely to lead to Plaintiff Hamilton's eventual placement in an institution given that he has significant disabilities and is in need of constant care. Hamilton is a 22-year-old man with autism and lives at home with his mother, who is 56-years-old and acts as Hamilton's primary caregiver. (Compl. ¶¶ 59–60.) Mrs. Hamilton works full time to support her son and herself. Hamilton is enrolled in Medicaid and had been on the waiting list for both Individual Options and Level One waiver programs for seven years. Two weeks before this action was filed, Hamilton was approved for a Level One waiver, but argues that the services provided through the program are segregated facility-based services that fail to provide meaningful community participation and contact.

Defendants acknowledge that a plaintiff need not be currently institutionalized to have standing, but argue that any risk of institutionalization Hamilton in particular faces is speculative and contingent upon several intervening events. Defendants hypothesize that Hamilton would first have to face a change in medical or financial circumstances so that his mother would no longer be able to act as his primary caregiver. They argue that this situation could place him at

risk of substantial harm, in which case he "would be in a very different position on waiver waiting lists than [he is] now, and could get services quickly." (Defs. Reply at 21.) In other words, if such a situation arises, Defendants maintain that Hamilton would likely be granted an "emergency status" waiver under Ohio law for individuals on waiting lists who are "at risk of substantial self-harm or substantial harm to others if action is not taken within thirty days," such as when a person suffers a loss in residence or caretaker. Ohio Rev. Code §§ 56126.042(A) & (D). However, such assurance is also speculative. As the Seventh Circuit held in a similar situation, the "hypothetical availability" of a waiver did not make the plaintiff's at-risk claim unripe. *Steimel v. Wernert*, 823 F.3d 902, 913 (7th Cir. 2016). Alternatively, Plaintiffs could be placed in a smaller ICF (with less than eight beds) before necessarily being placed in a large ICF. This too is speculative.

Plaintiffs respond that "even if it is impossible to predict the exact date and time when [Hamilton] will experience an ICF admission, it is certain these conditions—significant unmet needs, limited access to services, and the anticipated loss of a primary caregiver—present a serious risk of institutionalization sufficient to provide standing." (Pls. Resp. at 34.) Besides these factors, Plaintiffs allege that the State's failure to provide residential and day services to individuals with disabilities in sufficient community settings is reasonably related to and predictably forces individuals with disabilities into inappropriate institutionalization. (Pls. Resp. at 30.) Thus, they allege the State's decision to provide segregated services without access to sufficient community-based services "reflects a present failure to 'administer service, programs and activities in the most integrated setting appropriate' in violation of the ADA." (*Id.* (citing 28 C.F.R. § 35.130(d)).)

Defendants further argue that to state an "at-risk" claim under *Olmstead*, Plaintiffs must

24

point to some specific "state action or change in state policy" that will directly cause Hamilton to be institutionalized. (Defs.' Mot. at 23.) They argue that here, Hamilton could eventually be institutionalized for a number of other reasons, such as a change in his health or financial circumstances. The United States, as an interested party, filed a Statement of Interest in response to this argument, arguing that Defendants conflate the ripeness inquiry with the merits of Plaintiffs' claims and misconstrue the meaning of "state action." (Statement of Interest of the United States ("Statement of Interest") at 1, ECF No. 41.) First, a plaintiff need not show that institutionalization is imminent or inevitable to have standing. (*Id.* at 7.) Other courts have found that plaintiffs had standing to bring claims under the ADA's integration mandate without facing immediate institutionalization. *See, e.g.*, M.*R. v. Dreyfus*, 663 F.3d 1100 (9th Cir. 2011) ("An ADA plaintiff need not show that institutionalization is 'inevitable' or that she has 'no choice' but to submit to institutional care to state a violation of the integration mandate."); *Fisher v. Oklahoma Health care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003) (finding state's action placed the plaintiffs at risk of eventual institutionalization, though not immediate harm); *Guggenberger v. Minnesota*, 198 F. Supp. 3d 973 (D. Minn. 2016) (finding that claims for the denial of waiver services based on state's mismanagement and administration were ripe for review).

Additionally, "a state's administration, operation, and funding of services, including decisions to deny services," can "constitute state action." (Statement of Interest at 9.) Nothing in the text of Title II of the ADA requires that a plaintiff allege a change to pre-existing home and community-based services to establish an at-risk claim. It merely requires a public entity to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 42 U.S.C. § 35.130(d). Thus, Plaintiffs allege that even if Hamilton's eventual institutionalization is contingent on future events, the personal

financial strain he faces in addition to the limited availability of integrated and community-based services makes such an outcome a predictable consequence.

Moreover, contrary to Defendants' assertion that "Mr. Hamilton may never be harmed by the public policies with which they disagree," Plaintiffs further allege that Hamilton is currently harmed by the State's policies even though he is not institutionalized. Hamilton maintains that he currently faces segregation from his non-disabled peers by living at home and working in a segregated facility-based workshop. (Pls. Resp. at 35.) The Seventh Circuit in *Steimel v. Wernert* considered whether a person who is capable of participating in the community but is nevertheless isolated in the home is inconsistent with the mandate that individuals be served "in the most integrated setting appropriate." *Steimel*, 823 F.3d at 910 (citing "unjustified isolation" as discrimination based on disability under *Olmstead*, 527 U.S. at 600). In comparing it to the segregation an individual would experience in an institution, the Seventh Circuit concluded that "we see no reason why the same analysis should not apply" to the home. *Id.* at 911.

In sum, Hamilton has sufficiently alleged that he is currently harmed and faces a serious risk of institutionalization as a result of the State's ongoing failure to provide adequate community-based waiver services. Thus, his claims are ripe for review.

### D. *Standing of the Ability Center of Greater Toledo*

Next, Defendants argue that the Ability Center of Greater Toledo ("Ability Center") lacks associational standing to bring this action on behalf of its constituent members. The Ability Center is a non-profit Ohio corporation operating as a "center for independent living" pursuant to 29 U.S.C. § 796 with the mission to improve the independence of individuals with disabilities, including those with intellectual and developmental disabilities. Defendants do not challenge the Ability Center's standing to bring suit on its own behalf as an organization.

26

An association has standing to bring suit on behalf of its members when (1) its members would otherwise have standing to sue in their own right; (2) the interests at stake are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires participation by individual members in the lawsuit. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

Defendants argue that the Ability Center cannot meet the first or third prongs of the *Hunt* test because its constituents are not members and because *Olmstead* requires the participation of individual plaintiffs themselves. They do not dispute the second element that the interests at stake are germane to the Ability Center's purpose of advocating for the rights of disabled people.

With respect to the first prong, when an association lacks traditional members, the association may nonetheless have standing where its constituents "possess all of the indicia of membership in an organization." *Hunt*, 432 U.S. at 344. In *Hunt*, the apple growers and dealers were not traditional members, but because they elected members to and served on the Commission they possessed sufficient indicia of membership to give associational standing on their behalf. *Id.* at 344–45. Courts have found associational standing where the constituents are the "functional equivalent" of members. *See Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1112 (9th Cir. 2003); *Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999) (finding associational standing because constituents, "[m]uch like members of a traditional association, . . . possess the means to influence the priorities and activities" of the organization.)

Here, Defendants argue that constituents of the Ability Center are not traditional members and do not possess the indicia of membership. Unlike the apple growers in *Hunt*, who alone elected members to and alone could serve on the board, Defendants allege that the Ability Center has stated a much looser connection between the putative class members and the

27

organization's Board of Trustees. The majority of the Ability Center's Board of Trustees are people with disabilities in addition to four members who are individuals or parents of individuals with intellectual or developmental disabilities. (Pls. Resp. at 42.) Further, a majority of the Ability Center's staff are people with disabilities and many hold leadership positions. Defendants essentially allege that because not every single members of the Ability Center's Board or constituency is a putative member of the class that it cannot have standing.

*Hunt* need not be read so strictly. For instance, in *Liberty Res., Inc. v. Philadelphia Hous. Auth.*, 528 F. Supp. 2d 553, 563 (E.D. Pa. 2007), the court held that "representational standing does not require that every individual in an organization, nor every decision-maker in an association, suffers the precise, direct injury allegedly caused by the defendant." *Id.* (citing *Warth v. Seldin,* 422 U.S. 490, 511 (1975)). "On the contrary, an organization can achieve representational standing if 'its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.'" *Id.* Here, Plaintiffs have pled that the Ability Center's constituents "include individuals with intellectual and developmental disabilities currently institutionalized in large ICFs or at serious risk of institutionalization in these facilities." (Compl. ¶ 70.) This, in addition to its representations regarding the constituent membership on its Board, satisfies the indicia of membership.

As to the third prong regarding individual participation, the Sixth Circuit has held that "[t]he individual participation of an organization's members is not normally necessary when an association seeks prospective or injunctive relief for its members." *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004); *see also Fednav, Ltd. v. Chester*, 547 F.3d 607, 615 (6th Cir. 2008) (individual participation not required because organization seeks

declaratory judgment, and not individualized damages). Here, the Ability Center only seeks prospective and injunctive relief in the form of a declaratory judgment and permanent injunction. (Compl. at 58–59.) Thus, the Ability Center has associational standing to bring suit on behalf of its constituents.

### E. *Enforceability and Standing Under the Social Security Act*

Finally, Defendants challenge Plaintiffs' standing to privately enforce their claim under 42 U.S.C. §1396n(c)(2)(B) & (C), the "Free Choice" provision of the Social Security Act that governs the issuance of Medicaid waivers to states. Plaintiffs bring their claim under 42 U.S.C. § 1983, which creates a cause of action against a person, who under color of state law, deprives "any citizen of the United States . . . of any rights, privileges, or immunities secured by the Constitution and laws." "[I]n order to seek redress through § 1983, . . . a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). Plaintiffs allege that the State of Ohio violated their rights under § 1396n(c)(2) by failing to inform and provide them meaningful choices to feasible alternatives to institutional placement, including their eligibility for home and community-based services. Defendants argue that § 1396n cannot be privately enforced by Plaintiffs because its language does not clearly confer an individual right. Alternatively, Defendants argue that Plaintiffs lack standing because they are all aware of ICF alternatives by virtue of their placement on waiver waiting lists and therefore have not been harmed.

A statute confers an individual federal right if three factors are met: (1) "Congress must have intended that the provision in question benefit the plaintiff;" (2) "the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial resources;" and (3) "the provision giving rise to the

asserted right must be couched in mandatory, rather than precatory, terms." *Blessing*, 520 U.S. 329 at 340–41. The Supreme Court clarified this standard in *Gonzaga v. Doe*, 536 U.S. 273, 284 (2002). It held that an individual may privately enforce a federal law under § 1983 when Congress makes clear through the statutory language that it unambiguously confers an individual right. In order to do so, the statute "must be phrased in terms of the persons benefited" using "individually focused terminology." *Gonzaga*, 536 U.S. at 284, 287.

Before *Gonzaga*, the Sixth Circuit had held that § 1396n(c)(2)(B) & (C) were enforceable through § 1983. *See Wood v. Tompkins*, 33 F.3d 600 (6th Cir. 1994). However, the Sixth Circuit has not revisited the issue after *Gonzaga* to determine if the statute contains sufficient individually-focused language under the new standard. Other courts have since disagreed as to whether § 1396n is privately enforceable through § 1983. *See e.g.*, *Ball v. Rodgers*, 492 F.3d 1094, 1116–17 (9th Cir. 2007) (finding sufficient rights-containing language under § 1396n(c)(2)(C)); *Michelle P. ex rel. Deisenroth v. Holsinger*, 356 F. Supp. 2d 763, 769 (E.D. Ky. 2005) (same); *Steward v. Abbott*, 189 F. Supp. 3d 620, 635–37 (W.D. Tex. 2016) (finding §§ 1396n(c)(2)(B) and (C) reflect a "congressional intent to create a right in those individuals to such evaluations and information"); *Masterman v. Goodno*, No. Civ.03-2939, 2004 WL 51271, at *10 (D. Minn. Jan. 8, 2004) (disagreeing that § 1396n is not privately enforceable simply because it speaks about the entity regulated rather than individuals benefit). *But see M.A.C. v. Betit*, 284 F. Supp. 2d 1298, 1307 (D. Utah 2003) (holding that "the freedom of choice provisions do not contain the unambiguous rights-creating language of *Gonzaga*); *Gaines v. Hadi*, No. 06-60129-civ-seitzmc, 2006 WL 6035742, at *23–24 (S.D. Fla. Jan. 30, 2006) (disagreeing with *Woods v. Tomkins* and finding no private right of action under § 1396n).

The Court is persuaded by those cases finding sufficient rights-creating language in the

30

statutory provisions. Sections 1396n(c)(2)(B) and (C) provide that a waiver shall not be granted unless the State "will provide . . . for evaluation of the need" of services to individuals who "are entitled to [institutional care]" who may be eligible for home or community-based services and those individuals "are informed of the feasible alternatives [to institutional care], if available under the waiver, at the choice of such individuals." Interpreting this language according to *Blessing* as modified by *Gonzaga*, the Court finds that the statutory provision sufficiently "phrased in terms of the persons benefited" and focused on the individual's right to receive evaluation and information about feasible alternatives to institutional care. *Gonzaga*, 536 U.S. at 284. As another district court in the Sixth Circuit concluded with respect to § 1396n(c)(2)(C):

> [T]he assurances set forth in the statute are clearly intended to protect the health and welfare of individuals such as Plaintiffs. The individually focused terminology confers the sort of individual entitlement enforceable under § 1983. Further, the section imposes a mandatory duty on the participating state-a state must provide the enumerated assurance in order to obtain a home care waiver. Finally, the Court finds that the concept of a state providing assurances that it has informed eligible individuals of their options, and provided them with ICF/MR services (if the individuals so choose), is not so vague or ambiguous as to be unenforceable by the judiciary.

*Holsinger*, 356 F. Supp. 2d at 769 (E.D. Ky. 2005). Also persuasive are cases in which the Sixth Circuit has analyzed similarly-worded Medicaid provisions after *Gonzaga*. *See Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006) (finding 42 U.S.C. § 1396a(a)(23) confers an individual right, as it requires a state "must provide" "any individual eligible for medical assistance" such assistance from any qualified agency or person); *Westside Mothers v. Olszewski*, 454 F.3d 532, 543–44 (6th Cir. 2006) (finding § 1396a(a)(43)(A), which requires a state Medicaid plan to inform all persons eligible for Medicaid of the availability of early and period screening and treatment services, to be enforceable under § 1983).

Turning to standing, Defendants argue that even if § 1396n(c)(2)(B) & (C) confer an individual right to receive information about ICF alternatives, Plaintiffs have not sufficiently

alleged that they were not informed about such alternatives since each Plaintiff is currently on a waiting list to receive waiver services; and thus, they have not suffered an injury in fact to have standing. Defendants contend that the statute does not require states to provide information about feasible alternatives *before* an individual is admitted to an ICF, nor does it require it to offer a waiver as an alternative before placement in an ICF. (Def. Reply at 29.)

However, the relevant regulation provides that states will not be granted a waiver unless they provide "assurance that when a beneficiary is determined *to be likely* to require the level of care provided [by an ICF], the beneficiary . . . will be (1) Informed of any feasible alternatives available under the waiver; and (2) *Given the choice* of either institutional or home and community-based services." 42 C.F.R. § 441.302(d) (emphasis added). Consequently, the Ninth Circuit in *Ball v. Rodgers* has interpreted § 1396n(c)(2)(C) to confer "two explicitly identified rights—(a) the right to be informed of alternatives to traditional, long-term institutional care, and (b) the right to choose among those alternatives." *Ball*, 492 F.3d at 1107. Other courts have found an adequate showing of injury based on plaintiffs' right to assessment and information about community-based alternatives to institutional care. *See Steward*, 189 F. Supp. 3d at 630 (finding a sufficient showing of injury to preclude dismissal where plaintiffs seeking waivers were "detained in a years-long waitlist"); *Rolland v. Cellucci*, 52 F. Supp. 2d 231, 241 (D. Mass. 1999) (finding sufficient facts to survive motion to dismiss where plaintiffs alleges feasible alternatives and lack of freedom of choice by failing to inform plaintiffs about such choices).

Here, Plaintiffs allege that "Defendants Kasich, Martin, and McCarthy have failed to meaningfully inform individuals who are determined to be likely to require an ICF level of care of the feasible alternatives to institutional placement, including their eligibility for, and the availability of, home and community-based services which could prevent or avoid their

continued and unnecessary institutionalization in violation of 42 U.S.C. § 1396n(c)(2)(B)&(C)." (Compl. ¶ 222.) Specifically, Plaintiff Ball alleges that her family was merely informed that she could put her name on a waiting list before they had to place her in an ICF, where she has remained for over twenty years. (*Id.* ¶ 18.) Plaintiffs Butler and Mason have spent twenty and fourteen years respectively on waiting lists for waiver services and allege that they were not informed about or afforded meaningful choices regarding alternatives to continued ICF placement. (Id. ¶¶ 26, 35, 40) Plaintiffs Walters and Hamilton make similar allegations. Collectively, Plaintiffs allege that they have been injured by their lack of a meaningful choice between institutional care and alternative services, and that their years-long waiting periods for waiver services have caused them to remain unnecessarily segregated.

Although Defendants argue that Plaintiffs' interpretation of the statute attempts to make waiver slots an entitlement, the Court finds that at this point, Plaintiffs have sufficiently alleged that they have been denied a meaningful choice of participation in feasible alternatives to institutional care. Accordingly, Defendants' motion to dismiss on this ground is denied.

## VI.    CONCLUSION

For the reasons above, Defendant Miller's Motion (ECF No. 16) is **DENIED**, Defendant Kasich's Motion (ECF No. 28) is **DENIED in part** and **GRANTED in part**, and Defendants McCarthy's and Martin's Motion (ECF No. 27) is **DENIED**.

**IT IS SO ORDERED.**

<u>    3-23-2017    </u>
**DATED**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**