IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

PHYLLIS BALL, et al.,

      Plaintiffs,

    v.

JOHN KASICH, et al.,

      Defendants.

Civil Action 2:16-cv-282
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth P. Deavers

## OPINION AND ORDER

This matter is before the Court on the Motion to Intervene of the Ohio Association of
County Boards Serving People with Developmental Disabilities ("Ohio Association of County
Board's Motion to Intervene") (ECF No. 68), the Motion to Intervene of the Guardians of Henry
Lahrmann, Elizabeth Lahrmann, Kelly Jones, Shawna Klein, Garry Wojciak, Elizabeth
Colombo, Glenn Baxter, Barbara Meola, Mary Meola, and Tim Collett ("Guardians' Motion to
Intervene") (ECF No. 107), the Motions of the Additional Guardians to Join the Guardians'
Motion to Intervene ("Additional Guardians' Motions to Join Guardians' Motion to Intervene")
(ECF Nos. 123, 125–29, 138–39, 141–48, 152, 153, 155, 160, 161, 166–77, 182–86, 192–220,
223–32, 234–41, 243–45, 247–52, 253–60), the Guardians' Motion for Oral Argument on their
Motion to Intervene (ECF No. 145), and the Motion of VOR, Inc. for Permission to File Brief as
Amicus Curiae in Support of Proposed Intervenors' Motion to Intervene ("VOR's Motion to File
an Amicus Brief") (ECF No. 164).  For the reasons set forth below, the Court **DENIES AS
MOOT** the Guardians' Motion for Oral Argument on their Motion to Intervene and **GRANTS**
all of the remaining motions.

## I.

This case was filed on March 31, 2016, by Disability Rights Ohio ("DRO") and the

Center for Public Representation on behalf of Plaintiffs Phyllis Ball, Antonio Butler, Caryl

Mason, Richard Walters, Ross Hamilton, Nathan Narowitz, and the Ability Center of Greater

Toledo ("Plaintiffs").  (Compl., ECF No. 1.)  Plaintiffs filed this action on behalf of themselves

and other similarly situated individuals with intellectual and developmental disabilities who are

currently institutionalized or who are at serious risk of institutionalization in Intermediate Care

Facilities ("ICFs") with eight or more beds throughout Ohio.  In their Complaint, Plaintiffs

allege:

> The six Individual Plaintiffs are part of a class of approximately 27,800 similarly-
> situated adults with intellectual and developmental disabilities throughout Ohio
> ("Ohio" or "the State") who are needlessly institutionalized in publicly- and
> privately-operated large ICFs or are at serious risk of institutionalization because
> of systemic limitations on access to integrated, home and community-based
> services.  By virtue of where they live and spend their day, they are isolated from
> their communities and denied meaningful opportunities to interact with their
> nondisabled peers.

(*Id.* ¶ 2.)

Of "[t]he Plaintiff class" of 27,800 adults, Plaintiffs allege that 22,000 are at serious risk

of institutionalization and that "5,800 people with intellectual and developmental disabilities []

are institutionalized in Ohio's statewide network of publicly- and privately-operated large ICFs[,

*i.e.*, eight or more bed ICFs]."  (*Id.* ¶¶ 102, 103.)  Plaintiffs aver that "[o]nce in the ICF system,

people often remain institutionalized indefinitely."  (*Id.* ¶ 6)  Plaintiffs further aver that, "[o]nce

admitted to a large ICF, people quickly become isolated from their families, friends, and

communities [and] [m]ost have little or no contact with their non-disabled peers.  Their lives are

highly regimented and controlled, with little privacy, independence, or personal autonomy."  (*Id.*

¶ 4)  Plaintiffs contend that the institutionalized putative class members are deprived of dignity

2

because their ICF living situation lacks any meaningful choice for autonomy and self-sufficiency, describing it as follows:

> By virtue of their discriminatory institutionalization, the Individual Plaintiffs in large ICFs and thousands of other similarly-situated Medicaid-eligible adults with intellectual and developmental disabilities are denied access to integrated employment and day services. They have little or no choice but to spend their days in segregated, facility-based sheltered workshops where they perform routinized, repetitive manual tasks, usually for less than minimum wage, or in equally segregated day programs, where they are deprived of meaningful community interactions and experiences consistent with their unique abilities, skills, and preferences. The lack of access to integrated employment at competitive pay, in particular, deprives them of the dignity that comes with work and the autonomy and self-sufficiency that comes with financial resources.

(*Id.* ¶ 5.)

Plaintiffs name as Defendants in this lawsuit Governor John Kasich, Director of Opportunities for Ohioans with Disabilities Kevin Miller, Director of the Ohio Department of Medicaid John McCarthy, and Director of the Ohio Department of Developmental Disabilities John Martin.

On November 29, 2017, the Ohio Association of County Boards filed its Motion to Intervene. (ECF No. 68.) The Ohio Association of County Boards speaks on behalf of itself and all 88 of Ohio's County Boards of Developmental Disabilities ("DD Boards"). Defendants did not oppose this motion. Plaintiffs filed their Memorandum in Opposition on December 23, 2016 (ECF No. 73), and the Ohio Association of County Boards filed its Reply on January 17, 2017 (ECF No. 79).

On April 19, 2017, a group of individuals filed pro se the Guardians' Motion to Intervene on behalf of ten individuals with intellectual and developmental disabilities. (ECF No. 107.) The Guardians possess legal guardianships over the ten individuals named in their motion. Since the Guardians' Motion to Intervene was filed, 99 individuals have filed the Additional

3

Guardians' Motions to Join the Guardians' Motion to Intervene. (ECF Nos. 123, 126–29, 138, 39, 141–48, 152, 153, 155, 160, 161, 166–77, 182–86, 192–20, 223–32, 234–41, 243–45, 247–52, 253–60.) Similar to the Guardians, the Additional Guardians filed on behalf of individuals for whom they possess legal guardianships, and have all moved without the assistance of counsel.

The individuals for whom the Guardians and the Additional Guardians speak are part of the 27,800 individuals with developmental and/or intellectual disabilities Plaintiffs' Complaint identifies as the class of individuals for whose benefit this lawsuit was filed. Specifically, they are some of the 5,800 individuals named in Plaintiffs' Complaint who are currently institutionalized in Ohio ICFs of eight beds or more. The Guardians and the Additional Guardians indicate that although they are members of the putative class for which Plaintiffs speak, they do not want to move from their current institutional setting, and forcing them to move would cause substantial harm because they are not capable of living and working in the community based housing and programing Plaintiffs' support. The Guardians contend that they filed their Motion to Intervene and the Additional Guardians filed their Motions to Join the Guardians' Motion to Intervene, so they can protect their choice for their wards to remain in an ICF and for ICF placement to be provided as an option for the 22,000 people who live in the community, but have immediate, unmet service needs, such as inadequate residential supports and/or aging primary caregivers.

On May 10, 2017, Defendants filed their Memorandum in Support of the Guardians' Motion to Intervene, in which they support the Guardians' motion "for the limited purpose of allowing the Intervenor ICF Residents to contest class certification." (ECF No. 131.) On that

same day, Plaintiffs filed their Memorandum in Opposition (ECF No. 130), and on May 24, 2017, the Guardians filed a Reply in support of their motion (ECF No. 163).

On May 15, 2017, the Guardians filed a Motion for a Hearing on their Motion to Intervene. (ECF No. 145), and on June 6, 2017, Plaintiffs filed their Memorandum in Opposition (ECF No. 188.) Defendants did not oppose the Guardians' Motion for a Hearing on their Motion to Intervene. The Guardians filed a Reply in support or their motion on June 15, 2017. (ECF No. 221.)

On May 26, 2017, VOR, Inc. filed its Motion to File a Brief an Amicus Brief. (ECF No. 164, 164-1.) VOR describes itself as a nationwide, nonprofit advocacy organization dedicated to ensuring that individuals with intellectual disabilities receive the care and support they require in environments appropriate to their needs. (St. Amand Decl, ¶ 2, ECF No. 164-2). On June 16, 2017, Plaintiffs filed a Memorandum in Opposition. (ECF No. 222.) Defendants have not opposed VOR's motion. On June 29, 2017, VOR filed a Reply in support of its motion. (ECF No. 246.)

On June 2, 2017, counsel made an appearance on behalf of the Guardians. (ECF Nos. 178–180, 187, 191.)

On June 5, 2017, this Court held a settlement conference in which Plaintiffs, Defendants, the Guardians, and the Ohio Association of County Boards all participated. (ECF No. 181.) The Court and the conference participants agreed that continued mediation would be fruitful and have scheduled a second settlement conference for August 22, 2017. (ECF No. 250.)

## II.

Prior to the Guardians retaining counsel, VOR moved to file a brief as amicus curiae in support of the Guardians' Motion to Intervene.

5

## A.    Standard

"Classical participation as an amicus to brief and argue as a friend of the court was, and

continues to be, a privilege within 'the sound discretion of the courts,' *see Northern Sec. Co. v.*

*United States,* 191 U.S. 555 (1903); 4 Am.Jur.2d, Am.Cur § 4 at 113, depending upon a finding

that the proffered information of amicus is timely, useful, or otherwise necessary to the

administration of justice." *U.S. v. State of Mich.*, 940 F.2d 143, 165 (6th Cir. 1991) (citing *Leigh*

*v. Engle,* 535 F. Supp. 418, 420 (N.D. Ill. 1982) (parallel citations omitted).

## B.    Discussion

VOR requests permission to file a brief in support of the Guardians' Motion to Intervene,

arguing that its request is timely and that its brief is useful and otherwise necessary to the

administration of justice.  Specifically, VOR states:

> VOR has a substantial interest in this litigation because it will directly
> affect the right of developmentally disabled residents in Ohio to choose their own
> care and receive the services necessary to meet their individual needs. VOR
> supports the Proposed [Guardian] Intervenors' request to participate in this matter
> because, absent such intervention, the rights of those individuals who do not wish
> to leave Intermediate Care Facilities ("ICFs") and be forced into alternative
> settings will not be protected.

(VOR's Mot. to File an Amicus Brief at 1, ECF No. 164-1.)

In Plaintiffs' Memorandum in Opposition, they do not claim that VOR's Motion to File

an Amicus Brief is untimely.  Instead, Plaintiffs request that the Court deny VOR's motion

because "virtually every position argued in VOR's proposed brief can be found in the

[Guardians'] Motion for Intervention.  Both filings lay out the same basic arguments in support

of intervention."  (Pls' Mem. in Opp. to VOR's Mot. to File Amicus Brief at 4, ECF No. 222.)

Plaintiffs contend that

> VOR's motion for leave to file an amicus brief should be denied because
> its brief will not assist, and will only further burden, the Court's review of this

6

matter.  Acceptance of an amicus brief requires courts to expend judicial resources analyzing its arguments and the parties various responses to them.  *See, Voices for Choices v. Illinois Bell Tel. Co.*, 339 F.3d 542, 544-45 (7th Cir. 2003) (Denying leave to file proposed amicus briefs which covers the same ground and "essentially duplicates" a party brief).  In support of its ruling, the court noted that "the time and other resources required for the preparation and study of, and response to, amicus briefs drive up the cost of litigation; and the filing of an amicus brief is often an attempt to inject interest group politics into the federal appeals process."); *see also*, Supreme Court Rule 37 ("An amicus curiae brief that brings to the attention of the Court relevant matter not already brought to its attention by the parties may be of considerable help to the Court.  An amicus curiae brief that does not serve this purpose burdens the Court, and its filing is not favored.").

(*Id*. at 3.)  Plaintiffs' arguments are not well taken.

This Court has found that there are situations in which it is appropriate to accept an amicus brief even when the brief lays out the same general propositions and arguments as does the brief of one of the parties to the case.  In *Triad International Maintenance Corp. v. S. Air Transport, Inc.*, 2:04-CV-1200, 2005 WL 1917512 (S.D. Ohio Aug. 10, 2005), the party opposing the request to file an amicus brief relied upon the same case upon which Plaintiffs here rely (*Voices for Choices v. Illinois Bell Telephone Co.*, *supra*), and argued, *inter alia*, that the Court should reject the proposed brief because it was "duplicative of the brief filed by [the plaintiffs]."  *Id.* at *1.  In its opinion granting leave to file the amicus brief, this Court explained why it could not "agree that the concerns discussed by the Seventh Circuit" in *Voices for Choices v. Illinois Bell Telephone Company.*, were present in the case before it:

[The] Court agrees that the proposed amicus brief supports the position of [the plaintiff], this Court also concludes that [proposed amici] is in a position to provide information and/or a perspective that can assist the Court in addressing the important issues in this case.

*Triad Intern. Maint. Corp.*, 2005 WL 1917512, at *2.

This Court finds an analogous situation in the case *sub judice*.  That is, the Guardians' Motion to Intervene was filed without the assistance of counsel.  Thus, while VOR's proposed

7

brief lays out the same basic arguments in support of intervention as may be found in the Guardians' Motion to Intervene, the clarity of, and legal citations in, VOR's brief provide assistance to the Court in addressing important issues in this case. Additionally, no further judicial resources will be expended analyzing responses to future amicus briefing since VOR asks permission to file only one brief for the limited purpose of supporting the Guardians' Motion to Intervene. Therefore, the Court **GRANTS** VOR'S Motion to File an Amicus Brief.

**III.**

Both the Ohio Association of County Boards and the Guardians have intervention motions that are ripe for review. Further, the 99 Additional Guardians have all filed unopposed Motions to Join the Guardian's Motion to Intervene. Finally, the Guardians have filed a motion requesting oral argument on their Motion to Intervene. The Court will review each motion in turn.

## A. The Additional Guardians' Motion to Join the Guardians' Motion to Intervene

The Court finds well taken the Additional Guardians' request to join the Guardians' Motion to Intervene. The Additional Guardians' interests align with the Guardians' interests and their ability to intervene rises or falls with the Court's ruling on the Guardians' Motion to Intervene. Accordingly, the Court **GRANTS** the Additional Guardians' Motions to Join the Guardians' Motion to Intervene.

## B. Motions for Intervention

### 1. Standard

The Guardians and the Ohio Association of County Boards move to intervene in this case pursuant to Federal Rule of Civil Procedure 24. As a general matter, "Rule 24 should be broadly

8

construed in favor of potential intervenors." *Stupak-Thrall v. Glickman*, 226 F.3d 467, 472 (6th

Cir. 2000) (citing *Purnell v. Akron,* 925 F.2d 941, 950 (6th Cir. 1991)).  Rule 24(a) provides:

> On timely motion, the court must permit anyone to intervene who:
>  . . . .
>
> (2) claims an interest relating to the property or transaction that is the subject of
> the action, and is so situated that disposing of the action may as a practical matter
> impair or impede the movant's ability to protect its interest, unless existing parties
> adequately represent that interest.

Fed. R. Civ. P. 24(a).

Even if a party is not entitled to intervention as a matter of right, the trial court has

discretion to allow for permissive intervention.  *Wiley v. Triad Hunter LLC*, No. 2:12-cv-605,

2013 U.S. Dist. LEXIS 112066, at *18 (S.D. Ohio Aug. 8, 2013) (citing *Comtide Holdings, LLC*

*v. Booth Creek Mgmt. Corp.*, No. 2:07-cv-1190, 2010 U.S. Dist. LEXIS 81511, 2010 WL

2670853, at *3 (S.D. Ohio June 29, 2010) (explaining that the Court is not bound to consider

only one subsection of Rule 24, and is free to consider permissive intervention)).  "Under Rule

24(b), the Court may allow '[o]n timely motion' a party to intervene who 'has a claim or defense

that shares with the main action a common question of law or fact.'"  *Id*. (quoting Fed. R. Civ. P.

24(b)(1)(B)).  "The Court should also balance the factors of 'undue delay prejudice to the

original parties, and any other relevant factors . . . .'"  *Id*. at *18–19 (citing *Michigan State AFL-*

*CIO v. Miller*, 103 F.3d 1240, 1248 (6th Cir. 1997)).

"Regardless of whether a movant requests intervention of right or permissive

intervention, the preliminary determination to make is whether the motion was 'timely' made."

*Id*. at *19 (citing *Shy v. Navistar Intern. Corp.*, 291 F.R.D. 128, 2013 U.S. Dist. LEXIS 16236,

2013 WL 485808 at *3 (S.D. Ohio 2013)).

2.    **Timeliness of the Motions to Intervene**

The threshold determination of whether a motion to intervene is timely is a matter within

the sound discretion of the trial court.  *Bradley v. Milliken*, 828 F.2d 1186, 1191 (6th Cir. 1987)

(citing *NAACP v. New York,* 413 U.S. 345, 365–66 (1973); *Michigan Ass'n for Retarded Citizens*

*v. Smith,* 657 F.2d 102, 105 (6th Cir. 1981)).  In evaluating the timeliness of a motion to

intervene, a court considers:

> 1) the point to which the suit has progressed; 2) the purpose for which
> intervention is sought; 3) the length of time preceding the application during
> which the proposed intervenors knew or should have known of their interest in the
> case; 4) the prejudice to the original parties due to the proposed intervenors'
> failure to promptly intervene after they knew or reasonably should have known of
> their interest in the case; and 5) the existence of unusual circumstances militating
> against or in favor of intervention.

*Blount-Hill v. Zelman*, 636 F.3d 278, 284 (6th Cir. 2011) (internal citation omitted).  "No one

factor is dispositive, but rather the determination of whether a motion to intervene is timely

should be evaluated in the context of all relevant circumstances."  *Id*. (internal quotation

omitted).

In the instant action, no party argues that the Ohio Association of County Boards

untimely filed its intervention motion, and Defendants do not contend that the Guardians' motion

is late.  Plaintiffs, however, contend that the Guardians failed to timely file their Motion to

Intervene "resulting in prejudice to timely adjudication of Plaintiffs' claims." (Pls.' Mem. in

Opp. to the Guardians' Mot. to Intervene at 18, ECF No. 130.)  Plaintiffs maintain that

intervention by the Guardians could delay resolution of Plaintiffs' Motion for Class Certification,

further complicate a briefing schedule involving multiple state Defendants, delay progress

towards the establishment of a joint trial schedule for discovery on the merits, and the

adjudication of liability on the merits.  (*Id*. at 18.)  This Court, however, disagrees.

The point at which this action has progressed, the first factor in evaluating timeliness, weighs in favor of the proposed Guardian intervenors.  Discovery on the merits has not even begun in this case, Defendants have not yet filed a response to Plaintiffs' Motion for Class Certification, no dispositive motions deadline has been scheduled nor has a trial date been set. *See United States v. City of Detroit*, 712 F.3d 925, 931 (6th Cir. 2013) ("Where future progress remains and the intervenor's interests are relevant, intervention may be the most effective way to achieve a full and fair resolution of the case.").  There would be no need to reopen discovery, delay trial, or cause some other prejudicial delay, important factors that this Court has previously recognized.  *Shy v. Navistar Intern. Corp.*, 291 F.R.D. 128, 133 (S.D. Ohio 2013) (explaining that the progression of the suit "is most relevant when the motion arrives at a point in time that would require reopening discovery, delaying trial, or some other prejudicial delay to the parties"); *see also Stupak–Thrall,* 226 F.3d at 475 (upholding denial of intervention where motion to intervene was filed ten weeks after the close of discovery and seven weeks before the deadline for filing of dispositive motions).

The third and fourth factors, the length of time preceding the application during which the Guardians knew or should have known of their interest in the case, and the prejudice to the original parties due to the Guardians' failure to promptly intervene after they knew or reasonably should have known of their interest in the case, also weigh in favor of the Guardians.  The Guardians filed their motion for intervention before any factual or legal issues have been litigated.  It is for this reason, as well as those articulated in consideration of the first factor, that the Court finds that the prejudice to the original parties due to the proposed intervenors' failure to promptly intervene is minimal, if existent at all.  As such, the parties will not suffer any prejudice by intervention nor will intervention delay the proceedings in any significant way.

11

Indeed, judicial economy is better served having all relevant interests represented at this stage of the proceedings. *See Jansen v. City of Cincinnati*, 904 F.2d 336, 339–41 (6th Cir. 1990) (noting intervention serves judicial economy resulting from disposition of related issues in a single lawsuit and "the original parties' interests are better served by having all relevant interests represented prior to the summary judgment motion's disposition because piecemeal litigation is likely to be avoided").

The Court next considers the purpose for which intervention is sought, the second factor when assessing the timeliness of an intervention motion. The Guardians argue, *inter alia*, that Plaintiffs' success in this litigation may result in the cessation of funding to ICFs or at a very minimum a declination in the amount of funding available to ICFs. Plaintiffs do not, and of course could not, dispute the fact that if more of the designated funding is devoted to community based resources, ICF funding will be reduced and contribute to closing or downsizing ICFs. In *Blount-Hill v. Zelman*, 636 F.3d 278, 285 (6th Cir. 2001), the Sixth Circuit found this type of "purpose" sufficient to satisfy this factor of the timeliness issue.

In *Blount-Hill*, the "individual proposed Intervenors" sought "to protect their 'children's property interest in their education, and [the school intervenor]'s ability to provide alternative education." *Id*. The proposed intervenors argued that if the plaintiffs obtained the relief they sought, the school intervenor "would lose its only source of funding[, meaning that proposed intervenors] and their children would lose their only economically viable alternative to the failing and dangerous public schools the children would be forced to attend." *Id*. (alteration in original). The *Blount-Hill* court explained:

> Plaintiffs' success in this litigation may result in the cessation of funding to proposed [school] Intervenor HOPE Northwest. As a result, proposed Intervenors' purpose for intervention may weigh in their favor if their allegations are considered in the light most favorable to them.

12

*Id.*

A similar situation is presently before this Court. Plaintiffs' success in this litigation may result in the cessation of funding to the ICFs at which the Guardians' charges reside. And, as a result, the Guardians' purpose for intervention, like the *Blount-Hill* intervenors' purpose, weighs in favor of permitting intervention.

As for the final factor in determining the timeliness of the Guardians' Motion to Intervene, the Court finds no unusual circumstances militating against intervention. Accordingly, in weighing all of the relevant circumstances as set out above, the Court finds that the Guardians' Motion to Intervene was timely filed.

### 3. The Guardians' Motion to Intervene

Plaintiffs ask the Court to deny the Guardians' Motion to Intervene because "the absence of common facts and legal claims, the resulting unnecessary delay and complexity in the conduct of the litigation, and the negative impact on potential settlement" counsel against permitting intervention. (Pls.' Mem. in Opp. to the Guardians' Mot. to Intervene at 15, ECF No. 130.) Further, Plaintiffs take the position that the Guardians speak for individuals who are not members of the putative class for whom this lawsuit was filed and "the concerns raised by non-class members about the potential financial impact of future systemic relief are most appropriately weighed in the remedial phase of litigation." *Id*. Plaintiffs' arguments are not well taken.

First, the parties' briefing makes clear that there are common facts and legal claims/defenses between Plaintiffs, Defendants, and the Guardians. As Plaintiffs allege in their Complaint, this case involves of a class of approximately 27,800 adults with intellectual and developmental disabilities throughout Ohio who are at serious risk of institutionalization or who

are institutionalized in an ICF with eight or more beds.  All of those for whom the Guardians

speak are in the group of 5,800 who are currently institutionalized and want to stay in their

current ICF.  These individuals, the Guardians assert, have complex behavioral and/or medical

needs and are unable to thrive in the community setting advocated by Plaintiffs.  The Guardians

take issue with Plaintiffs' framing of ICF residency as "discriminatory" or as causing all

residents to be "isolated from their communities."  The Guardians contend, and all of the

Additional Guardians provide affidavits averring, that the individuals for whom they speak

would suffer severe harm if they were forced to move from their ICF.  They maintain that their

charges are totally incapable of benefitting from the community based options Plaintiffs

champion, and that where they currently reside was a purposeful, informed choice.

The Guardians posit that the moving force behind Plaintiffs' lawsuit is the flawed

premise that "[a]ll persons with developmental disabilities are capable of living fully engaged in

their communities. . . . [and there is] a presumption that, with sufficient supports and services, all

individuals (including individuals with complex behavioral and/or medical needs) can live in an

integrated setting."  (Guardians' Mot. to Intervene at 10, 14, ECF No. 107) (citing DRO letter to

Governor Kasich and DRO "Fact Sheet on DD Integration Case").  The Guardians explain that

while Plaintiffs frame the community based services as "integrated," these community based

services work to segregate the Guardians' charges from their peers, their caregivers, their

families, and their homes (the ICF) at which many have lived all or most of their lives.  The

Guardians highlight that those whom they represent are unlike the named Plaintiffs.  For

example, one of the named plaintiffs, Phylliss Ball, volunteers at the local library, while

Guardian Caroline Lahrmann's 17 year old twins, Henry and Elizabeth, have profound

intellectual and developmental disorders, seizure disorders, and function respectively at the age

14

of a four to seven month old and a four month old infant. (*Id.* at 5–6.)  Both twins need twenty-four hour a day care for their physical, medical, and behavioral needs.

While Mrs. Lahrmann's children receive the care they need at their current ICF, she asserts that she was not given the option of ICF placement for her twins and instead was placed on a waiting list for housing.  Mrs. Lahrmann indicates that she independently searched for housing for her children and found in the phone book the ICF at which they currently reside.  The Guardians maintain that Mrs. Lahrmann's story is not unique.  The Guardians present a statement from one of the Additional Guardians, C. William Purcell, in which he tells a similar story.  (Guardians' Reply in Support of Mot. for Hearing on Mot. for Intervention, ECF No. 192.)  Mr. Purcell states that he placed his 14 year old son on the wait list for housing that would be needed when he reached the age of majority.  After 13 years on the wait list, Mr. Purcell himself found the ICF at which his son currently resides.  Mr. Purcell contends that his son has flourished in the 70-bed ICF over the last 14 years.  "He is engaged in many activities and has many friends and loves it there."  (Purcell's Mot. to Join the Guardians' Mot. to Intervene at 4, ECF No. 192.)  Mr. Purcell expresses concern that if he had not found the ICF "there is a chance that he would still be with his mother or me [who] would not be able to give him proper care or possibly any care at all due to our advanced ages."  *Id.*  The Guardians maintain that it is unknown how many other wait-listed individuals have not been offered ICF placement.

Second, the Court finds additional common facts regarding class membership between Plaintiffs and those whom the Guardians represent.  As discussed, the individuals whom the Guardians represent are designated as part of the group of 5,800 putative class members who are currently institutionalized in Ohio.  Plaintiffs have redefined the class in their Motion for Class

15

Certification to provide an opt-out mechanism for any of the putative class members who do not

wish to be included in the class, defining the class as:

> All Medicaid-eligible adults with intellectual and developmental disabilities residing in the state of Ohio who, on or after March 31, 2016, are institutionalized, or at serious risk of institutionalization, in an Intermediate Care Facility with eight or more beds, and *who have not documented their opposition* to receiving integrated, community-based services.

(Pls.' Mem. in Opp. to the Guardians' Mot. to Intervene at 4, ECF No. 130) (citing Pls.' Mot. for

Class Cert. at 9–10 , ECF No. 42) (emphasis added).

Plaintiffs explain that the filing of a motion to intervene is sufficient to document

opposition to receiving integrated, community based services. Thus, Plaintiffs conclude that

"[t]he proposed class does not include the Proposed Intervenors, as they have documented their

opposition to more integrated services." (*Id*. at 4) (citing the Guardians' Motion to Intervene at

5, ECF No. 107). This sequence, however, sets up an odd circular problem for any of the 5,800

putative class members who do not wish to leave their current institutional home or those who

are at serious risk of being placed in an ICF and wish to be so placed.

That is, it is not disputed that Plaintiffs do not seek to represent the interests of these

putative class members. Yet, the action of seeking to intervene to protect their interest is the

mechanism that would prohibit their intervention. In other words, Plaintiffs' position is that the

proposed intervenors are not entitled to intervene by virtue of requesting to intervene. As VOR

on behalf of the Guardians correctly points out, "the reverse is also true; without attempting to

intervene, those who oppose being forced out of ICFs remain in the class." (VOR's Mot. to File

Amicus Brief at 11, ECF No. 164-1.) Thus, the Court finds that the rights of those individuals

who do not wish to move from their residence in an ICF, or those who are at serious risk of

institutionalization who wish to obtain residence in an ICF, are directly impacted in this lawsuit. Those rights were not protected until the Guardians filed their Motion to Intervene.

These facts also highlight another reason that weighs in favor of permitting the Guardians to intervene. Plaintiffs bring this class action pursuant to, *inter alia*, Federal Rule of Civil Procedure 23(b)(2), which provides for neither notice nor the ability for class members to opt-out. *See Phipps v. Wal-Mart Stores, Inc.*, 792 F.3d 637, 641 (6th Cir. 2015). Therefore, without the Guardians' presence in this case, there are potentially other putative class members who may wish to stay in an ICF or be placed in an ICF whose interests would not have a voice.

Third, in addition to the common facts shared by the Guardians and the main action before this Court, there are common questions of law. Both Plaintiffs and the Guardians agree that this case involves the interpretation and application of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.,* Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Supreme Court's decision in *Olmstead v. L.C.*, 527 U.S. 581 (1999), which interprets these statutes. Plaintiffs and the Guardians seek to protect the same personal interest in receiving appropriate care in the state and federal programs set up for that purpose. *See e.g.*, 42 U.S.C. § 15009(a)(1) ("individuals with developmental disabilities have a right to appropriate treatment, services, and habilitation for such disabilities"); 42 U.S.C. § 15001(c)(3) (noting that "individuals with developmental disabilities and their families are the primary decisionmakers regarding the services and supports such individuals and their families receive, including regarding choosing where the individuals live.")

Plaintiffs argue that this law does not provide for "a significant, legally protectable interest in continuing to receive ICF and sheltered workshop services." (Pls.' Mem. in Opp. to the Guardians' Mot. to Intervene at 9, ECF No. 130.) Specifically, Plaintiffs assert:

17

Neither the ADA, the Rehabilitation Act, nor the Social Security Act create an individual right to remain in the program or facility of one's choosing. And while it is a violation of the ADA and Rehabilitation Act to force individuals with disabilities to remain in segregated settings when they are able and willing to receive more integrated services, numerous courts have rejected the "obverse *Olmstead*" argument.

(*Id.* at 10) (citing *Lane v. Kitzhaber*, No. 3:12-CV-00138-ST, 2014 WL 2807701, at *3 (D. Or. June 20, 2014); *Sciarrillo ex rel. St. Amand v. Christie*, No. CIV.A. 13-03478 SRC, 2013 WL 6586569, at *3-4 (D.N.J. Dec. 13, 2013); *Illinois League of Advocates for Developmentally, Disabled v. Quinn*, No. 13 C 1300, 2013 WL 3168758 (N.D. Ill. June 20, 2013)).

The Guardians, however, contend that *Olmstead* does protect those who do not wish to leave their ICF, highlighting the following statement the Supreme Court made in *Olmstead*:

This Court emphasizes that nothing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings. Nor is there any federal requirement that community-based treatment be imposed on patients who do not desire it.

*Olmstead*, 527 U.S. at 583.

Notwithstanding their interpretation of *Olmstead*, the Guardians correctly note that, even if Plaintiffs are correct that there is no "obverse *Olmstead*" claim, it is irrelevant for the purposes of intervention. (VOR's Mot. to File an Amicus Brief at 8, ECF No. 164-1.) It is not necessary for the Guardians to have a legally enforceable right to intervene. Instead, Rule 24(b) requires only that the proposed intervenors' claims share questions of law or fact with the main action. Here, the common question of law argued by Plaintiffs, Defendants, and the Guardians is: What does *Olmstead* require of Defendants to comply with the ADA?

Fourth, the Court addresses Plaintiffs' contention that it should deny the Guardians' request to intervene because the concerns raised by the non-class members about the potential financial impact of future systemic relief are most appropriately weighed in the remedial phase

18

of litigation.  Defendants and the Guardians disagree with Plaintiffs' position and persuade this

Court to support their position.  Specifically, Defendants explain:

> Two other cases involving issues similar to those raised here, *Benjamin ex rel. Yock v. Dep't of Pub. Welfare of Pennsylvania*, 701 F.3d 938, 948 (3d Cir. 2012), and *Ligas v. Maram,* No. 05C4331, 2010 WL 1418583, at *1 (N.D. Ill. Apr. 7, 2010), show the importance of considering the diverse viewpoints in a proposed class *before* certifying a class.  In both of these cases, plaintiffs alleged, on behalf of a proposed class, that the state failed to offer sufficient community options to them in violation of the Integration Mandate of the Americans with Disabilities Act.  *Benjamin* at 941; *Ligas* at *1.

> And, in both cases, motions to intervene filed by ICF residents seeking to challenge class certification were initially denied.  *Benjamin* at 945, *Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 772 (7th Cir. 2007)*.*  However, both the Seventh Circuit in *Benjamin ex rel. Yock* and the district court in *Ligas*, ultimately were forced to reconsider these decisions when, after years of litigation, the Courts discovered the views and interests of the ICF residents were not adequately represented by the class.  *Benjamin* at 949-959; *Ligas*, 2010 WL 1418583, at *6.

(Defs.' Mem. in Support of the Guardians' Mot. to Intervene at 4, ECF No. 131) (emphasis in

original).  Defendants conclude that "[t]his Court should allow the Intervenor ICF Residents to

intervene to challenge class certification now so that their position can be adequately considered

at the outset of the case, before a decision on class certification is made."  (*Id.*)

The Guardians agree with Defendants that both *Ligas* and *Benjamin* support their

position.  The Guardians, however, contend that their intervention should not be limited to the

issue of class certification.  VOR, on behalf of the Guardians, convincingly asserts that the

Guardians' presence is important for the entire case, stating:

> Other similar cases involving precisely these same issues (and many of the same public interest groups) underscore the propriety of allowing the Proposed Intervenors to represent themselves in this suit.  For example, in *Ligas v. Maram*, the district court overseeing a similar case certified a class of Illinois' ICF residents except those who "oppose community placement."  No. 1:05-cv-04331, 2006 WL 644474, at *5 (N.D. Ill. Mar. 7, 2006).  The district court denied a motion to intervene filed by ICF residents who wished to stay in their homes, finding that nothing in the complaint "would require the state to force those who

desire institutional care to move out." *Ligas v. Maram*, 478 F.3d 771, 774 (7th Cir. 2007).

After four years of litigation, the district court held a fairness hearing in connection with a proposed consent decree jointly supported by the plaintiffs and the state defendants. As explained by the district court:

> Approximately 240 people attended the fairness hearing, and thirty-four individual class members or their legal guardians spoke at the hearing. Many more objectors were represented at the hearing by counsel. A common theme among the objectors was the concern that many developmentally disabled individuals, who were within the class definition, would be adversely affected by provisions of the Proposed Consent Decree even though the individual neither met the *Olmstead* criteria nor desired placement in a community-based setting.

*Ligas v. Maram*, No. 1:05-cv-04331, 2009 WL 9057733, at *1 (N.D. Ill. July 7, 2009) (class decertification order). Ultimately, the district court concluded that, as a practical matter, "the class definition fail[ed] to restrict the class to . . . [those who] desire[d] community placement" and that "sufficient commonality does not exist among the highly specialized needs and desires of the class members and their legal guardians." *Id.*

(VOR'S Mot. to File Amicus Brief at 12–13, ECF No. 164-1.)

VOR continues:

Similarly, in *Benjamin v. Dep't of Public Welfare*, the district court certified a class of Pennsylvania ICF residents, excluding those who would "oppose community placement." 701 F.3d 938, 943 (3d Cir. 2012). A group of ICF residents and their families sought to intervene, and their motion was denied by the district court. Affirming that denial, the Third Circuit reasoned that "[t]he current parties have deliberately defined the class and the relief sought so that Intervenors' right to choose institutional treatment would not be affected." *Benjamin v. Dep't of Public Welfare*, 432 Fed. App'x. 94, 98 (3d Cir. 2011).

Thereafter, the litigation proceeded and the plaintiff class and state defendants entered into a proposed settlement agreement that was approved by the district court. *Benjamin*, 701 F.3d at 946-47. On appeal, the Third Circuit vacated the settlement, finding that the proposed intervenors should have been allowed to participate in the proceedings. *Id.* The court explained that "there are several components of the Settlement Agreement reached by the parties (and ultimately approved by the District Court after it denied Appellants' motions to intervene) that may affect or impair the protectable interests of Appellants themselves as well as other ICF/MR residents, guardians, and involved family

> members." *Id.* at 952. Accordingly the Third Circuit concluded that the proposed intervenors there "should have the opportunity to be heard insofar as the Settlement Agreement may have an impact on the available resources as well as the needs of other individuals with mental disabilities, especially other ICF/MR residents." *Id.* at 957.

(*Id.* at 13.)

Plaintiffs contend that *Benjamin* and *Ligas* support their position that the Court could reevaluate its denial of the Guardians' request to intervene at the remedial stage of this case. Plaintiffs maintain that "[s]hould a pre-trial settlement be proposed by the parties, this Court must determine that the proposed settlement agreement is fair and reasonable in accordance with Fed. R. Civ. P. 23(e), [which Plaintiffs maintain will] provide[] an important safeguard for class members, as well as the public interest." (Pls.' Mem. in Opp. to the Guardians' Mot. to Intervene at 19, ECF No. 130.) Plaintiffs posit:

> Proposed Intervenors' discussion of the *Ligas* case illustrates this principle and the ability of objectors to intervene in the remedial phase of litigation when a proposed settlement agreement is alleged to threaten their interests. Doc. 107 at 17-18. However, unlike *Ligas*, the Proposed Intervenors here are not members of the proposed class. As a result, their opposition to community services does not undermine findings of commonality or typicality with regard to the plaintiff class. *Id.* Finally, in the unlikely event that the fears of the Proposed Intervenors are realized, and a proposed settlement or other future remedial order does threaten a legally protectable interest, or deny them access to life-saving treatment, this Court can reassess the appropriateness of intervention in the remedial phase of the litigation. *See Benjamin*, 701 F.3d 938 (remanding with instructions to grant guardians' renewed motion for intervention at the remedial stage of litigation for purpose of challenging proposed ICF consolidation in proposed settlement agreement); *United States v. Virginia*, 282 F.R.D. 403, 405 (E.D. Va. 2012) (allowing family members to intervene at time of proposed consent decree where initial pleadings were in progress and there was no previously certified class, but ultimately approving settlement over intervenors' objection).

(*Id.* at 19–20.)

This Court finds Plaintiffs' suggested procedure unsatisfactory. The ten proposed intervenors here and the 99 Additional Guardian intervenors were part of the class until they

21

filed their requests to intervene. That leaves thousands of putative class members who have not opted out of the class by "documenting their opposition to receiving integrated, community-based services." It is currently unknown whether these individuals' interests are represented by Plaintiffs or are represented by the Guardians. Thus, similar to the situations in *Ligas* and in *Benjamin*, Plaintiffs recasting of the class so as not to include those who document their opposition to being in the class is not sufficient to protect those individuals. See *Ligas*, No. 1:05-cv-04331, 2006 WL 644474, at *5 (class of Illinois' ICF residents except those who "oppose community placement"); *Benjamin*, 701 F.3d at 943 (the district court certified a class of Pennsylvania ICF residents, excluding those who would "oppose community placement").

Moreover, regardless of the number of the putative class members who may object at the remedial stage, a tremendous amount of judicial resources will undoubtedly be spent by the time this case may reach the remedial stage. Therefore, the Court finds no solace in Plaintiffs' suggestion that it can reassess the appropriateness of intervention at a future remedial phase.

For all of these reasons, the Court is persuaded by Defendants and the Guardians that *Ligas* and *Benjamin* counsel allowing the participation of the Guardians.

Fifth, the Court finds little if any prejudice to Plaintiffs based on "unnecessary delay and complexity in the conduct of the litigation." This litigation is complex and important. Excluding individuals with disabilities who will be directly impacted is not the appropriate way to make this case less complex. To the extent that the addition of these parties delays these proceedings, the Court does not find that delay unnecessary.

Finally, the Court does not find that any possible settlement will be negatively impacted by the participation of the Guardians. The Court has permitted the Guardians to participate in settlement discussions and has found their presence did not frustrate those discussions.

22

Based on the foregoing, the Court finds that the Guardians have shown that there are claims and/or defenses that share with the main action common questions of law and fact. Thus, the Court **GRANTS** the Guardians' Motion to Intervene.

### 4.      **Ohio Association of County Boards**

The Ohio Association of County Boards moves to intervene as a defendant on behalf of itself and all 88 of Ohio's County Boards of Developmental Disabilities ("DD Boards"). It is undisputed that the DD Boards play an integral and legally mandated role in the implementation and monitoring of community services in Ohio. Over 72% of funding for local, community-based services comes directly from local resources developed by the local DD Boards. (Aff. of Bridget Gargan, ¶ 7, ECF No. 68-2.) The Ohio Association of County Boards contends that the "DD Boards have interests which will be substantially affected by this litigation and State Defendants may not protect these interests, especially the interests which differ from positions of the State Defendants." (Oh. Assoc. of Cnty. Bds. Reply in Support of its Mot. to Intervene at 1, ECF No. 79.) The proposed intervenors further contend that there are issues of law and fact which DD Boards have in common with the State Defendants, and that allowing DD Boards to intervene will not delay or unduly complicate the proceedings.

Defendants do not oppose the Ohio Association of County Board's Motion to Intervene.

Plaintiffs do oppose the motion, arguing that "[i]ntervention would unnecessarily duplicate the state agency Defendants' defense of Plaintiffs' claims, add even more complexity and associated costs to litigation that already involves four defendants with three sets of defense counsel, and needlessly delay resolution of Plaintiffs' prayers for relief." (Pls.' Mem. in Opp. to the Oh. Assoc. of Cnty. Bds. at 1, ECF No. 73.) Plaintiffs continue, asserting that the Ohio Association of County Boards "has not demonstrated a significant legal interest or any claim or

23

defense that warrants its independent participation in this case." (*Id*. at 12.) Plaintiffs'
arguments are not well taken.

First, the Court notes that the proposed intervenors are not required to demonstrate a
significant legal interest or any claim or defense that warrants independent participation in this
case. Instead, the Ohio Association of County Boards must show that it "has a claim or defense
that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B).
Here, with the following argument convinces the Court that there are common questions of law
and fact:

> There are common questions of fact including, for example, the degree of
> integration in various counties for services, the progress made by DD Boards and
> State Defendants in implementing integration mandates, procedures for ensuring
> choice and management of waiting lists on State and local levels. There are
> common questions of law, including such issues as the scope and application of
> integration mandates and the degree to which proposed relief is subject to the
> fundamental alteration defense under Title II of the ADA.

(Oh. Assoc. of Cnty. Bds. Reply at 9, ECF No. 79.)

Second, while it is true that Defendants represent some of the same interests of the Ohio
Association of County Boards, the Boards lay out numerous issues on which their interests "are
not totally co-extensive with those of Defendants." (*Id*. at 6.) For example, the Ohio
Association of County Boards does not agree with Defendants that the data it collects is
sufficient to ensure accurate and efficient employment data from the Sheltered Workshops. The
Boards state that "[t]he employment data collected by the State is seriously flawed. Data at the
local level is best obtained through local DD Board data." (*Id*. at 7.) Finally, the Court agrees
with the Ohio Association of County Boards that "the substantial local funds which DD Boards
provide for community-based programs are key elements in the current system [and] [a]ny

change will affect the local boards in ways that the State Defendants cannot or will not always anticipate." (*Id*. at 8.)

Third, the Court finds that the addition of the Ohio Association of County Boards will not needlessly delay resolution of this action or add unnecessary complexity and associated costs. The proposed intervenor indicates that it does not plan to file duplicative briefs. And, as with the Guardians, excluding those who will be directly impacted by this litigation is not the appropriate way to cause less complexity. To the extent that the addition of the Ohio Association of County Boards delays these proceedings, the Court does not find that delay unnecessary.

Based on the foregoing, the Court finds that the Ohio Association of County Boards have shown that they have claims and/or defenses that share with the main action common questions of law and fact. Accordingly, the Court **GRANTS** the Ohio Association of County Board's Motion to Intervene.

**C.      The Guardians' Motion for Oral Argument**

The Guardians filed a motion requesting oral argument on their Motion to Intervene. The Court's decision herein granting the Guardians' Motion to Intervene renders moot the Guardians request. Thus, the Court **DENIES AS MOOT** the Guardians' Motion for Oral Argument.

**IV.**

Based on the foregoing, the Court:

1.      **GRANTS** the Ohio Association of County Board's Motion to Intervene (ECF No. 68);

2.      **GRANTS** the Guardians' Motion to Intervene (ECF No. 107);

3.      **DENIES AS MOOT** the Guardians' Motion for Oral Argument (ECF No. 145);

4.      **GRANTS** VOR'S Motion to File an Amicus Brief (ECF No. 164); and

25

5.      **GRANTS** the Additional Guardians' Motions to Join the Guardians' Motion to Intervene (ECF Nos. 123, 125–29, 138–39, 141–48, 152, 153, 155, 160, 161, 166–77, 182–86, 192–220, 223–32, 234–41, 243–45, 247–52, 253–60).

The Clerk is **DIRECTED** to file the Ohio Association of County Board's Answer that is currently filed as Exhibit A to its Motion to Intervene (ECF No. 68-1), and is **DIRECTED** to file VOR's brief (ECF No. 164-1) and title the docket entry "VOR's Amicus Brief in Support of the Guardian's Motion to Intervene."

**IT IS SO ORDERED.**

7-24-2017
_____
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**