IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

PHYLLIS BALL, et al.,

    Plaintiffs,

v.

    Case No. 2:16-cv-282
    CHIEF JUDGE EDMUND A. SARGUS, JR.
    Magistrate Judge Elizabeth Preston Deavers

JOHN KASICH, et al.,

    Defendants.

## OPINION AND ORDER

This matter is before the Court on *Plaintiffs' Motion for Class Certification*, which is, for the reasons that follow, **GRANTED IN PART AND DENIED IN PART**. (ECF No. 42.)

### I.    OVERVIEW

This case was filed by Disability Rights Ohio and the Center for Public Representation on behalf of Plaintiffs Phyllis Ball, Antonio Butler, Caryl Mason, Richard Walters, Ross Hamilton, Nathan Narowitz, and the Ability Center of Greater Toledo ("Plaintiffs"). Plaintiffs contend that the State of Ohio unnecessarily institutionalizes people with intellectual and developmental disabilities in violation of federal law. Plaintiffs filed this action on behalf of themselves and other similarly situated individuals with intellectual and developmental disabilities (1) who currently reside in Intermediate Care Facilities ("ICFs") with eight or more beds ("Large ICFs") throughout Ohio, but who are willing and able to live in the community, and those (2) who are in community-based care, but who are at serious risk of placement in a Large ICF.

Plaintiffs seek declaratory and injunctive relief under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12132 *et seq.*, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 *et seq.*, and the Social Security Act, 42 U.S.C. §§ 1396n(c)(2)(B) and (C), and are asking for "a single injunctive order requiring Defendants to remedy systemic deficiencies that deny class members their rights under federal law." (Pls.' Mot. for Class Cert. at 3, ECF No. 42.)

> In particular, the Individual Plaintiffs seek the opportunity to leave segregated ICFs, or to avoid unnecessary and unwanted admission to these facilities, through the provision of integrated residential, employment, and day services. A single injunction requiring the Defendants to develop and deliver these services in a manner sufficient to avoid class members' unnecessary institutionalization would resolve the alleged legal violations and create alternatives that benefit the class as a whole.

*Id.*

Plaintiffs name as Defendants in this lawsuit Ohio Governor John Kasich, Director of Opportunities for Ohioans with Disabilities Kevin Miller, Director of the Ohio Department of Medicaid John McCarthy, and Director of the Ohio Department of Developmental Disabilities John Martin ("Ohio Defendants"). After full briefing by all interested groups or parties (ECF No. 68, 73, 79; 130, 131, 163), the Court permitted intervention by the Ohio Association of County Boards of Developmental Disabilities ("DD Boards") and by a group of guardians of individuals with developmental and intellectual disabilities who currently reside in Large ICFs in Ohio ("Guardians") (ECF No. 261).

Early in the life of this action, Plaintiffs filed their *Motion for Class Certification* (ECF No. 42), which this Court granted as unopposed (ECF No. 91). The Ohio Defendants moved for expedited reconsideration of that decision (ECF No. 92), which this Court granted (ECF No. 98).

The parties then engaged in mediation, which was ultimately unsuccessful in settling the entire case, but focused various issues. The parties also engaged in significant discovery.

The Court set a briefing schedule on *Plaintiffs' Motion for Class Certification*, and *Memoranda in Opposition* were filed by the Ohio Defendants (ECF No. 273), the DD Boards (ECF No. 275), and the Guardians (ECF No. 278). Based on the mediation, the additional parties added to the case, and the discovery obtained, Plaintiffs modified their definition of the requested class in their *Reply in Support of their Motion for Class Certification*. (ECF No. 283.) With the Court's permission (ECF No. 288), the ARC of the United States, the ARC of Ohio, and the Judge David L. Bazelon Center for Mental Health Law ("ARC") filed a brief as *amicus curiae* in support of *Plaintiffs' Motion for Class Certification* (ECF No. 289).

The Ohio Defendants, the DD Boards, and the Guardians all filed *Supplemental Memoranda in Opposition to Plaintiffs' Motion for Class Certification* to address the modified class definition proposed in *Plaintiffs' Reply*. (ECF Nos. 291, 293, 296, respectively.) With the Court's permission (ECF No. 261), the Voice of the Retarded ("VOR") filed a brief as *amicus curiae* in opposition *to Plaintiffs' Motion for Class Certification* (ECF No. 294).

Plaintiffs then filed their *Final Reply in Support or Their Motion for Class Certification*. (ECF No. 300.)

## II. PARTIES' POSITIONS

### A. Plaintiffs

Plaintiffs contend that the Ohio Defendants discriminate against them and a group of similarly situated individuals in violation of the integration regulations of the ADA and the Rehabilitation Act. In *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), the United States

3

Supreme Court addressed what actions constitute discrimination in violation of the integration

regulations. The *Olmstead* Court framed the issue as follows:

> In the [ADA], Congress described the isolation and segregation of individuals
> with disabilities as a serious and pervasive form of discrimination. 42 U.S.C. §§
> 12101(a)(2), (5)). Title II of the ADA, which proscribes discrimination in the
> provision of public services, specifies, *inter alia*, that no qualified individual with
> a disability shall, "by reason of such disability," be excluded from participation
> in, or be denied the benefits of, a public entity's services, programs, or activities.
> § 12132. Congress instructed the Attorney General to issue regulations
> implementing Title II's discrimination proscription. *See* § 12134(a). One such
> regulation, known as the "integration regulation," requires a "public entity [to]
> administer . . . programs . . . in the most integrated setting appropriate to the needs
> of qualified individuals with disabilities." 28 CFR § 35.130(d). A further
> prescription, here called the "reasonable-modifications regulation," requires
> public entities to "make reasonable modifications" to avoid "discrimination on the
> basis of disability," but does not require measures that would "fundamentally
> alter" the nature of the entity's programs. § 35.130(b)(7).

*Id.* at 581, syllabus.

The *Olmstead* Court held that, under Title II of the ADA, States are required to provide

community-based treatment services for persons with disabilities when

> (1) the State's treatment professionals have determined that community placement
> is appropriate,
>
> (2) the transfer from institutional care to a less restrictive setting is not opposed by
> the affected individual, and
>
> (3) "the placement can be reasonably accommodated, taking into account the
> resources available to the State and the needs of others with mental disabilities."

*See id.* at 607.

Several Plaintiffs allege that they reside in Large ICFs, are appropriately qualified to

receive community-based treatment, and "seek the opportunity to leave segregated ICFs." (Pls.'

Mot. for Class Cert. at 3, ECF No. 42.) One Plaintiff, whose aging parents care for him in their

home, alleges that he is at serious risk of ICF placement when his parents can no longer care for

him. Plaintiffs provide a large amount of evidence, which, they contend, shows that "Ohio's

4

service system for people with intellectual and developmental disabilities leaves thousands of

Ohioans who prefer to live in the community unnecessarily institutionalized in Large ICFs, or at

serious risk of unnecessary institutionalization in these facilities, in violation of federal law."

(Pls.' Reply at 1, ECF No. 283.)

> Plaintiffs contend that, as a result of Defendants' administrative, planning, policy,
> and funding decisions, Ohio has failed to provide the home and community-based
> services necessary to avoid class members' unnecessary segregation. The State
> has not paid for or implemented a sufficient number of waivers[1] within its home
> and community-based service system to meet class members' demonstrated need.
> It has employed a funding and rate structure that incentivizes unnecessary
> institutionalization. It has adopted counseling processes that do not provide a real
> choice between institutionalization and home and community-based services.
> Defendants continue to license, maintain, and fund a system of large, segregated
> ICFs providing restrictive facility-based residential, employment, and day
> services. The size of Ohio's ICF system makes it a national outlier. These
> discrete actions and inactions by the State harm a large group of people with
> intellectual and developmental disabilities and subject them to unnecessary
> segregation.

*Id.*

Plaintiffs conclude that "hundreds, if not thousands, of people with intellectual and

developmental disabilities in Ohio remain segregated in Large ICFs, even though they qualify for

community-based services and have chosen or expressed interest in learning more about such

alternatives to institutional care." *Id.* at 5. Plaintiffs offer, *inter alia*, the following evidence to

support their position:

> Thousands of adults live in large ICFs across Ohio. In total, Defendants' own
> figures show that there are 6,169 public and private ICF beds, and 5,901 residents
> of these facilities, across Ohio. Doc. 273 at 14, 17; *see also* Doc. 42 at 11.
> Although Ohio has gradually reduced the size of its state-operated ICFs

---

[1] Medicaid-eligible adults are individuals with intellectual and developmental disabilities who
have been determined eligible for ICF services. Once these individuals are determined to be
eligible for ICF services, they can then seek to "waive" from an ICF placement into a
"community" placement; hence the phrase, "waiver services." Waiver recipients are, by
definition, waiving from their ICF entitlement. When waiver is granted, these individuals move
into a more independent living arrangement, with Medicaid and DD Board funds used to pay the
associated costs.

("developmental centers"), Defendants continue to license, fund, and sustain a substantial network of private ICF beds. For at least twenty years, the number of individuals in private ICFs has remained relatively stagnant: The total number in SFY [State Fiscal Year] 1995 was 5,788; by SFY 2015, the number had actually increased to 5,877. Email from Clayton Weidner, Ohio Dep't of Developmental Disabilities, to Joshua Anderson, Ohio Dep't of Developmental Disabilities at 1–2 (July 23, 2014), attached as Exhibit 1.

*Id.*

**B.    ARC**

ARC, which filed an *amicus* brief in support of *Plaintiffs' Motion for Class Certification*, explains that "[t]he need to maximize the availability of these community-based services for the benefit of people with [intellectual and developmental disabilities] strongly counsels in favor of granting *Plaintiffs' Motion for Class Certification*." (ARC Br. in Support of Class Cert. at 5, ECF No. 289.) ARC clarifies its position:

> While the Court need not explore the merits in depth at this stage of the case, it is important in connection with the motion for class certification that the Court fully understand the relief Plaintiffs seek on behalf of Ohioans with disabilities who are currently unnecessarily institutionalized or at risk of such institutionalization. The research supporting community-based services and supports for people with disabilities as well as evidence from other states that have made this transition successfully clearly demonstrates that people with significant disabilities who require regular, intensive supports greatly benefit from living in community settings.
>
> Experience shows that states can effectively shift their focus and funding priorities from institutional to community-based services without causing undue disruption to the residents who transition from institutions. Indeed, the lesson from those experiences is that residents and families are more satisfied with integrated community alternatives —even families that had initially opposed the changes. As a recent report from the American Association on Intellectual and Developmental Disabilities (AAIDD) and the Association of University Centers on Disability (AUCD) noted:
>
>> Over the past half-century we have learned that large institutions do not promote positive outcomes for people with [intellectual and developmental disabilities] and limit community interaction and involvement for some of our most vulnerable citizens. These

> settings have negative outcomes for their health, well-being, quality of life, independence, and overall happiness. As a society we have moved from providing residential supports for people with intellectual and other developmental disabilities in the large, segregated, isolated institutions of the first half of the 20th century . . . to smaller group homes, shared apartments, and individually-owned or rented houses or apartments.

*Community Living and Participation for People with Intellectual and Developmental Disabilities: What the Research Tells Us* (July 24, 2015) (hereafter *AAIDD/AUCD Report*), at 2, available at http://www.aucd.org/docs/publications/2015_0723_aucd_aaidd_community_livin g3.pdf.

*Id.* at 4–5.

## C. Defendants

The Ohio Defendants and the DD Boards agree that "community-based services are a good thing," referring to this as "common ground" with Plaintiffs and ARC. (Ohio Defs.' Supp. Mem. in Opp. at 6, ECF No. 291.) The Ohio Defendants, however, contend that the statistical evidence does not support Plaintiffs' position that Ohio has failed to provide an ever increasing number of community-based services to individuals with intellectual and developmental disabilities. Rather, the Ohio Defendants provide statistics they contend show the increase in community care and decrease in ICF services as follows:

> Plaintiffs overstate the current role ICFs play in Ohio's system. Describing ICF numbers as "relatively stagnant," Pls.' Supp. 5, is a half-truth at best. By looking solely at Ohio's raw ICF numbers, Plaintiffs ignore the expansion of Ohio's system since *Olmstead*. In 1999, when *Olmstead* was decided, Ohio had less than 14,000 people with developmental disabilities receiving Medicaid funding. *See* Weidner Aff. Exs. A–B, Doc. 273-4. And 59% of those people were living in ICFs. *Id.* By 2016, the service population had more than tripled, with over 42,000 Ohioans receiving Medicaid funding. *See id. But* waiver participants made up the strong majority: 85%. *Id.* And this trend projects forward. Over the past three years, Ohio has averaged 205 new waiver participants to only 32 new ICF participants each month. McGonigle Aff. ¶¶ 3–4, Doc. 273-9. Thus, given the overall growth of Ohio's service population, any "stagnation" in *raw* ICF numbers, is, in reality, a dramatic *proportional* decrease.

7

*Id*. at 7 (noting that "even looking only at raw figures, the number of people in Ohio ICFs has

gone down since *Olmstead*" because of the interplay between private and public ICFs).

Further, the Ohio Defendants explain that "Ohio has encouraged ICF downsizing,"

asserting that:

> Ohio has provided rate incentives to ICFs that have committed to either (1)
> converting ICF beds to waivers or (2) transitioning people from ICFs with 16 or
> more beds to smaller ICFs. Ohio Resp. 13–14; Ohio Rev. Code § 5124.67(A)(1).
> These efforts have led to many ICF beds being voluntarily converted or
> downsized. So far, over 450 ICF beds have been converted to waivers and over
> 260 beds have shifted to smaller ICFs. Horvath Supp. Aff. ¶ 17 (attached Ex. 1).

*Id*. at 7–8.

Finally, the Ohio Defendants contend that it is not "accurate to imply, as Plaintiffs do,

that ICFs are an inherently bad thing." *Id*. at 8. They continue:

> Many ICFs make extensive efforts to integrate their residents into the
> community, while also caring for their needs. *See generally* Lee Aff., Doc. 273–
> 25; Slight Aff., Doc. 273–26; Gall Aff., Doc. 273–27. For these and other
> reasons, thousands prefer ICFs for their, or their loved ones', care. *See* Ohio
> Resp. 22, 27–29. And while Plaintiffs feel that Ohio's ICF-reduction efforts have
> not gone far enough, others feel they have gone too far. *See* Guardians' Ex. 5,
> Doc. 278–5.
>
> Ohio's difficult task is to balance competing preferences in an area where people
> understandably have passionate views. Ohio seeks to serve a wide variety of
> interests. The goal is not to "phase out" ICFs, but to administer services with an
> "even hand." *See Olmstead*, 527 U.S. at 604–05.

*Id*.

## D.     The Guardians

The Guardians take the position that Plaintiffs seek to push a social policy of requiring all

individuals with intellectual and developmental disabilities into community-based treatment –

whether they want it or not. (Guardians' Supp. Mem. in Opp. at 2, ECF No. 296) (stating that "it

is social policy masquerading as a lawsuit"); (*see also* Guardians' Mot. to Intervene at 10, 14,

8

ECF No. 107) (explaining that while Plaintiffs frame the community based services as "integrated," these community based services work to segregate the Guardians' charges from their peers, their caregivers, their families, and their homes (the ICF) at which many have lived all or most of their lives). The Guardians note that, as the Ohio Defendants assert, "Ohio has encouraged ICF downsizing." (Guardians' Mem. in Opp. at 5, ECF No. 278.) The Guardians conclude:

> The irony is that Ohio has actually done such a good job of encouraging ICF downsizing, that what is threatened today in Ohio – and may require class protection – is not the waiver choice, but instead the ICF choice.

*Id.*

The Guardians expound on their conclusion:

> If once upon a time [developmentally disabled] individuals were unnecessarily forced *into* "institutions," this case is necessary because Plaintiffs – with the state's and county boards' help – now may be unnecessarily forcing individuals *from* institutions. This is exactly what Justice Kennedy cautioned against in *Olmstead*:
>
>> "It would be unreasonable, it would be a tragic event, then, were the Americans with Disabilities Act of 1990 (ADA) to be interpreted so that States had some incentive, for fear of litigation, to drive those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision." 527 U.S. at 610.

*Id.* at 4. The Guardians further posit:

> The irony is that this case *is* necessary, but *not* because – as Plaintiffs allege – the state is forcing people into "segregated" "institutions." It *is* necessary, but *not* because – as Plaintiffs allege – the state fails to provide waiver placements. In fact, all agree, that in less than 20 years, the state's waiver population has increased 556% while its ICF population has decreased 22%. *See* Dkt. 273-4.
>
> In 1999, 59% of Ohioans receiving services received them in ICFs, while 41% received waiver services. *Id.* Fast forward to today and 85% receive waiver services while only 15% – like Guardians' loved ones – receive ICF services. *Id.* That is almost a 6:1 ratio in favor of waiver services, not "institutional" services,

meaning the system is already overwhelmingly "balanced" toward community settings. The irony is the state – and county boards – have now been doing for decades exactly what Plaintiffs demand in this lawsuit: to shift more care and dollars to "waiver" services in the "community."

*Id.* at 3, 4.

## E.     VOR

VOR, who filed an *amicus* brief in support of the opposition memoranda of Defendants

and the Guardians, contend that Plaintiffs' requests cannot help but have a negative impact on

disabled Ohioans. VOR offers the following:

> To be clear, VOR believes that Plaintiffs' representatives are well-intentioned and motivated by their sincere belief about what is the most appropriate care for the class members. Neither the ADA nor the Rehabilitation Act, however, gives them the right to impose those beliefs on others, no matter how well-meaning they may be. VOR agrees with both Plaintiffs and Defendant Martin that "[t]he more choices we take away from people[,] the more we dehumanize them." (Pls.' Moving Br. at 6) (citation omitted). That said, the way to honor that belief is to actually allow options and individualized determination, not to substitute one forced choice for another.

(VOR's Amicus Brief at 2, ECF No. 294.)

## III.     LAW

### A.     Standard

A district court has broad discretion to decide whether to certify a class. *In re Am. Med.*

*Sys., Inc.,* 75 F.3d 1069, 1079 (6th Cir. 1996). When determining whether to certify a class, the

Court "must begin [its] analysis with a recognition that the 'class action is 'an exception to the

usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *In*

*re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.,* 722 F.3d 838, 850 (6th Cir.

2013) (quoting *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338 ,388 (2011)).

> To obtain class certification, the plaintiffs must show that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of

10

law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). These four requirements—numerosity, commonality, typicality, and adequate representation—serve to limit class claims to those that are fairly encompassed within the claims of the named plaintiffs because class representatives must share the same interests and injury as the class members. *Dukes,* 131 S.Ct. at 2550.

*Id.*

In addition to fulfilling the four prerequisites of Rule 23(a), the proposed class must also

meet at least one of the three requirements listed in Rule 23(b). *Dukes,* 564 U.S. at 345; *Young v.*

*Nationwide Mut. Ins. Co.,* 693 F.3d 532, 537 (6th Cir. 2012). *In re Whirlpool Corp.*, 722 F.3d at

850–55. Federal Rule of Civil Procedure 23(b) authorizes three types of class action suits. *See*

Fed. R. Civ. P. 23(b)(1), (2), (3). Here, Plaintiffs request certification under Rule 23(b)(2),

which provides for declaratory and injunctive relief.

## B. Consideration of the Merits at the Class Certification Stage

A main argument Plaintiffs make throughout their class certification briefing is that

Defendants inappropriately engage in merits inquiries at the certification stage. In this regard,

the Sixth Circuit explains:

> Class certification is appropriate if the court finds, after conducting a "rigorous analysis," that the requirements of Rule 23 have been met. *Dukes*, [564 U.S. at 351]; *Young*, 693 F.3d at 537; *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006). Ordinarily, this means that the class determination should be predicated on evidence presented by the parties concerning the maintainability of the class action. *In re Am. Med. Sys., Inc.*, 75 F.3d at 1079. On occasion "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," *Gen. Tele. Co. of Southwest v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), and "rigorous analysis" may involve some overlap between the proof necessary for class certification and the proof required to establish the merits of the plaintiffs' underlying claims. *Dukes*, [564 U.S. at 351]. There is nothing unusual about "touching aspects of the merits in order to resolve preliminary matters . . . [because doing so is] a familiar feature of

11

litigation." *Id.* at 351–52. But permissible inquiry into the merits of the plaintiffs' claims at the class certification stage is limited:

> Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

*Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 568 U.S. 455, 466, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013) (citing *Dukes*, 131 S.Ct. at 2552 n.6 (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974))).

*In re Whirlpool Corp.*, 722 F.3d at 851.

The *In re Whirlpool* court continued, stating that "[t]he Supreme Court's recent opinions

in *Amgen* and *Dukes* now clarify that some inquiry into the merits may be necessary to decide if

the Rule 23 prerequisites are met." *Id.* (citing *Amgen*, 568 U.S. at 464; *Dukes*, 564 U.S. at 349–

350).

> *Amgen*, however, admonishes district courts to consider at the class certification stage only those matters relevant to deciding if the prerequisites of Rule 23 are satisfied. *See Amgen*, [568 U.S. at 460]. In other words, district courts may not "turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 811 (7th Cir. 2012).

*Id.* at 851–52.

The Court herein has considered only those matters relevant to deciding if the

prerequisites of Rule 23 are satisfied.

## IV. ANALYSIS

Plaintiffs move to certify an injunctive and declaratory relief class defined as follows:

> All Medicaid-eligible adults with intellectual and developmental disabilities residing in the state of Ohio who, on or after March 31, 2016, are qualified for home and community-based services, but (a) are institutionalized in an Intermediate Care Facility with eight or more beds, and, after receiving options

12

counseling, express that they are interested in, or may be interested in, integrated community-based services; or (b) are at serious risk of institutionalization in an Intermediate Care Facility with eight or more beds and have, by placing themselves on a waiting list for community-based services, expressed an interest in receiving integrated services while continuing to live in the community.

(Pl. Reply at 2, ECF No. 283.) Plaintiffs explain:

> Class members at serious risk of institutionalization in large ICFs include people with intellectual and developmental disabilities who are qualified for home and community-based services and who now, or in the future: (1) apply for or are referred for admission to an ICF; (2) are on waiting lists for Medicaid home and community-based services and have either an aging caregiver, intensive needs, or an emergency, as defined by Ohio's current or future waiting list rule, or (3) have another immediate need which creates a substantial risk of harm, as determined by Ohio's current or future waiting list rule.

*Id.* at 2–3.

## A.   Rule 23(b)(2) – Injunctive and Declaratory Relief Classes

In Rule 23(b)(2) classes, the movant must show "that the party opposing the class has affected the class in a way generally applicable to the class as a whole so that final injunctive or declaratory relief with respect to the entire class is appropriate." *Reeb v. Ohio Dept. of Rehab. and Correction*, 435 F.3d 639, 645–46 (6th Cir. 2006) (citing Fed. R. Civ. P. 23(b)(2)). Further, the subdivision "requirements are designed to permit only classes with homogenous interests" because it provides for mandatory, non-opt-out classes. *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 447 (6th Cir. 2002). The Sixth Circuit explains:

> Rule 23(b) can be divided into two general categories of class actions based on the procedural requirements that they entail. Rule 23(b)(1) and (2) are referred to as "mandatory" classes due to the fact that they do not require that a court provide individual members of the class with notice and the opportunity to "opt out" of the class action. These procedural protections are considered unnecessary for a Rule 23(b)(2) class because its requirements are designed to permit only classes with homogenous interests. *See Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1155–56 (11th Cir.1983) ("The relief provisions of the rule reflect the need for homogeneity in the rights and interests of the class . . . .") (internal quotation marks omitted); *Wetzel v. Liberty Mut. Insurance Co.*, 508 F.2d 239,

13

256 (3d Cir.1975) (1975) ("The very nature of a (b)(2) class is that it is homogeneous without any conflicting interests between the members of the class.").

*Id.* at 447–48.

In their *Motion for Class Certification*, Plaintiffs highlight that Rule 23(b)(2) has long

been recognized as "an appropriate and important vehicle for civil rights actions." (Pls.' Mot. for

Class Cert. at 41) (citing *Dukes*, 564 U.S. at 361). Plaintiffs argue that

> Rule 23(b)(2) is satisfied here because Plaintiffs allege systemic civil rights violations (discriminatory segregation) and seek declaratory and injunctive relief (the provision of integrated, community-based alternatives) designed to benefit the class as a whole. The modifications that Plaintiffs seek to the State's service system can be achieved through a single injunction. [*Dukes*], 564 U.S. at 365. Class injuries can be redressed by the expansion of community-based services as feasible alternatives to institutionalization.

*Id.* at 41. Plaintiffs explain:

> Defendants administer, operate, fund, and plan their system of services for people with intellectual and developmental disabilities in a discriminatory manner by failing to provide the community-based services required by the Plaintiff class to avoid their unnecessary institutionalization. Class members' experience of discriminatory segregation is a product of these structural deficiencies in Defendants' service system. Defendants' decision to license, fund, and maintain an excessive number of segregated ICF placements, when coupled with their inadequate funding for and provision of home and community-based services, results in a continuing pattern of unnecessary and avoidable ICF admissions. This systemic policy and practice harms the Plaintiff class by depriving them of integrated, community-based service alternatives and causing their discriminatory segregation. As a result, Defendants are acting or refusing to act in a manner that is generally applicable to the class as a whole.

*Id.* at 43.

In sum, the systemic policies and practices about which Plaintiffs complain are Ohio's

licensing, funding, and maintenance of an excessive number of ICFs and inadequate funding of

home and community-based services required by the Plaintiff class to prevent "their

discriminatory segregation." Plaintiffs maintain that Ohio "provid[es] fewer community service

14

slots than are necessary to meet the demonstrated need." (Pls.' Reply at 37, ECF No. 283.)

Plaintiffs assert that these class injuries can be addressed by declaratory and injunctive relief that would require the Ohio Defendants to expand community-based services.

The Ohio Defendants respond that Plaintiffs cannot meet their burden to show an appropriate 23(b)(2) class because their proposed class is not cohesive with homogenous interests. Specifically, they argue:

> A Rule 23(b)(2) class "share[s] the most traditional justification[] for class treatment" in that "the relief sought must perforce affect the entire class at once[.]" *Dukes*, 564 U.S. at 361–62. Thus, a Rule 23(b)(2) class envisions a "single injunction." *Id.* at 360. The "defining characteristic" of such a class is "'the homogeneity of the interests of the members of the class.'" *Romberio[ v. UNUMProvident Corp.*, 385 F. App'x 423, 432 (6th Cir. 2009)] (quoting *Reeb[*, 435 F.3d at 649).] The class "by its very nature" must have few if any "conflicting interests among its members." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 413 (5th Cir. 1998).

*Id.* at 32, 33 ("If a court is going to give the same answer for everyone, it needs to be confident everyone wants the same thing.").

The Ohio Defendants posit that Plaintiffs' modified class definition did not remedy its previous lack of cohesiveness and homogeneity of interests, specifying that the definition implicates three groups[2] of individuals with differing interests: (1) individuals who reside in a Large ICF, and after receiving options counseling, express that they *are interested* in integrated community-based services, (2) individuals who reside in a Large ICF, and after receiving options counseling, express that they *may be interested* in integrated community-based services, and (3)

---

[2] The Ohio Defendants add "residents of eight-bed ICFs" as a fourth category. (*Ohio Defs.' Supp. Opp.* at 28, ECF No. 291.) However, the Ohio Defendants admit that they are "uncertain whether, and to what extent, these people are in or out of this proposed class" because, while Plaintiffs "repeatedly suggests they seek to represent such people" the definition of the class requires an ICF resident to have "'receiv[ed] options counseling' and then expressed at least some interest in waivers." (*Id.* at 32.) The Court does not interpret Plaintiffs' request to encompass all residents of Large ICFs. Thus, the Court will not address the Ohio Defendants' arguments related to this category.

15

individuals who are at serious risk of institutionalization by placing themselves on a waiting list

for community-based services, expressed an interest in receiving integrated services while

continuing to live in the community. (Ohio Defs.' Supp. Opp at 28, ECF No. 291.)

In *Plaintiffs' Final Reply*, they assert that the Sixth Circuit does not require every

member "of the class be identically situated or that all must have a claim for relief," stating:

> Under the various headings of cohesiveness, commonality, typicality, adequacy of representation, and the propriety of the class definition, Defendants make essentially the same argument. They contend that the members of the proposed class are not identically situated to one another—and may not all have a claim for relief. But the Sixth Circuit has specifically rejected any requirement that the members of the class be identically situated or that all must have a claim for relief. "'All of the class members need not be aggrieved by . . . [the] defendant's conduct in order for some of them to seek relief under Rule 23(b)(2).'" *Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 428 (6th Cir. 2012) (quoting 7A Charles A. Wright, *et al.*, *Federal Practice & Procedure* § 1775). Rather, "'[w]hat matters to class certification . . . [is] the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *Id.* at 427 (quoting [*Dukes*], 564 U.S. at 350) (alterations in *Gooch*). *See also, Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 505 (6th Cir. 2015) ("The Supreme Court in *Dukes* did not hold that named class plaintiffs must prove at the class-certification stage that all or most class members were in fact injured to meet [the commonality] requirement.").

> Rather, the Sixth Circuit has held that the relevant question for class certification is whether the plaintiffs challenge "a pattern or practice that is generally applicable to the class as a whole"—one that can be enjoined at once for the entire class. *Gooch,* 672 F.3d at 428 (internal quotation marks omitted). Each of the systemic statewide practices that we challenge can be enjoined for the class as a whole. For example, if this Court orders the State to increase the number of community-based services slots it funds, to change its financing structure to eliminate the incentive to unnecessarily institutionalize, or to provide a certain set of diversionary and counseling services at an earlier time than is the present practice, that order will apply to the entire class. Even if not all of the class members can ultimately show that the challenged practices violated their rights— the question on the merits—these statewide practices can be challenged in a class proceeding. *See, id.* (class certification appropriate "[e]ven if some class members have not been injured by the challenged practice") (internal quotation marks and citation omitted).

> Thus, contrary to Defendants' suggestion (Doc. 291 at 46), this case is in exactly the same position as was *Gooch*. Here, as in *Gooch*, we seek an order

that would resolve key issues classwide: there, an order directing a particular interpretation of an insurance contract that applied to the plaintiff class; here, an order barring or requiring specific statewide policies that apply to the plaintiff class. Even if, as Defendants argue, some members of the proposed class here will not be able to prove that they were injured by the statewide policies we target, the same was true in *Gooch*. *See*, Doc. 291 at 46 (acknowledging that "[n]ot all class members were injured by the provision at stake").

(Pls.' Final Reply at 7–9, ECF No. 300.)

In short, Plaintiffs rely on *Gooch* for the proposition that any policy that will have an impact on the members of the proposed class is adequate to show cohesiveness and homogeneity of interests sufficient to support the requirements of Rule 23(b)(2), even when some members of the proposed class "will not be able to prove that they were injured by the statewide policies [Plaintiffs] target." However, the uniform potential harm to which the class was subject in *Gooch* renders the case inapposite.

By way of explanation, in *Gooch*, the defendant insurer *reduced benefits* available under a supplemental cancer-only insurance policy with its May 2006 policy clarification, which interpreted the phrase "actual damages" in the insurance contract. All members of the class had purchased this supplemental cancer-only policy, and presumably desired greater benefits. The *Gooch* class contained individuals who were aggrieved by the defendant's interpretation of the contractual phrase "actual damages" when they submitted a claim and received reduced benefits. The class also contained individuals who had not submitted a claim, so they were not aggrieved by the defendant's interpretation of the phrase "actual damages."

Thus, when the *Gooch* court stated that "[a]ll of the class members need not be aggrieved by . . . [the] defendant's conduct in order for some of them to seek relief under Rule 23(b)(2)," it did not mean that a group of plaintiffs could target a policy that would not potentially cause uniform harm. The *Gooch* class members were not then aggrieved by the defendant's

interpretation of the contract simply because they had not made a claim under that provision of the policy, not because of some fundamental inability to prove uniform injury (such as not having purchased the cancer-only insurance policy). Yet, if in the future, these non-aggrieved class members made a claim under the policy, they would have received reduced benefits and therefore would have been injured in the same way as the other class members by the defendant's interpretation of the contractual language in the cancer-only policy. Their coverage, in other words, was affected even if no claim had yet been made. Thus, the relief was indivisible in nature as to the entire class, whether each individual class member had made a claim or not, and the court's ruling on the defendant's interpretation of the contract would "generate common answers" apt to drive the resolution of the litigation. *Dukes*, 564 U.S. at 350. Indeed, the harm would be effectively redressed by final injunctive or declaratory relief with respect to the entire class.

The policies or practices targeted by a proposed plaintiff class must at a minimum have the potential to uniformly harm the class so that the entire class has an interest in modifying those policies. In the case *sub judice*, individuals who are currently residing in Large ICFs and who have requested community-based services are potentially harmed by the policies targeted by Plaintiffs, *i.e.,* providing fewer community services slots than are necessary to meet this need.

However, some of the class members who after counseling indicate that they "may be" interested in community-based services will not be harmed by this targeted conduct. Some of the class members who indicated that they "may be" interested in community-based services will decide that they prefer to stay in a Large ICF. These class members, therefore, will not be harmed by the Ohio Defendants' failure to fund community-based services. Indeed, the opposite.

The class members who decide that they prefer to stay in a Large ICF may actually be harmed by Plaintiffs' proposed modification of Ohio's funding policies, which would divert funding away from these class members' preferred service option (Large ICFs) to community-based service. Indeed, this concern is not merely hypothetical. The Guardians in this case make this precise contention. Thus, some of the class members will not "complain of a pattern or practice [failure to sufficiently fund community-based services] that is generally applicable to the class as a whole." *Id.* (quoting *Gooch*, 672 F.3d at 428). The class members who do not want community-based services do not complain that there are insufficient community-based services available for them.

The potentially aggrieved class members in the instant action are those individuals with intellectual and developmental disabilities who have indicated that they want community-based services. If Ohio does not have enough "community-based services required by the Plaintiff class," this group is harmed – a harm that may be "redressed by the expansion of community based services." (Pls.' Mot. for Class Cert. at 41, ECF No. 42) (articulating requested relief)

The same issues of cohesiveness and homogeneity of interests exist with Plaintiffs' proposed "at-risk" class (individuals who "are at serious risk of institutionalization in an Intermediate Care Facility with eight or more beds and have, by placing themselves on a waiting list for community-based services, expressed an interest in receiving integrated services while continuing to live in the community"). The DD Boards provide evidence that placement on a waiting list and assignment to a priority category is not necessarily reflective of need or desire for community-based services.

Specifically, the DD Boards provide affidavits from two individuals who oversee the

implementation of the waiting lists for Cuyahoga and Franklin Counties, the two most populated counties in Ohio.[3] (DD Boards' Supp. Mem. in Opp. at 3, ECF No. 293; Aff. of Amber Gibbs ¶ 2, ECF No. 293-1; Aff. of Karin Crabbe ¶¶ 1, 2, ECF No. 293-2.) These affiants indicate the parents and guardians of individuals with intellectual and developmental disabilities are encouraged by DD Board staff and other advocates to place their eligible family members on the waiting lists as early as possible, even if they do not need services. *Id.* ¶¶ 5, 6, *id.* ¶¶ 3, 4 Further, the affiants state that placement in a priority category is determined by whether or not the person meets the priority criteria and does not reflect a need for services in the near future. *Id., id.*

The DD Boards also provide affidavits that demonstrate that placement in priority does not mean that people are at serious risk of institutionalization in an ICF of any size, or that they will accept community-based services when offered. The DD Boards provide the example of Rebecca Huelskamp, the mother and guardian of her daughter Patricia who lives at home and is actively engaged in work and community activities. (Aff. of Rebecca Huelskamp ¶¶ 5–10, ECF No. 293-3.) Patricia has been engaged in competitive employment since 2005, using the sheltered workshop at times when not on her regular job. She has had steady employment at a local private company since 2011 at a rate above minimum wage. When not working, Patricia has a wide range of interests and activities. Patricia has been on the waiver waiting list for at least 15 years and was placed in the Aging Caregiver priority category. Patricia's mother attests in her affidavit that she did not place Patricia on the waiting list because of an immediate need for a waiver from ICF placement; rather she wanted to be on the list if a need arose in the future.

---

[3] The average county population in Ohio is 131,096. Both Franklin and Cuyahoga Counties have over 1.2 million residents. WIKIPEDIA, the Free Encyclopedia, *List of Counties in Ohio*, at https://en.wikipedia.org/wiki/List_of_counties_in_Ohio (last visited March 29, 2018).

The DD Boards show that the experience of the Huelskamp family is not unique. A significant percentage of persons who are offered waivers from ICF placement decline the offer while remaining on the wait list. With respect to Level One waivers in Cuyahoga County, Amber Gibbs stated in her affidavit:

> Since August [2017], the DD Board contacted 77 people on the waiting list who met priority criteria under Ohio Admin. Code § 5123:2-1-08(D)(10) to offer them Level One waivers. Of these 77:
>
> a. 42 (54.5%) elected to accept the waiver and are being enrolled;
>
> b. 27 (35%) declined the waiver but requested that they be left the Waiting List;
>
> c. 8 (10.5%) did not respond to letters sent to their home offering them a waiver.

(Aff. of Amber Gibbs ¶ 4, ECF No. 293-1.)

Plaintiffs reply that this inquiry is a "merits question" that is not proper at the class certification juncture. (*Pls.' Final Reply* at 2–3, ECF No. 300.) This Court disagrees. The Court does not review the evidence to determine whether the individuals who have placed themselves on a wait list are unnecessarily institutionalized, *i.e.*, whether Ohio provides sufficient community-based services to comply with the ADA. Instead, the Court reviews the evidence as part of its "rigorous analysis" required under Rule 23 to determine whether the proposed class members have homogenous interests so that the relief sought would benefit them. *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525–26 (6th Cir. 1976) (stating that the rigorous analysis "[o]rdinarily, this means that the class determination should be predicated on evidence presented by the parties concerning the maintainability of the class action") (citing *In re Am. Med. Sys., Inc.*, 75 F.3d at 1079).

The Court concludes that the proposed "at risk" class members do not have homogenous interests for the same reasons the proposed class members above did not. That is, the class

members who may want community-based services do not have homogenous interests with those class members who do want community-based services. Likewise, some class members who are on the wait list want community-based services and some want services provided in Large ICFs. In a situation where there is limited funding, this not only reflects lack of homogenous interests, it indicates competing interests, which could actually harm certain members of a broad Rule 23(b) class because of the lack of notice and opportunity for class members to opt out. Therefore, because the proposed class does not suffer a uniform harm that can be remedied with the same relief, certifying a broad class is inappropriate. *See Reeb*, 435 F.3d at 645–46 (the plaintiffs must show "that the party opposing the class has affected the class in a way generally applicable to the class as a whole so that final injunctive or declaratory relief with respect to the entire class is appropriate.") (citing Fed. R. Civ. P. 23(b)(2)).

This Court has "broad discretion to modify class definitions," and a district court's *sua sponte* amendment "show[s] that the court took seriously its obligation to make appropriate adjustments to the class definition as the litigation progressed." *Powers v. Hamilton County Pub. Def. Commn.*, 501 F.3d 592, 619 (6th Cir. 2007) (citing as examples *Schorsch v. Hewlett–Packard Co.*, 417 F.3d 748, 750 (7th Cir. 2005) (noting that "[l]itigants and judges regularly modify class definitions"); *In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004) ("District courts are permitted to limit or modify class definitions to provide the necessary precision.")). Based on the foregoing, the Court finds that the following revision of the class definition will ensure that a Rule 23(b)(2) class is properly constituted:

> All Medicaid-eligible adults with intellectual and developmental disabilities residing in the state of Ohio who, on or after March 31, 2016, are qualified for home and community-based services, and, after receiving options counseling, express that they are interested in community-based services.

This definition includes all individuals with intellectual and developmental disabilities who want to utilize the community-based services, whether they are currently in an ICF or in the community and wish to move to another setting in the community.

This modified class definition is similar in scope to the one certified in *Lane v. Kitzhaber*, 283 F.R.D. 587, 594 (D. Or. 2012), one of the main *Olmstead* class cases upon which Plaintiffs' rely. The *Lane* court certified a Rule 23(b)(2) class defined as:

> Individuals with intellectual or developmental disabilities who are in, or who have been referred to, sheltered workshops and who are qualified for supported employment services.

*Id.* at 594. The Lane court highlighted the homogeneity of interests among the class members:

> [A]ll plaintiffs are qualified for, but not receiving the full benefit of, supported employment services; all lack regular contact with non-disabled peers (other than paid staff); and *all want to work, but are not working, in an integrated setting*. As a result, they and all similarly situated persons suffer the same injury of unnecessary segregation in the employment setting

*Id.* at 598 (emphasis added).

Thus, unlike the proposed class in the case *sub judice*, all members of the *Lane* class wanted the same relief – expanded community work opportunities. Consequently, final injunctive or declaratory relief requiring the state to plan, administer, operate and fund a system that provide employment services that allow the class members to work in the most integrated setting would remedy the uniform potential harm of the entire class.

## B.    Plaintiffs' Proof on the Rule 23(a) Prerequisites

The class definition as modified by the Court also meets all of the criteria in Rule 23(a). The Ohio Defendants contend that Plaintiffs cannot meet their burden under Rule 23(a) to show commonality, typicality, and adequacy. The Court notes, however, that the Ohio Defendants' arguments, obviously, are not directed at the modified class definition the Court has set forth *supra*.

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Dukes*, 564 U.S. at 349–50 (quotations omitted). As discussed at length above, the modified class definition contains individuals who have suffered the same injury. The class members wish to receive care in the community and contend that Ohio "provid[es] fewer slots than are necessary to meet the demonstrated need." (Pls.' Reply at 37, ECF No. 283.)

In turn, typicality exists where "by pursuing their own interests, the class representatives also advocate the interests of the class members." *In re Whirlpool Corp.*, 722 F.3d 852–53 (6th Cir. 2013). "A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *In re Am. Med. Sys.*, 75 F.3d at 1082 (quotations omitted). Here, Plaintiffs' interest in utilizing community-based services is aligned with the class who also seek an expansion of waiver services.

Last, the standard for adequacy of representation overlaps significantly with the commonality and typicality requirements. *See Prater v. Ohio Educ. Ass'n*, C2041077, 2008 WL 2566364, at *7 (S.D. Ohio June 26, 2008) (citing *Dalesandro v. International Paper Co.,* 214 F.R.D. 473, 483 (S.D. Ohio 2003) and *Amchem Prods., Inc.* 521 U.S. at 626 n. 20). Class representatives are adequate when it appears that they will vigorously prosecute the interests of the class, which usually will be the case if the representatives are part of the class, possess the same interest, and suffer the same injury as the class members. Here, Plaintiffs have vigorously prosecuted the interests of the class and possess the same interest and same injury of the class members, *i.e.*, insufficient community-based services resulting in unnecessary institutionalization.

24

## III.

For the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART** *Plaintiffs' Motion for Class Certification.* (ECF No. 42.)

**IT IS SO ORDERED.**

3-30-2018
_____
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**