**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **PHYLLIS BALL,** *et al.*, | : | **Case No.: 2:16-cv-282** |
| **Plaintiffs,** | : | **Chief Judge Sargus, Jr.** |
| **v.** | : | **Magistrate Judge Deavers** |
| **MIKE DEWINE,** *et al.*, | : | |
| **Defendants.** | : | |
| **and** | : | |
| **GUARDIANS OF HENRY LAHRMANN,** *et al.***; OHIO ASSOCIATION OF COUNTY BOARDS,** | : | |
| | : | |
| **Defendant-Intervenors.** | : | |

---

**JOINT MOTION FOR FINAL APPROVAL OF
PROPOSED CLASS ACTION SETTLEMENT**

---

The Individual Plaintiffs and the Ability Center of Greater Toledo, the State Defendants, and the Ohio Association of County Boards of Developmental Disabilities (hereinafter "the Moving Parties") respectfully move this Court to grant final approval of the proposed class Settlement Agreement, attached as Exhibit A.

Respectfully submitted,

s/Kerstin Sjoberg
Kerstin Sjoberg (0076405)
ksjoberg@disabilityrightsohio.org
Trial Attorney
Kevin J. Truitt (0078092)
ktruitt@disabilityrightsohio.org
Alison McKay (0088153)
amckay@disabilityrightsohio.org
DISABILITY RIGHTS OHIO
200 Civic Center Drive, Suite 300
Columbus, Ohio 43215
Telephone: 614-466-7264
Facsimile: 614-644-1888

*Counsel for Plaintiffs*

Neil R. Ellis
nellis@sidley.com
Kristen A. Knapp
kknapp@sidley.com
SIDLEY AUSTIN LLP
1501 K Street N.W.
Washington, DC 20005
Telephone: 202-736-8075
Facsimile: 202-736-8711

Jonathan W. Muenz
jmuenz@sidley.com
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone: 212-839-5300
Facsimile: 212-839-5599

s/ Larry H. James
Larry H. James (0021773)*
*Trial Attorney
Robert C. Buchbinder (0039623)
Christopher R. Green (0096845)
Crabbe, Brown & James, LLP
500 S Front Street, Suite 1200
Columbus, Ohio 43215
P:      614-229-4567
F:      614-229-4559
E:      ljames@cbjlawyers.com
rbuchbinder@cbjlawyers.com
cgreen@cbjlawyers.com

DAVE YOST
Ohio Attorney General

s/ Zachery P. Keller
ZACHERY P. KELLER (0086930)
Assistant Attorney General Constitutional Offices
Section 30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: 614-466-2872 | Fax: 614-728-7592
Zachery.Keller@OhioAttorneyGeneral.gov

s/ Julie E. Brigner
Julie E. Brigner (0066367)
Assistant Attorney General
Health and Human Services Section
30 E. Broad Street, 26th Floor
Columbus, Ohio 43215
Telephone: (614) 466-1181
Facsimile: (866) 372-7126
julie.brigner@ohioattorneygeneral.gov

*Counsel for State Defendants*

Cathy E. Costanzo
ccostanzo@cpr-ma.org
Kathryn L. Rucker
krucker@cpr-ma.org
Anna M. Krieger
akrieger@cpr-ma.org
CENTER FOR PUBLIC
REPRESENTATION
22 Green Street
Northampton, Massachusetts 01060
Telephone: 413-586-6024
Facsimile: 413-586-5711

Samuel R. Bagenstos
sbagen@gmail.com
625 South State Street
Ann Arbor, Michigan 48109
Telephone: 734-647-7584

*Pro hac vice Counsel for Plaintiffs*

*s/ Franklin J. Hickman*
Franklin J. Hickman (0006105)*
*Trial Attorney
John R. Harrison (0065286)
Linda M. Gorczynski (0070607)
HICKMAN & LOWDER CO., L.P.A.
1300 East Ninth St., Suite 1020
Cleveland, Ohio 44114
P:      216-861-0360
F:      216-861-3113
E:      fhickman@hickman-lowder.com
        jharrison@hickman-lowder.com

*Counsel for OACBDD*

**JOINT MOTION FOR FINAL APPROVAL OF
PROPOSED CLASS ACTION SETTLEMENT**

**TABLE OF CONTENTS**

I.    **INTRODUCTION** ................................................................................. 1

II.   **FACTS** ............................................................................................... 3

   A.  **History of Proceedings**................................................................ 3

   B.  **The Moving Parties' Settlement Agreement** ............................... 3

   C.  **Completion of Moving Parties' Notice Obligations** .................... 5

      1.  **Direct Notice** ..................................................................... 5

      2.  **Indirect Notice** .................................................................. 6

   D.  **Responses to the Court-Approved Notice of Preliminary Approval**............................ 6

III.  **ARGUMENT** ...................................................................................... 7

   A.  **The Proposed Settlement Should be Approved in Light of the Overwhelmingly
Positive Reaction from Class Members and Stakeholder Organizations Representing
Class Members' Interests.** ..................................................................... 10

The Agreement has received support from class members and community advocacy
organizations alike. The Agreement will benefit both current and future class members. No
class member, legal guardian, or family members of a class member opposed the Agreement.

      1.  **Class Representatives and Class Members**.............................. 10

      2.  **Community and advocacy organizations support the Agreement**.......................... 14

   B.  **The Proposed Agreement Serves the Public Interest.** ................................... 18

In evaluating a class action settlement, the Court must evaluate if the proposed settlement
serves the public interest. *Does 1-2 v. Déjà Vu Servs., Inc.*, 925 F.3d 886, 899 (6th Cir. 2019).
As the Sixth Circuit has noted, "the law generally favors and encourages the settlement of
class actions." *Franks v. Kroger Co.*, 649 F.2d 1216, 1224 (6th Cir. 1981) (citations omitted).
In this case, the Agreement serves the public interest. To be sure, in weighing settlement in
this case, the State and County Defendants considered the interests of people with
developmental disabilities both inside and outside the class. In doing so, State and County
Defendants are confident that the Agreement will not harm the interests of people who prefer

the ICF option. The Agreement also serves the public interest because it is fiscally responsible. Going forward with litigation and a likely appeal would be very costly to Ohio and its taxpayers.

1. **The Agreement balances competing preferences in this field, and it spares the Moving Parties the costs and risks of further litigation.** ................................................... 19

2. **Non-class objectors' fears about the Agreement are unfounded.** ........................... 22

   a. **The objectors are not class members who will be bound under the Agreement.** 22

   b. **Objectors rely on the Guardian-Intervenors' talking points, which paint an inaccurate picture of the Agreement.** .............................................................................. 24

3. **The Agreement does not seek to minimize or close ICFs.** ........................................ 24

4. **The State and County Defendants extensively negotiated with the Guardian-Intervenors.** ............................................................................................................................... 27

**C.    The Agreement Effectively Identifies Class Members and Distributes Service Commitments in a Fair and Reasonable Manner.** ................................................................. 28

Recent amendments to the Federal Rules also require the Court to consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C)(ii). The state's options counseling program is a reasonable and equitable method of distributing relief to the class. It connects those individuals who express an affirmative interest in home and community-based services with the specific benefits provided to class members under the Agreement. Comments by Named Plaintiffs and APSI underline the importance of expanded options counseling.

**D.    Guardian-Intervenors' Remaining Arguments Opposing Final Approval Are Wrong as a Matter of Fact and Law.** ................................................................................... 29

Defendants sent direct notice to more than 200 individuals who after receiving options counseling, have expressed interest in, and are awaiting the provision of home and community-based services. Accordingly, and contrary to Guardian-Intervenors' claims, there is a class. Community organizations with experience serving the developmental disability community confirm the Agreement's benefits are needed and will be utilized by both current and prospective class members. Furthermore, court-enforceable settlement agreements may contain remedies and benefits that go beyond what might have otherwise been secured through a litigated final judgment. *See, e.g.*, *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501 (1986). Even if the Moving Parties resolved this case differently than a court judgment might have, this should not stand in the way of the Agreement's approval.

1. **The assertion that there are no current class members is erroneous.** ..................... 29

v

**2.   The Agreement's relief directly benefits class members. ........................................... 31**

**3.   The Moving Parties may choose to settle this case in a different way than a litigated court judgment. ...................................................................................... 32**

**4.   Defendants' actions to ensure timely implementation of agreed-to relief do not moot or otherwise obviate the need for final approval of the Agreement. ..................... 34**

**5.   The agreed-upon fee award is fee and reasonable. .................................................... 35**

**IV.  CONCLUSION .................................................................................................. 37**

## I.      INTRODUCTION

The Moving Parties ask the Court to grant final approval of the proposed class Settlement

Agreement (hereinafter, "the Agreement").  As set forth in detail in the Moving Parties' Motion

for Preliminary Approval, Doc. 408, and discussed further below, the Agreement is a fair,

reasonable, and adequate resolution of the class claims, and satisfies the requirements for final

approval described by the Sixth Circuit, this Court, and the recently-amended Rule 23 of the

Federal Rules of Civil Procedure.

The Agreement has received wide-ranging support from class members and organizations

in the developmental disability field.  The class members who have weighed in, and their legal

guardians, have expressed unanimous support for the Agreement.  Advocacy and Protective

Services, Inc. ("APSI")—Ohio's public guardianship agency, which serves as legal guardian for

some current and future class members—approves of the Agreement as well.  So too do a dozen

community and advocacy organizations in this field, including the Arc of Ohio, People First of

Ohio, and the Ohio Developmental Disabilities Council.

Collectively, the above support highlights the many benefits of the Agreement.  First, the

Agreement's counseling commitments will benefit future class members by providing them with

information that will allow them to make meaningful choices about whether they prefer

community-based service options.  Second, the Agreement's waiver commitments will benefit

class members by ensuring that those who affirmatively choose community-based services have

available slots.  Third, current and future class members will benefit from provisions designed to

facilitate community-based services—including transition training and services, housing support,

follow-along visits, and transformation grants funding the expansion of integrated day and

employment services.  Taken together, as the class commenters recognize, the Agreement's

benefits adequately resolve the class claims.  And they allow everyone to avoid the costs and uncertainty of further litigation of those claims.

The only objections the Court has received come from outside the class: people who prefer Intermediate Care Facilities ("ICFs") for their loved ones.  Among the objectors are the Guardian-Intervenors and a large number of individual guardians following their lead and repeating their message.  These commenters speculate that the Agreement will somehow lead to the reduction and closing of ICFs, causing them to lose their services.  Such concerns, while no doubt sincere, have no factual basis.  The Agreement does not seek to minimize or close ICFs. In fact, in the most recent budget the Ohio Department of Developmental Disabilities ("Department") was able to both honor its commitments under the Agreement and obtain a reimbursement *increase* for ICFs.  Indeed, a main reason why State and County Defendants were willing to accept this deal is because it sets realistic commitments for the expansion of home and community-based services—building on, but comparable to, past practices—that will *not* endanger the ICF option.

The Guardian-Intervenors' legal arguments opposing final approval of the Agreement are without merit.  There are hundreds of class members who have yet to transition into the community.  And the various commitments within the Agreement will directly benefit both current and future class members.  To the extent other individuals in the State system also benefit by the provision of information on service options, that counseling serves the public interest, a factor supporting final approval.  Finally, in settling a case, the parties are free to resolve their dispute in different ways than a litigated judgment might have.

After almost four years of litigation, substantial class and merits discovery, and multiple rounds of arms-length negotiations, the Moving Parties view the proposed Agreement as an

acceptable resolution to this case.  The Agreement will benefit current and future class members, while respecting individuals' choice to enter or remain in an ICF.  For these reasons, the Moving Parties respectfully request this Court approve the proposed Agreement as the final resolution of class claims.

## II.    FACTS

### A.    History of Proceedings

Comprehensive descriptions of the Plaintiffs' Complaint and the State Defendants' Motions to Dismiss, the various motions for intervention, the class certification and merits stages of the case, and past settlement efforts are contained in the Moving Parties' Motion for Preliminary Approval filed on October 18, 2019, Doc. 408,[1] and in Plaintiffs' Motions for Attorneys' Fees and Costs filed on November 15, 2019, Doc. 413, and are not repeated here.

In brief, the Agreement seeks to settle the claims of the certified class.  The certified class consists of people who, after receiving counseling, state that they want community-based services, but who have not yet received such services.  Or. 2, Doc. 332.

### B.    The Moving Parties' Settlement Agreement

The Moving Parties' Agreement is attached to this motion, and is summarized in their Motion for Preliminary Approval and the Court-Approved Notice.  *See* Docs. 408; 408-2.

As stated in the Notice, the Agreement proposes to identify class members who express that they are interested in community-based services using the Defendants' two options counseling programs: options counseling and pre-admission counseling.  Doc. 408-2. Participation in options counseling is voluntary for ICF residents, and the State may exclude individuals who have intervened in this case or who have asked the Department to take them off

---

[1] The Moving Parties filed second and third versions of the Motion for Preliminary Approval on October 11 and 18, 2019, following clarification from the Court.  Docs. 407, 408.  The original Motion for Preliminary Approval was filed on May 10, 2019.  Doc. 396.

the options counseling list.  Doc. 408-1, section III(A)(1).  The Agreement does not require any individual to choose home and community-based services, nor does it penalize them for failing to do so.  Doc. 408-2.  Individuals may still elect to enter, or remain in, an ICF.  *Id.*

The Agreement extends the State's current options counseling to individuals in or on the verge of entering eight-bed ICFs, benefitting hundreds of potential class members who had not previously received this form of counseling.  Doc. 408-1, section III(A)(1), III(B).  The Agreement also confers important benefits on those who will receive a second round of options counseling, since Ohio has added community exploration, family-to-family, and peer-to-peer elements to its counseling process.  *See* Doc. 408-1, section III(A)(4)-(5).

Most importantly, for class members who choose community-based services after receiving options counseling, the Agreement confers a series of additional benefits, designed to increase access to integrated services and supports in the community.  This includes access to 700 new state-funded Individual Options waivers over the first two-year period of the Agreement, and a commitment to seek additional state-funded waivers in the next state budget based on an assessment of unmet need.  Doc. 408-1, section IV(A).  In addition, the Agreement provides additional funding to support class members' access to affordable housing in the community.  Doc. 408-1, section IV(B).

Other  parts of the Agreement simply seek to continue existing state policies.  For example, it continues select financial incentives for ICFs—relating to costs reports and bed counts—that voluntarily choose to convert ICF beds to waiver services.  Doc. 408-1, section IV(A)(4).  Under the Agreement, the Department must also seek $250,000 in transformation grants.  Doc. 408-1, section (IV)(D).  This commitment continues the Department's practice of offering financial

support and technical assistance to providers who want to increase their capacity to offer integrated employment and day services.  *See* Collins Aff. ¶10, Doc. 273-6.

In addition to what the Agreement does do, it is important to note what the Agreement does not do.  The Agreement does not contain any obligations to close or reduce ICFs.  Nor does it require Ohio to reduce IFC funding.  It also does not require Ohio to reduce or close sheltered workshops.  Rather, the Agreement's goal is access and choice:  it seeks to "provid[e] individuals with developmental disabilities with access to integrated home and community[-]based services and with opportunities to make meaningful and informed choice about their service options."  Doc. 408-1.  While increasing waivers under the Agreement during the current budget cycle, the State has also increased ICF reimbursement rates.  *See* Weidner Decl. ¶ 3, attached as Exhibit B.  And the Department does not anticipate a reduction in ICF reimbursement over the next budget cycle.  *See* Weidner Decl. ¶ 7.

### C.    Completion of Moving Parties' Notice Obligations

In their Motion for Preliminary Approval, the Moving Parties outlined a notice process, which the Court approved.  *See* Or., Doc. 409.  Complying with that process, the Moving Parties timely informed the class and public of the proposed Agreement through both direct and indirect methods.

#### 1.    Direct Notice

Shortly after preliminary approval, the Department mailed notices to class members (and their legal guardians, when applicable).  McKinney Decl. ¶ 3, attached as Exhibit C.  Specifically, the Department mailed notices to the 211 individuals who, as of the approval date, had requested exit or diversion waivers but who have not yet been enrolled on waivers.  McKinney Decl. ¶ 3. Thirteen of those notices were returned as undeliverable.  McKinney Decl. ¶ 4.  Eleven of the undeliverable notices were attributable to address errors, which the

Department promptly corrected.  McKinney Decl. ¶ 4.  One of the undeliverable notices involved

an individual—who was under guardianship—who had already received notice through a

separate mailing.  McKinney Decl. ¶ 4.  The Department also emailed notice to Advocacy &

Protective Services, Inc. ("APSI"), which serves as guardian for a number of class members.

McKinney Decl. ¶ 5; Doc. 434, letter from Kristen Henry, executive director of APSI.

### 2.    Indirect Notice

Both the Department and Disability Rights Ohio ("DRO") posted the notice on their

respective websites.  DRO circulated the notice to its Constant Contact email list, containing

roughly 2,400 people.  *See* Truitt Decl. ¶ 4, attached as Exhibit D.   The Court-approved Notice

included DRO's phone number as a resource for individuals who may have questions about the

Agreement or the Notice itself.  Only one such inquiry was received. Truitt Decl. ¶ 6.

Additionally, the Department provided the notice to the Superintendents of all 88 County

Boards of Developmental Disabilities.  McKinney Decl. ¶ 6.  The Department asked each

County Board to post the notice in conspicuous areas.  McKinney Decl. ¶ 6.  The Department

also distributed notices to all ICFs with eight or more beds.  McKinney Decl. ¶ 8.  As with the

County Boards, the Department asked these ICFs to post the notice in conspicuous areas.

McKinney Decl. ¶ 8.

As instructed, the Moving Parties met their notice obligations within one week of the

Court's October 18, 2019 Order.

### D.    Responses to the Court-Approved Notice of Preliminary Approval

Notice of the Moving Parties' Agreement generated extensive comments from a range of

stakeholders.  The Court received letters from class members and their legal guardians, from

community organizations that include, and advocate on behalf of, individual class members and

their legal guardians, and from advocacy groups who represent and support the rights of people

with developmental disabilities to be offered integrated, community-based services. These individuals and organizations unanimously support the Agreement, and urge this Court to approve it as a fair and adequate resolution of class claims. Many of these supporters specifically acknowledged the Agreement's respect for individual choice, and the ability for non-class members to decline offers of community alternatives if they preferred to enter, or remain in, an ICF.

The Court also received over 200 objections from non-class members, who prefer ICFs as a service option for their loved ones.[2] Based on the content and format of these objections, it seems that most people received an email from the Guardian-Intervenors (which they sent through an advocacy group they control, Disability Advocacy Alliance) urging them to object to the Agreement and providing specific reasons for doing so. *See* Disability Advocacy Alliance Email, available at https://bit.ly/2rl5mxB (hereinafter "DAA Email"), attached as Exhibit E. Relying on the email, these objectors express an understandable, but unfounded, fear about losing the ICF services they prefer.

Finally, the Court received a brief in opposition to the Agreement from Guardian-Intervenors, Doc. 437, and a Motion for Leave to file an amicus brief in opposition to the Agreement, submitted by VOR. Doc. 436.

## III.   ARGUMENT

As discussed in the Moving Parties' Motion for Preliminary Approval, Doc. 408, district courts in the Sixth Circuit must follow three procedural steps before approving a proposed class settlement: (1) the Court must preliminarily approve the proposed settlement; (2) the parties must provide notice of the proposed settlement to the class members; and (3) the Court must hold a

---

[2] In many instances, several individuals filed letters on behalf of the same family member, and multiple objections used the DAA form letter but contained no individual content. Individual intervenors, or their supporters, filed 63 letters.

fairness hearing. *Tennessee Ass'n of Health Maint. Organizations v. Grier*, 262 F.3d 559, 565-66 (6th Cir. 2001) (citing *Williams v. Vukovich*, 720 F.2d 909, 920-21 (6th Cir. 1983)). The Court has already granted preliminary approval to the Agreement, and the parties provided notice to class members as the Court instructed; the Court has also scheduled a fairness hearing for December 17, 2019. *See supra* at II-C; Doc. 409.

With these procedural requirements satisfied, the remaining issue before the Court is whether the Agreement meets the substantive requirements for final approval. Specifically, before granting approval of a class action settlement, a district court must find that it is "'fair, reasonable, and adequate.'" *Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007) (quoting the former Fed. R. Civ. P. 23(e)(1)(c), now Fed. R. Civ. P. 23(e)(2)). Traditionally, district courts in the Sixth Circuit look to the following seven factors in evaluating a proposed class settlement: (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel; (6) the reaction of class members; and (7) the public interest. *See, e.g.*, *In re Packaged Ice Antitrust Litig.*, No. 17-2137, 2018 WL 4520931, at *6 (6th Cir. May 24, 2018) (citing *Gen. Motors Corp.*, 497 F.3d at 631). Following the December 2018 amendments to Federal Rule of Civil Procedure 23(e), district courts nationwide are now required to also consider whether:

> (A)    the class representatives and class counsel have adequately represented the class;
> (B)    the proposal was negotiated at arm's length;
> (C)    the relief provided for the class is adequate, taking into account:
> > (i)    the costs, risks, and delay of trial and appeal;
> > (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii)    the terms of any proposed award of attorney's fees, including timing of payment; and

(iv)    Any agreement required to be identified under Rule 23(e)(3); and

(D)    the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

The Court has already made a preliminary determination that the Agreement is "fair, reasonable, and adequate." For the reasons set forth in the Motion for Preliminary Approval, Doc. 408, the Agreement is a fair, reasonable, and adequate result and should be granted final approval. As explained in the Motion, the class representatives and class counsel have adequately represented the class, *id.* at 12-13, there is no risk of fraud or collusion because the parties reached the settlement after extensive arms-length negotiations, *id.* at 13-14, the costs and risks of pursuing a litigated outcome weigh in favor of approving the proposed settlement, *id.* at 14-16, and the settlement treats the class members equitably vis-à-vis one another, *id.* at 16. The Moving Parties incorporate in full their Motion for Preliminary Approval. Doc. 408.

At this point, no serious dispute exists as to many of the class-settlement factors. For example, given the adversarial history of this case and the length of negotiations, no reasonable basis exists to conclude that the Moving Parties colluded in reaching an agreement. This brief, therefore, focuses on previously unaddressed factors of settlement approval, which should remove any doubt as to final approval. *First*, through the commitments outlined above, this Agreement directly benefits current and future class members. The uniform support of past and current class members, as well as support from many stakeholder organizations in this area, confirm these benefits. *Second*, the brief explains why the Agreement serves the public interest and, in particular, why the ICF objectors' fears are unfounded. *Third*, the Agreement effectively

identifies class members and distributes relief in a fair and reasonable manner.  *Fourth*, the brief

responds to the legal arguments of Guardian-Intervenors and VOR, which lack merit.

> **A.     The Proposed Settlement Should be Approved in Light of the Overwhelmingly Positive Reaction from Class Members and Stakeholder Organizations Representing Class Members' Interests.**

As evidenced by the recent experiences of class representatives and exemplars, current

and future class members will benefit in remarkable ways from information about their service

options and the ability to access integrated, community-based services.  Despite a preference for

community living, and a desire to learn more about alternatives to ICF care, the Named Plaintiffs

and class members describe having little or no access to, or information about, available home

and community-based services prior to the litigation.  Now, having transitioned from ICFs into

their own homes in the community, they are experiencing firsthand the benefits of integration

and greater independence and autonomy.  They overwhelmingly support approval of the

Agreement so that current and future class members who want community services can benefit in

similar ways.  Numerous disability community and advocacy organizations also support the

Agreement because it will promote informed choice, identify class members, and provide those

class members with opportunities to live and receive services in integrated community settings.

> **1.     Class Representatives and Class Members**

The experiences described by the Named Plaintiffs illustrate how the provisions in the

Agreement will benefit class members.  Antonio Butler lived in an eight-bed ICF for years,

where he felt unhappy and limited.  *See* Butler Decl. ¶¶ 1-2, attached as Exhibit F.  He describes

having no access to community services, but after being provided an exit waiver, he was able to

access home and community-based services and now lives in his own home. Butler Decl. at ¶¶2-

6.  He now describes having more freedom and more opportunities to work and to be active in

his community. Butler Decl. at ¶¶6-7. Linda Walters is the guardian and sister of Richard

Walters, who had lived in an ICF since 2012. Walters Decl. ¶¶ 1-2, attached as Exhibit G. Despite her desire for her brother to remain in the community, Mr. Walters entered the ICF at that time because, she said, community services were unavailable. Walters Decl. at ¶2. Thus, his sister believes information about community services options, and the ability to access those services, is very important. Walters Decl. at ¶6. Mr. Walters is now enrolled in an exit waiver and living in his own apartment. Walters Decl. at ¶7. His sister relays that "[h]e's in a better situation now" and "has a more normal way of living." Walters Decl. at ¶¶7, 10. She says that he has more control over his life and can participate in more chosen community activities, and he has developed new friendships. Walters Decl. at ¶¶6-10.

Cathy Mason Jordan is the sister and guardian of Caryl Mason, who lived for years in an eight-bed ICF. Jordan Decl. ¶¶ 1-2, attached as Exhibit H. Prior to the lawsuit, Ms. Mason Jordan had not known of community-based services. Jordan Decl. at ¶4. Since the lawsuit was filed, her sister was enrolled in an exit waiver and now lives in her own home. Jordan Decl. at ¶6. Her sister says that Caryl is much happier, healthier, and safer in her own home; has more independence and autonomy; and has increased opportunities for community interactions and activities. Jordan Decl. at ¶¶6-7.

Several other class members who have transitioned from ICFs during this litigation tell of comparable experiences. They describe similar improvements in their quality of life, increased integration in their communities, and greater independence and autonomy. As Chuck Junior recounts, he had been living in an ICF for fifteen years and desperately wanted to live independently and be more active in his community. Doc. 283-13. After enrolling in an exit waiver, he was able to move into his own home this year. Doc. 446 at 2. He says he is happier

11

being integrated in his community and has more independence and autonomy and fuller experiences. *Id.* He sees his family more often and has more privacy. *Id.*

ICF resident Pat Callahan (another class member earlier in this case) wanted to live in the community. Doc. 283-14. As she describes, she received no help accessing the services she would need to live successfully outside of an ICF. *Id.* But after enrollment in an exit waiver, she now lives in a home she loves, with a "big yard with a lot [of] flowers." Doc. 433 at 1. She says it is quieter and she has her own bedroom, and she enjoys more independence and privacy. *Id.*

Taken together, these comments reflect Named Plaintiffs' and class members' commitment to obtaining the relief provided by the Agreement, thereby ensuring that other current and future class members have the same opportunities to access integrated, community-based services.[3]

The Agreement has also received support from APSI. This publicly-appointed agency serves as legal guardian for approximately 50 current class members, around 800 people who currently reside in ICFs, and over 300 recent class members who in recent years have requested exit waivers and transitioned from ICFs to community settings. Doc. 434. Kristen Henry, APSI's Executive Director, describes this experience as "life-changing for many . . . who have desired for years to live in more integrated settings in their communities." *Id.* at 1.

APSI supports the Agreement's proposed increase in waiver funding so that community-based waiver services are available to the individuals they represent now and in the future. As Ms. Henry notes, their clients' needs or preferences can change over time, making community-

---

[3] *See* Butler Decl. ¶ 9, attached as Exhibit F ("I think people should have the option of moving into homes if they want. And they should be able to work and make money if they want."); Walters Decl. ¶¶ 4, 7, attached as Exhibit G (supporting increased waiver funding so people in ICFs can choose to live in a community setting and information about these service options so people can make an informed choice Jordan Decl. ¶¶ 8-9, attached as Exhibit H (advocating for improved and expanded counseling programs so people can understand their service options and increased funding for community-based services). *See also* letters from Chuck Junior, Doc. 446 at 2, and Pat Callahan, Doc. 433 at 1, both of whom want others in ICFs to have opportunities to live in their own homes in the community if they choose.

based services more appropriate in the future.  *Id.*  Ms. Henry also stressed the importance of an expansion of options counseling programs, enhanced materials, and exploratory community visits to enable people to make informed choices regarding their service options.  *Id.* at 2.  Based on APSI's experience, exploratory community visits "help us and our clients make informed decisions about the best option for each individual."  *Id.*

Other class members also expressed support for the Agreement.  *See* Doc. 438 at 17, (letter from Veronica B. Fox, parent of an adult who spent several difficult years in multiple ICFs, the only option for him at the time, and who was recently approved for an exit waiver); Doc. 438 at 49 (letter from Vickie M. Primes, parent of an adult who has resided in an ICF for over ten years wants him to live closer to home and believes the service system needs more funding for waivers, other integrated services, and housing); Doc. 442 at 7(letter from Selena Mobley, sister of an adult who lives in an ICF, which is not an appropriate place for her, and who has been allocated an exit waiver to move into the community with more independence and freedom); *see also* Exhibit I (letter of support from Judith L. Hug, writing on behalf of an adult for whom she is legal guardian and who is transitioning from an eight-bed ICF to the community and is very excited about the prospect of living independently)[4]; Doc. 440  at 12-15(letter from Tammi Hanson, parent of an adult who is transitioning for an eight-bed ICF to a smaller residential setting in the community supports many of the terms of the Agreement, including those involving integrated employment and day services and options counseling, and makes several suggestions for how data collection and options counseling could be improved).

Another guardian expressed support for the Agreement because it provided the opportunity to learn about and access services when desired, even if she was not yet ready to

---

[4] For unknown reasons, only the first page of Ms. Hug's letter was filed with the Court on November 26, 2019. Doc. 429 at 17.  The Moving Parties request that the entirety of her two-page letter (attached here as an exhibit) be considered by the Court.

avail herself of these options.  Doc. 433 at 2(letter from Susan Davis, guardian of adult in ICF supports the Agreement so that people can learn about options and have access to needed services in the community, though the adult is not yet ready to transition to the community).

Significantly, no class member or legal guardian or family member of a class member opposed the Agreement.

### 2.    Community and advocacy organizations support the Agreement

The support received from community and advocacy organizations is also compelling. The Coalition for Community Living – Ohio ("CCL- Ohio"), a parent-led organization, believes the present lawsuit has moved the system in the right direction, and the Agreement continues that progress.  Doc. 411.  Its members also celebrate that their family members, "many of whom have complex medical needs," are able to live with them at home because of the availability of waiver programs, which enables them to afford their loved ones "enriched life experiences that far exceed those living segregated from the community at large."  *Id.* at 1-2.  They suggest that, without "the same funding and services outlined in the [Agreement], the majority of us would have had no option but to put our family member in an institution or facility."  *Id.* at 2.

The Ohio Association of Centers for Independent Living represents the twelve centers for independent living across Ohio, which are designed and operated within local communities by people with disabilities and provide an array of independent living services.  Doc. 412.  They fully support the terms of the Agreement.  *Id.* at ¶13.  Among the Association's constituents with intellectual and developmental disabilities and their families, there is a real need for community-based services, information about these service options, and safe, accessible, and affordable housing.  *Id.* at 11-12.

Tim Harrington, executive director of the Ability Center of Greater Toledo, the organizational plaintiff in this litigation, supports the Agreement because of the needs and

preferences of its constituents with intellectual and developmental disabilities and their families, many of whom, in his view, must consider ICFs as an option for services because of a lack of community services.  *See* Harrington Decl. ¶ 10, attached as Exhibit J.  The Agreement, according to Mr. Harrington, will do much to improve the availability of community-based services in Ohio.  Other centers for independent living submitted separate letters of support for the Agreement.[5]

The Ohio Olmstead Task Force is a statewide grassroots coalition of Ohioans with disabilities of all ages, family members, advocates, and organizations advocating for the right to live, work, and participate in their communities.  Doc. 421.  Its submission explains that, "[i]n the past, many with [intellectual and developmental disabilities] were not even given the information or resources to be able to make informed choices about living in the community, [and] therefore languished needlessly in ICFs and other institutions."  *Id.* at 1.  In the Task Force's view, despite victories in the movement for integration, a struggle remains to provide individuals with meaningful information about, and ready access to, integrated community options in Ohio.  *Id.* at 1-2.  For this reason, the Task Force supports approval of the Agreement and specifically the provisions that enable class members to understand, choose, and access community-based services.  *Id.* at 2.

The Arc of Ohio, the state's oldest and largest advocacy organization representing individuals with intellectual and developmental disabilities and their families, supports the Agreement.  The Arc of Ohio filed an amicus brief during the class certification stage, explaining

---

[5] *See* Doc. 410 (letter from Rob Festenstein, executive director of the Center for Independent Living Options, Inc., which empowers people with disabilities in the greater Cincinnati community to live inclusive lives and which "wholeheartedly" supports the Agreement);*see also* Doc. 446 (The letter of support from Jeremy Caffee, executive director of the Access Center for Independent Living, a center for independent living serving the greater Miami Valley area in southwest Ohio.  He explains that increases in funding for community services and information about these options is vital.  His constituents should have a choice in living independently in the community or living in a facility, and the Access Center supports the Agreement as written.)

"[t]he need to maximize the availability of these community-based services for the benefit of people with [intellectual and developmental disabilities]."  Doc. 289 at 6.

People First of Ohio and its local chapters, whose members have intellectual and developmental disabilities and who advocate for rights and choices, support the Agreement. Doc. 421 at 5.  Its members support "the goal to expand options counseling and pre-admission counseling programs, as well as expanding access to state-funded waivers" and expansion of funding for housing.  *Id.*  The Ohio Self-Determination Association is also an organization comprised of people with intellectual and developmental disabilities.  Doc. 421 at 8-9.  They support the Agreement, particularly commitments relating to informing people about their options for community-based services (including expansion of options counseling to people in eight-bed ICFs and maintaining peer-to-peer and family-to-family programs).  *Id.*  They support further investment in community waiver services, integrated employment and day services, and housing.

The Ohio Developmental Disabilities Council, created by the federal Developmental Disabilities Assistance and Bill of Rights Act of 2000, supports the Agreement.  It confirms that the Agreement's terms reinforce principles of self-determination, independence, productivity, integration, and inclusion.  Doc. 421 at 6-7.  The Council supports the additional investments in community services, integrated day and employment services, and affordable housing.  *Id.* at 6. The Agreement, in their view, supports the issues of choice for families since the purpose is to ensure people have information about their options and does not require anyone to choose to live in the community.  *Id.* at 6-7.

The University of Cincinnati Center for Excellence in Developmental Disabilities expressed support for expanded and enhanced options counseling programs and continued peer-

to-peer and family-to-family programs, since it feels that many people "do not have enough

information about community supports," and "may be unaware of the limiting aspects of living

in a facility."  Doc. 415 at 1.  The Center also supports the funding commitments for community-

based services, community housing, and integrated day and employment services.  *Id.*

Regarding attorneys' fees and costs in the Agreement, the Center states that Disability Rights

Ohio:

> [P]rovides much-needed protection of the civil rights of Ohioans with disabilities.
> The impact their services make is felt widely across the state. The provision of
> attorneys' fees would allow the time and capacity required for this substantial
> case to be recouped for the betterment of future work to support Ohioans with
> disabilities.

*Id.* at 2.

Ohio TASH, a disability advocacy organization committed to equity, opportunity, and

inclusion, in supporting the Agreement, emphasizes that the expansion of options counseling and

continuation of peer-to-peer and family-to-family programs in the Agreement are essential "to

educate [people in ICFs] that they need not remain in an institution."  Doc. 446 at 3.  In this

organization's words, the Agreement's terms are especially important since people in institutions

"tend to be socialized into a kind of resignation, adopting a diminished view of themselves and

where they belong."  *Id.*  But "[o]ver time, and with support, people overwhelmingly expand

their expectations to embrace integrated opportunities."  *Id.* at 2.  In helping people realize their

options, the Agreement provides "a path for the extensive planning, exposure, and connections

that people need."  *Id.*  And as people increasingly choose community-based services, the

Agreement strengthens investments in these service options.  *Id.*

Finally, Self-Advocates Becoming Empowered, a national self-advocacy organization, supports the Agreement to ensure that there are options for people with intellectual and developmental disabilities to live and receive services in the community. Doc. 446 at 5.

### B. The Proposed Agreement Serves the Public Interest.

When reviewing a class settlement, the Court also considers whether the settlement serves the public interest. *Does 1-2 v. Déjà Vu Servs., Inc.*, 925 F.3d 886, 899 (6th Cir. 2019). Settlements of complicated cases typically meet this factor because "there is a strong public interest in encouraging settlement of complex litigation and class action suits because they are notoriously difficult and unpredictable and settlement conserves judicial resources." *Id.* (quotations omitted). The public also has a similar interest "in ending . . . long and protracted litigation." *Blasi v. United Debt Servs., LLC*, No. 2:14-CV-83, 2019 WL 6050963, at *7 (S.D. Ohio Nov. 15, 2019) (quotations omitted). And the public interest in a settlement further grows when a government defendant faces the prospect of liability—liability that taxpayers would ultimately have to bear. *Lessard v. City of Allen Park*, 372 F. Supp. 2d 1007, 1013 (E.D. Mich. 2005). All said, settlements spare the parties, the court, and taxpayers the considerable burdens of litigation. *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976).

In assessing the public interest, courts should generally defer to the judgment of state officials who were involved in the settlement. *See, e.g.*, *Thompson v. Midwest Found. Indep. Physicians Ass'n*, 124 F.R.D. 154, 160 (S.D. Ohio 1988); *Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173, 1178 (9th Cir. 1977); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 525 (E.D. Mich. 2003); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 380 (D.D.C. 2002); *Guardians Ass'n of New York City Police Dep't v. Civil Service Comm'n of City of New York*, 527 F. Supp. 751, 757 (S.D.N.Y. 1981); *California v. eBay, Inc.*, 5:12-CV-05874, 2015 U.S. Dist. LEXIS 118060, at *15-16 (N.D. Cal. Sept. 3, 2015). Such deference makes sense. As

elected and appointed representatives, state officials are often in the best position to weigh the competing interests at stake and decide whether a settlement advances the public good.  Along similar lines, since a class settlement "is basically a bargained for exchange between the litigants," courts "should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel."  *Robinson v. Shelby Cty. Bd. of Educ.*, 566 F.3d 642, 649 (6th Cir. 2009) (quoting *Armstrong v. Bd. of Sch. Directors of City of Milwaukee*, 616 F.2d 305 (7th Cir. 1980)) .

The Court may, of course, consider how a settlement benefits the public at large.  This Court has noted, for example, that a settlement benefits the public if it facilitates services to the community.  *Thompson*, 124 F.R.D. at 161.  Sometimes a settlement will afford relief in the form of "systemic" commitments.  *Robinson v. Ford Motor Co.*, No. 1:04-CV-00844, 2005 U.S. Dist. LEXIS 11673, at *18 (S.D. Ohio June 15, 2005).  If such relief benefits "not only" class members but others as well, all the better.  *Id.*

Here, the Agreement serves the public interest by assisting people who prefer waivers *without* endangering services for people who prefer ICFs.  The Moving Parties certainly appreciate the concerns of non-class objectors who prefer ICFs, but those concerns are unfounded.

          **1.**      **The Agreement balances competing preferences in this field, and it spares the Moving Parties the costs and risks of further litigation.**

In negotiating the Agreement, the Moving Parties accounted for competing interests and preferences in this complex area.  To be sure, since class members are those who prefer waivers, the Agreement's terms focus on learning such preferences and facilitating waiver services for current and future class members.

But that does not mean that the Agreement ignores or harms people who prefer ICFs. In negotiating and approving the Agreement, the State and County Defendants considered not just the class's preferences, but also the preferences of people outside the class. Recall how this case unfolded: during class litigation, Defendants advocated for a service system that promotes waiver services but *maintains* ICFs as an alternative option. *See, e.g.*, Defs.' Br. In Opp'n Class Cert. 4, Doc. 273 (emphasizing that "[Ohio] has greatly expanded [waiver] services, while still preserving ICFs for people who prefer them"); *id.* at 49 (expressing concern that broad relief in this case "would likely harm many people who live, and prefer to stay, in ICF settings"); Defs.' Supp. Br. 1, Doc. 291 (expressing concern that overbroad relief might "force[] Ohio to shift resources away from other areas—such as ICFs"). The reason the Moving Parties were ultimately able to reach the Agreement is because it sets specific, realistic benchmarks that do not endanger other service options.

The evidence bears this out. To begin, nothing in the Agreement requires either privately-run or state-run ICFs to close or reduce beds. Second, the decision to actively participate in options counseling is entirely voluntary for ICF residents. And the Agreement states that the Department may exclude the following people from options counseling: "[i]ndividuals who, either on their own or through their guardian, have intervened [in this litigation]" and "[i]ndividuals who, either on their own or through their guardian, have affirmatively asked [the Department] to take them off the list for Options Counseling." Doc. 408-1 (III)(A)(1)(a), (b). In light of the Agreement, the Department sought and obtained sufficient funding to allocate 700 new individual-options waivers for the current state budget. Weidner Decl. ¶ 6. If those waivers slots are sufficient to meet demand, then that will naturally

reduce or eliminate any "unmet need" under the Agreement for the next state budget—and will thus reduce the Department's obligation. *See* Doc. 408-1 (IV)(A)(1), (2).

In any event, the funding for the additional waivers in the current budget did *not* reduce ICF funding. *See* Weidner Decl. ¶ 5 ("The proposed settlement with the plaintiffs has no impact on the [ICF] reimbursement system, which is governed by statute."). Rather, within the same budget requests, the Department successfully, and significantly, *increased* the ICF reimbursement rate. Weidner Decl. ¶ 3. And going forward, the Department does not anticipate that the Agreement will cause a reduction in ICF funding in the next budget cycle (the last budget cycle to which the Agreement applies). Weidner Decl. ¶ 7. As added proof of Ohio's continued ICF commitment, the General Assembly recently amended the Revised Code to confirm that County Boards must inform people who request residential services about the ICF option. *See* Ohio Rev. Code §5126.047. The bottom line is that, even with Defendants already meeting commitments under the Agreement, ICFs have remained a valued service option in Ohio. For those who choose that ICF option, open ICF beds—over 300 across Ohio—remain available. McKinney Decl. ¶ 9.

By settling, the Moving Parties also spare themselves the significant costs and uncertainty of further litigation. When the Moving Parties reached an agreement in early 2019, much work remained in this case. Fact depositions, expert discovery, dispositive motions, and a potential trial still loomed. *See* Or., Doc. 374. Furthermore, given the significant issues at stake, the losing side was likely to appeal. The costs of these tasks would have undoubtedly added up. The State and County Defendants, moreover, had to weigh potential costs of liability, including costs associated with any relief granted and costs of any fee shifting. Settling allows both sides to save costs with a definite outcome. It also prevents taxpayers from bearing additional costs.

Thus, the money associated with the Agreement—including attorneys' fees to Plaintiffs' counsel—must be measured against these savings and the uncertainty of pressing on.

### 2. Non-class objectors' fears about the Agreement are unfounded.

As discussed above, the Court has received many objections from people who prefer ICFs for their loved ones and fear that the Agreement will somehow eliminate that option. These objectors should take comfort because their fears are unwarranted. The Agreement does not force anyone to leave their homes. Nor does it cause Ohio to underfund ICFs.

The source of the objectors' confusion is readily apparent. As the Court is aware, last month the Guardian-Intervenors—through an advocacy group they control—sent out an email blast about the proposed Agreement. *See* DAA Email, attached as Exhibit E. The email did not contain the Court-approved Notice, and it made little attempt to be neutral. It instead told people that they might "los[e] their ICF homes," and that "[i]f you care about maintaining ICF services in Ohio, you should act." *Id.* (emphasis omitted). Regrettably, such tactics succeeded in alarming many people without good reason.

For present purposes, two points stand out—one legal, one practical. First, as a legal matter, these objectors are not members of the class. Thus, in considering their opposition to class settlement, the Court should remember that the Agreement does not actually bind them. Second, and of more real-world importance, the Agreement is *not* going to force people out of ICFs. Objectors are repeating the Guardian-Intervenors' talking points, talking points that are full of incomplete, inaccurate, and uninformed statements.

### a. The objectors are not class members who will be bound under the Agreement.

The Federal Rules establish procedures for class members—that is, those "who would be bound" by a proposal—to receive notice of, and have the chance to object to, class settlements.

22

Fed. R. Civ. P. 23(e). The rights of people outside the class, who will not be bound, are more limited. *See, e.g.*, *Tenn. Ass'n of Health Maint. Organizations, Inc. v. Grier*, 262 F.3d 559, 566 (6th Cir. 2001); *In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*, No. 1:08-WP-65000, 2016 U.S. Dist. LEXIS 130467, at *39-40 (N.D. Ohio Sept. 23, 2016). On a related front, any objector or intervenor does not automatically have standing to appeal approval of a class settlement. *Cf. In re Packaged Ice Antitrust Litig.*, 17-2137, 2018 WL 4520931, at *5 (6th Cir. May 24, 2018).

Here, objections come from non-class members. This is not to say that the Court should disregard these people's positions. But the objectors' non-member status does influence the nature of the Court's review. Most of the relevant settlement-approval factors deal with the interaction between the settling litigants and how the settlement will affect the class. *See Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. V. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007). For instance, how non-class members feel about a settlement tells the Court nothing about "the reaction of absent class members." *Id.* at 631. As one court in this Circuit has described, approving a class settlement "is not a popularity contest," and the objections of non-class members "cannot be used to measure class opposition." *Berry v. Sch. Dist. of City of Benton Harbor*, 184 F.R.D. 93, 105 (W.D. Mich. 1998). And as mentioned above, no class members here opposed the Agreement.

At most, the opposition of these non-class members bears on whether the Agreement is in the public interest. Even then, however, the Court should proceed cautiously. Ohio serves over 45,000 people with developmental disabilities. Unsurprisingly, people in this broad universe sometimes feel differently about how funding should be spread. In this case, for example, Ohio has been sued by two different groups with two polar opposite theories of the system's alleged

shortcomings. Given this setting, the State and County Defendants—who must account for people's competing interests—are in the best position to decide what waiver increases Ohio's system can accommodate without harming ICFs. This is why these Defendants' judgments deserve deference.

### b. Objectors rely on the Guardian-Intervenors' talking points, which paint an inaccurate picture of the Agreement.

Through their email last month, the Guardian-Intervenors not only recruited others to object, but they also supplied a script. For example, while purporting to leave "what to say" up to the objectors, the email provided an explicit list of "some other points you may consider including." *See* DAA Email, attached as Exhibit E. The strategy worked. Most objectors echo Guardian-Intervenors' comments, including, most troubling, the false idea that people are going to lose their homes because of the Agreement. *E.g.*, Doc. 423 at 3 ("My sister loves her ICF home and doesn't deserve to have her home taken away."); Doc. 424 at 2 (requesting that a loved one "be allowed to stay at her current residence"); Doc. 430 at 10 (explaining that a family member "would be very upset if she was forced to leave her home that she loves"). Many objectors simply copied Guardian-Intervenors' messaging verbatim or attached the email. *E.g.*, Doc. 422 at 7; Doc. 423 at 4, 6-7; Doc. 424 at 14, 17; Doc. 427 at 2; Doc. 431 at 2, 4, 17; Doc. 438 at 8-9, 15, 43; Doc. 442 at 45-46; Doc. 443 at 2, 4, 6.

The problem is that bad input leads to bad output. The Guardian-Intervenors' themes, which objectors are repeating, are wrong on their face and disregard the plain language of the Agreement.

### 3. The Agreement does not seek to minimize or close ICFs.

The primary theme of the Guardian-Intervenors' email is that the costs of the Agreement will rob ICFs of funding. Not so. As explained above, the reason why State and County

Defendants agreed to settle is because the Agreement sets realistic commitments that Ohio can achieve without harming the ICF option.

Context is critical here: the price tag of the Agreement cannot be viewed in a vacuum. In isolation, the state and federal costs of added waivers seem high.[6] But the waiver increases the Agreement envisions are consistent with what Ohio has done in previous budgets. Weidner Decl. ¶ 6. With those previous budgets' waiver increases, Ohio has simultaneously supported its ICF programming. *See* Weidner Decl. ¶ 9 (discussing ICF spending in the 2019 fiscal year). Indeed, although waivers are increasing, ICF rates are increasing too. Weidner Decl. ¶ 3.

Viewing the bigger picture in Ohio supplies more context. In the most recent fiscal year, Ohioans received over $2.7 billion in developmental disability services. Weidner Decl. ¶ 9. That included over $518 million toward private ICFs. Weidner Decl. ¶ 9; *see also* Weidner Aff. ¶¶ 7-8, Doc. 273-4 (reflecting that the costs of ICFs and exit waivers are similar). Thus, it is no surprise that some objectors note that Ohio's ICF practices compare positively to other States. *See* Doc. 427 at 11-12; Doc. 430 at 3; Doc. 438 at 34.

The Guardian-Intervenors' email also exaggerates the conversion incentives within the Agreement. *See* DAA Email (suggesting that "incentives to convert ICF beds" in the Agreement will cause ICF residents to involuntarily "lose their homes"). And again, objectors' comments echo that notion. *E.g.*, Doc. 422 at 3; Doc. 424 at 14; Doc. 426 at 8; *cf. also* Doc. 438 at 12. In actuality, the Agreement has *a single* provision that references the Department "continu[ing]" select "current incentives" for the conversion of ICF beds until the end of FY 2021. Doc. 408

---

[6] Guardians' email is inaccurate as to waiver costs. It suggests, for example, that the Settlement will "cost the State about $100 million annually in perpetuity." DAA Email; *see also id.* (suggesting that the State is "spending an additional $100 million on exit-diversion waivers" alone). This statement is inaccurate, especially as to Ohio's cost. The email's $100 million descriptions *overestimate* the waiver cost, which is roughly $70 million total and about $26 million for Ohio's share. Weidner Decl. ¶ 8.

(IV)(A)(4).  As this phrasing suggests, the referenced incentives were *already in place* before the Agreement (and prior to the litigation, too).  The "incentives" relate to how ICFs report costs and count beds for regulatory purposes.  *See* Ohio Rev. Code §§5124.101, 5168.61.[7]  The point of both incentives is to make sure Ohio's regulation of ICFs promptly and accurately accounts for changes.  Put differently, these incentives are not coercive, ICFs providers can elect whether to participate.  And, based on its past experiences, State Defendants have no reason to think that these technical incentives will lead to the drastic consequences objectors fear.

Along similar lines, the Agreement's transformation grants will not phase out sheltered workshops or day services.  *See* Doc. 408-1 (IV)(D).  These commitments continue Ohio's past practices.  *See* Collins Aff. ¶10, Doc. 273-6.   They do not require people to leave their preferred day programs.

As the above facts show, nobody is robbing Peter to pay Paul: if anything, Peter is getting a raise.  *See* Weidner Decl.  ¶ 3.  No service system is perfect.  Undoubtedly, some people would prefer additional funding for their particular needs, while others would prefer that Ohio distribute funding in an entirely different way.  The State Defendants' decisions on allocation of agency resources, and Ohio's legislative and budgetary process, should be entitled to deference here, especially absent any concrete evidence that implementation of the Agreement will harm the public interest, or non-class members in particular.  But the idea that Ohio fails to fund ICFs, or that this Agreement will result in that outcome, simply lacks credibility.

---

[7]  The Agreement references Revised Code §5168.64, which is where the bed-count incentive was located at the time the Agreement was drafted.  The formula in Revised Code §5168.61 now ensures that ICF franchise fees are assessed on a per occupied bed, per day basis.

**4.** **The State and County Defendants extensively negotiated with the Guardian-Intervenors.**

The Guardian-Intervenors' email implies to the reader that the Moving Parties were unwilling to negotiate with Guardians. *See* DAA Email, attached as Exhibit E ("The ICF families were excluded from DRO's settlement negotiations."). Some objectors picked up on this, voicing concerns that Guardian-Intervenors were left out of the process. *See, e.g.*, Doc. 424 at 5; Doc. 426 at 1-2; Doc. 439 at 6, 8, 19. But the email omits significant details. From early this year until a few weeks ago, the State and County Defendants had been engaged in continued negotiations with the Guardian-Intervenors.[8] (The Court is obviously aware of this, as it helped facilitate negotiations). Unfortunately, the chance of a final settlement recently ended. *See* Or. 1, Doc. 417 (noting the Court's finding "that the Guardians breached the settlement agreement between the Guardians and the Defendants").

But along the way in this case, Guardian-Intervenors have still been able to offer commentary to the State Defendants about their materials. For example, like Plaintiffs, *see* Doc. 408-1 (III)(C)(4), Guardian-Intervenors were able to suggest edits to the Department's pamphlet informing people about waivers and ICFs. *See* Residential Options Counseling Pamphlet, attached as Exhibit K. The Department accepted some of those suggestions. Similarly, Guardian-Intervenors commented on the Department's guidance to County Boards concerning recent changes to Ohio law.[9] *See* Ohio Rev. Code §5126.047.

---

[8] Indeed, the Guardian-Intervenors were invited as early as February 2019 to discuss a global resolution with all the Moving Parties.
[9] A link to the Guidance can be found on the Department's website at https://dodd.ohio.gov/wps/portal/gov/dodd/about-us/communication/memos/memo-county-board-residential-services.

**C.     The Agreement Effectively Identifies Class Members and Distributes Service Commitments in a Fair and Reasonable Manner.**

Finally, in evaluating a class settlement, courts also consider how class relief is distributed. Recent amendments to the Federal Rules specifically require the Court to consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C)(ii). Here, the Agreement effectively distributes relief to current and future class members. In keeping with the terms of the class definition, the Agreement identifies current and future class members using the state's options counseling program, then connects those who express an affirmative interest in home and community-based services with the specific benefits provided to class members under the Agreement.[10] These benefits include exit and diversion waivers. But they also include commitments that will facilitate community services for people who already have a waiver slot but have not yet transitioned into the community, such as funding commitments for capital housing assistance as well as integrated day and employment services. Doc. 408-1, section IV.

Options counseling is a reasonable and equitable method precisely because it ensures individuals have access to information about the full range of service options, and the additional resources that can help to inform individual decision-making, including peer-to-peer and family-to-family network referrals, and opportunities to visit and explore community alternatives. Together, these offers of information, education, and community exploration allow future class members to determine whether to take advantage of specific benefits available to them under the proposed Agreement. Furthermore, as noted above, expansion of options counseling to people in or entering eight-bed ICFs enables more people to have information about their service options,

---

[10] The efficacy of this method is evidenced by the more than 200 individuals who have gone through the existing options counseling process, expressed their interest in receiving home and community-based services, and are in the process of planning for that transition. See *supra*, Section II(C)(1).

which is in the public interest and does not harm non-class members. *See supra*, Section III-B. Tellingly, as discussed above, class members, APSI, and organizations in this field all support the Agreement's option-counseling commitments. *Supra* Section III(A).

### D. Guardian-Intervenors' Remaining Arguments Opposing Final Approval Are Wrong as a Matter of Fact and Law.

#### 1. The assertion that there are no current class members is erroneous.

Guardian-Intervenors incorrectly suggest that there are few, if any, class members in this action. To be sure, given the nature of this class, membership ebbs and flows. People enter the class when they request waiver services, and they leave once they receive them. Then, new requests for such services start the process again. But nothing is unusual about class membership fluctuating. *See State Farm Mut. Auto. Ins. Co. v. Boellstorff*, 540 F.3d 1223, 1226 n.7 (10th Cir. 2008) ("Many class actions involve classes whose membership predictably fluctuates over the course of the litigation.") (quotations omitted).

While fluctuating, class members exist now and will in the future. Following preliminary approval, the Department was able to identify more than 200 individuals who fell within the class definition at that time. *See supra* Section II(C)(1). And the experiences of former class members, APSI, and other organizations further reinforce that there will undoubtedly be other people that request waiver services following further counseling. *See supra* Section III(A).

Guardian-Intervenors' arguments appear to be premised - at least in part - on a mistaken belief that the class defined by the Court is static, and not intended to afford prospective, injunctive relief to future class members. While the Court clarified its intent to focus the class on individuals who receive options counseling as provided by the State Defendants, and thereafter affirmatively state their interest in community-based services, it did not conclude that any future remedy would be limited to individuals who had expressed this interest by a date certain. Doc.

371. Rather, the definition makes clear that the class includes individuals who meet the enumerated criteria "on or after March 16, 2016." Doc. 303 at 22.

The Court should also reject any related attempts to revisit past class-certification disputes. The Court resolved arguments about the proposed class's cohesiveness by limiting the class to people who "affirmatively state that they want community services." Doc. 309 at 1-2. For these reasons, Guardian Intervenor's reliance on the district court's 2009 decision in *Ligas v. Maram*, a case where class members initially had differing preferences, is misplaced. *See* Doc. 437-3. Significantly, their opposition fails to acknowledge that the Court in *Ligas* went on to approve a second, proposed settlement class that focused on individuals who affirmatively chose integrated community services and a Consent Decree that tracked current and future class members' expressed preferences, while providing opportunities to receive information about the full range of service options.[11]

Additionally, the Court should reject Guardian-Intervenors' argument that the class is now moot. They insist that the Named Plaintiffs must still have live claims, despite the existence of a certified class. But federal law contains no such requirement. Instead, the U.S. Supreme Court and the Sixth Circuit have recognized that when a district court certifies a class, the unnamed members of that class acquire a legal status separate from the interests of the individual plaintiffs. *See, e.g., Sosna v. Iowa*, 419 U.S. 393, 399 (1975); *Unan v. Lyon*, 853 F.3d 279, 285–86 (6th Cir. 2017) (also recognizing exceptions to mootness of named plaintiffs' claims even before certification).

Indeed, "a named class representative may still adequately represent the class, for purposes of Rule 23, even if the representative's personal claims have become moot, at least

---

[11] The final 2011 Consent Decree approved in *Ligas v. Maram* is available at https://www.equipforequality.org/wpcontent/uploads/2014/03/Ligas-Consent-Decree.pdf; last visited December 5, 2019.

until such time that there is a determination that the representative is no longer adequate." *Binta B. ex rel. S.A. v. Gordon*, 710 F.3d 608, 619 (6th Cir. 2013). No such determination has been made in this case, nor would one be appropriate.  The Intervenors have not—and cannot—provide any evidence that the Named Plaintiffs are inadequate representatives.  The Named Plaintiffs have continued to more than adequately represent the class, including through their negotiation of comprehensive relief under the proposed Agreement that will benefit all class members.  The benefits and relief extended under that Agreement to class members—including, among other things, increased access to integrated, community-based services—mirror those already enjoyed by the Named Plaintiffs.

### 2. The Agreement's relief directly benefits class members.

Guardian-Intervenors' suggestion that the Agreement does not benefit the class also lacks merit.  A class action settlement is appropriate so long as it "primarily" benefits class members and provides equitable relief to both named and unnamed members of the class.  *See*, *In re Dry Max Pampers Litig.*, 724 F.3d 713, 720-21 (6th Cir. 2013) (reversing approval of class action settlement where monetary damages benefitted only named representatives, and relief provided to unnamed class members was "illusory.").  In addition, this Court has specifically considered whether such agreements broadly serve the public interest, suggesting that additional, systemic or collateral benefits to non-class members actually counsels towards approval, not against it. *Robinson v. Ford Motor Co.*, No. 1:04 CV 00844, 2005 WL 5253339, at *6 (S.D. Ohio, June 15, 2005) (approving a settlement agreement as consistent with the public interest where new apprentice testing procedures benefitted both African American class members and "all employees and future employees of Ford.")

Here, despite Guardian-Intervenors' suggestions, the benefits of the commitments the Agreement outlines primarily go to both current and future class members.  For example, the

roughly 200 current class members benefit from the Agreement's commitments regarding transition services, housing assistance, day and employment services, and follow-along services during the months after a person begins receiving community services.  Future class members will benefit form both these services and the increase in waiver slots over the Agreement's life.

Guardian-Intervenors' opposition to further options counseling is particularly confusing. During this case, all sides agreed that people should receive information about their different service options, so that they can choose their preference.  The Agreement's options counseling commitments are in line with this general consensus.  The commitments seek to give people information, so that future class members will be apparent.  While Guardian-Intervenors suggest that a second offer of voluntary options counsel will be unduly burdensome to individuals with developmental disabilities and their guardians, this argument fails to recognize that individuals' needs and preferences may change over time, as do available opportunities.

Finally, Guardian-Intervenors provide no legal authority for the proposition that a class action settlement can only be approved if there is a perfect fit between the class as defined and the agreed-to relief.  Doc. 437 at 14-15.  The case they do cite, *In Re Dry Max Pampers,* does not stand for this principle, and is inapplicable to the present facts, because there are no allegations that the Named Plaintiffs have compromised the interests of the class for their own personal gain. *Id*. at 722.

### 3. The Moving Parties may choose to settle this case in a different way than a litigated court judgment.

It is well-accepted that court-enforceable settlement agreements may contain remedies and benefits that go beyond what might have otherwise be secured through a litigated final judgment.  *See, e.g., Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501 (1986) (affirming a consent decree providing race-conscious relief and

other affirmative action in promoting firefighters, even if it may benefit individuals other than actual victims of discrimination, and holding that Title VII provisions precluding certain race-conscious forms of relief after trial do not apply). Such voluntary relief should "[come] within the general scope of the case" and "further the objectives of the law upon which the complaint was based." *Id.* at 525 (quotations omitted). But allowing flexibility in settlements is also important. After all, public policy strongly favors such resolutions. *Franks v. Kroger Co.*, 649 F.2d 1216, 1224 (6th Cir. 1981). Even if the Moving Parties resolved this case differently than a court judgment might have, this should not stand in the way of the Agreement's approval. Through the voluntary adopting of relief, parties may choose to take a different path than whatever relief "the court could have awarded after a trial." *Firefighters*, 478 U.S. at 501, 525. Regarding approval of these court-ordered consent decrees, the Supreme Court in *Firefighters* observed that while "an intervenor is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree, it does not have power to block the decree merely by withholding its consent." *Id.* at 529 (citations omitted).

Here, the Moving Parties worked extensively to resolve their differences without a fully-litigated judgment. Whether or not this Agreement looks like a court order, the Agreement's commitments align with the general scope and objectives of this case. The Guardian-Intervenors do not argue otherwise. Nor do they cite to any legal authority that suggests it is fatal, or even inappropriate, for a settlement agreement to look different than relief on a merits judgment.

Finally, this negotiated resolution does not constitute an attempt to re-litigate or otherwise circumvent the class definition, as Guardian-Intervenors allege. Doc. 437 at 14-16. Rather, it reflects the nature of settlements to complex class actions cases, an outcome which, again, courts favor. *Franks*, 649 F.2d at 1224. As this Court has held, the public is well served

by class action settlements that contribute to the continued provision of needed public services, and the public benefit of such settlements is verified when they are approved by other public officials. *Thompson v. Midwest Found. Indep. Physicians Ass'n.,* 124 F.R.D. 154, 161 (S.D. Ohio, 1988).

As noted in the Parties' Joint Motion for Preliminary Approval, Doc. 408, years of adversarial litigation, extensive discovery, multiple instances of arms-length negotiations, and the experience of counsel have all informed the Moving Parties' assessment of the adequacy of the Agreement and the extent to which its benefits fairly resolve class claims. Consistent with long-standing Sixth Circuit precedents, these factors counsel towards final approval. *See* Joint Motion for Preliminary Approval, Doc. 408 at 11-16.

**4.      Defendants' actions to ensure timely implementation of agreed-to relief do not moot or otherwise obviate the need for final approval of the Agreement.**

The Moving Parties reached an agreement early this year and moved for preliminary approval in the spring. *See* Doc. 396.  Guardian-Intervenors now suggest, however, that because Defendants have taken some of the steps necessary to honor the Agreement, the Moving Parties should be penalized, and the Agreement should be rejected.  Guardian-Intervenors are incorrect.

Initially, as the Court likely recalls, much of the delay in proceedings was for the Guardians-Intervenors' benefit.  In particular, proceedings were extended to see if Guardian-Intervenors and Defendants could also reach a settlement, and thus globally resolve the case. Regardless, the Agreement still has more than enough future consideration.  While the Department has made the initial budget requests, many of the Agreement's commitments— including the implementation of the funding the Department requested in the most current budget and commitments relating to the next budget—remain.  *See* Doc. 408-1, section V.A (recognizing that the Agreement runs through January 2023).

In short, Guardian- Intervenors' concerns about advisory opinions are misplaced, and their cited case law inapposite [12] given the current posture of this case, and the factors to be considered when granting final approval to a negotiated class action settlement.

### 5. The agreed-upon fee award is fair and reasonable.

Guardian-Intervenors also challenge the Agreement's agreed-upon award of attorneys' fees and costs, but this challenge lacks any legal or factual support.

Under amended Fed. R. Civ. P. 23(e)(2)(iii), courts reviewing class action settlements must consider "the terms of any proposed award of attorney's fees, including timing of payment." As referenced in the Motion for Preliminary Approval, Doc. 408, and the Court-approved Notice to Class Members, Doc. 408-2, the Moving Parties' proposed Agreement also resolves attorneys' fees, with Plaintiffs accepting an agreed-upon amount of fees following the ultimate dismissal of their claims. As with the Agreement's other provisions, the fee component was heavily negotiated and represents significant compromises from both sides. The Agreement anticipated submission of an assented-to Motion for Attorneys' Fees as part of the final approval process. Doc. 408-1, Section V-E-1.

Consistent with the Agreement, and the Court's Scheduling Order, Plaintiffs' filed their Motion for Attorneys' Fees and Costs on November 15, 2019, with supporting memorandum and attachments. *See* Doc. 413. That Motion details why the agreed-to award of $1.2 million dollars is fair and proper under Rule 23(h), and consistent with relevant case law governing the award of attorneys' fees in similar case action litigation. Those arguments, and their application to the facts of this case, are incorporated here by reference.

---

[12] In their brief, Guardian-Intervenors rely on a recent Sixth Circuit case, *Chapman v. Tristar Prod., Inc.,* 940 F.3d 299 (6th Cir. 2019). Specifically they cite to the Court's statement of legal principles concerning Article III standing requirements. *Id*. at 303. Interestingly, this case concerned a last minute attempt by the Attorney General of Arizona to intervene in, and appeal the issuance of, a nation-wide class action settlement agreement resolving product liability claims involving the manufacture of pressure cookers. Ultimately, the Court concluded that the intervening party did not have standing to appeal the district court's order of final approval. *Id*. at 302.

Guardian-Intervenors' Opposition to the proposed Agreement includes a request that the Court reject the Moving Parties' agreed-upon award of attorneys' fees and costs. Doc. 437 at 19. As an initial matter, only class members or a "party from whom payment is sought" can object to a fee award. *See* Fed. R. Civ. P. 23(h)(2). "Other parties—for example, nonsettling defendants—may not object because they lack a sufficient interest in the amount the court awards." Fed. R. Civ. P. 23(h)(2) advisory committee's note to 2003 Amendment.

Guardian-Intervenors (and all those who objected to the fee award) are neither class members nor parties responsible for paying the award. Thus, they cannot object to the agreed-upon award because they lack a sufficient interest in it and the Court should disregard those objections.

Even if Guardian-Intervenors could object, their comments on the award are conclusory and unsupported. Tellingly, they fail to challenge any argument set forth in Plaintiffs' Motion and Memorandum In Support of Attorney's Fees and Costs Pursuant to Settlement Agreement (Doc. 413) and entirely ignore the authorities cited in that motion. For example, Guardian-Intervenors seem to believe that attorneys who work at non-profit organizations are not entitled to their fees, despite Supreme Court precedent and innumerable decisions to the contrary. *See, e.g., Blum v. Stenson*, 465 U.S. 886, 894 (1984) ("[C]ongress did not intend the calculation of fee awards to vary depending on whether plaintiff was represented by private counsel or by a nonprofit legal services organization."); *Eggers v. Bullitt Cty. Sch. Dist.*, 854 F.2d 892, 899 (6th Cir. 1988) (attorneys for publicly funded agencies are entitled to fees at fair market value). Regardless, the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988, provides for awards of attorneys' fees in civil rights cases to ensure "effective access to the judicial process," and encourage private enforcement of civil rights laws. H.R. Rep. No. 94-1558, p.1 (1976).

Guardian-Intervenors also fail to cite to any relevant authority supporting their position on the award. Instead, they attempt to resurrect their voluntarily withdrawn third-party complaint against DRO in attacking the agreed-upon attorneys' fees and costs on the basis that DRO is somehow not complying with 42 U.S.C. § 15043. This claim is unsupported. Nothing in the federal PADD statute or its implementing regulations creates the alleged "fiduciary duty to represent the interests of all disabled people in Ohio." Doc. 437 at 15.[13] Moreover, as this Court previously found, "the scope of representation of Disability Rights Ohio to represent Plaintiffs is a collateral issue that is best left to the governing agency." Opinion and Order on Motions to Dismiss, March 23, 2017, at 8 (Doc. 90).

As for the Intervenors remaining "notes" on the agreed-upon award, those statements are similarly inapposite and irrelevant. The Court should disregard them and approve all provisions of the Agreement, including the agreed-upon fee award.

## IV. CONCLUSION

The Court should grant final approval of the proposed Settlement Agreement because it is a fair, reasonable, and adequate resolution of class members' claims, is in the public interest, and does not harm or otherwise undermine the rights of Guardian-Intervenors or other non-class members.

---

[13] Instead, 42 U.S.C. § 15043 sets out general authorities for a protection and advocacy system including the ability to bring legal actions and to set annual goals and priorities.

Respectfully submitted,

| | |
|---|---|
| s/Kerstin Sjoberg | s/ Larry H. James |
| Kerstin Sjoberg (0076405) | Larry H. James (0021773)* |
| ksjoberg@disabilityrightsohio.org | *Trial Attorney |
| Trial Attorney | Robert C. Buchbinder (0039623) |
| Kevin J. Truitt (0078092) | Christopher R. Green (0096845) |
| ktruitt@disabilityrightsohio.org | Crabbe, Brown & James, LLP |
| Alison McKay (0088153) | 500 S Front Street, Suite 1200 |
| amckay@disabilityrightsohio.org | Columbus, Ohio 43215 |
| DISABILITY RIGHTS OHIO | P:      614-229-4567 |
| 200 Civic Center Drive, Suite 300 | F:      614-229-4559 |
| Columbus, Ohio 43215 | E:      ljames@cbjlawyers.com |
| Telephone: 614-466-7264 | rbuchbinder@cbjlawyers.com |
| Facsimile: 614-644-1888 | cgreen@cbjlawyers.com |

*Counsel for Plaintiffs*

| | |
|---|---|
| Neil R. Ellis | DAVE YOST |
| nellis@sidley.com | Ohio Attorney General |
| Kristen A. Knapp | |
| kknapp@sidley.com | s/ Zachery P. Keller |
| SIDLEY AUSTIN LLP | ZACHERY P. KELLER (0086930) |
| 1501 K Street N.W. | Assistant Attorney General |
| Washington, DC 20005 | Constitutional Offices Section |
| Telephone: 202-736-8075 | 30 East Broad Street, 16th Floor |
| Facsimile: 202-736-8711 | Columbus, Ohio 43215 |
| | Tel: 614-466-2872 | Fax: 614-728-7592 |
| | Zachery.Keller@OhioAttorneyGeneral.gov |

| | |
|---|---|
| Jonathan W. Muenz | s/ Julie E. Brigner |
| jmuenz@sidley.com | Julie E. Brigner (0066367) |
| SIDLEY AUSTIN LLP | Assistant Attorney General |
| 787 Seventh Avenue | Health and Human Services Section |
| New York, NY 10019 | 30 E. Broad Street, 26th Floor |
| Telephone: 212-839-5300 | Columbus, Ohio 43215 |
| Facsimile: 212-839-5599 | Telephone:  (614) 466-1181 |
| | Facsimile:  (866) 372-7126 |
| | Julie.brigner@ohioattorneygeneral.gov |

*Counsel for State Defendants*

Cathy E. Costanzo
ccostanzo@cpr-ma.org
Kathryn L. Rucker
krucker@cpr-ma.org
Anna M. Krieger
akrieger@cpr-ma.org
CENTER FOR PUBLIC REPRESENTATION
22 Green Street
Northampton, Massachusetts 01060
Telephone: 413-586-6024
Facsimile: 413-586-5711

*s/ Franklin J. Hickman*
Franklin J. Hickman (0006105)*
*Trial Attorney
John R. Harrison (0065286) HICKMAN &
LOWDER CO., L.P.A.
1300 East Ninth St., Suite 1020
Cleveland, Ohio 44114
P:       216-861-0360
F:       216-861-3113
E:       fhickman@hickman-lowder.com
jharrison@hickman-lowder.com

*Counsel for OACBDD*

Samuel R. Bagenstos
sbagen@gmail.com
625 South State Street
Ann Arbor, Michigan 48109
Telephone: 734-647-7584

*Pro hac vice Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Joint Motion for Final Approval of

Proposed Class Action Settlement was filed electronically on December 9, 2019.  Notice of this

filing will be sent by operation of the Court's electronic filing system to all parties indicated on

the electronic filing receipt.

*s/ Larry H. James*
Larry H. James (0021773)