


EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | |
|---|---|
| PHYLLIS BALL, by her General Guardian, PHYLLIS BURBA, et al., | Case No. 2:16-cv-282 |
| Plaintiffs, | JUDGE EDMUND A. SARGUS, JR |
| v. | MAGISTRATE JUDGE ELIZABETH A. PRESTON DEAVERS |
| MIKE DEWINE, Governor of Ohio, in his official capacity, et al., | |
| Defendants. | |

## SETTLEMENT AGREEMENT

This class-action settlement Agreement is entered into by and between:

1. Plaintiffs Phyllis Ball, Antonio Butler, Caryl Mason, Richard Walters, and Ross Hamilton, in their individual capacities and representatives of the Fed. R. Civ. P. 23(b)(2) class certified in this case;

2. Plaintiff The Ability Center of Greater Toledo, on its own behalf and on behalf of its clients, constituents, and/or members;

3. Defendants Jeff Davis in his official capacity as Director of the Ohio Department of Developmental Disabilities, Maureen Corcoran in her official capacity as the Director of the Ohio Department of Medicaid, Kevin Miller in his official capacity as the Director of Opportunities for Ohioans with Disabilities, and Mike DeWine in his official capacity as Ohio's governor; and

4. Intervenor-Defendant the Ohio Association of County Boards Serving People with Developmental Disabilities, on its own behalf and as representative of Ohio's County Boards of Developmental Disabilities.

**WHEREAS**, in March 2016, Plaintiffs filed this action against State Defendants or their predecessors, alleging that Ohio's provision of services for people with developmental disabilities violates the American with Disabilities Act, the Rehabilitation Act, and the Social Security Act. In addition to bringing individual claims, Plaintiffs sought to represent a class of other people with developmental disabilities under Federal Rule of Civil Procedure 23(b)(2). State Defendants denied these claims and opposed class certification; and

**WHEREAS,** after two years of litigation, the Court granted in part and denied in part Plaintiffs' request for class certification, certifying a class consisting of the following people:

> All Medicaid-eligible adults with intellectual and developmental disabilities residing in the state of Ohio who, on or after March 31, 2016, are qualified for home and community-based services, and, after receiving options counseling, express that they are interested in community-based services.

Op. & Or. (Mar. 30, 2018), Doc. 303; *see also* Or. (May 2, 2018), Doc. 309; Or. (Sept. 25, 2018), Doc. 332; Op. & Or. (Dec. 7, 2018), Doc. 371; and

**WHEREAS,** the parties share an objective of providing individuals with developmental disabilities with access to integrated home and community based services and with opportunities to make meaningful and informed choices about their service options; and

**WHEREAS,** in January 2019, DoDD, through its designated vendor CareStar, Inc., completed its first round of Options Counseling to individuals with developmental disabilities in ICFs with 9 or more beds; and

**WHEREAS,** the State Defendants have made additional investments in home and community based services beginning with the SFY 16-17 budget; and

**WHEREAS,** the parties agree that this Agreement will further the purpose of providing individuals with developmental disabilities with access to integrated home and community based services; and

**WHEREAS, nothing in this Agreement is intended to force a person to forego or relinquish ICF services. Nor is anything in this Agreement intended to remove the ICF option in the future; and**

**WHEREAS,** the above Parties enter into this Agreement as a complete and final resolution of all matters, claims, differences, and/or causes of action arising from Plaintiffs' Complaint or the facts alleged therein. The Parties have reached this Agreement to resolve this multi-year case on satisfactory terms and, in doing so, avoid the inherent cost and uncertainty associated with further litigation.

**NOW, THEREFORE,** in consideration of the mutual covenants, agreements, warranties, and representations set forth in this Agreement, constituting consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

I. **Definitions**. For the purposes of this Agreement, the following terms shall have the following meanings, regardless of where in the Agreement those terms are used (that is, in the recitals or in another location):

  A. "Agreement" means this class-action settlement agreement.

<08>
<09>
<10>
<11>
<12>
<13>
<14>
<15>
<16>
<17>
<18>
<19>
<20>

B. "Complaint" means the complaint (Doc. 1) filed in the case settled by this Agreement, *Ball v. DeWine*, Case No. 2:16-cv-282 (S.D. Ohio 2016).

C. "Conversion" means funding previously directed toward an ICF bed being redirected toward a Medicaid waiver as described in R.C. 5124.60.

D. "County Board" means the County Board of Developmental Disabilities responsible for facilitating and administering services to the individual being offered Options Counseling or Pre-Admission Counseling.

E. "County Board Association" means the Intervenor-Defendant the Ohio Association of County Boards Serving People with Developmental Disabilities.

F. "Designee" means an entity or organization chosen by DoDD to carry out its obligations under this Agreement. A "Designee" may be a government, public, or private organization or entity.

G. "Diversion Waiver" means a Medicaid waiver, matched by state funding, allocated to a person who has applied for admission to an ICF of 8 or more beds but who has chosen to receive services through a Medicaid waiver instead.

H. "DoDD" means the Ohio Department of Developmental Disabilities.

I. "Exit Waiver" means a Medicaid waiver—funded in accordance with R.C. 5124.69(D)(3)—allocated to a person residing in an ICF who has decided to leave the ICF.

J. "FY" means the State of Ohio's fiscal year. Fiscal years will be stated by referring to the last two digits for the end date of the applicable year: for example, FY 20 refers to the fiscal year ending June 30, 2020.

K. "ICF" means a privately-run Intermediate Care Facility for individuals with intellectual disabilities.

L. "IO Waiver" means Ohio's Individual Options Medicaid waiver.

M. "Options Counseling" means the counseling provided either by the Department of Developmental Disabilities or its Designee to people who reside in ICFs who are not represented by Advocacy and Protective Services, Inc.

N. "Parties" means, collectively, Plaintiffs, State Defendants, and the County Board Association and a "Party" is any one of these Parties.

O. "Plaintiffs" means Phyllis Ball, Antonio Butler, Caryl Mason, Richard Walters, and Ross Hamilton in both their individual capacities and representatives of the Fed. R. Civ. P.

23(b)(2) class certified in this case, and Plaintiff The Ability Center of Greater Toledo, on its own behalf and on behalf of its clients, constituents, and/or members.

P. "Point of Contact" means a person designated by each Party to serve as the point of communication for purposes of this Agreement.

Q. "Pre-Admission Counseling" means the counseling the County Boards provide under R.C. 5124.68 to people who have applied for admission to and are about to enter ICFs.

R. "State Agency Defendants" means Jeff Davis, in his official capacity as Director of the Ohio Department of Developmental Disabilities; Maureen Corcoran, in her official capacity as Director of the Ohio Department of Medicaid; and Kevin Miller, in his official capacity as Director of Opportunities for Ohioans with Disabilities.

S. "State Defendants" means Jeff Davis, in his official capacity as Director of the Ohio Department of Developmental Disabilities; Maureen Corcoran, in her official capacity as Director of the Ohio Department of Medicaid; Kevin Miller, in his official capacity as Director of Opportunities for Ohioans with Disabilities; and Mike DeWine in his official capacity as the Governor of Ohio.

~~S.~~T. "Statewide Average Daily Rate" means the rate—calculated annually at the completion of rate setting—that is the mean total per Medicaid day rate calculated as of the first day of the fiscal year for which the rate is determined weighted by the May Medicaid days from the calendar year in which the fiscal year begins. The Statewide Average Daily Rate for FY 20 is $342.84.

II. **No Admission**. This Agreement does not constitute an admission by any Party of fault, liability, wrongdoing, or an inability to sustain any claim or defense in this case. State Defendants and the County Board Association expressly deny any violation of federal law or any other wrongdoing.

III. **Options Counseling and Pre-Admission Counseling**.

   A. DoDD will, either directly or through a Designee, do the following:

   1. By June 30, 2021, offer a second round of Options Counseling (the first round having been completed in January 2019) to include individuals with developmental disabilities who reside in ICFs with 8 or more beds and who are not represented by Advocacy and Protective Services, Inc. DoDD may exclude the following individuals from the Options Counseling described in this Section:

      a. Individuals who, either on their own or through their guardian, have intervened in Case No. 2:16-cv-282;

4

   b. Individuals who, either on their own or through their guardian, have affirmatively asked DoDD or its Designee to take them off the list for Options Counseling.

   b.c. Individuals who, either on their own or through their guardian, submitted written objections to this Agreement in Case No. 2:16-cv-282. This exclusion is limited to individuals DoDD can readily, and confidently, identify from the content within the written objections.

 2. When offering Options Counseling under Section III.A.1 of this Agreement, DoDD or its Designee will:

   a. Provide the individual or guardian(s), as applicable, with: i) a letter from DoDD introducing CareStar, Inc. (or other Designee) as the Options Counseling vendor and explaining the purpose and process of Options Counseling; ii) written materials on community and ICF service options; and iii) written contact information that an individual or guardian can use to ask DoDD further questions about this process.

   b. Attempt to reach the individual or guardian(s), as applicable, via telephone on four separate days (with one call being made after 6:00 PM EST and one call being made on a Saturday or Sunday) to schedule an Options Counseling visit.

   c. If the individual or guardian(s), as applicable, does not respond to any of the four phone calls described in Section III.A.2.b of this Agreement, a follow-up letter shall be sent to the individual or guardian(s). The letter will describe how to contact 1) a person for further information about a peer-to-peer or family-to-family visit or meeting; and 2) the appropriate County Board.

 3. If after receiving Options Counseling an individual or an individual's guardian expresses some interest in a community service option but does not affirmatively commit to that choice (that is, "maybes"), DoDD or its Designee will refer that individual and/or guardian to the appropriate County Board. This referral process will be conducted as follows:

   a. When making the referral described in Section III.A.3 of this Agreement, DoDD or its Designee will give the appropriate County Board a copy of the Options Counseling Form, Exhibit 1, which includes contact information for the individual who received options counseling.

   b. The appropriate County Board will use best efforts to contact the referred individual or guardian(s), as applicable, within 60 calendar days and notify DoDD or its Designee in writing whether it was able to contact the referred individual or guardian.

      c. DoDD or its Designee will track the referrals in Section III.A.3 of this Agreement. DoDD or its Designee will provide the following aggregate data on a quarterly basis to Plaintiffs' Point of Contact:

          i. The number of referrals made to a County Board under Section III.A.3 of this Agreement;

          ii. The number of referred individuals contacted by a County Board under Section III.A.3.b of this Agreement;

          iii. The number of individuals who do not respond to contact under Section III.A.3.b of this Agreement;

          iv. The number of individuals contacted under Section III.A.3.b of this Agreement who chose to remain in an ICF at or after the time of contact;

          v. The number of individuals contacted under Section III.A.3.b of this Agreement who chose to request a waiver at or after the time of the contact; and

          vi. The number of individuals contacted under Section III.A.3.b of this Agreement who have not informed the County Board of a decision as to where they would prefer to receive services.

4. DoDD or its Designee will maintain and continue to promote the existing program by which individuals with developmental disabilities—and their families and/or guardians—can participate in peer-to-peer or family-to-family meetings or community visits.

5. DoDD or its Designee will allow individuals represented by Advocacy and Protective Services, Inc. to participate in the program described in Section III.A.4 of this Agreement. DoDD or its Designee will make the counseling materials described in Section III.C of this Agreement available to Advocacy and Protective Services, Inc.

6. Beginning in the fall of 2019, DoDD or its Designee will conduct additional training for qualified intellectual disability professionals regarding discharge and transition planning.

B. County Boards will provide Pre-Admission Counseling for all individuals with developmental disabilities who apply for admission to an ICF of 8 or more beds between the time that the Court approves this Agreement and January 8, 2023.

C. DoDD will do the following with regard to materials for Options and Pre-Admission Counseling:

1. Convene a focus group to review the materials used in Options Counseling and Pre-Admission Counseling and to advise DoDD on how to effectively communicate with individuals with developmental disabilities and their families. This group will also provide input on the development of one or more videos designed to inform individuals with developmental disabilities about home and community based services. DoDD will invite at least one representative from each of the following organizations to participate in the focus group: i) The Ohio State University Nisonger Center; ii) the Arc of Ohio; and iii) People First of Ohio. DoDD will invite a designated representative of Plaintiffs to attend and observe, but not participate in, focus group meetings.

2. Within 60 days of the time that the Court approves this Agreement, following focus group input, DoDD will develop one or more videos designed to inform individuals with developmental disabilities about home and community based services.

3. Within 30 days of the time that the Court approves this Agreement, DoDD must review and consider the recommendations of the focus group described in Section III.C.1 of this Agreement and complete revisions of the Options Counseling and Pre-Admission Counseling written materials. Upon completion, DODD will provide Plaintiffs' Point of Contact with a copy of counseling materials, including any revisions made pursuant to the focus group's recommendations.

4. Within 30 days of receiving counseling materials, Plaintiffs will provide any comments. Upon receiving Plaintiffs' comments, DoDD will have up to 30 days to finalize revisions to its Options Counseling and Pre-Admission Counseling written materials described in Section III.C.3 of this Agreement. Revisions to, and the ultimate content of, counseling materials will be at DoDD's discretion. A final copy of counseling materials will be provided to Plaintiffs' Point of Contact. DoDD will make the video and counseling materials described in Section III.C of this Agreement available on DoDD's website.

5. Immediately after DoDD finalizes revisions to its Options Counseling and Pre-Admission Counseling materials under Section III.C.4 of this Agreement, DoDD and each County Board will incorporate them into their Options Counseling and Pre-Admission Counseling processes described in Sections III.A-B of this Agreement. However, neither DoDD nor any County Board is required to wait for counseling materials to be revised under Section III.C.3 of this Agreement to begin the counseling processes described in Sections III.A-B of this Agreement.

D. Until June 30, 2021, DoDD will collect data regarding Option Counseling by using the document attached as Exhibit 2 to this Agreement, modified to show the number of individuals or guardians, as applicable, that DoDD or its Designee has tried to contact 4 times under Section III.A.2.b of this Agreement. DoDD will provide Plaintiffs' Point of Contact with the aggregate data from the document attached as Exhibit 2 to this Agreement (modified as described directly above) on a quarterly basis.

E. Until January 8, 2023, DoDD will collect and provide the following aggregate data regarding Pre-Admissions Counseling on a quarterly basis to Plaintiffs' Point of Contact: i) the number of people counseled; ii) the number of people counseled who choose to reside in an ICF; and iii) the number of people counseled who choose a diversion waiver.

E.F. Nothing in this Section requires any individual to accept an Exit or Diversion Waiver as an alternative to ICF services.

IV. **Community-Based Services and Waiver Capacity**.

A. DoDD will seek to increase waiver capacity that is matched by state funding and give first priority to Exit Waivers and Diversion Waivers, by doing the following:

1. DoDD will request operating funding to allocate 350 new IO Waiver slots for FY 20 and 350 new IO Waivers slots for FY 21, for a total of 700 new IO Waiver slots during FY 20 and FY 21.

2. During FY 21, DODD will assess any unmet need for waivers from Options and Pre-Admission Counseling and will project future need for waivers for FY 22 and FY 23. DoDD will prepare a budget request seeking sufficient funding to meet both unmet and future need for waivers for FY 22 and FY 23. In assessing unmet and future need for the purposes of this Section, DoDD will:

   a. Include all additional waivers necessary to meet the needs of individuals who, after receiving Options or Pre-Admissions Counseling, have requested an Exit or Diversion Waiver but have not yet been allocated one.

   b. Project future need for waivers for FY 22 and FY 23. While the projection of future need shall be within DoDD's discretion, DoDD must consider the following factors:

      i. The number of individuals who have not received Options Counseling under Section III.A.1;

      ii. The number of individuals who, after receiving Options Counseling, have said they may be interested in community services;

      iii. The number of individuals who chose a Diversion Waiver during FY 20; and

      iv. The number of individuals with developmental disabilities in the waitlist category of immediate need—as defined in O.A.C. 5123-9-04(B)(9)—who will not have access to a county-funded waiver

8

      within 30 days if the appropriate County Board has determined that a waiver is necessary to meet the individual's immediate needs.

    3. DoDD will request funding so that any unused waivers from FY 20 and FY 21 will roll over into the next state fiscal year as additional waivers for the purpose of giving priority to exit and diversion.

    4. Until the end of FY 21, DoDD will continue the current incentives in R.C. 5124.101 and 5168.64 to support ICF providers who choose to convert ICF beds to waiver beds.

    5. DoDD will track the total number of individuals allocated a waiver slot under this Agreement including their date of transition to a community setting. DoDD will provide data under this Section to Plaintiffs' Point of Contact on a quarterly basis.

B. DoDD will seek to maintain and expand existing efforts to provide access to integrated, scattered-site affordable housing by doing the following:

    1. By July 1, 2021, working with the Ohio Housing Finance Agency to support the application for available funding from the federal Housing and Urban Development's Section 811 Supportive Housing for Persons with Disabilities.

    2. Implement the service "community transition under the IO waiver"—as described at O.A.C. 5123-9-48—for individuals transitioning from ICFs of 8 or more beds to Exit Waivers or Conversion Waivers.

    3. Provide $24 million in capital housing assistance to be primarily available for people receiving Exit, Diversion, or Conversion Waivers during FY 19 and FY 20.

    4. Project the amount needed for capital housing assistance for individuals with developmental disabilities during FY 21 and FY 22 and request budgetary approval for not less than $12 million in capital housing assistance to be primarily available for people receiving Exit, Diversion, or Conversion Waivers during FY 21 and FY 22.

C. DoDD will continue to provide follow-along visits by DoDD community resource coordinators to individuals transitioning from ICFs of 8 or more beds to Exit Waivers or Conversion Waivers. DoDD will collect aggregate data on the placement status of individuals who have transitioned at 60, 180, and 365 days after transition and provide this data on a quarterly basis to Plaintiffs' Point of Contact in the format matching the document attached as Exhibit 3 to this Agreement.

D. DoDD will request $250,000 to fund new transformation grants during FY 20 and FY 21. These grants will be similar to the prior Integrated Community Support Start up Pilot Grants and designed to support planned transitions from facility to community-based

9

service models and expand provider capacity to offer integrated day and employment services across the state. The selection of recipients for the grants described in this Section will be within the discretion of DoDD.

E. For the current biennium (FY 20-21), DoDD will not seek a change in the ICF reimbursement methodology as set forth in the current biennial budget (House Bill 166).

~~D.~~F.     For FY 22-23, DoDD will request and exercise best efforts and reasonable diligence in support of a Statewide Average Daily Rate (per bed) for ICF reimbursement that is no less than the Statewide Average Daily Rate for FY 20.

V. **Implementation**.

   A. The term of this Agreement will be through January 8, 2023 unless 1) the Parties have jointly agreed to extend the Agreement's timeframe under Section VII.A or 2) as of January 8, 2023, an unresolved compliance dispute exists under Section V.E.4 of this Agreement. If the Agreement continues past January 8, 2023 due to an unresolved compliance dispute, any compliance obligations unrelated to the dispute shall end on January 8, 2023. Otherwise, the terms of this Agreement will run through when the Court's continuing jurisdiction ends under Section V.B.3.

   B. Release and dismissal of claims

      1. On their own behalves and in their individual, organizational, and representative capacities (including their capacities as class representatives), Plaintiffs hereby release all Parties to this Agreement and its/their officials, members, agents, corporation, servants, employees, affiliates, parents, successor, and assigns from any and all current or future claims, charges, demands, causes of action, losses, and expenses of every nature whatsoever, whether known or unknown, arising out of or in connection with the Complaint or events alleged in the Complaint. Plaintiffs expressly release any claims they have raised or could have raised in the Complaint regarding the State of Ohio's management, funding, and oversight of residential, counseling, and employment and day services for people with developmental disabilities.

      2. Once this Agreement is final—which will occur following the Court's approval of settlement and the resolution of all appeals or, alternatively, the expiration of the appeal period with no appeal pending—the Parties will jointly move under Fed R.Civ. P. 41(a)(2) for an order dismissing all of Plaintiffs' claims (whether brought in an individual, class, organizational, representative, or any other capacity) with prejudice. In doing so, the Parties will request that the Court incorporate the terms of this Agreement into its dismissal order and retain jurisdiction for the limited purpose of enforcing the Agreement's terms.

3. The Court's continued jurisdiction shall end on January 8, 2023 unless 1) the Parties have jointly agreed to extend the Agreement's timeframe under Section VII.A or 2) as of January 8, 2023, an unresolved compliance dispute exists under Section V.E.4 of this Agreement. If the Court's jurisdiction continues past January 8, 2023 due to an unresolved compliance dispute, the Court's jurisdiction will end when one of the following occurs:

   a. The Parties resolve the dispute (if no agreement to extend);

   b. Plaintiffs withdraw their assertion of noncompliance or fail to pursue an enforcement motion within 30 days of the parties either not agreeing to mediation or not resolving the issues through mediation within 60 days as described in Section V.E.4.d.

   c. The Court denies Plaintiffs' enforcement motion;

   d. State Defendants comply with court-ordered enforcement; or

   e. The dispute ends or becomes moot in some other fashion.

C. Funding for Implementation

1. This Agreement does not guarantee that the General Assembly will grant sufficient funding for DoDD to complete the commitments within this Agreement. But DoDD, with the support of the Department of Medicaid and Opportunities for Ohioans with Disabilities, will make best efforts, and exercise reasonable diligence, in securing the funding necessary for implementation of this Agreement. Best efforts includes the development and submission of necessary budget requests, and advocacy in support of those budget provisions before relevant state agencies, provider organizations, system stakeholders, and the Ohio General Assembly. In the event that the Ohio General Assembly fails to appropriate funds to substantially comply with one or more provision of this Agreement, Plaintiffs may continue to enforce those provisions of the Agreement for which DoDD obtains necessary funding.

2. The Governor will not unreasonably withhold approval for funding requests submitted by DoDD in accordance with this Agreement in preparation of budget proposals to the General Assembly. Nothing in this Agreement shall be construed to limit the Governor's discretion to perform his general budgetary duties under the Ohio Constitution and Revised Code.

3. If DoDD is unable to obtain necessary funding to perform its obligations under this Agreement for the FY 20-21 biennium budget, DoDD will use best efforts to

obtain such funding through the budget process for the FY 22-23 biennium budget.

D. Information Sharing

1. Each Party will identify a central Point of Contact for purposes of communications about the Agreement between the Parties.

2. Upon written request of Plaintiffs, DoDD will provide data and documents developed or used to implement this Agreement within 10 business days. This may include reasonable access to individual class member names and contact information. DoDD may request a reasonable extension of this 10-day period for good cause. Upon such a request, the Parties shall confer to determine a reasonable timeframe for responding in light of the nature of the specific request.

3. DoDD and Plaintiffs' counsel will meet on a quarterly basis to discuss implementation status of the Agreement. Each Party will assume their own costs in preparing for and attending quarterly meetings.

E. Court Approval and Enforcement

1. The Parties will jointly seek and advocate for approval of this Agreement under Fed. R. Civ. P. 23(e). The Parties agree that Plaintiffs will file an assented-to motion for fees and expenses consistent with Section VI, Attorney Fees, and pursuant to Fed. R. Civ. P. 23(h).

2. If the Agreement is approved by the Court, the Court shall retain jurisdiction for the limited purpose of enforcing the terms of this Agreement.

3. If this Agreement is not approved under Fed. R. Civ. P. 23(e), the Parties will confer about whether modification of this Agreement, to obtain approval, is appropriate. But, if this Agreement is not ultimately approved under Fed. R. Civ. P. 23(e), none of its terms shall remain binding on the Parties.

4. The process contained in this Section (V.E.4) constitutes the sole and exclusive means to resolve disputes related to any claim from Plaintiffs that State Defendants are in noncompliance with the terms of this Agreement. The Parties may, by agreement, extend the deadlines within this Section.

   a. If Plaintiffs believe that State Defendants are in noncompliance with the Agreement, Plaintiffs' counsel will notify State Defendants' Point of Contact identified above. Within 30 days, the Parties will convene a meet and confer to discuss the identified areas of alleged noncompliance. Before this meeting, Plaintiffs

12

                shall give written notice to State Defendants that explains in detail the alleged noncompliance, including the specific provision(s) of this Agreement Plaintiffs allege has been violated and the reasons why they believe it has been violated.

      b.     State Defendants shall have 30 days from the meet and confer to notify Plaintiffs of what, if any, steps they have taken, and/or will take, to address the alleged noncompliance.

      c.     If the Parties are unable to resolve the issues within 60 days, the parties may jointly agree to mediate the dispute before an agreed-upon private mediator or the Court.

      d.     If the Parties do not both agree to mediation or are unable to resolve the issues through mediation within 60 days, Plaintiffs' counsel may file a motion with the Court seeking a judicial determination that State Defendants are not substantially complying with this Agreement.

## VI.   Attorney Fees.

A. Upon dismissal with prejudice of all of Plaintiffs' claims, the State Agency Defendants will pay Plaintiffs $1.2 million in attorney fees and costs. This payment will represent a complete settlement of all past, present, and/or future attorney fees and/or costs of any kind related to this case against all Parties (except as provided in Section VI.C). Plaintiffs and their counsel relinquish any claim to attorney fees and/or costs associated with negotiating, finalizing, and seeking approval of this Agreement. Plaintiffs and their counsel relinquish any future claims to attorney fees and/or costs associated with monitoring this Agreement.

B. The Parties understand that the State Agency Defendants' obligation to make the payment described in Section IV.A of this Agreement is subject to compliance with Ohio law, including R.C. 126.07. Payment will not be made until all necessary funds are available or encumbered and, if required, such expenditure of funds is approved by the Controlling Board of the State of Ohio.

C. Plaintiffs may seek reasonable attorney fees and costs if they are a prevailing party in an action to judicially enforce the terms of this Agreement, and such an application is limited to (1) activities performed under Section V.E.4.d of this Agreement, or (2) activities to defend against a motion by State Defendants to modify or terminate this Agreement. No fees or costs shall be sought or awarded under this Agreement for preparing or defending any fee application (that is, no "fees for fees").

**VII. <u>Miscellaneous</u>**.

    A. By mutual agreement, the Parties may change the terms of the Agreement, including timetables for taking specific actions, provided that the mutual agreement is in writing, signed by the Parties, and approved by the Court.

    B. Failure by any Party to enforce this entire Agreement or any provision thereof shall not be construed as a waiver.

    C. The Parties will promptly notify each other of any court or administrative challenge to this Agreement or any portion thereof and shall defend against any challenges to the Agreement.

    D. The Parties agree that, as of the date the Court enters an order granting the joint motion under Fed. R. Civ. P. 41(a)(2), the Parties' preservation and litigation-hold obligations resulting from this litigation shall expire. The Parties agree that the Stipulated Protective Order Governing Confidential Information, Doc. 72, will remain in effect and govern the exchange of any confidential information during the term of this Agreement.

    E. This Agreement embodies the entire Agreement of the Parties. All previous communications or proposals, whether written or oral, between and among the Parties and/or their attorneys, are superseded unless expressly incorporated and made a part of this Agreement. The parties agree that the whereas clause recitals in this Agreement do not create substantive obligations on the parties.

    F. Ohio law shall govern the interpretation and construction of this Agreement.

    G. This Agreement may be executed on separate signature pages by each of the Parties, and this Agreement shall be fully executed when each Party has signed on a signature page. All executed signature pages shall be aggregated and attached to this Agreement and shall constitute the entire Agreement of the Parties. The signatories represent that that they have the authority to bind the respective parties to this Agreement.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement on the dates shown below.

**Parties' signatures on the following pages**