**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**PHYLLIS BALL,** *et al.***,**
on behalf of themselves and a class of
those similarly situated,

      **Plaintiffs,**

                                **Case No. 2:16-cv-282**
     **v.**                         **JUDGE EDMUND A. SARGUS, JR.**
                                **Magistrate Judge Elizabeth Preston Deavers**

**JOHN KASICH,** *et al.***,**

      **Defendants.**

**OPINION AND ORDER**

This matter is before the Court on the Joint Motion for Final Approval of the Proposed Class Action Settlement Between Plaintiffs and Defendants (ECF No. 454), the Guardian-Intervenors' Response to the Motion for Final Approval of the Settlement (ECF No. 458), the Defendants' Brief in Support of Final Approval of the Settlement with Modifications (ECF No. 466), the Plaintiffs' Brief in Support of the Settlement Modifications (ECF No. 467), the Guardian-Intervenors' Brief Opposed to the Proposed Settlement Modifications (ECF No. 468), the Plaintiffs' Supplemental Authority (ECF No. 469), and the Guardian-Intervenors' Response to the Supplemental Authority (ECF No. 470). For the reasons set forth below, the Court **GRANTS** the Joint Motion for Final Approval of the Proposed Class Action Settlement Between the Plaintiffs and the Defendants (ECF No. 454), with the modifications proposed by the Defendants (ECF No. 466-1).

**I.**

On March 31, 2016, six individuals and the Ability Center of Greater Toledo ("Plaintiffs") filed this action seeking declarative and injunctive relief against the following in their official capacities: the Governor of Ohio and the Directors of the Ohio Department of Developmental Disabilities ("DODD"), the Ohio Department of Medicaid, and Opportunities for Ohioans with Disabilities (together "State Defendants").

In their complaint, the Plaintiffs alleged that Ohio's provision of services to people with intellectual and developmental disabilities violated Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12132 *et seq.*, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 *et seq.*, and the Social Security Act, 42 U.S.C. §§ 1396n(c)(2)(B) and (C). The State Defendants denied liability under any of these statutes.

**A.     Litigation**

Each of the State Defendants moved for dismissal of the Plaintiffs' claims for failure to state claims upon which relief can be granted (ECF Nos. 16, 27, 28.) The Court granted in part and denied in part those motions. (ECF No. 90.)

The Named Plaintiffs sought to represent a class of similarly situated individuals with intellectual and developmental disabilities pursuant to Federal Rule of Civil Procedure 23(b)(2). The State Defendants opposed class certification.

On July 25, 2017, the Court granted the request to intervene by the Ohio Association of County Boards of Developmental Disabilities ("County Boards") and a group of guardians of individuals with disabilities who are not part of the class of individuals for whom the Plaintiffs sought to represent ("Guardian-Intervenors"). The Guardian-Intervenors also opposed class certification.

After two years of litigation, extensive class-based discovery, and extensive class certification briefing (ECF Nos. 42, 53, 92, 94, 273, 275, 276, 278–81, 283, 291, 293, 293, 300), the Court granted in part and denied in part the Plaintiffs' request for class certification, certifying a class ("Plaintiff Class") consisting of the following:

> All Medicaid-eligible adults with intellectual and developmental disabilities residing in the state of Ohio who, on or after March 31, 2016, are qualified for home and community-based services, and, after receiving options counseling, express that they are interested in community-based services.

(ECF No. 303). After continued briefing (ECF Nos. 308, 344, 357, 358, 366), the Court clarified its decision on class certification several times (ECF Nos. 309, 332, 371).

The Defendants each moved for dismissal of the Guardian-Intervenors' claims for failure to state claims upon which relief can be granted. (ECF Nos. 353, 354, 355.) At the request of the parties, the Court withheld consideration of these motions so that the parties could engage in settlement negotiations.

**B.     Settlement**

Following extensive arms-length negotiations, including mediations held with this Court, all parties entered into a settlement as a complete and final resolutions of all matters. The Settlement Agreement was drafted to provide specific benefits to the Plaintiff Class and the Guardian-Intervenors in exchange for voluntary dismissal of their claims against the Defendants.

The Court then granted the unopposed request of the Plaintiffs, the State Defendants, and the County Boards ("Moving Parties") for Preliminary Approval of the Class Action Settlement Agreement (ECF Nos. 396, 407, 408) on October 18, 2019 (ECF No. 409).

The following month, the Guardian-Intervenors withdrew from the agreement to settle.

**1.     The Settlement Agreement**

The Settlement Agreement is summarized as follows.

### a. Options Counseling and Pre-Admission Counseling

Over the past few years, the DODD has offered options counseling to people residing in intermediate care facilities ("ICFs"), which focused on people in ICFs with nine or more beds. The first round of this counseling was recently completed.

Under the Settlement Agreement, the DODD will offer a second round of options counseling to run through June 30, 2021. This options counseling will be offered to individuals who reside in ICFs with eight or more beds and who are not represented by the Advocacy and Protective Services, Inc. ("APSI"). The DODD may exclude people who have asked to be removed from the options-counseling list or who have intervened in this case to advocate for their ICF preference. Additionally, under the Settlement Agreement's terms, the County Boards will provide pre-admission counseling for all individuals with developmental disabilities who apply for admission to ICFs with eight or more beds. This commitment will apply through January 8, 2023.

The Settlement Agreement contains several other details about these counseling processes. It outlines the method the DODD (or its designee) will use when offering options counseling. It also memorializes a process by which the County Boards will follow up with people who might be interested in community services. Under the Settlement Agreement, the DODD will continue to maintain and promote its existing program for peer-to-peer or family-to-family meetings or community visits. The DODD will also conduct a focus group to offer suggestions and revisions regarding counseling materials.

### b. Community-Based Services and Waiver Capacity

The Settlement Agreement includes commitments related to state-funded waivers and other services. For the upcoming budget cycle (fiscal years 2020 and 2021), the DODD will

4

request operating funding to allocate 700 new state-funded individual options waivers (350 each year).  For the next budget cycle (fiscal years 2022 and 2023), the DODD will assess unmet/future waiver need and request corresponding funding.  As the Agreement reflects, the Moving Parties negotiated factors to be considered for this assessment.

The Settlement Agreement also contains provisions relating to other services.  For example, the DODD will provide capital housing assistance ($24 million) over the current capital-budget cycle and request capital-housing funding (at least $12 million) during the next capital-budget cycle.  The DODD will also request $250,000 to fund transformation grants designed to support transitions to integrated day and employment services.  Further, the Agreement includes commitments related to further transition training and services.  As one example, the DODD will continue to conduct follow-along visits for people who have recently transitioned to waivers.

### c. Other Provisions

The Moving Parties negotiated the details of the Settlement Agreement's implementation. The Agreement contains terms related to information exchange, monitoring, continuing jurisdiction, and resolution of any compliance dispute.  The Agreement also resolves the amount of attorney fees for which the Plaintiffs will petition to Court.  As with the Agreement's other provisions, the fee component was heavily negotiated and represents significant compromises from both sides.  The Court will consider the attorney fees motion separately.

### 2. Completion of the Moving Parties' Notice Obligations

In their Motion for Preliminary Approval, the Moving Parties outlined a notice process, which the Court approved.  Complying with that process, the Moving Parties timely informed the

5

class of 211 individuals who fell into the class definition at that time and the public of the proposed Settlement Agreement through both direct and indirect methods.

### a. Direct Notice

Shortly after preliminary approval, the DODD mailed notices to class members (and their legal guardians, when applicable). Specifically, the DODD mailed notices to the 211 individuals who, as of the approval date, had requested exit or diversion waivers but who had not yet been enrolled on waivers. Thirteen of those notices were returned as undeliverable. Eleven of the undeliverable notices were attributable to address errors, which the DODD promptly corrected. The DODD also emailed notice to APSI, which serves as guardian for a number of class members.

### b. Indirect Notice

Both the DODD and Disability Rights Ohio ("DRO") posted the notice on their respective websites. DRO circulated the notice to its Constant Contact email list, containing roughly 2,400 people. The Court-approved Notice included DRO's phone number as a resource for individuals who may have questions about the Settlement Agreement or the Notice itself. Only one such inquiry was received.

Additionally, the DODD provided the notice to the Superintendents of all 88 County Boards. The DODD asked each County Board to post the notice in conspicuous areas. The DODD also distributed notices to all ICFs with eight or more beds. As with the County Boards, the DODD asked these ICFs to post the notice in conspicuous areas.

As instructed, the Moving Parties met their notice obligations within one week of the Court's October 18, 2019 Order.

### 3. Responses to the Court-Approved Notice of Preliminary Approval

Notice of the Moving Parties' Agreement generated extensive comments from a range of stakeholders. The Court received more than 20 letters from class members and their legal guardians, from community organizations that include, and advocate on behalf of, individual class members and their legal guardians, and from advocacy groups who represent and support the rights of people with developmental disabilities to be offered integrated, community-based services. These individuals and organizations unanimously supported the Settlement Agreement and urged this Court to approve it as a fair and adequate resolution of class claims.

The Court also received over 200 objections from non-class members, who prefer ICFs as a service option for their loved ones. These objectors expressed fear about losing the ICF services they prefer. These non-class members' interests are represented by the Guardian-Intervenors and their claims against Defendants are not resolved by the instant Settlement Agreement.

Finally, the Court received a brief in opposition to the Settlement Agreement from the Guardians, ECF No. 437, and a Motion for Leave to file an amicus brief in opposition to the Agreement, submitted by VOR, ECF No. 436. The Court considered these motions before it granted the Moving Parties' request for preliminary approval of the settlement.

### C. Fairness Hearing

The Fairness Hearing was held on December 17, 2019. At that Hearing, there were no objections by any class members. The Guardian-Intervenors, however, had numerous objectors present and each was permitted to speak, giving his or her reasons for objecting to the Settlement Agreement. Following the Fairness Hearing, the Court suggested modifications to the Settlement Agreement to alleviate the concerns of those whose interests are aligned with the

7

Guardian-Intervenors and offered the Moving Parties and the Guardian-Intervenors the opportunity to respond to the proposed modifications. All parties so responded.

**D.  Post Fairness Hearing Briefing**

In the post-Fairness Hearing briefing, the Moving Parties proposed modifications that they contend address the concerns of this Court and the Guardian-Intervenors. The Guardian-Intervenors do not agree that the modifications sufficiently address their concerns.

The proposed additions, however, reinforce Defendants continued position throughout this litigation that "they would not have reached this Agreement [with the Plaintiff Class] if it implicitly placed the ICF option at risk." (ECF No. 466 at 4.) The Defendants state, "[t]o further reinforce Ohio's ICF commitment, Defendants are able to alter the Agreement in three areas," all accepted by the Plaintiffs. *Id*.

> *First,* Defendants can add a statement about ICFs at the beginning of the Agreement. The Agreement begins with a series of "whereas" recitals. Doc. 454-1. Though not enforceable, these recitals provide context for the reader. For example, one recital discusses the settling parities' shared objective to provide people with informed choices and access to waiver services. To expressly include ICFs within these recitals, Defendants can add the following language:
>
>> Whereas, nothing in this Agreement is intended to force a person to forego or relinquish ICF services. Nor is anything in this Agreement intended to remove the ICF option in the future.
>
> *Second,* Defendants also suggest adding language within the Agreement's terms about options counseling (Section III). To begin, Defendants can add a category to the Agreement's exclusion provision (Section III.Al). Defendants propose to exclude the following individuals from options counseling:
>
>> Individuals who, either on their own or through their guardian, submitted written objections to this Agreement in Case No. 2:l6-cv-282. This exclusion is limited to individuals DODD can readily, and confidently, identify from the content within the written objections.
>
> Defendants additionally suggest including the following provision at the end of Section III:

8

> Nothing in this Section (III) requires any individual to accept an Exit or Diversion Waiver as an alternative to ICF services.

This language – particularly in combination with ICF residents already-existing ability to decline options counseling (Section III.Al ) – will reinforce that options counseling is a voluntary process intended to give people choices, not force them to leave their preferred setting.

*Third,* Defendants can include language about ICF reimbursement rates over the life of the Agreement (within Section IV of the Agreement). The Agreement covers the current budget cycle and the next budget cycle. As the Court is aware, Defendants were able to obtain an *increase* in ICF rates for the current cycle, even while meeting funding commitments under the Agreement. Defendants can agree to add the following language, which seeks to preserve this status quo:

> For the current biennium (FY 20-21), DODD will not seek a change in the ICF reimbursement methodology as set forth in the current biennial budget (House Bill 166).

Then, for the next budget cycle, Defendants can commit to seek at least the same reimbursement rate from the General Assembly:

> For FY 22-23, DoDD will request and exercise best efforts and reasonable diligence in support of a Statewide Average Daily Rate (per bed) for ICF reimbursement that is no less than the Statewide Average Daily Rate for FY 20.

To ensure clarity, these provisions will also require a definition of "Statewide Average Daily Rate," which is included in the attached redline proposal (Exhibit A).

*Id*. at 4–5. Defendants conclude with the following:

> Defendants take commitments in the Agreement and their representations to the Court very seriously, and they will act in good faith to meet these commitments.

*Id*. at 5.

## II.

At the final approval stage, a district court must conclude that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)(C); *see* Fed. R. Civ. P. 23(e)(1)(A). Several factors guide the inquiry:

9

> (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest.

*Intl. Union, United Auto., Aerospace, and Agr. Implement Workers of Am. ("UAW") v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007) (citing *Granada Invs., Inc. v. DWG Corp.,* 962 F.2d 1203, 1205 (6th Cir. 1992); *Williams v. Vukovich,* 720 F.2d 909, 922–23 (6th Cir. 1983)); *see also Does 1-2 v. Deja Vu Services, Inc.*, 925 F.3d 886, 894 (6th Cir. 2019) (utilizing the "*UAW* factors," and concluding "that the Settlement Agreement 'is the result of a bona-fide' dispute, and the terms established in the settlement are a fair, reasonable, and adequate resolution of the claims.'").

### III.

This Court has already made a preliminary determination that the Settlement Agreement is "fair, reasonable, and adequate," (ECF No. 409) for the reasons set forth in the Motion for Preliminary Approval (ECF No. 408). The Court now finds that final approval is appropriate for the reasons set forth below.

**A.     Risk of Fraud or Collusion**

In considering a class action settlement agreement, courts must consider whether the settling parties have acted in good faith. *See* Fed. R. Civ. P. 23(e)(2)(B). Some indicia of the parties' good faith include: that negotiations occurred after the case was well advanced, *Bronson v. Bd. of Educ. of City Sch. Dist. of City of Cincinnati*, 604 F. Supp. 68, 77 (S.D. Ohio 1984); that negotiations were not rushed once they started, *Thompson v. Midwest Found. Indep. Physicians Ass'n.*, 124 F.R.D. 154, 158-59 ¶30 (S.D. Ohio 1988); that the parties negotiated at arms-length, *e.g.*, *Stotts v. Memphis Fire Dep't*, 679 F.2d 541, 551 (6th Cir. 1982), *rev'd on other grounds*, *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561 (1984); and that the defendants had

motivations to adequately consider the interests of non-parties impacted by the settlement, *see id.* at 555 n.12. "Courts presume the absence of fraud or collusion unless there is evidence to the contrary." *Stanley v. Turner Oil & Gas Properties, Inc.*, Case No. 2:16-cv-386, 2018 WL 2928028, at *5 (S.D. Ohio June 12, 2018) (quoting *IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 598 (E.D. Mich. 2006)); *see also Brent v. Midland Funding, LLC*, No. 3:11 CV 1332, 2011 WL 3862363, at *15 (N.D. Ohio Sept. 1, 2011) ("'[T]he courts respect the integrity of counsel and presume the absence of fraud and collusion in negotiating the settlement, unless evidence to the contrary is offered.'") (quoting 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 11.51 (4th ed. 2002)).

In the instant action, the Moving Parties have acted in good faith. The Moving Parties have engaged in multiple mediation sessions with this Court over the course of this three-year litigation, have exchanged numerous settlement proposals, and have engaged in post-settlement briefing and modifications to alleviate the Court's concerns regarding non-parties. The Moving Parties reached the Modified Settlement Agreement following months of additional arms-length negotiations, and input from the Court and the Guardian-Intervenors. Throughout, the Plaintiffs, the State Defendants, and the County Boards vigorously sought to advance their interests and the interests of those they represent. In doing so, the Court observed the State Defendants and the County Boards consider the interests of people outside the class, including those who choose to remain in or enter ICFs whose interests are represented by the Guardian-Intervenors.

**B.      Complexity, Expense, Duration, Discovery, Likelihood of Success on the Merits**

As the advisory committee specified, Rule 23(e)(2)(C) and (D) "focus on what might be called a 'substantive' review of the terms of the proposed settlement." Fed. R. Civ. P. 23(e)(2)(C) & (D) advisory committee's notes to 2018 amendment. These new provisions

11

require courts to consider "the cost and risk involved in pursuing a litigated outcome." *Id*. These new rules contemplate a court forecasting "the likely range of possible recoveries and the likelihood of success in obtaining such results." *Id*. The trial court may also need to consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C)(ii).

Courts look to the complexity, expense, and likely duration of the litigation when considering these factors. Settlement is more likely to be approved if the case has a long history, *Bronson*, 604 F. Supp. at 77; if the issues involved would require significant discovery and trial time to resolve, *In re Cincinnati Policing*, 209 F.R.D. 395, 400 (S.D. Ohio 2002); if appeals are likely to further delay ultimate resolution, *e.g., In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 371 ¶ 18 (S.D. Ohio 1990); or if the plaintiffs' circumstances make delay particularly prejudicial, *In re Telectronics Pacing Sys.*, 137 F. Supp. 2d 985, 1015 (S.D. Ohio 2001).

Each of these considerations weigh in favor of approval. The Moving Parties have litigated this case for over three years and have engaged in extensive mediation and negotiations. Litigating this case through trial with a likely appeal to follow would bring significant further delay and expense. Whereas, approval of the Modified Settlement Agreement would result in both finality for the Moving Parties and immediate benefits for all class members. Importantly, in weighing the pros and cons of settlement, the Moving Parties have already had ample opportunity for discovery. During both class-based and merits-based discovery periods, each side issued and responded to numerous discovery requests and exchanged many documents. The State Defendants also deposed each of the five individual plaintiffs during class-based discovery. Accordingly, this settlement is the result of an informed analysis.

Further, under traditional factors, "the most important factor, 'is the probability of success on the merits[,] [and] [t]he likelihood of success, in turn, provides a gauge from which the benefits of the settlement must be measured.'" *In re Packaged Ice Antitrust Litig.*, 2018 WL 4520931 at *6 (quoting *Poplar Creek Dev. Co. v. Chesapeake Appalachia, LLC*, 636 F.3d 235, 245 (6th Cir. 2011)). This factor "weigh[s] the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." *Gen. Motors Corp.*, 497 F.3d at 631 (quoting *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 (1981)). The question for district courts, is "whether the parties are using the settlement to resolve legitimate legal and factual disagreements." *Gen. Motors Corp.*, 497 F.3d at 631.

Applying this likelihood factor here, each of the Moving Parties face litigation risks if they continue. On one hand, the Plaintiffs have been able to survive motions to dismiss and certify a class. On the other, the State Defendants and the County Boards have successfully limited the scope of the class and its claims. As these mixed results reflect, no side has any guaranteed litigation outcome. To avoid litigation risks and costs, the Moving Parties have agreed to exchange (1) the service commitments outlined above for (2) release of claims. The Court agrees with the Moving Parties that this is a fair deal that resolves legitimate legal and factual disagreements.

**C.     Opinions of Class Counsel, Class Representatives, Absent Class Members**

The Sixth Circuit has stated that "court[s] should defer to the judgment of experienced counsel who [have] competently evaluated the strength of [their] proofs." *Vukovich*, 720 F.2d at 922 (citations omitted). The Plaintiffs' counsel collectively has decades of experience in complex federal civil rights litigation on behalf of people with disabilities. The State Defendants

13

and the County Boards likewise have experienced legal teams with decades of litigation experience. These experienced counsel all seek approval of the Modified Settlement Agreement.

Rule 23 also requires an assessment of how class members are treated vis-à-vis one another. In particular, "[m]atters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23(e)(2)(C)& (D) advisory committee's notes to 2018 amendment.

Here, the Modified Settlement Agreement treats class members fairly and equally. All class representatives approve of and have benefitted from the settlement. For example, Named Plaintiff Antonio Butler provides a declaration that indicates that he lived in an eight-bed ICF for years, where he felt unhappy and limited. (ECF No. 454-6.) He describes having no access to community services, but after being provided an exit waiver, he was able to access home and community-based services and now lives in his own home. He describes having more freedom and more opportunities to work and to be active in his community.

Similarly, a declaration is provided by Linda Walters, the guardian and sister of Named Plaintiff Richard Walters, who had lived in an ICF since 2012. (ECF No. 454-7.) Despite her desire for her brother to remain in the community, Mr. Walters entered the ICF at that time because, she said, community services were unavailable. Thus, his sister believes information about community services options, and the ability to access those services, was important and helpful. Mr. Walters is now enrolled in an exit waiver and living in his own apartment. His sister relays that "[h]e's in a better situation now" and "has a more normal way of living." *Id*. ¶¶

7, 10.  She says that he has more control over his life and can participate in more chosen community activities, and he has developed new friendships.

As a last example, a declaration was provided by Cathy Mason Jordan is the sister and guardian of Named Plaintiff Caryl Mason, who lived for years in an eight-bed ICF.  (ECF No. 454-8.)  Prior to the lawsuit, Ms. Mason Jordan had not known of community-based services.  Since the lawsuit was filed, her sister was enrolled in an exit waiver and now lives in her own home.  Her sister says that Caryl is much happier, healthier, and safer in her own home; has more independence and autonomy; and has increased opportunities for community interactions and activities.

The experiences described by these Named Plaintiffs illustrate how the provisions in the Modified Settlement Agreement will benefit the Plaintiff Class.  Several other class members who have transitioned from ICFs during this litigation tell of comparable experiences.  They describe similar improvements in their quality of life, increased integration in their communities, and greater independence and autonomy.  Finally, as detailed above, the Agreement contains several service commitments, across a range of areas, which will benefit all class members.  The Agreement does not differentiate between certain sub-groups of the class.

**D.     Public Interest**

When reviewing a class action settlement agreement, courts also considers whether the settlement serves the public interest.  *Does 1-2 v. Déjà Vu Servs., Inc.*, 925 F.3d 886, 899 (6th Cir. 2019).  Settlements of complicated cases typically meet this factor because "there is a strong public interest in encouraging settlement of complex litigation and class action suits because they are notoriously difficult and unpredictable and settlement conserves judicial resources."  *Id.* (quotations omitted).  The public has a similar interest "in ending . . . long and protracted

litigation." *Blasi v. United Debt Servs., LLC*, No. 2:14-CV-83, 2019 WL 6050963, at *7 (S.D. Ohio Nov. 15, 2019) (quotations omitted). And, the public interest in a settlement further grows when a government defendant faces the prospect of liability, a liability that taxpayers would ultimately have to bear. *Lessard v. City of Allen Park*, 372 F. Supp. 2d 1007, 1013 (E.D. Mich. 2005). Settlements spare the parties, the courts, and taxpayers the considerable burdens of litigation. *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976).

The Court finds that the Modified Settlement Agreement serves the public interest by assisting people who prefer waivers. The non-class objectors/Guardian-Intervenors who prefer ICFs have their claims against the Defendants alive in this litigation and will similarly either litigate those claims or settle them.

## IV.

For the reasons set forth above, in light of the factual, legal, practical, and procedural considerations raised by this suit, the Court concludes that the Modified Settlement Agreement is a fair, reasonable, and adequate resolution of the class members' claims, is in the public interest, and does not harm the rights of any non-class members. The Court finds that although the Guardian-Intervenors are not a part of this settlement, the Modified Settlement Agreement memorializes the State Defendants' commitment to continue to provide the ICF choice to Ohioans and the Agreement does nothing to threaten the ICF choice for non-class members and those whose interests are represented by the Guardian-Intervenors. As to the dispute between the Defendants and the Guardian-Intervenors, the Court shall reactivate the currently pending motions to dismiss and move forward with that dispute.

Accordingly, the Court **GRANTS** the Joint Motion for Final Approval of the Proposed Class Action Settlement Agreement (ECF No. 454) and **APPROVES** the Modified Settlement Agreement docketed at ECF No. 466-1.

**IT IS SO ORDERED.**


**4/24/2020**                                      **s/Edmund A. Sargus, Jr.**
**DATE**                                   **EDMUND A. SARGUS, JR.**
                                           **UNITED STATES DISTRICT JUDGE**